# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Squirrels Research Labs LLC, *et al* [1],<br><br>Debtors. | Case No. 21-61491 (RK)<br><br>Chapter 11<br><br>Judge Russ Kendig |

**OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION FOR AN ORDER (A)(I) ESTABLISHING AND APPROVING BID PROCEDURES RELATED TO THE SALE OF CERTAIN OF THE DEBTORS' ASSETS PURSUANT TO 11 U.S.C. §§ 105(A), INCLUDING THE DESIGNATION OF A STALKING HORSE BIDDER AND RELATED BID PROTECTIONS; (II) APPROVING CONTRACT/LEASE ASSUMPTION AND ASSIGNMENT PROCEDURES AND THE FORM AND NOTICE THEREOF; (III) SCHEDULING THE AUCTION; (IV) SCHEDULING A HEARING AND OBJECTION DEADLINE WITH RESPECT TO THE SALE; (V) APPROVING THE FORM AND NOTICE THEREOF; AND (VI) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING SALE OF CERTAIN OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. §§ 105 AND 363; AND (II) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND <u>(C) GRANTING RELATED RELIEF</u>**

Andrew R. Vara, United States Trustee for Region 9 (the "<u>United States Trustee</u>"), by and through his undersigned counsel hereby files this objection to the *Motion for an Order (A)(i) Establishing and Approving Bid Procedures Related to the Sale of Certain of the Debtors' Assets Pursuant To 11 U.S.C. §§ 105(A), Including the Designation of a Stalking Horse Bidder and Related Bid Protections; (ii) Approving Contract/Lease Assumption and Assignment Procedures and the Form and Notice Thereof; (iii) Scheduling the Auction; (iv) Scheduling a Hearing and Objection Deadline with Respect to the Sale; (V) Approving the Form and Notice Thereof; and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Squirrels Research Labs LLC (9310), case no. 21-61491 and The Midwest Data Company LLC (1213), case no. 21-61492.

*(vi) Granting Related Relief; and (B)(i) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. §§ 105 and 363; and (ii) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* (the "Sale and Sales Procedure Motion") (Docket No. 6) filed by debtors and debtors in possession Squirrels Research Labs LLC and The Midwest Data Company LLC (the "Debtors").

## JURISDICTION

1. Under (i) 28 U.S.C. § 1334, (ii) applicable orders of the United States District Court for the Northern District of Ohio issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine this objection.

2. Under 28 U.S.C. § 586, the United States Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that United States Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the United States Trustee as a "watchdog").

3. Under section 307 of title 11 of the United States Code (the "Bankruptcy Code"), the United States Trustee has standing to be heard on the issues raised in this limited objection.

## BACKGROUND

4. On November 23, 2021, (the "Petition Date"), Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have sought joint administration of their cases.

5. Also on the Petition Date, Debtors filed the Sale and Sales Procedure Motion, seeking, among other things, approval of notice and bidding procedures, stalking horse protections and other relief as identified in the Sale and Sales Procedure Motion and accompanying Asset Purchase Agreement (the "APA").

6. In the Sale and Sales Procedure Motion, the Debtors seek to designate Instantiation LLC as the stalking horse bidder (the "Stalking Horse Bidder").

7. Concurrently with the filing of the Sale and Sales Procedure Motion, the Debtors filed a motion to approve $350,000 in DIP financing (the "DIP Loan"). The Stalking Horse Bidder is the lender of the proposed DIP Loan. Debtor The Midwest Data Company LLC is the sole borrower under the proposed DIP Loan, although it is unclear whether the loan would encumber the assets of both of the Debtors.

8. Although the Debtors have not yet filed their Schedules of Assets and Liabilities or Statement of Financial Affairs, their first day papers disclose that, as a result of certain pre-filing negotiations with Debtor Squirrels Research Labs LLC's secured lender, Avnet, Avnet agreed to reduce the amount of its secured claim to $3,000,000.00. *See* Docket No. 6 at 3-4.

## ARGUMENT

### A. Overview

9. The Sale and Sales Procedure Motion seeks the sale of the majority of the Debtors' assets.

10. The filing of the bankruptcy allows the orderly, efficient, and expedited sale of the Debtors' assets. *See, e.g.*, *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986) (adopting *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) and concluding that "a bankruptcy court can

authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action").

11. However, while such sales are generally permissible, due consideration and adequate time must be afforded to prospective purchasers in order to (1) produce the highest and best offer possible and (2) protect the integrity and transparency of the bankruptcy process.

