**EXHIBIT A**

**(Bid Procedures Order)**

**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 04:19 PM December 1, 2021**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Squirrels Research Labs LLC[1] | ) | Case No. 21-61491 |
| | ) | *(Request for Joint Administration Pending)* |
| Debtors. | ) | |
| | ) | Judge Russ Kendig |

**ORDER (I) APPROVING BIDDING PROCEDURES, (II) APPROVING STALKING HORSE BID PROTECTIONS, (III) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (IV) SCHEDULING THE AUCTION, (V) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE SALE, (VI) APPROVING THE FORM AND MANNER OF <u>NOTICE THEREOF, AND (VII) GRANTING RELATED RELIEF</u>**

Upon the Motion filed by the above-referenced Debtors, Squirrels Research Labs LLC and

The Midwest Data Company LLC (collectively, "Debtors"), for the entry of an order (the "Bidding

Procedures Order") (i) authorizing and approving the proposed bidding procedures ("Bidding

Procedures") attached hereto as Exhibit 1 by which the Debtors will conduct a sale (the "Sale

Transaction") of their Assets (as defined in the Motion) under section 363 of the Bankruptcy Code;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Squirrels Research Labs LLC (9310), case no. 21-61491 and The Midwest Data Company LLC (1213), case no. 21-61492.

1

(ii) approving the proposed Bid Protections as set forth herein to be provided to Instantiation, as the stalking horse bidder in connection with the Sale Transaction; (iii) approving procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale Transaction (collectively, the "Assigned Contracts"), including notice of proposed cure amounts (the "Cure Notice"), attached hereto as Exhibit 3; (iv) scheduling an auction in connection with the Sale Transaction (the "Auction"); (v) scheduling hearing dates in connection with approval of the Sale Transaction (the "Sale Hearing") and the objection deadline for the Sale Hearing (collectively, the "Sale Objection Deadline"); (vi) approving the form and manner of notice of the Auction and Sale, attached hereto as Exhibit 2 (the "Auction and Sale Notice"); and (vii) granting related relief; and (a) authorizing Sale of Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. §§ 105 and 363; and (b) authorizing and approving assumption and assignment of the Assigned Contracts; and (c) granting related relief; and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 USC § 157(b)(2) and that the Court may enter a final order; and the Court having found that venue of this proceeding and the Motion is proper pursuant to 28 USC §§ 1408 and 1409; and the Court having reviewed the Motion; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors and other parties in interest; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary; and the court having found that good and sufficient cause exists for the granting of the relief requested in the Motion,

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.       Any objections to the motion not resolved or otherwise withdrawn are overruled.

A.      Timeline and Deadlines

3.      The Sale Schedule is approved as set forth below and subject to modification in accordance with the Bidding Procedures.

i. Key Dates

| Key Dates | |
|---|---|
| Date/Time | Event |
| December 17, 2022 | Deadline by which Debtor must file the Cure Notice with the Court and serve the Cure Notice on the Contract Counterparties |
| December 31, 2021 | Deadline by which Bids (as well as Deposits and all other documentation required under the Bidding Procedures) must be submitted in accordance with the Bidding Procedures |
| December 31, 2021 | Deadline by which to file Assigned Contract Objections |
| January 3, 2021 | Date on which Auction (if any) shall be held electronically via video/telephone, or at such later date, time, or other place, as selected by Debtor, in consultation with Avnet, or approved by order of the Court. |
| January 10, 2022 | Deadline by which objections to the Sale Transaction must be filed |
| January 11, 2022 | Date on which the Sale Hearing shall occur, subject to the Court's availability |

ii.   The Bidding Procedures

1.   The Bidding Procedures, substantially in the form attached hereto as Exhibit 1, are hereby approved in their entirety and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed sale of the Assets. Any party desiring to bid on the Assets shall comply with the Bidding Procedures and this Bidding Procedures Order. The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

3

iii. Stalking Horse Bid Protection

    1. The Bid Protection, payable in certain circumstances as set forth in the APA, is approved as follows: payment in cash equal to 3.0% of the Purchase Price (the "***Break-Up Fee***").

iv. Sale Order

    1. As set forth in the Motion and provided for in the Bidding Procedures, the Debtors seek entry of an order (i) authorizing (a) the sale of the of the Assets free and clear of all liens, claims, interests, and encumbrances, other than those expressly assumed, and (b) assumption and assignment of certain executory contracts and unexpired leases, and (ii) granting related relief.

    2. The Court shall hold the Sale Hearing on January 11, 2022 at 2:00 p.m.

v. Notice Procedures

    1. The Auction and Sale Notice, substantially in the form attached hereto as Exhibit 2 is approved.

    2. Notice of the Motion coupled with service of the Auction and Sale Notice (together, the "Notice"), constitutes good and adequate notice of the Auction and Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

    3. No other or further notice of the Auction and Sale shall be required.

vi. The Assumption and Assignment Procedures

    1. The Assumption and Assignment Procedures are approved.

    2. The notice to be provided under the Assumption and Assignment Procedures shall constitute adequate and sufficient notice and no additional notice need be provided.

    3. On or before December 17, 2021 (the "Assumption and Assignment Service Date"), the Debtors shall file with the Court and serve on the Contract Counterparties, the Cure Notice, substantially in the form attached hereto as Exhibit 3 including the Assigned Contracts Schedule; provided that the Debtors may supplement the Assigned Contract Schedule by filing and serving an additional cure notice no later than seven days prior to the Sale Objection Deadline.

    4. Service of a Cure Notice does not constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed

4

and assigned pursuant to any Winning Bid.

5. Assigned Contract Objections, if any, must comply with the Assigned Contract Objection Requirements and be filed with the court at least one business day prior to the Auction.

6. Any Assigned Contract Objection that remains unresolved as of the Sale Hearing shall be resolved at the Sale Hearing, or such later hearing as may be agreed between the Successful Bidder and the Contract Counterparty, but such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Successful Bidders discretion. If an Assigned Contract Objection is not satisfactorily resolved, the Successful Bidder may determine that such Assigned Contract should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Costs or Adequate Assurance with respect to such contract.

7. If a Contract Counterparty does not file an Assigned Contract Objection: (a) the Cure Costs and Adequate Assurance, if any, set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document; and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract and the Cure Costs and Adequate Assurance, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder.

8. The inclusion of an Assigned Contract on the Assigned Contract Schedule will not: (a) obligate the Debtors to assume any Assigned Contract listed there on or obligate the Successful Bidder to take assignment of such contract or constitute any admission or agreement of the Debtor that such Assigned Contract is an executory contract or unexpired lease. Only those Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive sale agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

vii. Miscellaneous

1. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

2. The failure to include or reference a particular provision of the Bidding Procedures specifically in this Bidding Procedures Order shall not diminish or impair the effectiveness or enforceability of such provision.

3. In the event of any inconsistency between this order and the Motion

5

and/or the Bidding Procedures, the Bidding Procedures shall govern in all respects.

4. Notwithstanding the relief granted herein and any actions taken here under, nothing contained in the Motion or this Bidding Procedures Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or lien, or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code, except to the extent the Debtors have agreed to the Avnet Claim, the Reduced Avnet Claim, the amount of the Avnet Secured Claim, and the validity, priority, and extent of the Avnet Liens.

5. Notice of the motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

6. The requirements of Bankruptcy Rules 6004(h) and 6006(d) are hereby waived to the extent they apply.

7. The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Bidding Procedures Order.

# # #

SUBMITTED BY:

/s/Julie K. Zurn
Marc B. Merklin  (0018195)
Julie K. Zurn (0066391)
Brouse McDowell, LPA
388 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
jzurn@ brouse.com

*Counsel for the Debtors
and Debtors-in-Possession*

**EXHIBIT 1**

(Bidding Procedures)

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Squirrels Research Labs LLC[1] | ) | Case No. 21-61491 |
| | ) | *(Request for Joint Administration Pending)* |
| Debtors. | ) | |
| | ) | Judge Russ Kendig |

## FORM OF BIDDING PROCEDURES FOR THE SALE OF DEBTORS' ASSETS

On November 23, 2021, the Debtors filed voluntary petitions for relief under subchapter v of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

On November 23, 2021, Debtors, SQRL and MWDC, filed the Motion for an Order: (A)(I) Establishing and Approving Bid Procedures Related to the Sale of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105(A), including Designation of Stalking Horse Bidder and Related Bid Protections; (II) Approving Contract/Lease Assumption and Assignment Procedures and the Form and Notice Thereof; (III) Scheduling the Auction; (IV) Scheduling a hearing and Objection deadline with respect to the Sale; (V) Approving the Form and Notice Thereof; and (VI) Granting Related Relief; and (B)(I) Authorizing Sale of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. §§ 105 and 363; and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief [Docket #6] (the "Motion") seeking approval of, among other things, the procedures by which the Debtors are authorized to conduct a sale and Auction (the "Auction") of the Debtors' Assets as described in the APA attached hereto as Exhibit A to the Successful Bidder (defined herein). On [December 1] 2021, the Court entered an order with respect to the Motion [Docket # _____] (the "Bidding Procedures Order") approving the procedures contemplated herein (the "Bidding Procedures") and granting certain relief.

## 1. Marketing Process and Participation Requirements

Debtors shall distribute the notice of the sale, these Bidding Procedures, a copy of the Stalking Horse Bidder's Asset Purchase Agreement ("APA"), and a form or confidentiality agreement (a "Confidentiality Agreement") to those parties Debtors determine may have or demonstrate an interest in purchasing the assets of the Debtors to be sold pursuant to the APA (the "Assets").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Squirrels Research Labs LLC (9310), case no. 21-61491 and The Midwest Data Company LLC (1213), case no. 21-61492.

To receive due diligence information, including access to the Debtors' electronic data room and any additional non-public information regarding the Debtors, a party potentially interested in bidding on the Assets must deliver an executed Confidentiality Agreement on terms acceptable to the Debtors, to the extent not already executed to each of: (1) Marc B. Merklin, Brouse McDowell, 388 S. Main Street, Suite 500, Akron, OH 44311 (mmerklin@brouse.com).

After a party delivers the executed Confidentiality Agreement in accordance with these Bidding Procedures, the Debtors shall provide such party with access to an electronic data room and due diligence information, as reasonably requested by such party, and the Debtors shall post substantially all due diligence provided to any such party to the Debtors' electronic data room. The Debtors and their advisors will coordinate all reasonable requests from such parties for additional information and due diligence access, provide that the Debtors may decline to provide such information to any party, who, at such time and in the Debtors' reasonable business judgment, in consultation with Avnet, has not established that it intends in good faith to, or has the capacity to, consummate a Sale.

Parties which enter into Confidentiality Agreements with the Debtor will not, directly or indirectly, contact or initiate, or engage in discussions with respect to matters relating to the Debtors or a potential transaction with any customer, supplier, or contractual counterparty of the Debtors without the prior written consent of the Debtors.

The due diligence period will end on the Bid Deadline, and, after the Bid Deadline, the Debtors will have no obligation to furnish or update any due diligence information.

## 2. **Stalking Horse Bidder and Bid Protection**

The Debtors have received from INSTANTIATION, LLC a bid (the "Stalking Horse Bid") to purchase the Assets, as set forth in APA attached here as Exhibit A, and has selected INSTANTIATION, LLC to act as Stalking Horse Bidder, and has agreed, subject to Court approval, which approval was granted in the Bidding Procedures Order, a bid protection consisting of: an amount in cash equal to 3.0% of the Purchase Price (the "***Break-Up Fee***" or the "Bid Protection") payable to Instantiation LLC in certain circumstances as set forth in the APA.

## 3. **Bidding and Auction Process**

### A. Bid Deadlines

Each party that submits, at least five (5) days prior to the Bid Deadline, an executed Confidentiality Agreement and reasonable evidence demonstrating the party's financial capability to consummate a Sale as reasonably determined by the Debtors shall be an "Eligible Competing Bidder." Avnet shall be an Eligible Competing Bidder as set forth in section 3.D below.

Any Eligible Competing Bidder that desires to make a binding offer (each, a "Competing Bid") shall transmit the Competing Bid to the Debtors so as to be actually received on or before 5 p.m. PST thirty days after the entry of the Bid Procedures Order (the "Bid Deadline").

The Bid Deadline may be extended by the Debtors, in consultation with Avnet and the

2

Stalking Horse Bidder.

B.  Competing Bid Requirements

All Competing Bids must be submitted in writing and satisfy the requirements as fully set forth in these Bidding Procedures, B.i through B.xiii below, (collectively, the "Bid Requirements"), and use the APA as a template, clearly marked to show changes from the APA, which include the following key requirements:

i.  Purchase Price

Each Competing Bid must clearly set forth the purchase price to be paid, specifying (i) any cash and (ii) any non-cash components, in sufficient detail satisfactory to the Debtor (the "Purchase Price") and consist of cash in an amount that is greater than the sum of value offered under the APA, plus (1) the amount of the Break-Up Fee and (2) Fifty Thousand Dollars ($50,000) (the "***Bidding Increment***").  For clarity's sake, each Competing Bid must offer a cash component greater than the total of $3,010,000, the Break-Up Fee, and the Bidding Increment. A qualified competing bid must therefore exceed three million sixty thousand  Dollars ($3,060,000) plus the Break-Up Fee (the "***Opening Bid***"), plus the value of Assumed Liabilities under the APA, and otherwise meet the financing and other requirements set forth herein (such bid, a "***Qualified Competing Bid***").

Each Competing Bid for a combination of Assets, other than for the same combination set forth in the APA, must: (a) provide for a breakdown of the share of the Purchase Price allocable to each of the Assets included in the Competing Bid; (b) state whether the Competing Bid is conditioned on being the Winning Bid for any of the other Assets included in the Competing Bid (and if so, clearly identify which Assets); and (c) state whether the Eligible Competing Bidder is willing to purchase any of the Assets included in the Bid individually, and if so, the price such Eligible Competing Bidder would pay for each such Asset.

ii.  Deposit

Each Competing Bid must be accompanied by a good-faith deposit in the amount of One Hundred Fifty Thousand Dollars ($100,000).

iii.  Marked Asset Purchase Agreement

Each Competing Bid must include a draft purchase agreement substantially in the form the APA as a template, with an applicable redline, including the exhibits and schedules related thereto and any related documents or other material documents necessary to consummate the Sale contemplated by the Bid (collectively, the "Sale Documents").

iv.  Committed Financing

Each Competing Bid must contain evidence of the Eligible Competing Bidder's

3

ability to consummate the Sale within 15 calendar days after entry of the Sale Order and a representation that the bidder has the financial ability to perform and provide evidentiary documentation demonstrating such financial ability to close (e.g., financial statements and bank statements that show available cash necessary to close the transaction) that are satisfactory to the Debtors in their reasonable discretion.