12. With these principals in mind, the United States Trustee raises two principal concerns regarding the Sale and Sales Procedure Motion in this case: (1) the current lack of record evidence of prior marketing, which is needed to justify the shortened timeframe for a sale and (2) the potential for bid chilling based on the scope and cumulative effect of the various protections for the Stalking Horse Bidder.

### B. The Bid Procedures and Auction Date

13. The Debtors' bid procedures contemplate a December 31st bid submission deadline, an auction on January 3rd and sale hearing on January 11th. While the Debtors contend that the proposed timeline is required to meet the requirement of the Stalking Horse Bidder, the United States Trustee is concerned about whether potentially interested parties will have sufficient time to satisfy their due diligence requirements and prepare any competing bids.

14. The Debtors must provide evidence that the sale is for fair value and that a good business reason exists. *See In re Lionel Corp.*, 722 F.2d 1063 (2nd Cir. 1983). The Debtors must prove by credible evidence that the transaction is proposed in "good faith" and that it is an arms-length transaction. For example, if the proposed purchaser is an insider or an insider-controlled entity, or the transaction confers intended benefits upon insiders, the sales transaction must be given the highest scrutiny.

15. Initially, this Court must determine that the proposed sale and the attendant sale procedures will bring the best and highest price for the Debtors' assets. The Debtors must show that the assets have been fully marketed and that the sale is sufficiently publicized in order to prove that the assets will be sold for a fair and reasonable price. Here there is an abject lack of evidence or proof that the assets have been fully marketed.

16. The Debtors have not yet even filed their Schedules, which would at least provide parties with some understanding of the scope and value of saleable assets. The United States Trustee is concerned that the timeframe proposed by Debtors could operate to protect the Stalking Horse Bidder from potential bidders that may have higher and better offers but will be unable to complete due diligence or arrange financing within the allotted time.

17. These concerns may be alleviated based on pre-petition marketing efforts. The Debtors do not address whether any pre-petition marketing occurred and, if marketing did occur, the Debtors fail to detail the scope, breadth, and thoroughness of any such efforts. Without more information regarding such marketing efforts, the record does not currently demonstrate that the timeframe proposed in the Sale and Sales Procedure Motion is sufficient.

18. Accordingly, the United States Trustee objects to the proposed bid and sale schedule pending the presentation or offer of evidence that sufficient marketing efforts have already begun and that other parties in the industry have received some notice of the potential sale.

### C. The Stalking Horse Protections Risk Chilling Other Bids

19. The United States Trustee objects to the scope of the protections for the Stalking Horse Bidder contemplated in the bidding procedures. Those protections include: (1) the amount of the break-up fee and expense reimbursement (totaling up to $290,300) and (2) the bid

mechanics, including the initial overbid amount and deposit requirements. Such protections, taken together, could dissuade other participants from entering into the auction and thereby lower the benefit of the sale for the estates. This is particularly concerning given the fact that the Stalking Horse bid will result in an outcome of zero recovery for unsecured creditors.

*1. Amount of Break-up Fee and Expense Reimbursement*

20.     The Debtors propose that a 3% break-up fee ($90,300) and an expense reimbursement of up to $200,000 be paid to the Stalking Horse Bidder in the event that it is not the successful bidder at the auction.

21.     Break-up fees are "carefully scrutinized" in asset sales under § 363 "to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *In re Hupp Indus.*, 140 B.R. 191, 195-96 (Bankr. N.D. Ohio 1992). Break-up fees should not be a windfall and should represent a reimbursement of actual costs and expenses incurred by the stalking horse in formulating its offer or in facilitating the bid process. *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).

22.     Break-up fees generally reimburse "two types of expense: first, the cost of putting together a 'stalking horse' bid; and second, expenses from which all bidders will benefit." *In re John J. Peterson, Inc.*, 411 B.R. at 137; *see also*, *In re APP Plus*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (stating that "the break-up fee covers reimbursement of the disappointed purchaser's out-of-pocket expenses related to the proposed acquisition and/or compensation for the time, efforts, resources, lost opportunity costs and risks incurred by the disappointed purchaser"). Therefore, when a proposed sale contemplates both the payment of a break-up fee

6

and expense reimbursement, they must be combined to determine the true percentage of the purchase price.

23. To be approved, a break-up fee must be structured to encourage, not discourage overbidding. *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res. Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable."). When selling estate assets, a debtor has a duty to obtain the highest price or greatest overall benefit possible for the estate. *Id*. Courts must consider whether a break-up fee is "reasonable in relation to the bidder's efforts and to the magnitude of the transaction." *Id.* at 662. If a break-up fee is too large, it may chill bidding to the detriment of creditors. *Id*. at 660. Therefore, the bidding procedures must "facilitate an open and fair public sale designed to maximize value for the estate." *In re Nashville Senior Living*, No. 08-07254, 2008 WL 5062366, at *4-5 (Bankr. M.D. Tenn. Oct. 22, 2008).