To the extent that a Competing Bid is not accompanied by evidence of such party's capacity to consummate the Sale set forth in its Competing Bid with cash on hand, each Competing Bid must include committed financing, documented to the Debtors' satisfaction, that demonstrates that such party has received sufficient debt and/or equity funding commitments to satisfy the Competing Bid's Purchase Price and other obligations thereunder. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, diligence, or other approvals, and shall have covenants and conditions acceptable to the Debtors.

v.      No Financing or Diligence Outs

A Competing Bid shall not be conditioned on the obtaining or sufficiency of financing or any internal approval, or on the outcome or review of due diligence, or on the receipt of any regulatory third party approvals, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which representations and warranties shall be similar, and in any event, not more expansive, than the representations and warranties set forth in the APA.

vi.     Identity

Each Competing Bid must fully disclose the identity of the bidder, the contact information for such bidder, and provide full disclosure of any affiliates or insiders of the Debtors involved in such bid, and the complete terms of such participation. Nothing herein shall preclude any equity holder from bidding or otherwise participating in connection with such Competing Bid so long as such equity holder is disclosed as set forth above. Each Competing Bid must also include contact information for the specific person(s) and counsel whom the Debtor's advisors should contact regarding such Bid.

vii.    Authorization

Each Competing Bid must contain sufficient evidence that the Eligible Bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Competing Bid and the consummation of the Sale contemplated in such Competing Bid; provided however that if such Eligible Competing Bidder is an entity formed for the purpose of consummating the proposed Sale, then such Eligible Competing Bidder must furnish sufficient written evidence satisfactory to the Debtors of the approval of the submission of the Competing Bid and consummation of the Sale by equity holder(s) of such Eligible Competing Bidder.

viii.   Assumed Liabilities

Each Competing Bid must identify the Debtors' liabilities, if any, that each Eligible Competing Bidder seeks to assume.

ix.    Adequate Assurance of Future Performance

Each Competing Bid must: (i) identify any and all executory contracts and unexpired leases to be assumed and assigned in connection with such Competing Bid; and (ii) demonstrate, in the Debtors' reasonable business judgment, that the Eligible Competing Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.

x.    As-Is, Where-Is

Each Competing Bid must include a written acknowledgment and representation that the Eligible Competing Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation, and/or inspection of documents and the Assets in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures and in the representations and warranties contained in the Sale Documents submitted as a part of the Bid (as modified before acceptance and execution by the Debtor) and disclaims reliance on any such written or oral statements, representations, promises, warranties, or guaranties.

xi.    Honoring the Bid Procedures

Each Competing Bid must affirmatively state agreement, and by submitting its Competing Bid, each Eligible Competing Bidder is so agreeing, to abide by and honor the terms of the Bidding Procedures (including if such Bidder is declared the Successful Bidder or Backup Bidder (as defined below)) and to refrain from submitting a Bid or seeking to reopen the Auction after conclusion of the Auction. The submission of a Competing Bid shall constitute a binding and irrevocable offer to purchase the Assets. Each Competing Bid must state that the Eligible Competing Bidder consents to the jurisdiction of the Court and to the entry of a final judgment or order with respect to the Competing Bid, as well as with respect to any aspect of these Bid Procedures, and all orders of the Court entered with respect to the Sale.

xii.    Additional Diligence

Each Eligible Competing Bidder shall comply with all reasonable requests for additional information and due diligence access by Debtors or their advisors regarding the Competing Bid.

5

xiii.    Expenses

Each Competing Bid shall not contemplate or request (and no Eligible Competing Bidder that is not a Stalking Horse Bidder shall receive) any break-up fee, transaction fee, termination fee, expense reimbursement, or any similar type of payment or reimbursement, and by submitting is Competing Bid, each Eligible Competing Bidder is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

C.  Designation of Qualified Competing Bidder

i.    A Bid will be considered a "Qualified Competing Bid" and each Eligible Competing Bidder that submits a Qualified Competing Bid will be considered a "Qualified Competing Bidder," if the Debtors determine in their reasonable business judgment, in consultation with Avnet, that such Bid: (i) satisfies the Bid Requirements; and (ii) is reasonably likely (based on availability of financing, experience, and other considerations) to be consummated, if selected as the Winning Bid, within a time frame reasonably acceptable to the Debtors.

ii.    Notification

No later than two business days after the Bid Deadline, the Debtors will notify each Eligible Competing Bidder whether such party is a Qualified Competing Bidder.

iii.    Bid Modification

Between the date that Debtor notifies a Bidder that it is a Qualified Competing Bidder and the Auction: (i) the Debtors may discuss, negotiate, or seek clarification of any Qualified Competing Bid from a Qualified Bidder; and (ii) a Qualified Bidder may not, without the prior written consent of the Debtor modify, amend, or withdraw its Qualified Competing Bid, except for proposed amendments to increase their Purchase Price, or otherwise improve the terms of, the Qualified Bid, provided that any improved Qualified Bid must continue to comply with the requirements for Qualified Competing Bids set forth in these Bidding Procedures.

D.  Credit Bid

Avnet shall have the right to credit bid for the Assets without the need to provide a deposit and Avnet shall be deemed to be an Eligible Bidder, and shall have the right to credit bid any portion and up to the entire amount of its outstanding Reduced Avnet Claim (as defined in the Support Agreement) pursuant to section 363(k) of the Bankruptcy Code for its collateral, which credit bid shall be deemed to be a Qualified Bid (the "Credit Bid Right"), provided that any such credit bid is submitted by the Bid Deadline, provided however, that Avnet waives its rights under section 363(k) of the Bankruptcy Code to credit bid for the Assets, provided that a sale of Avnet's collateral is pursued and consummated pursuant to the Bidding Procedures Order and these

6

Bidding Procedures. Otherwise, Avnet retains and will retain all of its rights to credit bid its claims under applicable law.

E.  Opening Bid

Not later than one business day before the Auction, Debtors will notify all Qualified Competing Bidders, and the Stalking Horse Bidder, of the Opening Bid, such bid being the highest or otherwise best Qualified Bid with respect to the Debtors' Assets, which Qualified Bid may be the Stalking Horse Bid and the Debtors shall provide copies of the documents supporting the Opening Bid to all Qualified Bidders (defined below).

The determination of which Qualified Bid constitutes the Opening Bid and, ultimately, the Winning Bid shall take into account any factors the Debtors, in consultation with Avnet, reasonably deems relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (i) the amount and nature of the Purchase Price; and (ii) the Qualified Bidder's ability to consummate the Sale and the timing thereof.

F.  Auction Procedure

i.      Time and Place

If there is a Qualified Competing Bid, Debtors shall hold an auction for the Assets (the "*Auction*") within five (5) Business Days of the Bid Deadline, provided, however, if the fifth (5th) day is not a Business Day, then the first Business Day following the fifth (5th) day, and as more fully described in the Bid Procedures (the "*Auction Date*"). The Auction shall take place on January 3, 2022 at 3:00 p.m. EST and will (unless the Debtors provide notice otherwise) be held electronically via video/telephone, or at such later date, time, or other place as selected by the Debtors, in consultation with Avnet and the Stalking Horse Bidder, or approved by order of the Court.

ii.     Terms of Overbids

At the Auction, the first subsequent bid must exceed the Opening Bid by at least Fifty Thousand Dollars ($50,000). Thereafter and continuing until there is only one (1) bidder remaining, each bidder must increase the subsequent bid in an amount of at least Fifty Thousand Dollars ($50,000) to remain a bidder in the Auction. To determine the winning bid at any such Auction, the Debtors shall, in consultation with Avnet, evaluate the value to be provided under the bids, including the net economic effect upon Debtors' estates, taking into account the Break-Up Fee owed to the Stalking Horse Bidder and the obligations assumed by the Stalking Horse Bidder under the APA.

iii.    Eligibility

Only Qualified Competing Bidders that have submitted Qualified Competing Bids by the Bid Deadline, Avnet, to the extent it exercises its Credit Bid rights, and the Stalking Horse Bidder (together the "Qualified Bidders") are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with the Bidding

Procedures; provided that such other limitations are (i) not inconsistent with the Bidding Procedures Order, any other order of the Bankruptcy Court, or the Bankruptcy Code, (ii) disclosed orally or in writing to all Qualified Bidders, and (iii) determined by the Debtors, in consultation with Avnet, to further the goals of the Bidding Procedures.

     iv.     Required Attendance

Qualified Bidders participating in the Auction must appear at the Auction, or through a duly authorized representative, proof of which authority has been provided to Debtors at least one business day before the Auction.

     v.     Permitted Attendance

The Auction will be conducted openly and all creditors and counsel or other professional advisors may be permitted to attend. Only Qualified Bidders will be permitted to participate in the Auction.

     vi.     No Collusion, Good Faith Bona Fide Offer

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to bidding; and (b) its Qualified Bid is a good faith bona fide offer and it intends to consummate the proposed Sale if selected as the Successful Bidder.

     vii.     Adjourning the Auction

Notwithstanding anything else herein to the contrary, the Debtors reserve the right, in their reasonable business judgment, in consultation with Avnet, to adjourn the Auction on or more times to, among other things: (a) facilitate discussions between the Debtors and Qualified Bidders; (b) allow Qualified Bidders to consider how they wish to proceed; and (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, in consultation with Avnet, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Sale at the prevailing Overbid amount.

     viii.     Closing the Auction

The Auction shall continue until the Debtors, in consultation with Avnet, select, in their reasonable business judgment, pursuant to these Bidding Procedures, the highest or otherwise best Qualified Bid for the Assets. Such Qualified Bid shall be declared the "Winning Bid" and such Qualified Bidder, the "Successful Bidder," and at such point, the Auction will be closed.

In the event an Auction is held and the Stalking Horse Bidder is not the ***Successful Bidder***, the Stalking Horse Bidder shall be required to serve as a back-up bidder (the "***Backup Bidder***") and keep the Stalking Horse Bidder's bid to consummate the transactions contemplated by this APA on the terms and conditions set forth in the APA (as the same may be revised in the Auction)

open and irrevocable until the APA is otherwise terminated.

If the Successful Bidder fails to consummate the applicable Alternative Transaction (as defined in the APA) as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and the Debtors may consummate the transactions contemplated by the APA on the terms and conditions set forth in the APA as such terms may have been improved upon in the Auction.

As soon as reasonably practicable after closing the Auction, the Debtor shall finalize definitive documentation to implement the terms of the Winning Bid and, as applicable, cause such definitive documentation to be filed with the Court. The acceptance by the Debtor of the Winning Bid is conditioned upon approval by the Court of the Winning Bid.

The evidentiary hearing to consider approval of the Winning Bid (the "Sale Hearing") will be held at ___:___ __.m. on January 11, 2022, or such other date as the Court's docket may accommodate. The Sale Hearing may be adjourned or rescheduled as ordered by the Court, or by the Debtor with the consent of Avnet, but without further notice to creditors and parties in interest other than by announcement by the Debtors of the adjourned date at the Sale Hearing.

### ix. Return of Deposits

The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtor in its sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) within three business days after the Auction is closed, or as soon as is reasonably practicable thereafter. Upon the return of the Deposits, the applicable Qualified Bidders shall receive any interest that will have accrued thereon.

The Deposit of the Successful Bidder shall be applied to the purchase price of such Sale at closing. If a Successful Bidder (including a Backup Bidder which becomes a Successful Bidder) fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtor will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtor as liquidated damages, in addition to any rights, remedies, or causes of action that may be available to Debtor. If, through no fault of the Successful Bidder, the Court does not approve the transaction or the transaction does not close, the Bidder's Deposit shall be returned within three business days thereof, or as soon as is reasonably practicable thereafter.

### 4. Modification of Bidding Procedures

The Debtors reserve the right to modify these Bidding Procedures in their reasonable business judgment, in consultation with Avnet and the Stalking Horse Bidder in a manner consistent with its fiduciary duty and applicable law, without further order from the Court, in any manner that will best promote the goals of these Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions on a Sale, including, without limitation: (a) extending or modifying any of the dates and deadlines set forth in these Bidding Procedures; (b)

9

adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (c) adjusting the applicable minimum Overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis; (d) adjourning or canceling the auction; and (e) rejecting any or all Bids or Qualified Bids provided that the Debtor may not amend these bidding procedures to (i) reduce or otherwise modify their obligations to consult with Avnet, (ii) to permit the submission of bids after the close of the auction or (iii) limit, modify or otherwise alter or impede the exercise of the credit bid right without the consent of Avnet, unless ordered by the Court.

5. Consent to Jurisdiction

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures.

10

# EXHIBIT A

## (to Bidding Procedures)

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "*Agreement*") is entered into as of December 1, 2021 (the "*Effective Date*") by and among INSTANTIATION LLC (the "*Purchaser*"), SQUIRRELS RESEARCH LABS LLC ("*SQRL*"), and THE MIDWEST DATA COMPANY LLC ("*MWDC*" and, together with SQRL, each a "*Seller*" and collectively, the "*Sellers*"). The Purchaser and the Sellers are referred to herein individually as a "*Party*" and, collectively, as the "*Parties*".