24. The United States Trustee asserts that the proposed total break-up fee and expense reimbursement to the Stalking Horse Bidder is so large relative to the transaction that it will likely have a chilling effect on the bidding process. The transaction contemplates a purchase price of $3,010,000, plus an unknown amount in assumed liabilities. *See* Docket No. 6, Ex. B, at 5. A 3% break-up fee of $90,300 plus $200,000 in expense reimbursements would yield a total fee of up to $290,300—9.64% of the Stalking Horse bid.

25. A break-up fee of this size is not customary and significantly exceeds what is generally approved by courts that have reviewed and awarded break-up fees. *See, e.g.*, *In re Texas Rangers Baseball Partners*, 431 B.R. 706 (Bankr. N.D. Tex. 2010) (approving 2% breakup fee

7

and noting that other courts had approved "breakup fees of as much as 4%"); *In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approving combined "breakup fee and expense reimbursement" when "less than 3% of the total purchase price"); *In re Nashville Senior Living*, 2008 WL 5062366, at *2 (approving a breakup fee of 1% of the total purchase price); *In re Hupp Indus.*, 140 B.R. at 196-97 (rejecting a breakup fee of $100,000.00 (plus expenses up to $50,000) on a $4.75 million transaction, which constituted slightly more than 3% of the transaction price with expenses included). The nearly 10% break-up fee sought in this case is far beyond what is reasonable and typically approved by courts.

## 2. *Bid Mechanics*

26. In addition, the Sale and Sales Procedure Motion provides that in order to be deemed a "Qualified Competing Bid," the bid must be in an amount greater than the initial bid ($3,010,000) plus $290,300.00 (for the break-up fee and expenses), plus the outstanding DIP loan, plus the assumed liabilities, plus a minimum initial overbid of $50,000. Docket No. 6 at 7-8. Accordingly, should the $350,000 DIP Loan be approved by the Court and even without knowing costs associated with the assumed liabilities, this requires that the first overbid amount be at least $3,700,300, or $690,300 more than the Stalking Horse bid—an increase of 22.93%.

27. The Debtors have not articulated why such a significant initial overbid amount is merited. While the Stalking Horse Bidder is the prospective DIP lender, the Stalking Horse bid does not include a credit bid for the DIP Loan amount. The proposed initial overbid amount will likely have the effect of chilling bidding and discouraging overbids rather than to encourage bidding to achieve the highest sale price.

28. The United States Trustee further asserts that the deposit requirements set forth in the bid procedures favor the Stalking Horse Bidder and may discourage competing bids. Pursuant to the proposed bid procedures, any third-party bidder must make a $150,000 deposit with the Debtors to become a Qualified Competing Bid, which is $125,000 more than the deposit required by the Stalking Horse Bidder. The Debtors have not articulated why the disparity in the deposit requirement is appropriate, particularly in light of the other bid protections afforded to the Stalking Horse Bidder.

## CONCLUSION

For the foregoing reasons, the United States Trustee respectfully requests that this Court deny the Sale and Sales Procedure Motion.

Respectfully Submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 & 9**

By: */s/ Kate M. Bradley*
Kate M. Bradly (0074206)
Trial Attorney
U. S. Department of Justice
Office of the U. S. Trustee
201 Superior Avenue E, #441
Cleveland, Ohio 44114
(216) 522-7800, ext. 255
(216) 522-7183 (facsimile)
kate.m.bradley@usdoj.gov

**CERTIFICATE OF SERVICE**

       I hereby certify that on November 30, 2021, a true and correct copy of the foregoing was served:

<u>Via the Court's Electronic Case Filing System on these entities and individuals who are listed on the Court's Electronic Mail Notice List:</u>

- Marc Merklin  mmerklin@brouse.com
- Julie Zurn jzurn@brouse.com
- John Cannizzaro john.canizzaro@icemiller.com

    */s/ Kate M. Bradley*
    Kate M. Bradley (0074206)
    Trial Attorney
    U.S. Department of Justice
    Office of the U.S. Trustee
    201 Superior Avenue, E. #441
    Cleveland, Ohio 44114
    (216) 522-7800, ext. 255
    (216) 522-7193 (facsimile)
    kate.m.bradley@usdoj.gov

10

21-61491-tnap    Doc 34    FILED 11/30/21    ENTERED 11/30/21 13:49:57    Page 10 of 10