### RECITALS

WHEREAS, the Sellers are in the business of the development of high-performance computing and blockchain hardware technology and related businesses (the "*Acquired Business*");

WHEREAS, the Sellers intend to commence a voluntary petition for relief (the "*Bankruptcy Case*") under subchapter V (§§ 1181-1195) of chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division at Canton (the "*Bankruptcy Court*"); and

WHEREAS, the Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from the Sellers, and the Sellers desire to sell, convey, assign, and transfer to the Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (collectively, the "*Bankruptcy Rules*"), all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order;

WHEREAS, on November 22, 2021, the Parties entered into an Asset Purchase Agreement (the "*Original APA*"); and

WHEREAS, the Parties desire to amend and restate the Original APA, pursuant to Section 9.6 of the Original APA, in its entirety on the terms and subject to the conditions set forth herein

NOW, THEREFORE, for and in consideration of the foregoing and their mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

### ARTICLE 1
### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

**1.1** **Purchase and Sale of Acquired Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, the Sellers shall sell, transfer, assign, convey, and deliver to the

Purchaser, and the Purchaser shall purchase, acquire, and accept from the Sellers, all of the Sellers' right, title and interest in and to the following assets, properties and rights of the Sellers, free and clear of all Encumbrances other than Permitted Encumbrances (the "***Acquired Assets***") but excluding in all cases the Excluded Assets:

(a)     all Cash and Cash Equivalents, all bank accounts (including the bank accounts listed on <u>Schedule 1.1(a)</u>), and all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Sellers;

(b)     all accounts receivable of the Sellers (the "***Acquired AR***");

(c)     all leasehold, subleasehold or license interests in real property (including the leasehold, subleasehold, or license interests set forth on <u>Schedule 1.1(c)</u>) and any and all buildings, structures, fixtures and other improvements thereon owned or leased by the Sellers (the "***Leased Real Property***");

(d)     all of the Sellers' tangible assets (including Equipment) (the "***Acquired Tangible Assets***");

(e)     all Contracts listed on <u>Schedule 1.1(e)</u> and all other Contracts that the Purchaser, in its discretion by written notice to the Sellers, designates as "Assigned Contracts", to the extent assignable under applicable Law and contractual restrictions after giving effect to the Sale Order (the "***Assigned Contracts***");

(f)     all goodwill, payment intangibles and general intangible assets and rights of the Sellers;

(g)     all Business Intellectual Property, including all rights to collect royalties and proceeds in connection therewith;

(h)     all causes of Action, lawsuits, judgments, claims and demands of any nature, whether arising by way of counterclaim or otherwise (collectively, the "***Assigned Claims***");

(i)     copies of all Documents including, to the extent permitted by applicable Law, the employee and personnel records of the Transferred Employees; <u>provided</u> that the Sellers may retain copies of any Documents transferred pursuant to this <u>Section 1.1(i)</u> to the extent required by Law;

(j)     all of the Sellers' customer data, lists and information (excluding from the foregoing any credit card numbers or related payment source, social security numbers, or other personally identifiable information, the transfer of which would contravene applicable privacy Law) (the "***Customer Information***");

21-10949-mb   Doc 40-1 FILED 12/17/21 ENTERED 12/17/21 16:54:13 Page 21 of 82

**(k)** to the extent transferable under applicable Law after giving the effect to the Sale Order, all of the rights, interests and benefits accruing under all Permits, and all pending applications and renewals therefor (collectively, the "***Assigned Permits***");

**(l)** the insurance claims described on Schedule 1.1(l) (the "***Insurance Claims***");

**(m)** all of Seller's financial accounting Documents; and

**(n)** all other or additional assets, properties, privileges, rights and interests of the Sellers relating to the Acquired Business, the Assumed Liabilities or the Acquired Assets (other than Excluded Assets) of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement.

**1.2** **Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, in no event shall the Sellers be deemed to sell, transfer, assign, or convey, and the Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests and rights of such Seller (collectively, the "***Excluded Assets***"):

**(a)** all Protected Information that such Seller is prohibited by or would otherwise contravene applicable Law from transferring to the Purchaser;

**(b)** any records, documents or other information relating to employees of the Sellers who are not Transferred Employees, and any materials containing information about any Transferred Employee, disclosure of which would violate applicable Law;

**(c)** all Contracts other than the Assigned Contracts (the "***Excluded Contracts***");

**(d)** all Documents that are minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers) and any other Tax information or records of such Seller, corporate seal, checkbooks, and canceled checks;

**(e)** such Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between such Seller and the Purchaser in connection with the transactions contemplated hereby, or any other agreement between such Seller and the Purchaser entered into on or after the date hereof; and

**(f)** all Tax attributes that are not transferred by the operation of applicable Tax Law; and

**(g)** the causes of Action set forth on Schedule 1.2(g) attached hereto.

**1.3** **Assumption of Certain Liabilities**. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, the Purchaser shall irrevocably

assume from the Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and the Sellers shall irrevocably convey, transfer, and assign to the Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "***Assumed Liabilities***"):

> (a) all Liabilities of the Sellers under the Assigned Contracts that become due from and after the Closing but excluding Liabilities arising out of the Sellers' performance of the Assigned Contracts prior to Closing;

> (b) all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "***Cure Costs***");

> (c) all Liabilities arising out of the conduct of the business or the ownership, use or operation of the Acquired Assets, in each case, from and after the Closing; and

> (d) all Liabilities arising from the Assigned Permits but excluding Liabilities arising out of the conduct of the business or the Sellers' performance of the Assigned Permits prior to Closing.

Notwithstanding anything to the contrary contained herein, "Assumed Liabilities" shall not include any Liabilities in respect of any Action or other contested claims against the Sellers, other contingent Liabilities, fees of the Sellers' professional advisors, management incentive plans or other Liability not incurred in the Ordinary Course, or any indebtedness, obligation or other claim (as defined in the Bankruptcy Code) of any kind arising from any financing including any Liability under the DIP Loan Agreement, any other DIP financing, credit facility, revolver, borrowing, debt or securities of any kind. All such Liabilities shall constitute "Excluded Liabilities".

> **1.4** **Excluded Liabilities**. The Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place on or prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "***Excluded Liabilities***").

> **1.5** **Assumption/Rejection of Certain Contracts**.

> (a) <u>Assumption and Assignment of Executory Contracts</u>. The Sellers shall provide reasonably timely written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which a Seller is a party that are Assigned Contracts as of the Closing and take all other actions reasonably necessary to cause such Assigned Contracts to be assumed by a Seller and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the Sellers shall assign or cause to be assigned to the Purchaser, as

21261449 Chap. 40-1 Doc 40-1 FILED 02/17/21 ENTERED 02/17/21 16:52:413 Page 22 of 6182

applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes (if available), all included on an exhibit attached to either a notice filed in connection with the motion for approval of the Sale Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth the applicable Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by such Seller based on such Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, such Seller shall, pursuant to the Sale Order, assume and assign to the Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to the Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code. At the Closing, the Purchaser shall assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract constituting Assumed Liabilities pursuant to section 365 of the Bankruptcy Code.

        **(b)**    <u>Non-Assignment</u>. Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, the Purchaser to the extent that such Contract (i) is rejected or terminated by a Seller in accordance with the terms of this Agreement or is terminated by any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by the Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to the Purchaser of a Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by the Purchaser as an Assigned Contract hereunder. In the event that any Assigned Contract is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 1.5(b), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing (or the remaining term of such Contract or the closing of the Bankruptcy Case, if shorter), the Sellers and the Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by the Purchaser, including subcontracting, licensing, or sublicensing to the Purchaser any or all of the Sellers' rights and obligations with respect to any such Assigned Contract, under which (1) the Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on the Sellers or its Affiliates) under such Assigned Contract with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) the Purchaser shall assume any related burden and obligation (including performance) with respect to such Assigned Contract constituting Assumed Liabilities. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Assigned Contract after the Closing, such Assigned Contract shall promptly be transferred and assigned to the Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code.

**1.6     Purchase Price**.  The consideration payable by the Purchaser to the Sellers for the Acquired Assets shall be equal to $3,010,000 in cash (the "***Purchase Price***") plus assumption of the Assumed Liabilities; provided, that of the Purchase Price, $10,000 is allocated to and shall be paid to MWDC in respect of the Acquired Assets to be sold by MWDC to the Purchaser pursuant to this Agreement.  Within five (5) Business Days of the execution of this Agreement, the Purchaser shall deliver to the Sellers $50,000 (the "***Deposit***"), which amount shall be applied to the Purchase Price at the Closing.

**1.7     Closing**.  The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "***Closing***") will take place by telephone conference and electronic exchange of documents at 10:00 a.m. Canton, Ohio time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article 6 (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree. The date on which the Closing actually occurs is referred to herein as the "***Closing Date***".

**1.8     Closing Deliveries by the Sellers**.  At or prior to the Closing, the Sellers shall deliver to the Purchaser:

**(a)**     all required documentation for Transfer Taxes, duly executed by the Sellers;

**(b)**     each instrument of assignment and assumption of the Leased Real Property and other unexpired leases and executory contracts as set forth on Schedule 1.1(c), in each case, in form and substance approved by the Purchaser (the "***Assignments and Assumptions of Leases***"), duly executed (and acknowledged as applicable) by the Sellers;

**(c)**     copies of all reasonable and customary instruments, certificates, documents and other filings (if applicable) necessary to release the Acquired Assets from Encumbrances, including any applicable UCC termination statements and releases of mortgages, in form and substance appropriate for recording;

**(d)**     a copy of the Sale Order, as entered by the Bankruptcy Court;

**(e)**     a duly executed certificate from each Seller, satisfying the requirements of Treasury Regulation 1.1445-2(b)(2);

**(f)**     a duly executed IRS Form W-9 with respect to each Seller;

**(g)**     a copy of the resolutions adopted by the board of directors (or similar governing body) of the Sellers evidencing the authorization of the execution of this Agreement and the consummation of the transactions contemplated by this Agreement, certified by an authorized officer of the Sellers;

21-61949-maps    Doc 40-1 FILED 02/17/21 ENTERED 02/17/21 16:24:13    Page 25 of 82

**(h)**   an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Sellers certifying that the conditions set forth in Sections 6.2(b) and 6.2(c) have been satisfied; and

**(i)**   such other documents as the Purchaser may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

**1.9**   **Closing Deliveries by the Purchaser**.  At the Closing, the Purchaser shall deliver to the Sellers:

**(a)**   The Purchase Price;

**(b)**   each Assignment and Assumption of Leases, duly executed (and acknowledged, as applicable) by the Purchaser;

**(c)**   a copy of the resolutions adopted by the board of directors (or similar governing body) of the Purchaser evidencing the authorization of the execution of this Agreement and the consummation of the transactions contemplated by this Agreement, certified by an authorized officer of the Purchaser;

**(d)**   an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Purchaser certifying that the conditions set forth in Sections 6.3(a) and 6.3(b) have been satisfied; and

**(e)**   such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

**1.10**   **Withholding**.  The Purchaser shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement to the extent required by applicable Law. Prior to making any withholding, the Purchaser must notify the Sellers at least five (5) Business Days prior to the effective date of any potentially applicable withholding requirement that the Purchaser believes applies, and each of the Parties agrees to take commercially reasonable efforts to cooperate to eliminate or reduce any such deduction or withholding. To the extent that amounts are withheld and paid to the applicable Governmental Body, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Schedules delivered by the Sellers to the Purchaser concurrently herewith, the Sellers, jointly and severally, represent and warrant to the Purchaser as follows as of the date hereof and as of the Closing Date (except where a representation or warranty is limited to a specific date, in which case such representation and warranty is given only as of such specific date):

**2.1** **Organization and Qualification**. Such Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, in the case of (b) and (c), except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**2.2** **Authorization of Agreement**. The execution, delivery, and performance of this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party by such Seller. Subject to requisite Bankruptcy Court approvals, this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party has been duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of the Purchaser, this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar applicable Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) (the "*Enforceability Exceptions*").

**2.3** Conflicts; Consents.

**(a)** Assuming that requisite Bankruptcy Court approvals are obtained, the execution, delivery and performance by the Sellers of this Agreement and each of the documents and agreements contemplated hereby to which the Sellers is a party and the consummation by the Sellers of the transactions contemplated hereby and thereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of the Sellers; (ii) violate any Law applicable to the Sellers; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any property or asset of the Sellers under, any Assigned Contracts; except, in the case of clauses (ii) and (iii), for any such violations, breaches, defaults or other occurrences as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

**(b)** The Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body in connection with the execution, delivery and performance by the Sellers of this Agreement and each of the documents and agreements contemplated hereby to which each Seller is a party or the

21-61149-amp   Doc 40-1 FILED 12/17/21 ENTERED 12/17/21 16:24:13 Page 26 of 82

consummation by such Seller of the transactions contemplated hereby and thereby, except (i) requisite Bankruptcy Court approvals, (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not and could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, or (iii) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

### 2.4 Title to Properties.

(a) Schedule 1.1(c) contains a correct and complete list of the Leased Real Property as of the date hereof. Subject to requisite Bankruptcy Court approvals, and assumption by the Sellers of the applicable lease in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, the Sellers have a valid leasehold estate in the Leased Real Property, free and clear of all Encumbrances, other than Permitted Encumbrances. The Sellers have not leased to or otherwise granted to any Person the right to use or occupy any Leased Real Property except as could not, individually or in the aggregate, reasonably be expected to materially impair the use or occupancy of such Leased Real Property in the operation of the Acquired Business.

(b) Subject to requisite Bankruptcy Court approvals and assumption by such Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, such Seller owns good title to, or holds a valid leasehold interest in, all of the material tangible property (including the Equipment) used or held for use in the conduct of the Acquired Business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property as could not, individually or in the aggregate, reasonably be expected to be material to the operation of the Acquired Business.

(c) The Acquired Assets include all of the properties and assets required to operate, in all material respects, the Acquired Business in the Ordinary Course as currently operated by such Seller.

(d) After giving effect to the Closing, the Purchaser will hold good title to, or will hold a valid leasehold interest in, the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) pursuant to the Sale Order.

### 2.5 Contracts.

(a) Except as set forth on Schedule 2.5(a), Contracts entered into by the Sellers after the date hereof in compliance with the terms of this Agreement, and Contracts that are not primarily related to the Acquired Business, such Seller is not a party to any:

(i) collective bargaining agreement with any labor union;

(ii) Contract under which such Seller has borrowed any money or issued any note, indenture or other evidence of similar indebtedness or guaranteed such indebtedness of others;

(iii)    license of any Intellectual Property (other than licenses of commercially available, off-the-shelf software and other than licenses entered into in the Ordinary Course);

(iv)    lease or other Contract under which such Seller is lessee of, or holds or operates any personal property owned by any third party;

(v)    Contract or group of related Contracts with the same party for the purchase of products or services (other than purchase orders entered into in the Ordinary Course);

(vi)    Contract that materially limits or purports to limit the ability of the Acquired Business to compete in any line of business or with any Person or in any geographic area;

(vii)    Contract relating to any acquisition or disposition by such Seller of any business (whether by asset or stock purchase or otherwise) or any merger, consolidation or similar business combination transaction, in each case, pursuant to which such Seller has any outstanding obligation to pay any purchase price thereunder;

(viii)    Contract relating to any joint venture or partnership; or

(ix)    agreement in writing to enter into any of the foregoing.

(b)    Subject to requisite Bankruptcy Court approvals and assumption by such Seller of the applicable Contract in accordance with applicable Law and except as a result of the commencement of the Bankruptcy Case or as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, as of the date hereof, each of the Assigned Contracts is in full force and effect and is a valid, binding and enforceable obligation of such Seller and, to the Knowledge of such Seller, each of the other parties thereto, except as may be limited by the Enforceability Exceptions.  Except, as a result of the commencement of the Bankruptcy Case, or as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, such Seller is not in material default, or is alleged in writing by the counterparty thereto to have materially breached or to be in material default, under any Assigned Contract, and, to the Knowledge of such Seller, the other party to each Assigned Contract is not in material default thereunder.  As of the date hereof, none of the Assigned Contracts has been canceled or otherwise terminated, and such Seller has not received any written notice from any Person regarding any such cancellation or termination except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

2.6    **Litigation**. Other than the Bankruptcy Case and the Actions set forth on Schedule 2.6, there are no Actions pending or, to the Seller's Knowledge, threatened against or by the Sellers or any of its Affiliates with respect to the Acquired Business, at law or in equity, or before or by any Governmental Body. Other than in connection with the Bankruptcy Case, the Sellers are not subject to any outstanding Order.

2.7    **Permits; Compliance with Laws**.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, the Sellers hold and is in compliance with all permits, certificates, licenses, approvals, registrations and authorizations that are material to the Acquired Business and required in connection with the conduct of its business as operated by the Sellers under applicable Laws (the "*Permits*").  Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, all of the Permits are valid and in full force and effect and no Action is pending, or, to the Seller's Knowledge, threatened, which seeks to revoke, limit or otherwise affect any such Permit.

(b)     During the prior five (5) years the Sellers have not received any written notice of any Action against it alleging any failure to comply in any material respect with any Laws, except in each case as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.  No investigation by any Governmental Body with respect to each Seller or any of its Affiliates is pending or, to the Seller's Knowledge, threatened, and during the prior five (5) years the Sellers have not received any written notice of any such investigation, except, in each case, for any such investigation that could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

## 2.8     Environmental Matters.

(a)     The Sellers are in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining all material permits, licenses and authorizations required under applicable Environmental Laws, except in each case for any noncompliance that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(b)     The Sellers have not during the prior five (5) years received written notice from any Governmental Body regarding any actual or alleged violation of or liability under Environmental Laws that could, individually or in the aggregate, reasonably be expected to be material to the Acquired Business; and

(c)     To the Knowledge of the Sellers, no Hazardous Substance has been released by the Sellers in violation of, and in a manner that would result in liability for the Sellers under, any Environmental Law, except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

## 2.9     Intellectual Property.

(a)     Schedule 2.9(a) sets forth a correct and complete list of all material registered Intellectual Property, and all applications for registrations of Business Intellectual Property, in each case, filed with the United States Patent and Trademark Office and owned by the Sellers (collectively, "*Registered Intellectual Property*").

(b)     The Business Intellectual Property is owned by the Sellers free and clear of all Encumbrances, other than Permitted Encumbrances. The Business Intellectual Property is subsisting and, to the Knowledge of the Seller, enforceable.

(c)     To the Knowledge of the Sellers, the Acquired Business does not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person, except where such infringement, misappropriation or violation could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

(d)     To the Knowledge of the Sellers, no third party infringes, misappropriates or otherwise violates any Business Intellectual Property, except where such infringement, misappropriation or violation could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

(e)     The Sellers have used efforts that are reasonable under the circumstances to maintain the secrecy of the material Trade Secrets included in the Business Intellectual Property, except where such failure could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

**2.10    Data Security**. Except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, the Sellers maintain commercially reasonable policies and procedures regarding data privacy, protection and security designed to protect any personally identifiable information of any individuals, including any customers, prospective customers, employees and/or other third parties directly related to the Acquired Business collected by the Sellers. Except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, to the Knowledge of the Sellers, the transactions contemplated by this Agreement will not result in a breach of such Seller's published privacy policies in effect as of the date hereof.  The Sellers and their respective Affiliates are in compliance in all material respects with all Laws relating to data loss, theft and breach of security notification obligations.

**2.11    Seller Plans**.  Sellers have no Liabilities under any Seller Plans.

**2.12    Employees**.

(a)     The Sellers have delivered to the Purchaser a correct and complete list of all Business Employees as of the date hereof, specifying their position, location, annual salary, date of hire and target bonus (including any incentive or retention payment opportunity in connection with Bankruptcy Case).  With respect to the Business Employees, the Sellers are in compliance in all material respects with all applicable Laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, layoffs and immigration compliance, except for such non-compliance that is not material to the Acquired Business. With respect to the Business Employees, there are no administrative charges or court complaints pending or, to the Seller's Knowledge, threatened against the Sellers or any of its Affiliates before the U.S. Equal Employment Opportunity Commission or any other Governmental Body concerning alleged employment discrimination or any other matters relating to the employment of labor, in each case, that could reasonably be expected to be material to the Acquired Business.

(b)     There is no unfair labor practice charge or complaint pending or, to the Seller's Knowledge, threatened against the Sellers or any of its Affiliates before the National Labor Relations Board or any similar foreign, state or local body with respect to any Business

Employees. To the Knowledge of the Sellers, during the prior five (5) years, and other than work stoppages or slowdowns resulting from the COVID-19 pandemic and associated "stay-at-home", "shelter-in-place" and similar orders of Governmental Bodies, the Sellers have not experienced any union organizing or decertification activities, work stoppage, slowdowns or other material labor disputes with respect to Business Employees, and, to the Knowledge of the Seller's no such activities or disputes are underway or threatened.

**2.13    Tax Matters**.

**(a)**    All Tax Returns required to be filed under applicable Law by the Sellers with respect to the Acquired Assets or the Acquired Business have been filed and such Tax Returns are correct and complete in all material respects.

**(b)**    All Taxes shown as due from the Sellers with respect to the Acquired Assets or the Acquired Business have been paid, except (i) to the extent nonpayment of which is permitted or required by the Bankruptcy Code and (ii) for Taxes that are being disputed by the Sellers in good faith.

**(c)**    No written notice from any Governmental Body of proposed adjustment, deficiency or underpayment of material Taxes with respect to the Sellers, the Acquired Assets or the Acquired Business has been received by any Seller that has not since been satisfied by payment or been withdrawn. No Seller has waived any statute of limitations or agreed to any extension of time during which a material Tax or deficiency assessment may be made with respect to the Acquired Assets or the Acquired Business.

**(d)**    To the Seller's Knowledge, there are no Encumbrances for Taxes on the Acquired Assets or the Acquired Business, other than Permitted Encumbrances.

**(e)**    The Sellers have collected or withheld all amounts required to be collected or withheld by the Sellers for all Taxes in compliance with applicable Law, and all such amounts have been paid to the appropriate Governmental Body or set aside in appropriate accounts for future payment when due, in each case, in accordance with applicable Law.

**(f)**    To the Seller's Knowledge, no Governmental Body has in the last five (5) years made a claim that the Sellers, the Acquired Assets or the Acquired Business are or may be subject to taxation by a jurisdiction in which Tax Returns are not filed by, or with respect to, the Sellers, the Acquired Assets or the Acquired Business, as applicable.

**2.14    Brokers**. There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of the Sellers that would become the obligation of the Purchaser or its Affiliates after the Closing.

**2.15    Compliance with Applicable Sanctions and Embargo Laws**.

**(a)**    Neither the Sellers nor any of their respective Affiliates is (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), the OFAC

Consolidated Sanctions List or in any Executive Order issued by the President of the United States and administered by OFAC, or a person or entity prohibited by any OFAC sanctions program or a person or entity whose property and interests in property subject to U.S. jurisdiction are otherwise blocked under any U.S. laws, Executive Orders or regulations; (ii) an entity owned, directly or indirectly, individually or in the aggregate, fifty percent or more by one or more persons described in subsection (i); (iii) a person or entity listed on the Sectoral Sanctions Identifications ("**SSI**") List maintained by OFAC or otherwise determined by OFAC to be subject to one or more of the Directives issued under Executive Order 13662 of March 20, 2014, or an entity owned, directly or indirectly, individually or in the aggregate, fifty percent or more by one or more persons or entities that are subject to the SSI List restrictions; or (iv) a person or entity named on the U.S. Department of Commerce, Bureau of Industry and Security Denied Persons List, Entity List, or Unverified List.

(**b**)	Neither the Sellers nor any of its respective Affiliates has violated any applicable sanctions, embargo, or export control laws or regulations, except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

**2.16	Compliance with Applicable Anti-Bribery and Anti-Corruption Law**. Neither the Sellers nor any of its respective Affiliates has, directly or indirectly: (a) made, offered, or paid any illegal contributions, payments, bribes, kickbacks, expenditures, gifts or similar payments or provided any unlawful compensation or gifts or payments to any officer, employee, or representative of any Governmental Body, or any employee, customer or supplier of the Sellers or any other Person, in each case, in violation of applicable Law; (b) made or offered to make any improper payment to any foreign official (as defined in the FCPA); or (c) taken any other action that would cause the Sellers to be in violation of any Anti-Bribery and Anti-Corruption Law.

**2.17	Financial Statements**. The Sellers have delivered to the Purchaser correct and complete copies of (i) the unaudited balance sheet of the Sellers as of, and the consolidated statements of operations, changes in members' equity and cash flows for, the fiscal year ended on December 31, 2020 and (ii) the unaudited balance sheet of the Sellers as of, and the consolidated statements of operations and cash flow for, the nine month period ended on September 30, 2021 (collectively, the "**Financial Statements**"). The Financial Statements have not been prepared in accordance with GAAP but presently fairly, in all material respects, the financial position of the Sellers as of the respective dates thereof and for the periods indicated therein (subject to normal and recurring year-end adjustments and the absence of footnotes).

**2.18	Absence of Changes**. Except as a result of or in connection with the Bankruptcy Case, (a) there has not been a Material Adverse Effect and (b) the Sellers have not taken any action that, if taken following September 30, 2021, would have violated Section 5.1.

**2.19	Insurance**. The Sellers are in material compliance with the terms and provisions of its policies of insurance, all such policies are in full force and effect and all premiums due and payable with respect to such policies have been paid. The Sellers have not received a written notice of cancellation or termination of any such policy. Except for the Insurance Claims, there are no pending claims or, to the Seller's Knowledge, incidents that would give rise to a claim under any such policy. The sale and transfer of the Insurance Claims contemplated by this

Agreement is not prohibited by any legal, contractual, or other restriction. For the avoidance of doubt, and without limiting the generality of the foregoing, the Sellers are free to assign and sell the Insurance Claims to the Purchaser in compliance with the Sellers' insurance policies.

**2.20 Bank Accounts**. Schedule 1.1(a) is a list as of the date hereof of Sellers' bank accounts (including any deposit accounts, securities accounts and any sub-accounts).

**2.21 Disclaimer of Other Representations and Warranties**. NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO PURCHASER OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ADVISORS OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA), EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 2 OR IN ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY, NEITHER THE SELLERS, ANY AFFILIATE OF A SELLER OR ANY OF THEIR RESPECTIVE ADVISORS OR ANY OTHER PERSON MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY CONSENTS OR APPROVALS REQUIRED IN CONNECTION THEREWITH), THE ACQUIRED ASSETS, THE ACQUIRED BUSINESS, THE ASSUMED LIABILITIES, THE EXCLUDED ASSETS, OR ANY INFORMATION PROVIDED OR MADE AVAILABLE TO THE PURCHASER IN CONNECTION THEREWITH (INCLUDING ANY FORECASTS, PROJECTIONS, ESTIMATES OR BUDGETS), INCLUDING ANY WARRANTY WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ALL OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.

The Purchaser represents and warrants, to and for the benefit of the Sellers, as follows:

**3.1 Authority; Binding Nature of Agreement**. This Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms, subject to the Enforceability Exceptions.

**3.2 Due Authorization.** The Purchaser has all requisite power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by the Purchaser of this Agreement have been duly approved and authorized by all necessary action.

## ARTICLE 4
## BANKRUPTCY COURT MATTERS

**4.1 Bankruptcy Actions**.

(a)     The Sellers and the Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval pursuant to the Bid Procedures Order. The Purchaser acknowledges that the Sellers must take

reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Sellers and other interested parties, providing information about the Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

**(b)** The Sellers shall use reasonable best efforts to cause the Bankruptcy Court to enter the Bid Procedures Order approving Bid Procedures acceptable to both the Purchaser and Sellers and consistent with the provisions and obligations set forth in Section 4.1(c) and 4.1(d) below, as soon as practicable after full execution of this Agreement. If the Bankruptcy Court does not approve the Bid Procedures in their entirety, or if the Purchaser does not accept any modified terms approved by the Bankruptcy Court, then the Purchaser shall have the right to terminate this Agreement and neither party shall have any further obligation under this Agreement except for Sellers' obligation to return the Deposits as provided for in Section 7.2.

**(c)** If the Purchaser is not the Successful Bidder (as defined in Section 4.1(e) at the Auction, if any is held, or if the Sellers defaults under this Agreement pursuant to Section 9.4, Sellers shall, subject to Bankruptcy Court approval in connection with the approval of the Bid Procedures, pay to the Purchaser the Break-Up Fee as set forth in Section 7.3 as and for consideration of the Purchaser conducting its due diligence and entering into this Agreement subject to higher and better offers pursuant to the Auction, to compensate the Purchaser for its legal, accounting, and other professional costs and expenses, as well as the Purchaser's internal management time, incurred in connection with the proposed sale.

**(d)** *Competing Bid Requirements.*

**(i)** A competing bid must be in the form of cash in an amount equal to or greater than the sum of the Purchase Price, plus (1) the amount of the Break-Up Fee, plus (2) Fifty Thousand Dollars ($50,000) (the "***Opening Bid***"), plus the value of Assumed Liabilities under this Agreement, and otherwise meet the financing and other requirements set forth in the Bid Procedures, including such requirements set forth in Section 4.1(d)(ii) (such bid, a "***Qualified Competing Bid***"). If there is a Qualified Competing Bid, Seller shall hold an auction for the Acquired Assets (the "***Auction***") within five (5) Business Days of the Bid Deadline, provided, however, if the fifth (5th) day is not a Business Day, then the first Business Day following the fifth (5th) day, and as more fully described in the Bid Procedures (the "***Auction Date***"). At the Auction, the first subsequent bid must exceed the Opening Bid by at least Fifty Thousand Dollars ($50,000). Thereafter and continuing until there is only one (1) bidder remaining, each bidder must increase the subsequent bid in an amount of at least Fifty Thousand Dollars ($50,000) to remain a bidder in the Auction. To determine the winning bid at any such Auction, the Sellers shall evaluate the value to be provided under the bids, including the net economic effect upon Sellers' estate, taking into account the Break-Up Fee owed to the Purchaser and the obligations assumed by the Purchaser under this Agreement.

**(ii)** To be deemed a Qualified Competing Bid, a bidder must comply with the Bid Procedures, including, without limitation: (1) submit its bid using an Asset Purchase Agreement substantially in the form of this Agreement, with a copy marked to show changes, if

any, from this Agreement; (2) submit its bid by no later than 5:00 p.m. PST thirty (30) days after the entry of the Bid Procedures Order (the "***Bid Deadline***"); (3) not include any contingencies to closing the transaction in its bid, including, without limitation, financing, inspection, and due diligence contingencies; (4) be able to close the transaction no later than fifteen (15) days after entry of the Sale Order as further explained in the Bid Procedures; (5) provide at the time of its bid (A) a representation that the bidder has the financial ability to perform and provide evidentiary documentation demonstrating such financial ability to close (e.g., financial statements and bank statements that show available cash necessary to close the transaction) that are satisfactory to the Sellers in its reasonable discretion; and (B) a representation that the bidder is duly authorized to submit the bid and close the transaction and has already obtained all necessary approvals (e.g., board approvals), plus, if requested by Sellers, supporting documents satisfactory to Sellers in its reasonable discretion; and (6) submit with its bid a good-faith deposit in the amount of One Hundred Thousand Dollars ($100,000).

(e)     If an Auction is conducted, and the Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "***Successful Bidder***"), the Purchaser shall be required to serve as a back-up bidder (the "***Backup Bidder***") and keep the Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated.  If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and the Sellers may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement as such terms may have been improved upon in the Auction.

(f)     Notwithstanding anything herein to the contrary, the Purchaser acknowledges that the Sellers and their respective Affiliates and their respective professional advisors may, subsequent to the entry of the Bid Procedures Order, continue (i) soliciting inquiries, proposals, or offers for the Acquired Assets in connection with any Alternative Transaction, (ii) responding to requests for information or due diligence inquiries, or making management available for such purposes, to Persons in connection with any Alternative Transaction and (iii) furnishing any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing. Notwithstanding any other provision of this Agreement to the contrary, the Purchaser acknowledges and agrees that the Sellers and their respective Affiliates may enter into a definitive agreement providing for an Alternative Transaction.

(g)     The Sellers shall promptly serve true and correct copies of the motion seeking entry of the Sale Order and all related pleadings in accordance with the Bid Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable Order of the Bankruptcy Court.

(h)     The Purchaser shall promptly take all actions as are reasonably requested by the Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information or other

documents or information for filing with the Bankruptcy Court and making such employees and Advisors of the Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating the Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

4.2 **Cure Costs**. Subject to entry of the Sale Order, the Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Sellers and assigned to the Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

4.3 **Bankruptcy Court Filings**. The Sellers shall use reasonable best efforts to obtain entry of the Bid Procedures Order and the Sale Order. The Bid Procedures Order shall, among other things, approve the Break-Up Fee. The Sale Order shall, among other things, (a) approve and direct, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances), and (iii) the performance by the Sellers of its obligations under this Agreement; (b) authorize, empower and direct the Sellers to assume and assign to the Purchaser the Assigned Contracts; (c) find that the Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that the Purchaser is not a successor to the Sellers, and grant the Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that the Purchaser shall have no Liability or responsibility for any Liability or other obligation of the Sellers arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that the Purchaser has provided adequate assurance (and as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; (f) find that the Purchaser shall have no Liability for any Excluded Liability; and (g) find that there was no violation of section 363(n) of the Bankruptcy Code. The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code. At Closing, the Purchaser shall pay $3,000,000 of the Purchase Price directly to Avnet, Inc. in full satisfaction of the Avnet Secured Claim.

4.4 **Approval**. The Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Bid Procedures Order and the Sale Order). Nothing in this Agreement shall require the Sellers or their respective Affiliates to give

testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

# ARTICLE 5
# COVENANTS AND AGREEMENTS

## 5.1 Conduct of Business of the Sellers

(a) Until the earlier of the termination of this Agreement pursuant to Article 7 and the Closing, except (w) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (x) as required by applicable Law, Order or a Governmental Body, (y) as required or restricted by the terms of the DIP Loan Agreement, or (z) with the prior written consent of the Purchaser, the Sellers shall (i) conduct the Acquired Business only in the Ordinary Course and in all material respects in compliance with all applicable Laws, (ii) use reasonable best efforts to maintain the Acquired Business and the Acquired Assets in good working order (normal wear and tear excepted), (iii) use reasonable best efforts to keep available the services of their respective Business Employees subject to the Sellers' right to make sound business terminations, and (iv) use reasonable best efforts to maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers, vendors and others having business relationships with the Sellers in connection with the operation of the Acquired Business.

(b) Until the earlier of the termination of this Agreement pursuant to Article 7 and the Closing, except (w) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (x) as required by applicable Law, Order or a Governmental Body, (y) as required or restricted by the terms of the DIP Loan Agreement, or (z) with the prior written consent of the Purchaser, the Sellers shall not:

(i) issue any notes, bonds or other debt securities, or otherwise incur any indebtedness for borrowed money or otherwise become liable for any such indebtedness of any other Person, in each case, other than Excluded Liabilities;

(ii) terminate (other than by expiration), amend or modify (other than by automatic extension or renewal) in any material respect the terms of any Assigned Contract; provided, however, that the Sellers may terminate, amend or modify purchase orders in the Ordinary Course;

(iii) settle or compromise any pending or threatened Action if such settlement or compromise would create Liabilities that are not Excluded Liabilities;

(iv) acquire any material assets that would become Acquired Assets or sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any Acquired Assets, other than (A) sales in the Ordinary Course, (B) licenses of Intellectual Property granted on a non-exclusive basis, or (C) pursuant to existing Contracts;

(v) subject any portion of the Acquired Assets to any Encumbrance, except for Permitted Encumbrances;

**(vi)** (A) increase wages or salary of any employee except in the Ordinary Course consistent with cost of living increases, (B) grant any bonuses to any employee except in the Ordinary Course pursuant to the Seller Plans or other applicable Contracts, or (C) increase other compensation or material benefits of any employee;

**(vii)** hire any new employee;

**(viii)** establish, enter into, terminate, adopt or amend any Seller Plan;

**(ix)** fail to maintain any insurance policy in effect on the date hereof or amend any such policy (other than extensions, replacements or amendments thereof in the Ordinary Course);

**(x)** amend the DIP Loan Agreement in any material respect;

**(xi)** make, change or rescind any Tax election, amend any Tax Return, omit to take any action, enter into any settlement or compromise of any claim, notice, audit report or assessment in respect of any Taxes, adopt or change any method of Tax accounting, enter into any Tax allocation, sharing or closing agreement, surrender any right to claim a Tax refund, consent to any extension or waiver of the statute of limitations applicable to any Tax claim or assessment, or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Purchaser in respect of any Tax period ending after the Closing Date;

**(xii)** make any expenditure except in accordance with the DIP Budget; or

**(xiii)** authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

**(c)** Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Sellers intend to liquidate and sell the Excluded Assets, and that the Sellers shall be permitted to take, or appoint a third party to take, all reasonable actions in connection therewith, including entering into liquidation agreements and other Contracts, selling Excluded Assets at discounted prices, and using Sellers' Intellectual Property to advertise such sales and liquidation.

**(d)** Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that the Sellers may determine their need to take measures or will sustain impacts on their respective business as a result of COVID-19, and nothing herein shall prevent the Sellers from taking all commercially reasonable measures in good faith in order to preserve their respective business, operations, assets, Liabilities, prospects or any portion thereof as a result thereof, nor shall any such impact sustained by the Acquired Business be deemed as a breach of this Agreement.

**(e)** Nothing contained in this Agreement is intended to give the Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Acquired Business prior to the Closing in violation of applicable Laws.

**5.2    Access to Information**.  Until the earlier of the termination of this Agreement pursuant to Article 7 and the Closing, the Sellers (in its sole discretion) will provide the Purchaser and its professional advisors with reasonable access, upon reasonable advance notice and during regular business hours, to the books and records of the Sellers and their respective Affiliates, in order for the Purchaser and its professional advisors to access such information regarding the Sellers and their respective Affiliates as the Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of the Seller, (ii) such access will occur in such a manner as the Sellers reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, and (iii) nothing herein will require the Sellers to provide access to, or to disclose any information to, the Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws; provided that, in the event that the Sellers withhold access or information in reliance on the foregoing clause (A) or (B), the Sellers shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to the Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

**5.3    Employee Matters**.

**(a)**    The Purchaser shall extend to substantially all employees of the Sellers that are engaged in the operation of the Acquired Business (the "***Business Employees***") an offer of employment in a position that is comparable to such Business Employee's position immediately prior to the Closing (including level of responsibility, primary location of employment, and authority) on the terms set forth in this Section 5.3 ("***Transfer Offer***") that, if accepted, shall become effective upon the Closing. Business Employees who accept such Transfer Offers and begin employment with the Purchaser in accordance with this Section 5.3(a) as of the Closing shall be referred to herein as "***Transferred Employees***." Nothing herein shall be construed as a representation or guarantee by the Sellers or any of their respective Affiliates that any or all of the Business Employees will accept the offer of employment from the Purchaser or will continue in employment with the Purchaser following the Closing. The Purchaser shall use reasonable best efforts under applicable Law to effect the transfer of employment to the Purchaser or its Affiliates of each such Transferred Employee who has accepted that offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of the Sellers or any of their respective Affiliates.

**(b)**    On the Closing Date, the Purchaser shall provide each Transferred Employee with a base salary or base wage rate and commission rate that is no lower than that provided to such Transferred Employee as of the date hereof.

**(c)**    The Sellers shall bear all the Liabilities and costs relating to, and shall indemnify and hold harmless the Purchaser and its Affiliates from and against, any claims made by any Business Employees for any severance or other separation payments or benefits arising out of the termination of the employment by any Seller.

**(d)** The provisions of this Section 5.3 are for the sole benefit of the Parties to this Agreement and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Business Employees or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 5.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement.

**5.4    Reasonable Efforts; Cooperation.**

**(a)** Subject to the other terms of this Agreement, each Party shall, and shall cause its professional advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, advisable or permitted under applicable Law to cause the transactions contemplated hereby to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its professional advisors in connection with any step required to be taken as a part of its obligations hereunder.

**(b)** The obligations of the Sellers pursuant to this Agreement, including this Section 5.4, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bid Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

**5.5    Further Assurances**. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

**5.6    Receipt of Misdirected Assets**. From and after the Closing, if the Sellers or any of their respective Affiliates receives any right, property or asset that is an Acquired Asset, the Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to the Purchaser, and such asset will be deemed the property of the Purchaser held in trust by the Sellers for the Purchaser until so transferred. From and after the Closing, if the Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, the Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Sellers, and such right, property or asset will be deemed the property of the Sellers held in trust by the Purchaser for the Sellers until so transferred.

**5.7    Confidentiality**. Following the completion of the Auction, the Sellers agree to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential

information regarding the Acquired Business which is in such Seller's possession or of which such Seller is aware. Each Seller hereby further agrees, unless disclosure is required by applicable Law, to use reasonable best efforts to safeguard such confidential information and to protect it against disclosure, misuse, loss and theft. In furtherance and not in limitation of the foregoing, such Seller shall not, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Acquired Business, provided that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 5.7 or information not otherwise known by such Seller that becomes available to such Seller from a Person other than the Purchaser not subject to an obligation of confidentiality to the Purchaser or the Acquired Business, or (b) any of the discussions or negotiations conducted with the Purchaser in connection with this Agreement, provided that such Seller shall be entitled to disclose (i) any information required to be disclosed by such Seller to the Bankruptcy Court, parties in interest in the Bankruptcy Case, or other Persons bidding on assets of the Seller, (ii) any information required to be disclosed by such Seller pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), legal proceeding or Governmental Body, or (iii) any information to such Seller's professional advisors on a need-to-know basis; provided that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required.

5.8    **Casualty Loss**.  Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, the Sellers shall notify the Purchaser promptly in writing of such fact, and (i) in the case of condemnation or taking, the Sellers shall assign or pay, as the case may be, any proceeds thereof to the Purchaser at the Closing, and (ii) in the case of fire, flood or other casualty, the Seller shall assign the insurance proceeds therefrom to the Purchaser at the Closing.

5.9    **Change of Name**.  Promptly following the Closing, the Sellers shall discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by the Sellers) and shall not subsequently change its name to or otherwise use or employ any name which includes the word "Squirrels" or "Midwest Data Company" without the prior written consent of the Purchaser, and the Sellers shall cause the name of the Sellers in the caption of the Bankruptcy Case to be changed.

5.10    **Notification of Certain Matters**.

(a)    The Sellers shall give to the Purchaser, and the Purchaser shall give to the Sellers, copies of notices or other communications received by the Sellers or the Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement that are not filed with the Bankruptcy Court.

(b)    Each Party shall promptly advise the other in writing of any matter hereafter arising or events or conditions arising prior to Closing, which, if existing or known at the date hereof and not set forth on the Schedules, would have constituted a breach of or

inaccuracy in a representation made by such Party such that the conditions under Article 6, as the case may be, would not be satisfied

**5.11    Insurance Claims**.  In the event that, notwithstanding Section 1.1(l), some or all of the Insurance Claims are not transferred and assigned to Purchaser, Sellers shall take, and shall cause their representatives, affiliates, and agents to take, all actions reasonably requested by Purchaser in connection with the liquidation, realization, investigation, and prosecution of all of such Insurance Claims.   Upon receipt of any proceeds arising from such Insurance Claims, Sellers shall immediately transfer the full amount of such proceeds to the Purchaser.

**ARTICLE 6**
**CONDITIONS TO CLOSING**

**6.1    Conditions Precedent to the Obligations of the Purchaser and the Sellers**. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver) on or prior to the Closing Date, of each of the following conditions:

**(a)**    no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

**(b)**    the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order and such orders shall not have been reversed, modified, amended or stayed.

**6.2    Conditions Precedent to the Obligations of the Purchaser**. The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

**(a)**    the Sellers shall have delivered to the Purchaser a certified copy of the Sale Order;

**(b)**    each of the representations and warranties made by the Sellers in Article 2 (other than Sections 2.1, 2.2, 2.4(a)-(d) and 2.14) shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct has not had, and would not, individually or in the aggregate, reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) the representations and warranties set forth in Sections 2.1, 2.2, 2.4(d)-(d) and (f) and 2.14 shall be true and correct in all respects as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date);

21261619491-hap    Doc 80-1 Filed 2021/27/21 Entered 2021/27/21 16:52:47413 Page 42 of 6182

(c)     the Sellers shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by the Sellers on or prior to the Closing;

(d)     the Sellers shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Section 1.8;

(e)     each Consent set forth on <u>Schedule 6.2(e)</u> shall have been obtained without any change in the terms and conditions of any Permit or Contract to which such Consent relates from those in effect on the date hereof that is materially adverse to the Purchaser or the Acquired Business; and

(f)     since the date of this Agreement, there shall not have been a Material Adverse Effect.

**6.3     Conditions Precedent to the Obligations of the Sellers**.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     each of the representations and warranties made by the Purchaser in Article 3 shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

(b)     the Purchaser shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Purchaser by the Closing; and

(c)     the Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 1.9.

**6.4     Waiver of Conditions**.  None of the Purchaser or the Sellers may rely on the failure of any condition set forth in this Article 6 to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE 7
## TERMINATION

**7.1     Termination of Agreement**.  This Agreement may be terminated only in accordance with this Section 7.1.  This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of the Sellers and the Purchaser;

**(b)**      the issuance by any other Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 7.1(b) if the issuance of such Order was caused by the breach or action or inaction of such Party;

**(c)**      by written notice of the Purchaser or the Sellers to the other Party, if the Closing shall not have occurred on or before February 28, 2022 (the "***Outside Date***"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 7.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

**(d)**      by written notice of the Purchaser or the Sellers to the other Party, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of any Sellers is appointed in the Bankruptcy Case;

**(e)**      by written notice from the Sellers to the Purchaser, upon a breach of any covenant or agreement on the part of the Purchaser, or if any representation or warranty of the Purchaser will have become untrue, in each case, such that the conditions set forth in Section 6.3(a) or 6.3(b) would not be satisfied; provided that (i) if such breach is curable by the Purchaser then the Sellers may not terminate this Agreement under this Section 7.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Sellers notify the Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 7.1(e) will not be available to the Sellers at any time that the Sellers are in material breach of any covenant, representation or warranty hereunder;

**(f)**      by written notice from the Purchaser to the Sellers, upon a breach of any covenant or agreement on the part of the Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 6.2(b) or 6.2(c) would not be satisfied; provided that (i) if such breach is curable by the Seller then the Purchaser may not terminate this Agreement under this Section 7.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Purchaser notifies the Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 7.1(f) will not be available to the Purchaser at any time that the Purchaser is in material breach of any covenant, representation or warranty hereunder;

**(g)**      by written notice from the Purchaser to the Sellers, if (i) the DIP Financing Motion, the Bid Procedures Motion and the Sale Motion shall not have been filed by December 1, 2021, (ii) the Bid Procedures Order shall not have been entered by the Bankruptcy Court by December 15, 2021, (iii) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Bid Procedures Order, (iv) following its entry, the Bid Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect or (v) the Sellers have failed to comply with the Bid Procedures Order;

21-11549-mbmp   Doc 40-1   FILED 12/17/21   ENTERED 12/17/21 16:52:43   Page 45 of 82

**(h)** by written notice from the Purchaser to the Sellers, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by January 25, 2022, (ii) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect or (iii) the Sellers have failed to comply with the Sale Order;

**(i)** by written notice from the Purchaser to the Sellers, if (i) the DIP Interim Order shall not have been entered by the Bankruptcy Court by December 7, 2021, (ii) the DIP Final Order shall not have been entered by the Bankruptcy Court by December 23, 2021, (iii) following its entry, either DIP Interim Order or the DIP Final Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect or (iv) the Sellers are in default under the DIP Loan Agreement;

**(j)** by written notice from the Sellers to the Purchaser, if the Sellers or the board of directors (or similar governing body) of the Seller, based upon the written advice of the Sellers' outside legal counsel, determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Seller's or governing body's fiduciary duties; or

**(k)** by written notice from the Sellers to the Purchaser, if (i) the Sellers enter into one or more Alternative Transactions with one or more Persons other than the Purchaser or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Purchaser, in each case, and such Alternative Transaction is consummated.

**7.2** **Effect of Termination**. In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party, except that the Sellers shall return to the Purchaser the Deposit; provided that this Section 7.2, Section 7.3 and Article 9 shall survive any such termination.

**7.3** **Termination Fee**.

**(a)** In the event that this Agreement is terminated by the Sellers pursuant to Section 7.1(j) or Section 7.1(k), then the Sellers shall pay to the Purchaser an amount in cash equal to **3.0%** of the Purchase Price (the "***Break-Up Fee***"); provided, however, that in the event the Sellers have insufficient funds at the time of the termination of this Agreement pursuant to Section 7.1(j) or Section 7.1(k) to pay both the full amount of the Break-Up Fee and the full amount of the Avent Secured Claim then the Purchaser shall have a secured claim (junior only to the Avnet Secured Claim) with respect to the unpaid portion of the Break-Up Fee. Any payment of the Break-Up Fee pursuant to the first sentence of this Section 7.3(a) in connection with the consummation of an Alternative Transaction or the consummation of any other transaction in which the Avnet Secured Claim has been or will be repaid in full shall be a super-priority administrative expense claim senior to all other administrative expense claims under section 364(c)(1) of the Bankruptcy Code. In the event that this Agreement is terminated pursuant to Section 7.1(k), any payments of the Break-Up Fee shall be payable from, and shall at the time of closing be paid out of, the proceeds of the closing of the applicable Alternative Transaction.

**(b)** Each of the Sellers and the Purchaser acknowledges and agrees that: (i) the agreements contained in this Section 7.3 are an integral part of the transactions contemplated by this Agreement; (ii) the Break-Up Fee is not a penalty, but is liquidated damages, in a reasonable

amount that will compensate the Purchaser in the circumstances in which such amount is payable, for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision; and (iii) without these agreements, neither the Sellers nor the Purchaser would have entered into this Agreement.

(c)     As collateral security for the prompt and complete payment when due (whether at stated maturity, by acceleration or otherwise) of the Break-Up Fee pursuant to the terms of Section 7.3(a) (the "*Secured Obligations*"), the Sellers hereby mortgage, pledge and hypothecate to the Purchaser, and grants to the Purchaser an Encumbrance on and security interest in, all of such Seller's right, title and interest in, to and under all of the assets and properties of such Seller (collectively, "*Collateral*"); provided, however, that the Encumbrance and security interest granted pursuant to this Section 7.3(c) shall in all events be junior to the liens and security interests securing the Avnet Secured Claim.  The security interest granted pursuant to this Section 7.3(c) constitutes a valid and continuing perfected security interest in favor of the Purchaser in all Collateral.  The Sellers hereby authorize the Purchaser to file one or more UCC-1 financing statements in the appropriate filing office to reflect the security interest granted pursuant to this Section 7.3(c).

## ARTICLE 8
## TAXES

**8.1     Transfer Taxes**. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other Taxes and recording charges payable by reason of the sale of the Acquired Assets and the Acquired Business or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "*Transfer Taxes*") shall be borne 50% by the Sellers and 50% by the Purchaser, and the Purchaser shall timely file all Tax Returns related to any Transfer Taxes.  The Sellers and the Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.

**8.2     Allocation of Purchase Price**.  For U.S. federal and applicable state and local income Tax purposes, the Purchaser, the Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other items treated as part of the purchase price for applicable income Tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "*Allocation Methodology*").  As soon as commercially practicable, the Purchaser shall provide a proposed allocation to the Sellers setting forth the allocation of the Purchase Price (and other amounts treated as Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "*Allocation*").  If the Sellers deliver a written objection within thirty (30) days after receipt of the draft Allocation proposed by the Purchaser, then the Purchaser and the Sellers shall negotiate in good faith to resolve any such objection. Any resolution by the Sellers and the Purchaser shall be conclusive and binding on the Parties once set forth in writing (any such conclusive and binding Allocation, the "*Final Purchase Price Allocation*").  If the Sellers and the Purchaser cannot resolve such dispute within thirty (30) days of the Purchaser's receipt of the Sellers' objection, the Final Purchase Price Allocation shall be

determined pursuant to Section 9.13. The Parties and their respective Affiliates shall file all Tax Returns in accordance with the Allocation Methodology and the Final Purchase Price Allocation (if any). None of the Parties shall take any Tax related action inconsistent with the Final Purchase Price Allocation (if any) unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

**8.3     Cooperation**.  The Purchaser and the Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

**8.4     Preparation of Tax Returns and Payment of Taxes.**

**(a)**     Except as otherwise provided by Section 8.1, the Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date other than with respect to any Assumed Tax and (ii) all income Tax Returns of the Sellers for all Tax Periods.  Except to the extent any Tax reflected on a return required to be prepared and filed by the Sellers pursuant to this Section 8.4 is constitutes an Assumed Liability, the Sellers shall be responsible for paying any Taxes due with respect to Tax Returns that the Sellers are obligated to prepare and file under this Section 8.4(a).

**(b)**     The Purchaser shall prepare and timely file all other Tax Returns with respect to the Acquired Assets that are not addressed by Section 8.4(a).  With respect to any Straddle Period, the Purchaser shall prepare such Tax Returns consistent with past practice of the Sellers, and shall provide the Sellers with a draft of such Tax Returns at least thirty (30) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by the Sellers with respect to such Tax Returns; provided that such changes are consistent with past practice of the Sellers and applicable Law.  The Purchaser shall be responsible for paying any Assumed Tax reflected on any Tax Return that the Purchaser is obligated to prepare and file under this Section 8.4(b).

# ARTICLE 9
# MISCELLANEOUS

**9.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and nothing in this Section 9.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement.  The Purchaser and the Sellers acknowledge and agree, on their own behalf and on behalf of their respective Affiliates, as the case may be, that the agreements contained in this Section 9.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing, and (b) are an integral part of the

transactions contemplated hereby and that, without the agreements set forth in this Section 9.1, none of the Parties would enter into this Agreement.

9.2    **Indemnity; Expenses**. Whether or not the Closing takes place, the Sellers shall indemnify, and hold harmless, the Purchaser and its Affiliates and their respective representatives and agents from all Liability (including reasonable expenses of counsel) arising from any Action instituted in the Bankruptcy Case in connection with the transactions contemplated hereby. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 7.3), all fees, costs and expenses (including fees, costs and expenses of professional advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to Section 8.1 and (b) all Cure Costs will be allocated pursuant to Section 1.3(b) and Section 4.2.

9.3    **Notices**. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), one Business Day after delivery to such courier; (c) if otherwise actually personally delivered, when delivered; (d) if delivered by electronic mail before 5:00 p.m. (local time at the location of recipient) on a Business Day, when transmitted and receipt is confirmed; and (e) if delivered by electronic mail after 5:00 p.m. (local time at the location of recipient), when transmitted and receipt is confirmed, at 9:00 a.m. (local time at the location of recipient) on the following Business Day, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

Notices to Purchaser:

Instantiation LLC
434 Dorado Beach E
Dorado, Puerto Rico 00646
Attention:     Sam Cassatt
Email:         sam@aligned.capital

with a copy to (which shall not constitute notice for purposes of this Section 9.3):

Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center
17th Floor
San Francisco, California 94111
Attention:     Jason R. Schendel and Jeannie Kim
Email:         jschendel@sheppardmullin.com
               jekim@sheppardmullin.com

21261-49491map  Doc 40-1 FILED 12/17/21 ENTERED 12/17/21 16:52:43 Page 49 of 82

Notices to Sellers:

Squirrels Research Labs, LLC
121 Wilbur Drive NE
North Canton, OH 44720
Attention:     David Stanfill, President
Email:          david@squirrelsresearch.com

and

The Midwest Data Company LLC
121 Wilbur Drive NE
North Canton, OH 44720
Attention:     David Stanfill, President
Email:          david@squirrelsresearch.com

with a copy to (which shall not constitute notice for purposes of this Section 9.3):

Brouse McDowell, a Legal Professional Association
388 S. Main Street, Suite 500
Akron, OH  44311
Attention:     Marc B. Merklin
Email:          MMerklin@brouse.com

**9.4     Remedies**.

(a)     **Default by Purchaser**. The parties agree that the Purchase Price has been determined not only by a consideration of the value of the property per se but also by a consideration of the value of the various covenants, conditions and warranties of this Agreement as they relate to the property. The consideration of such values, sometimes measurable in relation to known external standards and sometimes determined only by subjective business judgments of the parties, are all interrelated and affected by the Parties' ultimate agreement upon the Purchase Price. The Parties have discussed and negotiated in good faith upon the question of the damages that would be suffered by Sellers in the event this Agreement terminates prior to the close of escrow due to a buyer material default.  It shall be a material default by Purchaser under this Agreement (a "***Purchaser's Default***") if any of the Purchaser's representations and warranties are materially untrue or the Purchaser shall fail to perform or comply with any of its covenants, acts and agreements contained in this agreement in any material respect when required to be performed hereunder and such failure shall continue for five (5) Business Days after Sellers give Purchaser written notice of such failure, except that if such failure relates to any material covenant or agreement to be performed at the Closing, there shall be no notice required or grace or cure period allowed. If a Purchaser's Default occurs and provided no material default by a Seller has occurred that has not been cured, then such Seller shall have the right to terminate this Agreement immediately by giving written notice to the Purchaser, in which event, the Parties have endeavored to reasonably estimate such damages and they hereby agree that, by reason of the aforesaid considerations, (i) such damages are and will be impracticable or extremely difficult to fix, (ii) liquidated damages in the amount of any Deposits actually delivered by the

Purchaser are and will be reasonable, (iii) in the event of such default, Sellers shall receive such Deposits as liquidated damages, and (iv) in consideration of the payment of such liquidated damages, Sellers shall be deemed to have waived all other claims for damages.

(b) **Default by Seller**. If this transaction fails to close as a result of a Seller's material default, which such Seller fails to cure within five (5) Business Days after receipt of written notice describing in reasonable detail the nature of such material default, then the Purchaser's sole and exclusive remedy shall be to (i) terminate this Agreement by giving Sellers written notice of the Purchaser's election to immediately terminate this Agreement and receive an administrative claim in the Bankruptcy Case pursuant to section 503(b) of the Bankruptcy Code in the amount of the Breakup Fee or (ii) assert and seek judgment against Seller for specific performance, and if such judgment is not obtained, then exercise such remedy under Section 9.4(b)(i) hereof.

**9.5 Binding Effect; Assignment**. This Agreement shall be binding upon the Purchaser and, subject to the terms of the Bid Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, the Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of the Purchaser and the Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void; provided, however, upon prior written notice to the Sellers, the Purchaser shall have the right to assign its rights and/or delegate its obligations hereunder (a) to any Affiliates and (b) after Closing, to any subsequent purchaser of all or any portion of the equity interests or assets of the Purchaser or the Acquired Business.

**9.6 Amendment and Waiver**. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by the Purchaser and the Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**9.7 Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**9.8 Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

**9.9 Construction**. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this

Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

**9.10    Schedules**. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules to the extent reasonably apparent. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, any updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

**9.11    Complete Agreement**. This Agreement, together with the Schedules and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the other transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the other transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

**9.12    Specific Performance**. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event

that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 9.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor the Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 9.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to the Sellers pursuant to this Section 9.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Sellers from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any Action, in each case in accordance with this Section 9.12, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such Action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such Action, as the case may be. In no event will this Section 9.12 be used, alone or together with any other provision of this Agreement, to require any Sellers to remedy any breach of any representation or warranty of any Sellers made herein.

**9.13    Jurisdiction and Exclusive Venue**. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Court of Chancery (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court located within Wilmington, Delaware) (the courts described in clauses (a) and (b), the "***Chosen Courts***"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non-conveniens. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 9.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

### 9.14 Governing Law; Waiver of Jury Trial.

(a) Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND EACH PARTY THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. THE PROVISIONS OF THIS SECTION 9.13 SHALL BE ENFORCEABLE BY EACH DEBT FINANCING SOURCE, ITS AFFILIATES AND THEIR RESPECTIVE SUCCESSORS AND PERMITTED ASSIGNS.

### 9.15 Counterparts.

This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Delivery of an executed counterpart of the signature page to this Agreement or any agreement or instrument contemplated hereby by email, facsimile, portable document format (pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (including DocuSign) shall be as effective as delivery of a manually executed counterpart of this Agreement. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will

raise the use of a DocuSign, .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of DocuSign, .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

**9.16   Publicity**. Neither the Sellers nor the Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the reasonable judgment of the Purchaser or the Sellers, as the case may be, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that the Party intending to make such release shall use its reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

**9.17   Bulk Sales Laws**. The Parties intend that, pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets contemplated hereby shall be free and clear of any Encumbrances (other than Permitted Encumbrances) including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

**9.18   No Solicitation**.  This Agreement and the transactions contemplated herein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act of 1933 ("***Securities Act***") or the Securities Exchange Act of 1934 (the "***Exchange Act***") and the Seller will not solicit acceptances of any plan of reorganization from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

**9.19   Release.**

(a)      Effective upon the Closing, the Sellers on behalf of themselves and their respective Affiliates and each of their respective directors, officers, control persons (as defined in Section 15 of the Securities Act or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, professional advisors, legal representatives, shareholders, partners, estates, successors and assigns solely in their capacity as such, and any of their respective agents, attorneys, financial advisors, professional advisors, legal advisors, Affiliates, directors, managers, officers, control persons, shareholders, members or employees, in each case, solely in their capacity as such (each a "***Related Party***", and collectively, the "***Related Parties***") acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against the Purchaser or any of its Related Parties that

directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder (any and all such direct or derivative claims, collectively, the "***Seller Released Claims***"); and, should any Seller Released Claims nonetheless exist, the Seller on behalf of itself and its Related Parties hereby (i) releases and discharges the Purchaser and its Related Parties from any liability whatsoever on such Seller Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder, and (ii) releases, remises, waives and discharges all such Seller Released Claims against the Purchaser and its Related Parties; provided that nothing herein shall release the Purchaser of its obligations under this Agreement and the other documents and agreements contemplated herein.

(b)     Effective upon the Closing, the Purchaser on behalf of itself and its Affiliates acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against the Sellers or any of its Related Parties that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder (any and all such direct or derivative claims, collectively, the "***Purchaser Released Claims***"); and, should any Purchaser Released Claims nonetheless exist, the Purchaser on behalf of itself and its Affiliates hereby (i) releases and discharges the Sellers and each of its Related Parties from any liability whatsoever on Purchaser Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder, and (ii) releases, remises, waives and discharges all such Purchaser Released Claims against the Sellers and each of their Related Parties; provided that nothing herein shall release the Sellers of its obligations (A) under this Agreement and the other documents and agreements contemplated herein or (B) for indemnification of any individuals serving as a director or manager of any Sellers or under any directors and officers insurance policy.

(c)     Without limiting in any way the scope of the release contained in this Section 9.19 and effective upon the Closing, each Party, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown claims. Each Party hereby affirms its intent to waive and relinquish such unknown claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto.

**9.20    Amendment and Restatement**.  This Agreement amends certain provisions of the Original APA in their entirety so as to reflect and give effect to such amendments.  All amendments to the Original APA effected by this Agreement shall have effect from the date of this Agreement, and all other covenants, agreements, terms and provisions of this Agreement, shall have effect from the date of the Original APA.

**ARTICLE 10**
**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

**10.1    Certain Definitions.**

"***Action***" means any Order, action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"***Affiliate***" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"***Alternative Transaction***" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of the Sellers or any portion of its equity interests or any material portion of its assets (in any form of transaction, whether by merger, sale of assets or equity or otherwise) with any party other than the Purchaser or its Affiliates; provided, however, that the foregoing shall not include (a) sales of goods and services in the Ordinary Course and (b) any sale of the Excluded Assets pursuant to *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the Bankruptcy Rules.

"***Anti-Bribery and Anti-Corruption Law***" means, collectively: (a) the U.S. Foreign Corrupt Practices Act ("***FCPA***"); (b) the UK Bribery Act 2010; and (c) any other anti-bribery or anticorruption laws, statutes, and regulations applicable to the Acquired Business.

"***Assumed Taxes***" means any Liability for Taxes arising from the ownership or operation of the Acquired Business or the Acquired Assets for any taxable period (including any portion thereof) beginning after the Closing Date (including the portion of any Straddle Period after the Closing Date).  In the case of any Straddle Period, (a) property taxes for the period following the Closing Date shall be equal to the amount of such property taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that is for the period following the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (b) Taxes (other than property taxes) for the period

following the Closing Date shall be computed as if such taxable period began on the day following the Closing Date.

"***Auction***" has the meaning ascribed to such term in the Bid Procedures Order and Section 4.1(d).

"***Avnet Secured Claim***" means the claim of Avnet, Inc. against SQRL in the Bankruptcy Case, which claim shall be treated as an allowed claim that is fully secured under 11 U.S.C. §506(a) in the amount of three million dollars ($3,000,000).

"***Bid Procedures***" means the bidding and sale procedures approved by the Bankruptcy Court, including the Competing Bid Requirements set forth in Section 4.1(d).

"***Bid Procedures Order***" means a final order of the Bankruptcy Court, in form and substance reasonably acceptable to the Purchaser and Sellers, meeting the requirements of Section 4.1, and which, among other things establishes a date by which Qualified Competing Bids must be submitted.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which commercial banks in Canton, Ohio are generally authorized or required by Law to be closed.

"***Business Intellectual Property***" means Intellectual Property used or held out for use in the Acquired Business.

"***Cash and Cash Equivalents***" means all of the Sellers' cash (including petty cash and checks received on or prior to the Closing), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"***Code***" means the United States Internal Revenue Code of 1986.

"***Consent***" means any approval, consent, ratification, permission, waiver or other authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"***Contract***" means any written contract, purchase order, station agreement, tower lease, service order, sales order, indenture, note, bond, Lease, sublease, mortgage, agreement, guarantee, purchase order, license, collective bargaining agreement, or other agreement that is binding upon a Person or its property.

"***COVID-19***" means SARS-CoV-2 or COVID-19, any evolutions thereof or related or associated epidemics, pandemics or disease outbreaks and any future epidemics, pandemics or disease outbreaks.

"***DIP Budget***" means the pro forma budget delivered to the Purchaser specifying the Sellers' operating budget, in form and substance reasonably satisfactory to the Purchaser, with

any modifications thereto made (a) in accordance with the DIP Loan Agreement or (b) with the written approval of the Purchaser, not to be unreasonably withheld, conditioned or delayed.

"***DIP Financing Motion***" means the motion filed by MWDC seeking the Bankruptcy Court's approval of the DIP Loan and the DIP Loan Agreement pursuant to Sections 105, 362, 363, and 364 of the Bankrtupcy Code, in form and substance reasonably satisfactory to the Purchaser.

"***DIP Final Order***" means a final order entered by the Bankruptcy Court which, among other things, approves the DIP Loan and the DIP Loan Agreement on a final basis, in form and substance reasonably satisfactory to the Purchaser.

"***DIP Interim Order***" means an interim order entered by the Bankruptcy Court which, among other things, approves the DIP Loan Agreement on an interim basis, in form and substance reasonably satisfactory to the Purchaser.

"***DIP Loan Agreement***" means that certain Loan and Security Agreement, dated on or about the date hereof, by and between the Purchaser, as lender, and MWDC, as borrower.

"***DIP Loan***" means debtor-in-possession financing facility made available by the Purchaser to MWDC pursuant to the DIP Loan Agreement.

"***Documents***" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, listener registries, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"***Encumbrance***" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, encroachments, Orders and conditional sale or other title retention agreements and other rights of first refusal or first offer, activity and use limitations, title defects, and any other restrictions of any kind.

"***Environmental Laws***" all applicable Laws including any common law cause of action concerning (a) pollution or protection of the environment, or worker health and safety (solely to the extent relating to exposure to Hazardous Substances) or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, release or threatened release of Hazardous Substances.

"***Equipment***" means any and all machinery, equipment, auxiliary and translator facilities, transmitting towers, transmitters, broadcast equipment, antennae, cables, supplies, vehicles,

furniture, fixtures, appliances, servers, traffic systems, graphic systems, audio boards, switchers, radar systems, microwaves, transponders, relays, backup generators, computers, computer hardware and peripherals, information technology infrastructure, telephone systems, office equipment, cameras, production equipment, inventory, leasehold improvements, spare parts and other tangible personal property of every kind and description, together with all rights against the manufacturers and/or suppliers of any of the foregoing.

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***GAAP***" means United States generally accepted accounting principles as in effect from time to time applied consistently throughout the periods involved.

"***Governmental Authorization***" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"***Governmental Body***" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"***Hazardous Substance***" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

"***Intellectual Property***" means all intellectual property rights anywhere in the world arising under or associated with: (a) patents and patent applications; (b) trademarks, service marks, trade dress, trade names, logos, slogans, domain names, and other designations of origin, and all registrations and applications for registration therefor, together with all goodwill associated therewith; (c) copyrights (and any other equivalent rights in works of authorship (including rights in Software as a work of authorship and rights in programs and programming materials)); (d) trade secrets and industrial secrets, and rights in know-how and other confidential or proprietary business or technical information in each case that derive independent economic value from not being generally known ("***Trade Secrets***"); (e) rights in domain names, uniform resource locators, Social Media Accounts, social media identifiers and other names and locators associated with Internet addresses and sites; (f) engineering data, advertising studies, databases, marketing and demographic data, advertiser, exhibitor and vendor lists, credit and sales reports; and (g) other similar or equivalent intellectual property rights anywhere in the world.

"***Knowledge of the Seller***", "***Seller's Knowledge***", "***Seller has Knowledge***" and words of similar import mean the actual knowledge of David Stanfill after due inquiry.

"***Law***" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

212 6 1 49 9 40 h t p o  Doc 80-1 F I EEL D 21 21 7 21 E N EN E R E D 21 21 7 21 16 15 24 7 13 Pa ce 9 60 of 182

"**Liability**" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"**Material Adverse Effect**" means any event, change, occurrence, or effect (each, an "**Effect**") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on (x) the Acquired Business or (y) the Acquired Assets and Assumed Liabilities, taken as whole; provided, however, that none of the following, and no Effect arising out of, or resulting from, the following, shall constitute, or be taken into account, individually or in the aggregate, in determining whether or not there has been, a Material Adverse Effect: (a) Effects in, arising from or relating to general business or economic conditions affecting the industry in which the Sellers operate, (b) Effects in, arising from or relating to national or international political or social conditions, including rioting, domestic disturbance or the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (c) Effects in, arising from or relating to financial, banking, or securities markets (including (i) any disruption of any of the foregoing markets, (ii) any change in currency exchange rates, (iii) any decline or rise in the price of any security, commodity, Contract or index and (iv) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement), (d) Effects in, arising from or relating to changes in GAAP, (e) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body, (f) Effects in, arising from or relating to (i) the taking of any action at the request of the Purchaser or its Affiliates, (ii) the failure to take any action if such action is prohibited by this Agreement, (iii) the Purchaser's failure to consent to any of the actions restricted in Section 5.1 or (iv) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of the Purchaser, including the impact thereof on the relationships, contractual or otherwise, of the business of the Sellers with employees, customers, lessors, suppliers, vendors or other commercial partners, (g) Effects that arise from any seasonal fluctuations in the Sellers' business and operations, (h) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with the Purchaser or its Affiliates or professional advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (i) the effect of any action taken by the Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or any breach by the Purchaser of this Agreement, (j) the matters set forth on the Schedules and any changes or developments in, or effects or results arising from or relating to, matters expressly set forth on the Schedules, (k) (i) the commencement or pendency of the Bankruptcy Case; (ii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions

contemplated hereby or thereby, (B) the reorganization of the Sellers, or (C) the assumption or rejection of any Assigned Contract; and (iii) any Order of the Bankruptcy Court or any actions or omissions of the Sellers in compliance therewith, or (m) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including COVID-19), including any Law, directive, pronouncement or guideline issued by a Governmental Body, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place", curfews or other restrictions that relate to, or arise out of, a national health concern, epidemic or pandemic (including COVID-19) or any change in such Law, directive pronouncement or guideline thereof following the date of this Agreement or any material worsening of such conditions threatened or existing as of the date of this Agreement or any quarantine, stay-at-home orders, shelter-in-place orders, or trade restrictions related thereto or any other force majeure; provided, further, however, that any Effect referred to in clauses (a), (b) or (c) may be taken into account in determining whether or not there has been or may be a Material Adverse Effect to the extent such Effects have a materially disproportionate adverse effect on the Acquired Business, taken as a whole, as compared to other participants engaged in the industries and geographies in which the Sellers operate the Acquired Business.

"*Order*" means any injunction, order, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"*Ordinary Course*" means the ordinary and usual course of operations of the Acquired Business consistent with past practice, taking into account the commencement and pendency of the Bankruptcy Case and recent past practice in light of COVID-19; provided, that, any action taken, or omitted to be taken, in good faith on a commercially reasonable basis that relates to, or arises out of, COVID-19 shall be deemed to be in the Ordinary Course.

"*Permitted Encumbrances*" means (a) utilities and current Taxes not yet due and payable, or the amount or validity of which are being contested in good faith by appropriate proceedings, or the nonpayment of which is permitted or required by the Bankruptcy Code, (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments of public record against any of the Acquired Assets, (c) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable or the amount or validity of which are being contested in good faith by appropriate proceedings, (d) such other Encumbrances or title exceptions as the Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (e) any Encumbrances that will be removed or released by operation of the Sale Order, (f) Encumbrances included in the Assumed Liabilities, and (g) liens that will be released at Closing.

"*Person*" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

21-10949-mg   Doc 40-1   Filed 07/21/21   Entered 07/21/21 16:52:43   Page 162 of 182

"**Protected Information**" means "personally identifiable information" within the meaning of section 363(b) of the Bankruptcy Code included as part of the Acquired Assets.

"**Sale Motion**" means the motion of the Sellers seeking approval and entry of the Bid Procedures Order and the Sale Order in form and substance approved by the Purchaser.

"**Sale Order**" means the order of the Bankruptcy Court to be entered by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance approved by the Purchaser, which order, amongst other approvals, (a) approves the sale of the Acquired Assets to the Purchaser free and clear of all Encumbrances and Liabilities pursuant to Section 363(f) of the Bankruptcy Code other than the Assumed Liabilities as set forth herein, and (b) approves the direct payment by Purchaser to Avnet, Inc. of $3,000,000 of the Purchase Price in full satisfaction of the Avnet Secured Claim.

"**Seller Plan**" means (a) "employee benefit plan" within the meaning of Section 3(3) of ERISA, (b) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (c) employment, severance, retention or other similar agreement, and (d) bonus, incentive, deferred compensation, profit-sharing, post- termination health or welfare, vacation, severance or termination pay or other material compensation or benefit plan, program, policy, agreement or other arrangement, in all cases, other than any plan or arrangement sponsored or maintained by a Governmental Body.

"**Social Media Account**" means an account registration with a social media platform, such as Facebook, Instagram, Twitter, Pinterest, Google, TikTok and the like, and includes handle names.

"**Straddle Period**" means any Tax period beginning on or before, and ending after, the Closing.

"**Tax**" or "**Taxes**" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

"**Tax Return**" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

**10.2    Rules of Interpretation**. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules, the exhibits and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder:

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

**(b)**     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified.    All exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

**(c)**     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

**(d)**     The words "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

**(e)**     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

**(f)**     Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

**(g)**     The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

**(h)**     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

**(i)**     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

**(j)**     Any document or item will be deemed "delivered," "provided" or "made available" by the Sellers, within the meaning of this Agreement if such document or item is (i) actually delivered or provided to the Purchaser or any of the Purchaser's professional advisors or (ii) made available upon request, including at the Sellers' offices.

**(k)**     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

**(l)**     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-

compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(n)     The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(o)     This Agreement is in the English language, and while this Agreement may be translated into other languages, the English language version shall control. All notices, demands, requests and other documents or communications under or in connection with this Agreement will be in English or will be accompanied by a certified English translation (in which case the English version will prevail in the event of a conflict except to the extent the communication contains or consists of an official document issued by a Governmental Body in a language other than English).

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement to be signed effective as of the date first above written by their duly authorized agents.

**SELLERS:**                                    **BUYER:**

SQUIRRELS RESEARCH LABS LLC          INSTANTIATION LLC

By: _____     By: _____
Name: David Stanfill                          Name: Sam Cassatt
Title:   Authorized Signatory                 Title: Managing Member


THE MIDWEST DATA COMPANY LLC

By: _____
Name: David Stanfill
Title:   Authorized Signatory

*Signature page to Amended and Restated Asset Purchase Agreement*

SMRH:4834-5381-6317.3

**Schedule 1.1(a)**

**Bank Accounts**

JPMorgan Chase Bank Acct *******6063 (SQRL)
JPMorgan Chase Bank Acct *******3991 (SQRL)
JPMorgan Chase Bank Acct *******1770 (SQRL)
Premier Bank Acct ******96 (SQRL)
Crypto Mining accounts (2) (SQRL)
JPMorgan Chase Bank Acct *****7939 (MWDC)
JPMorgan Chase Bank Acct *****7962 (MWDC)

SMRH:4834-5381-6317.3

**Schedule 1.1(c)**
**Leasehold, Subleasehold, or License Interests**

Lease Agreement for 8050 Freedom Avenue with One Haines Company, 120-month term. Signed May 5, 2020.

Lease Agreement for 7579 Freedom ("Skymax" building) with One Skymax Company, 120-month term. Signed March 16, 2020.

Lease Agreement for Fishers Foods building with GS8100. 120-month term. Signed 9-8-2020.

SMRH:4834-5381-6317.3

**Schedule 1.1(e)**

**Assigned Contracts**

Hosted customer contracts including the following customers:

| |
|---|
| Jose A Rubio |
| Robert Renna |
| Jonathan Hulecki |
| Robert Oxsen |
| Marco Mendoza |
| Spencer Gabriel Singh |
| Jose A Rubio |
| Jose Nunez |
| Fabian Delmotte |
| Richard Ramazinski |
| Richard Hall |
| Jason Palmer |
| Todd Dallimore |
| Barry Gluntz |
| Yannick Vergult |
| Matthew Peterson |
| Matthew Peterson |
| Michael Erceg |
| Arran Gracie |
| Aditya Chauhan |
| Andrew Wolf |
| James Soldi |
| Aaron Strating |
| Henrik Gustafsson |
| Lance Colton |
| Artem Pylypchuk |
| Instantiation LLC |

SMRH:4834-5381-6317.3

**Schedule 1.1(l)**

**Insurance Claims**

Cincinnati Insurance Company- Date of Loss: July 15, 2021. Fire damage to building and contents at 8050 Freedom Avenue building. Unknown value of loss.

SMRH:4834-5381-6317.3

**Schedule 1.2(g)**

**Excluded Causes of Action**

SQRL v. Fleur de Lis, Case No. 2021 CV 00251, Stark County, Ohio Court of Common Pleas

Potential claims against Roehl Trading for undelivered equipment and against Alpine Mining for undelivered equipment.

Potential Claims against Michael Maranda and/or Michael Maranda LLC.

Avoidance Actions, including those causes of action brought pursuant to Chapter 5 of the Bankruptcy Code

**Schedule 2.5(a)**

**<u>Contracts</u>**

No additional known at this time.

SMRH:4834-5381-6317.3

**Schedule 2.6**

**<u>Litigation</u>**

TorEA Consulting Ltd. vs. Squirrels Research Laboratories LLC, 2021CV1091, Stark County Common Pleas Court <u>115 Central Plaza North Canton, OH 44702</u>

Everhart Glass Co., Inc. v. Kylin Construction, LLC and Squirrels Research Labs, LLC 2021-CV-01487 , Stark County Common Pleas Court <u>115 Central Plaza North Canton, OH 44702</u>

Threats of litigation have also been brought forth by counsel for Mr. Michael Maranda/Michael Maranda LLC and counsel for Mr. Karl Forsell.

SMRH:4834-5381-6317.3

**Schedule 2.9(a)**

**<u>Intellectual Property</u>**

SQRL intellectual property includes the following:
-Unregistered copyrights
-Detailed customer lists
-www.squirrelsresearch.com

SMRH:4834-5381-6317.3

**Schedule 6.2(e)**

**Third Party Consents**

None known at this time.

SMRH:4834-5381-6317.3

**EXHIBIT 2**
(Auction and Sale Notice)

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Squirrels Research Labs LLC[1] | ) | Case No. 21-61491 |
| | ) | *(Request for Joint Administration Pending)* |
| Debtors. | ) | |
| | ) | Judge Russ Kendig |

**NOTICE OF FILING OF MOTION AND AN ORDER RELATED TO THE AUCTION AND SALE OF CERTAIN ASSETS OWNED BY SQUIRRELS RESEARCH LABS LLC AND THE MIDWEST DATA COMPANY LLC**

      **PLEASE TAKE NOTICE** that on November 23, 2021, the above-captioned Debtors filed the Motion for an Order: (A)(I) Establishing and Approving Bid Procedures Related to the Sale of the Debtor's Properties Pursuant to 11 U.S.C. §§ 105(A), Including Designation of Stalking Horse Bidder and Related Bid Protections; (II) Approving Contract/Lease Assumption and Assignment Procedures and the Form and Notice Thereof; (III) Scheduling the Auction; (IV) Scheduling a Hearing and Objection Deadline with Respect to the Sale; (V) Approving the Form and Notice Thereof; and (VI) Granting Related Relief; and (B)(I) Authorizing Sale of Debtor's Properties Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. §§ 105 and 363; and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief [Docket # 6]

      **PLEASE TAKE FURTHER NOTICE** that on [December 1, 2021], the Court entered an order with respect to the Motion [Docket # _____] (the "Bidding Procedures Order") approving the procedures contemplated therein (the "Bidding Procedures") for the sale of the Assets (as defined in the Motion) [Docket # _____]. A copy of the Bidding Procedures is annexed to the attached Bidding Procedures Order as Exhibit 1. Pursuant to the Bidding Procedures Order, a final hearing to approve the Auction and Sale is scheduled to take place on January 11, 2022 at 2 p.m. (the "Sale Hearing").

      **PLEASE TAKE FURTHER NOTICE** that, to ensure that the Auction and Sales process maximizes value, the following timeline and deadlines have been established by the Debtor and approved by the Court, pursuant to the Bidding Procedures Order:

| Key Dates | |
|---|---|
| **Date/Time** | **Event** |
| December 17, 2021 | Deadline by which Debtor must file the Cure Notice with the Court and serve the Cure Notice on the Contract Counterparties |
| December 31, 2021 | Deadline by which Bids (as well as Deposits and all other documentation required under the Bidding Procedures) must be submitted in accordance with the Bidding Procedures |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Squirrels Research Labs LLC (9310), case no. 21-61491 and The Midwest Data Company LLC (1213), case no. 21-61492.

| | |
|---|---|
| December 31, 2021 | Deadline by which to file Assigned Contract Objections |
| January 3, 2022 | Date on which Auction (if any) shall be held electronically via video/telephone, or at such later date, time, or other place, as selected by Debtor, in consultation with Avnet and the Stalking Horse Bidder, or approved by order of the Court. |
| January 10, 2022 | Deadline by which objections to the Sale Transaction must be filed |
| January 11, 2022 | Date on which the Sale Hearing shall occur, subject to the Court's availability |

Dated: December __, 2021

/s/ _____
Marc B. Merklin (0018195)
Julie K. Zurn (0066391)
Brouse McDowell, LPA
388 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
jzurn@ brouse.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

**EXHIBIT 3**
(Cure Notice)

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Squirrels Research Labs LLC[1] | ) | Case No. 21-61491 |
| | ) | *(Request for Joint Administration Pending)* |
| Debtors. | ) | |
| | ) | Judge Russ Kendig |

## NOTICE OF (I) POTENTIAL ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND (II) CURE AMOUNTS AND ADEQUATE ASSURANCE IN CONNECTION THEREWITH

*YOU ARE RECEIVING THIS NOTICE OF ((I) POTENTIAL ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND (II) CURE AMOUNTS AND ADEQUATE ASSURANCE IN CONNECTION THEREWITH BECAUSE YOU MAY BE A COUNTERPARTY TO A CONTRACT OR LEASE WITH THE ABOVE-CAPTIONED DEBTORS. PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE POTENTIAL TRANSACTION DESCRIBED HEREIN*

**PLEASE TAKE NOTICE** that on November 23, 2021, the above-captioned Debtors filed the Motion for an Order: (A)(I) Establishing and Approving Bid Procedures Related to the Sale of the Debtors' Properties Pursuant to 11 U.S.C. §§ 105(A), including Designation of Stalking Horse Bidder and Related Bid Protections; (II) Approving Contract/Lease Assumption and Assignment Procedures and the Form and Notice Thereof; (III) Scheduling the Auction; (IV) Scheduling a hearing and Objection deadline with respect to the Sale; (V) Approving the Form and Notice Thereof; and (VI) Granting Related Relief; and (B)(I) Authorizing Sale of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. §§ 105 and 363; and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief [Docket #6]

**PLEASE TAKE FURTHER NOTICE** that on _____, 2021, the Court entered an order with respect to the Motion [Docket # _____] (the "Bidding Procedures Order") approving the procedures contemplated therein (the "Bidding Procedures") for the sale of the Assets (as defined in the Motion) [Docket # _____], a copy of which is attached to this Notice as Exhibit A (the "Bidding Procedures Order"). A copy of the Bidding Procedures is annexed to the attached Bidding Procedures Order as Exhibit 1. Pursuant to the Bidding Procedures Order, an Auction will be held on January 3, 2022 and a final hearing to approve the Auction and Sale is scheduled to take place on January 11, 2022 at 2:00 p.m. (the "Sale Hearing").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Squirrels Research Labs LLC (9310), case no. 21-61491 and The Midwest Data Company LLC (1213), case no. 21-61492.

**PLEASE TAKE FURTHER NOTICE** that to attend the Sale Hearing, you must follow the Court's procedures for appearances which can be found here: _____or by emailing a request for a copy of such procedures to tpalcic@brouse.com.

**PLEASE TAKE FURTHER NOTICE** that the Bidding Procedures Order, among other things, established procedures for: (1) the assumption and assignment of certain executory contracts and unexpired leases that the Debtors believe they might seek to assume and assign in connection with a Sale Transaction (collectively, the "Assigned Contracts"), as detailed in the attached Exhibit B (the "Assigned Contracts Schedule"); (ii) the determination of related amounts necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "Cure Costs"); and (iii) the determination of any related adequate assurance of future performance (the "Adequate Assurance") that may be required.

**PLEASE TAKE FURTHER NOTICE** that, the Debtors hereby provide notice (the "Cure Notice") that they may assume and assign the schedule of Assigned Contracts listed on Exhibit B, attached hereto, to a purchaser of Debtors' Assets (as defined in the Motion). The Cure Notice sets forth any Cure Costs and proposed Adequate Assurance with respect to each Assigned Contract.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed Cure Costs or Adequate Assurance must (i) be in writing; (ii) comply with applicable Bankruptcy Rules, Local Rules, and any order governing the administration of this Chapter 11 case; (iii) state with particularity the nature of the objection and, state the cure amount alleged to be owed to the objecting Contract Counterparty and/or the adequate assurance amount believed to be required, together with any applicable and appropriate documentation in support thereof, and be filed with the Court no later than one business day prior to the Auction.

**PLEASE TAKE FURTHER NOTICE** that, if an Assigned Contract Objection is not satisfactorily resolved, the Successful Bidder may determine that the Assigned Contract should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Costs or Adequate Protection with respect to such contract.

**PLEASE TAKE FURTHER NOTICE** that, if you do not timely file and serve an objection as stated above, the Court may grant the relief requested in the Motion with no further notice or hearing and any party to an assigned contract that is so assumed will be deemed to have consented to the assumption and assignment of the assigned contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such assigned contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such assigned contract against the Debtors or the Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding the foregoing, the inclusion of assigned contracts on Exhibit B to this Notice, does not: (a) obligate the Debtors to assume any assigned contract listed thereon or obligate the Successful Bidder to take assignment of such assigned contract; or (b) constitute any admission or agreement of the Debtors that such assigned contract is an executory contract or unexpired lease. Only those assigned contracts that are included on a schedule of assumed and assigned contracts attached to the definitive sale agreement

with the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

Dated: _____, 2021

/s/ _____

Marc B. Merklin  (0018195)
Julie K. Zurn (0066391)
Brouse McDowell, LPA
388 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
jzurn@brouse.com

*Counsel for the Debtors*
*and Debtors-in-Possession*