In re:                                                     Case No. 21-61491-rk

Squirrels Research Labs LLC                         Chapter 11

     Debtor

# CERTIFICATE OF NOTICE

| District/off: 0647-6 | User: | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Jan 18, 2022 | Form ID: pdf701 | Total Noticed: 6 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |
| ++ | Addresses marked '++' were redirected to the recipient's preferred mailing address pursuant to 11 U.S.C. § 342(f)/Fed. R. Bank. P. 2002(g)(4). |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Jan 20, 2022:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | Squirrels Research Labs LLC, 8050 Freedom Avenue NW, North Canton, OH 44720-6912 |
| aty | + | Brouse McDowell, 388 South Main Street, Suite 500, Akron, OH 44311-4419 |
| aty | + | Jason R. Schendel, Sheppard, Mullin, Richter & Hampton LLP, Four Embarcadero Center, Seventeenth Floor, San Francisco, CA 94111-4106 |
| cr | + | Avnet, Inc., c/o Christopher Combest, Quarles & Brady LLP, 300 N. LaSalle Street, Suite 4000 Chicago, IL 60654-5427 |
| cr | | Better PC, LLC, c/o Christopher J. Niekamp, Esq., Buckingham, Doolittle & Burroughs, Suite 300, Akron, OH 443338398 |
| cr | ++ | OHIO BUREAU OF WORKERS COMPENSATION, LAW SECTION BANKRUPTCY UNIT, P O BOX 15567, COLUMBUS OH 43215-0567 address filed with court:, Ohio Bureau of Workers Compensation, Attn: Law Section Bankruptcy Unit, PO Box 15567, Columbus, OH 43215 |

TOTAL: 6

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| cr | | Cincinnati Insurance Company |
| cr | | Envista Forensics, LLC d/b/a AREPA |
| intp | | Instantiation LLC |
| intp | | Ohio Power Company dba American Electric Power |
| cr | | Torea Consulting Ltd. |

TOTAL: 5 Undeliverable, 0 Duplicate, 0 Out of date forwarding address

# NOTICE CERTIFICATION

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Jan 20, 2022                     Signature:         /s/Joseph Speetjens

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on January 18, 2022 at the address(es) listed**

below:

| Name | Email Address |
|---|---|
| Christopher Niekamp | on behalf of Creditor Better PC LLC cniekamp@bdblaw.com |
| Christopher Paul Combest | on behalf of Creditor Avnet Inc. christopher.combest@quarles.com |
| David M. Neumann | on behalf of Creditor Torea Consulting Ltd. dneumann@meyersroman.com jray@meyersroman.com;mnowak@meyersroman.com |
| David M. Neumann | on behalf of Creditor Envista Forensics LLC d/b/a AREPA dneumann@meyersroman.com, jray@meyersroman.com;mnowak@meyersroman.com |
| Frederic P. Schwieg | on behalf of Trustee Frederic P. Schwieg fschwieg@schwieglaw.com |
| Frederic P. Schwieg | fschwieg@schwieglaw.com |
| Jeannie Kim | on behalf of Interested Party Instantiation LLC JeKim@sheppardmullin.com dgatmen@sheppardmullin.com |
| John C. Cannizzaro | on behalf of Interested Party Instantiation LLC John.Cannizzaro@icemiller.com lauren.prohaska@icemiller.com |
| John G. Farnan | on behalf of Creditor Cincinnati Insurance Company jfarnan@westonhurd.com |
| Joshua Ryan Vaughan | on behalf of Creditor Ohio Bureau of Workers Compensation jvaughan@amer-collect.com SAllman@AMER-COLLECT.COM;HouliECF@aol.com |
| Julie K. Zurn | on behalf of Debtor Squirrels Research Labs LLC jzurn@brouse.com tpalcic@brouse.com |
| Kate M. Bradley ust44 | on behalf of U.S. Trustee United States Trustee kate.m.bradley@usdoj.gov |
| Marc Merklin | on behalf of Debtor Squirrels Research Labs LLC mmerklin@brouse.com tpalcic@brouse.com;mmiller@brouse.com |
| Paul J. Schumacher | on behalf of Interested Party Ohio Power Company dba American Electric Power pschumacher@dmclaw.com tgross@dmclaw.com |
| Robert E. Goff, Jr. | on behalf of Creditor Cincinnati Insurance Company rgoff@westonhurd.com jroberts@westonhurd.com |

TOTAL: 15

**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 12:43 PM January 18, 2022**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Squirrels Research Labs LLC, *et al.*[1] | ) | Case No. 21- 61491 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Judge Russ Kendig |

### ORDER: (I) AUTHORIZING SALE OF CERTAIN OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. §§ 105 AND 363; AND (II) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

After a hearing on certain relief requested by the Debtors' *Motion for an Order (A)(I) Establishing and Approving Bid Procedures Related to the Sale of Certain of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105(A), Including the Designation of a Stalking Horse Bidder and Related Bid Protections; (II) Approving Contract/Lease Assumption and Assignment Procedures*

---

[1] The "Debtors" in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Squirrels Research Labs LLC (9310), case no. 21-61491 and The Midwest Data Company LLC (1213), case no. 21-61492.

*and the Form and Notice Thereof; (III) Scheduling the Auction; (IV) Scheduling a Hearing and Objection Deadline with Respect to the Sale; (V) Approving the Form and Notice Thereof; and (VI) Granting Related Relief; and (B)(I) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. §§ 105 and 363; and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 6] (the "<u>Motion</u>"),[2] on December 1, 2021, the Court entered the *Order (I) Approving Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Approving Contract Assumption and Assignment Procedures and the Form and Manner of Notice Thereof, (IV) Scheduling the Auction, (V) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (VI) Approving the Form and Manner of Notice Thereof, and (VII) Granting Related Relief* [Docket No. 40] (the "<u>Bidding Procedures Order</u>").

On January 11, 2022, this Court held a hearing (the "<u>Sale Hearing</u>") on the Debtors' request, by the Motion, for entry of an order: (i) authorizing the sale of certain of the Debtors' assets free and clear of liens, claims, encumbrances and interests pursuant to sections 105 and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Northern District of Ohio (the "<u>Local Rules</u>") and approving the Debtors' entry into and performance under the terms and conditions of that certain Asset Purchase Agreement dated as of November 22, 2021, as amended and restated by that certain Amended and Restated Asset Purchase Agreement dated as of December 1, 2021, and that certain Second Amended and Restated Asset Purchase Agreement dated as of January 10,

---

[2] Unless otherwise indicated, capitalized terms not otherwise defined in this Sale Order shall have the same meanings ascribed to them in the Motion or the APA.

2022 (together with the schedules thereto and related documents, and as may be amended and restated, supplemented or otherwise modified from time to time, the "APA"), substantially in the form attached hereto as Exhibit 1, by and among the Debtors, as sellers, and Instantiation LLC, as purchaser (the "Buyer"); (ii) authorizing and approving the sale (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the APA, the "Sale") of the Acquired Assets (as defined in the APA) free and clear of all Liens, Claims, and Interests (each as defined herein) and the assumption of the Assumed Liabilities to the extent set forth in the APA upon the closing of the Sale (the "Closing"), (iii) authorizing the assumption and assignment of certain of the Debtors' (as applicable) executory contracts and unexpired leases related thereto as set forth on the applicable schedules of the APA (each, a "Assigned Contract," and, collectively, the "Assigned Contracts"), upon the Closing, subject to payment by the Buyer of all costs necessary to cure any defaults arising under any Assigned Contract to the extent required by section 365(b) of the Bankruptcy Code (such amounts, the "Cure Costs"), and (iv) granting such other and further relief as this Court deems necessary and proper, all as more fully set forth in the Motion.

On January 11, 2022, TorEA Consulting filed an untimely objection to the Sale [Docket No. 127].

After consideration of the legal and factual bases set forth in the Motion, the statements made by the parties in interest at the Sale Hearing, including that (a) the Debtors received no Qualified Competing Bids (as defined in the Motion) for the Acquired Assets and therefore cancelled the auction (the "Auction"); and (b) the Debtors determined that the Buyer, having submitted the only bid, is the Successful Bidder for the Acquired Assets in accordance with the Bidding Procedures; and the Court having reviewed and considered the Motion, the APA, the *Declaration of David Stanfill in Support of Finding of Good Faith Purchaser of Assets of Squirrels*

*Research Labs LLC and the Midwest Data Company LLC* [Docket No. 125] (the "Stanfill Declaration"), and it appearing that due notice of the Motion, the Sale Hearing, the APA, and the Sale has been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders, and all other parties in interest; and it appearing that the objection is not well taken; and it appearing that the Court has jurisdiction over this matter; and good cause appearing to grant the relief requested by the Motion, it is hereby

FOUND, CONCLUDED, AND DETERMINED THAT:

A. Debtors filed voluntary petitions for relief under subchapter V of chapter 11 of the Bankruptcy Code on November 23, 2021 (the "Petition Date"), and thereafter Debtors have continued in the management and possession of their businesses and property as debtors-in-possession pursuant to section 1184 of the Bankruptcy Code.

**Jurisdiction, Venue, and Final Order**

B. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtors' chapter 11, subchapter V cases in this district and division is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b), in which the Court may enter a final order.

C. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and the terms and conditions of this Sale Order should be immediately effective and enforceable upon its entry, and expressly directs entry of judgment as set forth herein.

D.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

<u>**Notice of the Motion, Auction, Sale Hearing, APA and<br>Sale and the Cure Costs**</u>

E.    As evidenced by declarations and/or certificates of service previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Hearing, the APA, and the Sale has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014.  The Debtors have complied with all obligations to provide notice of the Motion, the Auction, the Sale Hearing, the APA, and the Sale as required by the Bidding Procedures Order.  The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the APA, or the Sale is required.

F.    A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

G.    In accordance with the Bidding Procedures Order, the Debtors have served a notice of their intent to assume and assign the Assigned Contracts and of the Cure Costs upon each counterparty to an Assigned Contract.  The service and provision of such notice was good, sufficient, and appropriate under the circumstances and no further notice need be given in respect of assumption and assignment of the Assigned Contracts or establishing a Cure Cost for the respective Assigned Contracts.  Counterparties to the Assigned Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assigned Contracts and the Cure Costs set forth in the notice (including objections related to the adequate assurance of future

performance and objections based on whether applicable law excuses the counterparty from accepting performance by, or rendering performance to, the applicable Buyer for purposes of section 365(c)(1) of the Bankruptcy Code). All objections, responses, or requests for adequate assurance, if any, have been resolved, overruled, or denied, as applicable.

**<u>Highest and Best Offer</u>**

H.     As demonstrated by the Stanfill Declaration, the evidence proffered or adduced at the Sale Hearing, and the representations of counsel made on the record at the Sale Hearing, the Debtors conducted a sale process in accordance with, and have, along with the Buyer, complied in all material respects with, the Bidding Procedures Order and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Acquired Assets and assume the Assumed Liabilities.

I.     (i) The Debtors engaged in a robust and extensive marketing and sale process, both prior to the commencement of these chapter 11, subchapter V cases and through the post-petition sale process in accordance with the Bidding Procedures Order and the sound exercise of the Debtors' business judgment; (ii) the Debtors conducted a fair and open sale process; (iii) the sale process and the Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Acquired Assets, or who the Debtors believed may have had an interest in acquiring the Acquired Assets, to make an offer to purchase the Debtors' assets, including, without limitation the Acquired Assets; (iv) the Debtors and the Buyer have negotiated and undertaken their roles leading to the entry into the APA in a diligent, non-collusive, fair, reasonable, and good faith manner; and (v) the sale process conducted by the Debtors pursuant to the Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for the Acquired Assets for the Debtors and their estates, was in the best interests of the Debtors, their creditors,

and all parties in interest. There is no legal or equitable reason to delay consummation of the APA and the transactions contemplated therein.

J.    The Debtors have also determined, in a valid and sound exercise of their business judgment, that as they received no Qualified Competing Bids, to cancel the Auction as set forth in that *Notice of Cancellation of Auction for Sale of Assets of Squirrels Research Labs LLC and the Midwest Data Company LLC* [Docket No. 106].

K.    Approval of the Motion and the APA, and the consummation of the Sale contemplated thereby, is in the best interests of the Debtors, their respective creditors, estates, and other parties in interest. The Debtors have demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of their obligations under the APA.

L.    The consummation of the Sale outside a plan of reorganization pursuant to the APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors. The Sale does not constitute a *sub rosa* chapter 11 plan.

M.    Entry of an order approving the APA and all the provisions thereof is a necessary condition precedent to Buyer' consummation of the Sale, as set forth in the APA.

## Good Faith of Buyer

N.    The consideration to be paid by the Buyer under the APA was negotiated at arm's-length, in good faith and without collusion pursuant to section 363(m) of the Bankruptcy Code and constitutes reasonably equivalent value and fair and adequate consideration for the Acquired Assets under the APA. Specifically: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in purchasing the Acquired Assets; (ii) the Buyer complied in all respects with the applicable provisions of the Bidding Procedures Order in negotiating and entering

into the APA and the transactions described therein comply with the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments made or to be made by the Buyer in connection with the Sale have been disclosed in the APA; (v) there is no common identity of directors, officers or controlling stockholders existing among the Buyer and the Debtors and the Buyer is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code; (vi) the negotiation and execution of the APA were at arm's-length by parties not affiliated with one another and in good faith, and at all times each of the Buyer and the Debtors were represented by competent counsel of their choosing; and (vii) the Buyer has not acted in a collusive manner with any person. The Buyer and all affiliates thereof have at all times acted in good faith within the meaning of section 363(m) of the Bankruptcy Code in negotiating the transactions contemplated by the APA, in submitting the Stalking Horse Bid (as defined in the Bidding Procedures Order), and in presenting the APA to the Court for approval. The Buyer and all affiliates thereof will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the APA. The terms and conditions set forth in the APA are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws.

O.     The Debtors and the Buyer, and each of their respective management, boards of directors, members, officers, directors, employees, agents, and representatives, have acted in good faith in connection with negotiations and entry into the APA. The APA, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtors and the Buyer in good faith, without collusion or fraud, and from arm's-length bargaining positions.

The Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.

## No Fraudulent Transfer

P.       The consideration provided by the Buyer pursuant to the APA for its purchase of the Acquired Assets and the assumption of the Assumed Liabilities constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

Q.       Neither the Buyer nor its past, present and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies or partners (each, a "**Buyer Party**") is a continuation of the Debtors or their respective estates and no Buyer Party is holding itself out to the public as a continuation of the Debtors or their respective estates and the Sale does not amount to a sale of all or substantially all assets of the Debtors or a consolidation, merger, or de facto merger of the Buyer (or any other Buyer Party) and the Debtors.

## Validity of Transfer

R.       Each Debtor's board of directors has authorized the execution and delivery of the APA and the Sale of the Acquired Assets to the Buyer.  The Debtors (i) have full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Sale, and (iii) have taken all action necessary to authorize and approve the APA and to consummate the Sale, and no further consents or approvals, other than those expressly provided for in the APA, are

required for the Debtors to consummate the transactions contemplated by the APA, except as otherwise set forth in the APA. The Acquired Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtors' estates.

<u>**Section 363(f) Is Satisfied**</u>

S.      The Sale of the Acquired Assets to the Buyer and the assumption and assignment to the Buyer of the Assigned Contracts under the terms of the APA meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the Sale of the Acquired Assets will be free and clear of all Liens, Claims and Interests, and will not subject any Buyer Party to any liability for any Liens, Claims or Interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the APA. All holders of Liens, Claims or Interests who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of Liens, Claims or Interests are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code — by having their Liens, Claims, or Interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert Liens, Claims or Interests, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable. Those holders of Liens, Claims, or Interests who did object and that have an interest in the Acquired Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

T.      Except for the Assumed Liabilities and other obligations of the Buyer to the extent set forth in the APA, the transfer of the Acquired Assets to the Buyer shall be a legal, valid and effective transfer of the Acquired Assets to their respective Buyer and shall vest the Buyer at

Closing with all right, title and interest of the Debtors in and to the Acquired Assets under the APA, free and clear of all claims (as defined in Section 101(5) of the Bankruptcy Code, "Claims"), liens (as defined in Section 101(37) of the Bankruptcy Code, "Liens"), encumbrances and all other interests (collectively including each of the foregoing, "Interests"), including, but not limited to: (1) those that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal or termination of the Debtors' interest in the Acquired Assets, or any similar rights, including rights under section 365(h) of the Bankruptcy Code; (2) those relating to taxes arising under or out of in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing; and (3) (a) those arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, rights of setoff or recoupment, encumbrances, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, and (b) all debts arising in any way in connection with any agreements, acts or failures to act of any of the Debtors or any of the Debtors' predecessors or affiliates, Claims, obligations, liabilities, rights of set off or recoupment, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these chapter 11, subchapter V bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to, Claims otherwise arising under doctrines of successor liability to the greatest extent permitted by applicable law.

U.      The Buyer would not have entered into the APA and would not consummate the transactions, thus adversely affecting the Debtors, their estates and their creditors and other stakeholders, if the transfer of the Acquired Assets to the Buyer and the assumption of the Assumed

Liabilities by Buyer were not, except as otherwise expressly provided in the APA with respect to the Assumed Liabilities, free and clear of all Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could, be liable for any of such Interests including, but not limited to: (1) any employment or labor agreements; (2) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors; (3) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related Claim, including, without limitation, Claims that might otherwise arise under or pursuant to: (a) the Employee Retirement, Income, Security Act of 1974, as amended. (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) the Jones Act; (4) any products liability, personal injury or similar Claims, whether pursuant to any state or federal laws or otherwise, including, without limitation, asbestos-related Claims; (5) environmental Claims or Liens arising from conditions or emissions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.*, or similar state or local statutes or ordinances; (6) any bulk sales or similar law; (7) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (8) any theories of successor liability.

## Assumption and Assignment of the Assigned Contracts

V.     The assumption and assignment of the Assigned Contracts pursuant to the terms of this Sale Order are integral to the APA, are in the best interests of the Debtors and their respective

estates, creditors, and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors.

W.     The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts.  As provided for in the APA, with respect to any assumption and assignment of any Assigned Contract effective upon the Closing, the Buyer and/or the Debtors have (i) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assigned Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and (iii) provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.  With respect to any assumption and assignment of any Assigned Contract effective upon the Closing, the Buyer has provided adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) and in accordance with the Bidding Procedures to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts.

X.     As no objection to the assumption and assignment of the Assigned Contracts has been filed prior to the applicable objection deadline, the counterparties will be deemed to have consented (including consent under section 365(c)(1) of the Bankruptcy Code) to the assumption and assignment to Buyer and the Cure Cost, and such assumption and assignment to Buyer and the Cure Cost shall be deemed approved by this Sale Order without further order of this Court.

Y.     Other than the Cure Costs as specified in the APA the (i) transfer of the Acquired Assets to the Buyer and (ii) assignment to the Buyer of the Assigned Contracts, will not subject the Buyer to any liability whatsoever that arises prior to the Closing or by reason of such transfer

under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise.

**Prompt Consummation**

Z.      Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the sale of the Acquired Assets must be approved and consummated promptly to preserve the value of the Acquired Assets. Time, therefore, is of the essence in effectuating the Closing under the APA. As such, the Debtors and the Buyer intend to close the sale of the Acquired Assets as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the APA. Accordingly, there is sufficient cause to waive the stay provided in Bankruptcy Rules 6004(h) and 6006(d).

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Motion is GRANTED to the extent set forth herein.

2.      All objections to or reservation of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved as stated on the record of the proceedings are overruled. All persons and entities who did not object or withdraw their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      The APA, and all terms and conditions thereof, is hereby approved.

**Transfer of the Acquired Assets as set forth in the APA**

4.     The Debtors are authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale in accordance with the terms and conditions set forth in the APA and this Sale Order, (b) assume and assign any and all Assigned Contracts, and (c) take all further actions and execute and deliver the APA and any and all additional instruments and documents that may be necessary or appropriate to implement the APA and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

5.     The Buyer is not acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities (each as defined in the APA).

6.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the APA and this Sale Order.

7.     At Closing, the Buyer shall pay to Avnet, Inc. cash in the amount of $3,000,000 of the $3,010,000 Purchase Price in full satisfaction of the Avnet Secured Claim (each as defined in the APA) pursuant to Section 4.3 of the APA.

8.     At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Acquired Assets shall be immediately vested in the Buyer pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code.  Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Acquired Assets.  All persons or entities, presently or at or after the Closing, in possession of some or all of the Acquired Assets, are directed to surrender possession of any and all portions of the Acquired Assets to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

9.     This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) the Acquired Assets shall have been transferred to the Buyer free and clear of all Liens, Claims and Interests (including but not limited to those described in Findings T and U hereof), except to the extent set forth in the APA, and (ii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

10.     All Liens, Claims and Interests with respect to the Acquired Assets shall attach to the proceeds of the Sale ultimately attributable to the property against which such Liens, Claims and Interests applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such Liens, Claims and Interests applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

11.     Except as expressly permitted otherwise by this Sale Order, all persons and entities, including, but not limited to, all debt security holders; equity security holders; governmental, tax and regulatory authorities; lenders; trade creditors; and other creditors holding Interests of any kind or nature whatsoever against or in the Debtors or the Acquired Assets

(whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with or in any way relating to the Debtors, the Acquired Assets, the operation of the Acquired Assets prior to the Closing are forever barred, estopped and permanently enjoined from asserting against the Buyer, its successors or assigns, their property or the Acquired Assets such persons' or entities' Interests (including without limitation, any right of set-off or recoupment).

12.     If any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against the Debtors or in the Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all Liens, Claims and Interests that the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then only with regard to the Acquired Assets that are purchased by the Buyer pursuant to the APA and this Sale Order, (a) either Debtors or the Buyer are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Assets, (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, and Interests against each Buyer Party and the Acquired Assets, and (c) upon consummation of the Sale, the Buyer may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Liens, Claims and Interests that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Acquired Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in

the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Acquired Assets free and clear of Liens, Claims and Interests shall be self-executing and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

### No Successor or Transferee Liability

13.    No Buyer Party shall be deemed, as a result of any action taken in connection with the APA, the consummation of the Sale contemplated by the APA, or the transfer, operation, or use of the Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Buyer, solely with respect to any Assumed Liabilities), (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("ERISA"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations).

14.    Other than as expressly set forth in the APA, no Buyer Party shall have any responsibility for (a) any liability or other obligation of the Debtors or (b) any claims against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the APA with respect to the Buyer, no Buyer Party shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "Successor or

Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor

or vicarious liability of any kind or character, or based upon any theory of antitrust,

environmental, successor, or transferee liability, de facto merger or substantial continuity, labor

and employment or products liability, whether known or unknown as of the Closing, now

existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or

unliquidated, including, without limitation, liabilities on account of (a) any taxes arising,

accruing, or payable under, out of, in connection with, or in any way relating to the Acquired

Assets or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods or (b)

any plan, agreement, practice, policy, or program, whether written or unwritten, providing for

pension, retirement, health, welfare, compensation or other employee benefits which is or has

been sponsored, maintained or contributed to by any Debtor or with respect to which any Debtor

has any liability, whether or not contingent, including, without limitation, any "multiemployer

plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of

ERISA) to which any Debtor has at any time contributed, or had any obligation to contribute.

Except to the extent expressly included in the Assumed Liabilities with respect to the Buyer or as

otherwise expressly set forth in the APA, no Buyer Party shall have any liability or obligation

under any applicable law, including, without limitation, (a) the WARN Act (29 U.S.C. §§ 2101

*et seq.*), (b) the Comprehensive Environmental Response Compensation and Liability Act, (c)

the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal

Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. § 151

*et seq.*, (f) Section 1927 of the Social Security Act, 42 U.S.C. § 1396r-8 or (g) any foreign,

federal, state, or local labor, employment or environmental law, by virtue of the Buyer's

purchase of the Acquired Assets, assumption of the Assumed Liabilities, or hiring of certain

employees of the Debtors pursuant to the terms of the APA. Without limiting the foregoing, no

Buyer Party shall have any liability or obligation with respect to any environmental liabilities of the Debtors or any environmental liabilities associated with the Acquired Assets except to the extent they are Assumed Liabilities set forth in the APA.

15.     Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against any Buyer Party or their respective assets (including, without limitation, the Acquired Assets), with respect to any Successor or Transferee Liability including, without limitation, the following actions with respect to any such Successor or Transferee Liability: (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Acquired Assets or conduct any of the businesses operated with respect to such assets.

16.     The Buyer Parties shall have no obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtors.  The Buyer Parties shall have no liability with respect to any collective bargaining agreement, employee pension plan, employee welfare (including, without limitation, any retiree benefit liabilities or obligations) or retention, benefit

and/or incentive plan to which the Debtors or any affiliate is a party and relating to the Acquired Assets (including, without limitation, arising from or related to the rejection or other termination of any such agreement), and the Buyer Parties shall in no way be deemed parties to or assignees of any such agreement, and no employee of the Buyer Parties shall be deemed in any way covered by or a party to any such agreement, and, except for Assumed Liabilities, all parties to any such agreement are hereby permanently enjoined from asserting against the Buyer Parties any and all Claims arising from or relating to such agreement. All notices, if any, required to be given to the Debtors' employees pursuant to the Workers Adjustment and Retraining Notification Act, or any similar federal or state law, shall be the sole responsibility and obligation of the Debts, and the Buyer Parties shall have no duties, responsibility or liability therefor.

17. Except as otherwise set forth in the APA, the Buyer' purchase of the Acquired Assets under the APA is free and clear with respect to all workers' compensation obligations or liabilities, including, without limitation, workers' compensation claims or suits of any type, whether now known or unknown, whenever incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination or other incidents, acts or injuries prior to the Closing Date, including, but not limited to, any and all workers' compensation claims filed or to be filed, or reopenings of those claims, by or on behalf of any of the Debtors or its affiliates' current or former employees, persons on laid-off, inactive or retired status, or their respective dependents, heirs or assigns, as well as any and all premiums, assessments or other obligations of any nature whatsoever of the Debtors relating in any way to workers' compensation liability.

**Good Faith of Buyer**

18.     The Sale contemplated by the APA is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of the Assigned Contracts identified on Schedule 1.1(b) of the APA), unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

19.     Neither the Debtors nor the Buyer have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Buyer for the Acquired Assets under the APA is fair and reasonable and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

**Assumption and Assignment of Assigned Contracts**

20.     The Debtors are authorized and directed at the Closing to assume and assign each of the Assigned Contracts to the Buyer pursuant to sections 105(a) and 365 of the Bankruptcy Code and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Buyer.  The payment by the Buyer or the Debtors (as the case may be as provided for in the APA) or upon such other provision as approved by the Bankruptcy Court on the record at the Sale Hearing or subsequent hearing of the applicable Cure Costs (if any) under a Assigned Contract shall (a) effect a cure of all defaults existing thereunder as of the Closing, and (b) compensate for any actual pecuniary loss to such counterparty resulting from such default.

21.     In connection with any executory contracts or unexpired leases designated as Assigned Contracts, the Buyer shall provide satisfactory adequate assurance of future performance to the applicable counterparty under any such designated Assigned Contract as required under section 365(b)(1)(C) of the Bankruptcy Code.

22.     Pursuant to section 365(f) of the Bankruptcy Code, subject to payment by the Buyer of the applicable Cure Costs, the Assigned Contracts to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in the Assigned Contracts or other restrictions prohibiting their assignment or transfer.  Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract to the Buyer (including the invocation of Section 1927 of the Social Security Act, 42 U.S.C. § 1396r-8) or allow the counterparty to such Assigned Contract to terminate, recapture, setoff or recoup impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract to the Buyer, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code (including, without limitation, the satisfaction of the requirement under section 365(c)(1) of the Bankruptcy Code) for the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts have been satisfied. Upon the Closing, as applicable in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assigned Contracts, and such Assigned Contracts shall remain in full force and effect for the benefit of the Buyer. Each counterparty to the Assigned Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or any Buyer Party or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to

21-61491-tnap     Doc 136     FILED 01/20/22     ENTERED 01/21/22 00:11:05     Page 25 of 109

assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including, without limitation, any breach related to or arising out of change-in-control provisions in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts and (b) asserting against any Buyer Party (or its respective property, including, without limitation, the Acquired Assets) any claim, counterclaim, defense, breach, condition, or setoff asserted, or assertable against the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

23.     Upon the Closing, as applicable, and the payment of the relevant Cure Costs, if any, the Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contracts.  There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of the Assigned Contracts. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions or of the right of the Debtors or the Buyer, as the case may be, to enforce every term and condition of such Assigned Contract.  The validity of the assumption and assignment of any Assigned Contract to the Buyer shall not be affected by any existing dispute between the Debtors and any counterparty to such Assigned Contract.  Any party that may have had the right to consent to the assignment of any Assigned Contract is deemed to have consented for the purposes of section 365(e)(2)(A) of the Bankruptcy Code.

24.     The assignments of each of the Assigned Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

**Other Provisions**

25.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit (federal or state) may revoke or suspend any permit or License relating to the Acquired Assets sold, transferred, or conveyed to the Buyer on account of (i) the filing or pendency of these chapter 11 cases or (ii) the consummation of the Sale contemplated by the APA or the failure of the Debtors to pay any pre-petition claims of such governmental unit.

26.     The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, *provided, however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

27.     The terms and provisions of the APA and this Sale Order shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Acquired Assets, all counterparties to the Assigned Contracts, the Buyer, and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s) appointed in any of the Debtors' chapter 11 cases or upon conversion of any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.  The APA shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders, or any trustee(s).

28.     The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any of these chapter 11 cases; (b) converting any of the chapter 11 cases to a case under chapter 7 of

the Bankruptcy Code; (c) dismissing any of the chapter 11 cases; or (d) pursuant to which this Court abstains from hearing any of the chapter 11 cases. The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in (a)-(d) above, shall continue in these chapter 11 cases, or following dismissal of these chapter 11 cases and nothing contained in any chapter 11 plan hereafter confirmed or any order confirming such chapter 11 plan or any other order of this Court shall conflict with or derogate from the provisions of the APA or the terms of this Sale Order.

29.     Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA (including any document requesting a name change or assignment thereof and regardless of whether such agency or department has a Claim against the Debtors).

30.     The APA and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

31.     The APA may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court, *provided* that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or their creditors. For the avoidance of doubt, all other modifications, amendments, or supplements to the APA shall require Court approval.

32.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

33.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or otherwise, the terms and conditions of this Sale Order shall be effective

immediately upon entry and the Debtors and the Buyer is authorized to close the Sale immediately upon entry of this Sale Order.

34.     To the extent there is any conflict between the terms of this Sale Order and the APA, the terms of this Sale Order shall control.

35.     This Court retains exclusive jurisdiction to:

(a)     Interpret, implement and enforce the terms and provisions of this Sale Order, the Bidding Procedures Order, and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, and resolve any disputes thereunder except as otherwise provided therein;

(b)     Protect the Buyer and the Assigned Contracts, or Acquired Assets against any Interests or Excluded Liability, including, without limitation, to enjoin the commencement or continuation of any action seeking to impose on the Buyer successor liability;

(c)     Enter orders in aid or furtherance of the transactions;

(d)     Compel delivery of all Acquired Assets to the Buyer;

(e)     Adjudicate any and all issues relating to the Assigned Contracts;

(f)     Adjudicate all issues relating to any Liens or Interests: and

(g)     Adjudicate any and all issues relating to the Acquired Assets, the proceeds of the transactions provided for under the APA and the Motion.

36.     The Debtors shall serve a copy of this Sale Order upon all parties entitled to notice under the Bankruptcy Code and Bankruptcy Rules within two (2) business days after entry of this Sale Order.

# # #

SUBMITTED BY:

/s/ *Julie K. Zurn*
Marc B. Merklin (0018195)
Julie K. Zurn (0066391)
Brouse McDowell, LPA
388 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
jzurn@brouse.com

*Counsel for Debtors*
*and Debtors in Possession*

**EXHIBIT 1**

(Second Amended and Restated APA)

### SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "***Agreement***") is entered into as of January 10, 2022 (the "***Effective Date***") by and among INSTANTIATION LLC (the "***Purchaser***"), SQUIRRELS RESEARCH LABS LLC ("***SQRL***"), and THE MIDWEST DATA COMPANY LLC ("***MWDC***" and, together with SQRL, each a "***Seller***" and collectively, the "***Sellers***"). The Purchaser and the Sellers are referred to herein individually as a "***Party***" and, collectively, as the "***Parties***".

### RECITALS

**WHEREAS,** the Sellers commenced a voluntary petition for relief (the "***Bankruptcy Case***") under subchapter V (§§ 1181-1195) of chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division at Canton (the "***Bankruptcy Court***");

**WHEREAS**, the Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from the Sellers, and the Sellers desire to sell, convey, assign, and transfer to the Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (collectively, the "***Bankruptcy Rules***"), all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order;

**WHEREAS**, on November 22, 2021, the Parties entered into an Asset Purchase Agreement and on December 1, 2021, the Parties entered into an Amended & Restated Asset Purchase Agreement (the "***First A&R APA***"); and

**WHEREAS**, the Parties desire to amend and restate the First A&R APA, pursuant to Section 9.6 of the First A&R APA, in its entirety on the terms and subject to the conditions set forth herein

**NOW, THEREFORE**, for and in consideration of the foregoing and their mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

### ARTICLE 1
### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

**1.1** **Purchase and Sale of Acquired Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, the Sellers shall sell, transfer, assign, convey, and deliver to the Purchaser, and the Purchaser shall purchase, acquire, and accept from the Sellers, all of the Sellers' right, title and interest in and to the following assets, properties and rights of the Sellers, free and clear of all Encumbrances other than Permitted Encumbrances (the "***Acquired Assets***") but excluding in all cases the Excluded Assets:

**(a)** all manufacturing Equipment, components, racks, computers, and other related equipment owned by the Sellers and located at the Leased Real Property, including without limitation the assets identified on Schedule 1.1(a), and excluding, for the avoidance of doubt, the Excluded Equipment (collectively, the "***Acquired Equipment***");

**(b)** the Contracts identified on Schedule 1.1(b) (the "***Assigned Contracts***");

**(c)** all general intangible assets used or useful in connection with the use and operation of the Acquired Equipment;

**(d)** all Business Intellectual Property, including all rights to collect royalties and proceeds in connection therewith;

**(e)** copies of all Document directly related to the Acquired Assets described in Section 1.1(a), (b), (c), and (d); provided that the Sellers may retain copies of any Documents transferred pursuant to this Section 1.1(d); and

**(f)** all of Seller's financial accounting Documents.

**1.2** **Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, in no event shall the Sellers be deemed to sell, transfer, assign, or convey, and the Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests and rights of such Seller (collectively, the "***Excluded Assets***"):

**(a)** all Protected Information that such Seller is prohibited by or would otherwise contravene applicable Law from transferring to the Purchaser;

**(b)** any records, documents or other information relating to employees and former employees of the Sellers;

**(c)** all Contracts other than the Assigned Contracts (the "***Excluded Contracts***");

**(d)** all Documents that are minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers) and any other Tax information or records of such Seller, corporate seal, checkbooks, and canceled checks;

**(e)** such Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between such Seller and the Purchaser in connection with the transactions contemplated hereby, or any other agreement between such Seller and the Purchaser entered into on or after the date hereof;

**(f)** all Tax attributes that are not transferred by the operation of applicable Tax Law;

**(g)** the causes of Action described on Schedule 1.2(g) attached hereto;

**(h)** the insurance claims described on <u>Schedule 1.2(h)</u> attached hereto (the "***Insurance Claims***");

**(i)** the registered Intellectual Property described on <u>Schedule 1.2(i)</u> attached hereto (the "***Registered IP***");

**(j)** office furniture, office supplies, and similar non-production equipment (the "***Excluded Equipment***"); and

**(k)** all other assets of the Sellers that do not constitute Acquired Assets.

**1.3** **Assumption of Certain Liabilities**. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, the Purchaser shall irrevocably assume from the Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and the Sellers shall irrevocably convey, transfer, and assign to the Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "***Assumed Liabilities***"):

**(a)** all Liabilities of the Sellers under the Assigned Contracts that becomes due from and after the Closing but excluding Liabilities arising out of the Sellers' performance of the Assigned Contracts prior to Closing;

**(b)** all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "***Cure Costs***"); and

**(c)** all Liabilities arising out of the use or operation of the Acquired Assets from and after the Closing.

Notwithstanding anything to the contrary contained herein, "Assumed Liabilities" shall not include any Liabilities in respect of any Action or other contested claims against the Sellers, other contingent Liabilities, fees of the Sellers' professional advisors, management incentive plans or other Liability not incurred in the Ordinary Course, or any indebtedness, obligation or other claim (as defined in the Bankruptcy Code) of any kind arising from any financing including any Liability under the DIP Loan Agreement, any other DIP financing, credit facility, revolver, borrowing, debt or securities of any kind. All such Liabilities shall constitute "Excluded Liabilities".

**1.4** **Excluded Liabilities**. The Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place on or prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "***Excluded Liabilities***").

**1.5**    **Assumption/Rejection of Certain Contracts**.

(a)    <u>Assumption and Assignment of Executory Contracts</u>. The Sellers shall provide reasonably timely written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which a Seller is a party that are Assigned Contracts as of the Closing and take all other actions reasonably necessary to cause such Assigned Contracts to be assumed by a Seller and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code.  The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the Sellers shall assign or cause to be assigned to the Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes (if available), all included on an exhibit attached to either a notice filed in connection with the motion for approval of the Sale Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth the applicable Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by such Seller based on such Seller's books and records or as otherwise determined by the Bankruptcy Court.  At the Closing, such Seller shall, pursuant to the Sale Order, assume and assign to the Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to the Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code.    At the Closing, the Purchaser shall assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract constituting Assumed Liabilities pursuant to section 365 of the Bankruptcy Code.

(b)    <u>Non-Assignment</u>. Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, the Purchaser to the extent that such Contract (i) is rejected or terminated by a Seller in accordance with the terms of this Agreement or is terminated by any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by the Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to the Purchaser of a Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by the Purchaser as an Assigned Contract hereunder.  In the event that any Assigned Contract is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 1.5(b), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing (or the remaining term of such Contract or the closing of the Bankruptcy Case, if shorter), the Sellers and the Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by the Purchaser, including subcontracting, licensing, or sublicensing to the Purchaser any or all of the Sellers' rights and obligations with respect to any such Assigned Contract, under which (1) the Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on the Sellers

or its Affiliates) under such Assigned Contract with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) the Purchaser shall assume any related burden and obligation (including performance) with respect to such Assigned Contract constituting Assumed Liabilities. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Assigned Contract after the Closing, such Assigned Contract shall promptly be transferred and assigned to the Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code.

1.6 **Purchase Price**. The consideration payable by the Purchaser to the Sellers for the Acquired Assets shall be equal to $3,010,000 in cash (the "***Purchase Price***") plus assumption of the Assumed Liabilities; provided, that of the Purchase Price, $10,000 is allocated to and shall be paid to MWDC in respect of the Acquired Assets to be sold by MWDC to the Purchaser pursuant to this Agreement. Within five (5) Business Days of the execution of this Agreement, the Purchaser shall deliver to the Sellers $50,000 (the "***Deposit***"), which amount shall be applied to the Purchase Price at the Closing.

1.7 **Closing**. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "***Closing***") will take place by telephone conference and electronic exchange of documents at 10:00 a.m. Canton, Ohio time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article 6 (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree. The date on which the Closing actually occurs is referred to herein as the "***Closing Date***".

1.8 **Closing Deliveries by the Sellers**. At or prior to the Closing, the Sellers shall deliver to the Purchaser:

(a) all required documentation for Transfer Taxes, duly executed by the Sellers;

(b) an instrument of assignment and assumption of the real property lease set forth on Schedule 1.1(b), in form and substance approved by the Purchaser (the "***Assignment and Assumption of Lease***"), duly executed (and acknowledged as applicable) by the Sellers;

(c) copies of all reasonable and customary instruments, certificates, documents and other filings (if applicable) necessary to release the Acquired Assets from Encumbrances, including any applicable UCC termination statements and releases of mortgages, in form and substance appropriate for recording;

(d) a copy of the Sale Order, as entered by the Bankruptcy Court;

(e) a duly executed certificate from each Seller, satisfying the requirements of Treasury Regulation 1.1445-2(b)(2);

(f) a duly executed IRS Form W-9 with respect to each Seller;

(g)     a copy of the resolutions adopted by the board of directors (or similar governing body) of the Sellers evidencing the authorization of the execution of this Agreement and the consummation of the transactions contemplated by this Agreement, certified by an authorized officer of the Sellers;

(h)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Sellers certifying that the conditions set forth in Sections 6.2(b) and 6.2(c) have been satisfied; and

(i)     such other documents as the Purchaser may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

**1.9     Closing Deliveries by the Purchaser**.  At the Closing, the Purchaser shall deliver to the Sellers:

(a)     The Purchase Price;

(b)     the Assignment and Assumption of Lease, duly executed (and acknowledged, as applicable) by the Purchaser;

(c)     a copy of the resolutions adopted by the board of directors (or similar governing body) of the Purchaser evidencing the authorization of the execution of this Agreement and the consummation of the transactions contemplated by this Agreement, certified by an authorized officer of the Purchaser;

(d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Purchaser certifying that the conditions set forth in Sections 6.3(a) and 6.3(b) have been satisfied; and

(e)     such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

**1.10     Withholding**.  The Purchaser shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement to the extent required by applicable Law. Prior to making any withholding, the Purchaser must notify the Sellers at least five (5) Business Days prior to the effective date of any potentially applicable withholding requirement that the Purchaser believes applies, and each of the Parties agrees to take commercially reasonable efforts to cooperate to eliminate or reduce any such deduction or withholding. To the extent that amounts are withheld and paid to the applicable Governmental Body, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

**ARTICLE 2**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Except as set forth in the Schedules delivered by the Sellers to the Purchaser concurrently herewith, the Sellers, jointly and severally, represent and warrant to the Purchaser as follows as of the date hereof and as of the Closing Date (except where a representation or warranty is limited to a specific date, in which case such representation and warranty is given only as of such specific date):

**2.1** **Organization and Qualification**. Such Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, in the case of (b) and (c), except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**2.2** **Authorization of Agreement**. The execution, delivery, and performance of this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party by such Seller. Subject to requisite Bankruptcy Court approvals, this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party has been duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of the Purchaser, this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar applicable Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) (the "***Enforceability Exceptions***").

**2.3** Conflicts; Consents.

**(a)** Assuming that requisite Bankruptcy Court approvals are obtained, the execution, delivery and performance by the Sellers of this Agreement and each of the documents and agreements contemplated hereby to which the Sellers is a party and the consummation by the Sellers of the transactions contemplated hereby and thereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of the Sellers; (ii) violate any Law applicable to the Sellers; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any property or asset of the Sellers under, any Assigned Contracts; except, in the case of clauses (ii)

and (iii), for any such violations, breaches, defaults or other occurrences as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets.

(b)     The Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body in connection with the execution, delivery and performance by the Sellers of this Agreement and each of the documents and agreements contemplated hereby to which each Seller is a party or the consummation by such Seller of the transactions contemplated hereby and thereby, except (i) requisite Bankruptcy Court approvals, (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not and could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets, or (iii) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

## 2.4    Title to Properties.

(a)     Schedule 2.4(a) contains a correct and complete list of all real property leased by the Sellers as of the date hereof (the "**_Leased Real Property_**").  Subject to requisite Bankruptcy Court approvals, and assumption by the Sellers of the applicable lease in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, the Sellers have a valid leasehold estate in the real property lease set forth on Schedule 1.1(b), free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)     Subject to requisite Bankruptcy Court approvals and assumption by such Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, such Seller owns good title to, or holds a valid leasehold interest in, all of the material tangible property (including the Equipment) used or held for use in the conduct of the Acquired Assets as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property as could not, individually or in the aggregate, reasonably be expected to be material to the operation of the Acquired Assets.

(c)     After giving effect to the Closing, the Purchaser will hold good title to, or will hold a valid leasehold interest in, the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) pursuant to the Sale Order.

## 2.5    Contracts.

(a)     Except for Contracts entered into by the Sellers after the date hereof in compliance with the terms of this Agreement, and Contracts that are not primarily related to the Acquired Assets, such Seller is not a party to any:

(i)     collective bargaining agreement with any labor union;

(ii)    Contract under which such Seller has borrowed any money or issued any note, indenture or other evidence of similar indebtedness or guaranteed such indebtedness of others;

**(iii)** license of any Intellectual Property (other than licenses of commercially available, off-the-shelf software and other than licenses entered into in the Ordinary Course);

**(iv)** lease or other Contract under which such Seller is lessee of, or holds or operates any personal property owned by any third party;

**(v)** Contract or group of related Contracts with the same party for the purchase of products or services (other than purchase orders entered into in the Ordinary Course);

**(vi)** Contract relating to any acquisition or disposition by such Seller of any business (whether by asset or stock purchase or otherwise) or any merger, consolidation or similar business combination transaction, in each case, pursuant to which such Seller has any outstanding obligation to pay any purchase price thereunder;

**(vii)** Contract relating to any joint venture or partnership; or

**(viii)** agreement in writing to enter into any of the foregoing.

**(b)** Subject to requisite Bankruptcy Court approvals and assumption by such Seller of the applicable Contract in accordance with applicable Law and except as a result of the commencement of the Bankruptcy Case or as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets, as of the date hereof, each of the Assigned Contracts is in full force and effect and is a valid, binding and enforceable obligation of such Seller and, to the Knowledge of such Seller, each of the other parties thereto, except as may be limited by the Enforceability Exceptions. Except, as a result of the commencement of the Bankruptcy Case, or as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets, such Seller is not in material default, or is alleged in writing by the counterparty thereto to have materially breached or to be in material default, under any Assigned Contract, and, to the Knowledge of such Seller, the other party to each Assigned Contract is not in material default thereunder. As of the date hereof, none of the Assigned Contracts has been canceled or otherwise terminated, and such Seller has not received any written notice from any Person regarding any such cancellation or termination except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets.

**2.6** **Litigation**. Other than the Bankruptcy Case and the Actions set forth on Schedule 2.6, there are no Actions pending or, to the Seller's Knowledge, threatened against or by the Sellers or any of its Affiliates with respect to the Acquired Assets, at law or in equity, or before or by any Governmental Body. Other than in connection with the Bankruptcy Case, the Sellers are not subject to any outstanding Order.

**2.7** **Permits; Compliance with Laws**.

**(a)** Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets, the Sellers hold and is in compliance with all permits, certificates, licenses, approvals, registrations and authorizations that are material to the

Acquired Assets and required in connection with the conduct of its business as operated by the Sellers under applicable Laws (the "***Permits***"). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets, all of the Permits are valid and in full force and effect and no Action is pending, or, to the Seller's Knowledge, threatened, which seeks to revoke, limit or otherwise affect any such Permit.

(b)     During the prior five (5) years the Sellers have not received any written notice of any Action against it alleging any failure to comply in any material respect with any Laws, except in each case as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets. No investigation by any Governmental Body with respect to each Seller or any of its Affiliates is pending or, to the Seller's Knowledge, threatened, and during the prior five (5) years the Sellers have not received any written notice of any such investigation, except, in each case, for any such investigation that could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets.

2.8     **Environmental Matters**.

(a)     The Sellers are in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining all material permits, licenses and authorizations required under applicable Environmental Laws, except in each case for any noncompliance that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(b)     The Sellers have not during the prior five (5) years received written notice from any Governmental Body regarding any actual or alleged violation of or liability under Environmental Laws that could, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets; and

(c)     To the Knowledge of the Sellers, no Hazardous Substance has been released by the Sellers in violation of, and in a manner that would result in liability for the Sellers under, any Environmental Law, except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets.

2.9     **Intellectual Property**.

(a)     The Business Intellectual Property is owned by the Sellers free and clear of all Encumbrances, other than Permitted Encumbrances. The Business Intellectual Property is subsisting and, to the Knowledge of the Seller, enforceable.

(b)     To the Knowledge of the Sellers, the Acquired Assets do not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person, except where such infringement, misappropriation or violation could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets.

(c)     To the Knowledge of the Sellers, no third party infringes, misappropriates or otherwise violates any Business Intellectual Property, except where such infringement, misappropriation or violation could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets.

**(d)**     The Sellers have used efforts that are reasonable under the circumstances to maintain the secrecy of the material Trade Secrets included in the Business Intellectual Property, except where such failure could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets.

**2.10     Data Security**. Except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets, the Sellers maintain commercially reasonable policies and procedures regarding data privacy, protection and security designed to protect any personally identifiable information of any individuals, including any customers, prospective customers, employees and/or other third parties directly related to the Acquired Assets collected by the Sellers. Except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets, to the Knowledge of the Sellers, the transactions contemplated by this Agreement will not result in a breach of such Seller's published privacy policies in effect as of the date hereof.  The Sellers and their respective Affiliates are in compliance in all material respects with all Laws relating to data loss, theft and breach of security notification obligations.

**2.11     Seller Plans**.  Sellers have no Liabilities under any Seller Plans.

**2.12     Employees**.  The Sellers have no Liabilities with respect to any employees or former employees.

**2.13     Tax Matters**.

**(a)**     All Tax Returns required to be filed under applicable Law by the Sellers with respect to the Acquired Assets have been filed and such Tax Returns are correct and complete in all material respects.

**(b)**     All Taxes shown as due from the Sellers with respect to the Acquired Assets have been paid, except (i) to the extent nonpayment of which is permitted or required by the Bankruptcy Code and (ii) for Taxes that are being disputed by the Sellers in good faith.

**(c)**     No written notice from any Governmental Body of proposed adjustment, deficiency or underpayment of material Taxes with respect to the Sellers, the Acquired Assets have been received by any Seller that has not since been satisfied by payment or been withdrawn.  No Seller has waived any statute of limitations or agreed to any extension of time during which a material Tax or deficiency assessment may be made with respect to the Acquired Assets.

**(d)**     To the Seller's Knowledge, there are no Encumbrances for Taxes on the Acquired Assets, other than Permitted Encumbrances.

**(e)**     The Sellers have collected or withheld all amounts required to be collected or withheld by the Sellers for all Taxes in compliance with applicable Law, and all such amounts have been paid to the appropriate Governmental Body or set aside in appropriate accounts for future payment when due, in each case, in accordance with applicable Law.

**(f)**     To the Seller's Knowledge, no Governmental Body has in the last five (5) years made a claim that the Sellers, the Acquired Assets are or may be subject to taxation by a

jurisdiction in which Tax Returns are not filed by, or with respect to, the Sellers or the Acquired Assets, as applicable.

**2.14    Brokers**. There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of the Sellers that would become the obligation of the Purchaser or its Affiliates after the Closing.

**2.15    Compliance with Applicable Sanctions and Embargo Laws**.

(a)    Neither the Sellers nor any of their respective Affiliates is (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("***OFAC***"), the OFAC Consolidated Sanctions List or in any Executive Order issued by the President of the United States and administered by OFAC, or a person or entity prohibited by any OFAC sanctions program or a person or entity whose property and interests in property subject to U.S. jurisdiction are otherwise blocked under any U.S. laws, Executive Orders or regulations; (ii) an entity owned, directly or indirectly, individually or in the aggregate, fifty percent or more by one or more persons described in subsection (i); (iii) a person or entity listed on the Sectoral Sanctions Identifications ("***SSI***") List maintained by OFAC or otherwise determined by OFAC to be subject to one or more of the Directives issued under Executive Order 13662 of March 20, 2014, or an entity owned, directly or indirectly, individually or in the aggregate, fifty percent or more by one or more persons or entities that are subject to the SSI List restrictions; or (iv) a person or entity named on the U.S. Department of Commerce, Bureau of Industry and Security Denied Persons List, Entity List, or Unverified List.

(b)    Neither the Sellers nor any of its respective Affiliates has violated any applicable sanctions, embargo, or export control laws or regulations, except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets.

**2.16    Compliance with Applicable Anti-Bribery and Anti-Corruption Law**. Neither the Sellers nor any of its respective Affiliates has, directly or indirectly: (a) made, offered, or paid any illegal contributions, payments, bribes, kickbacks, expenditures, gifts or similar payments or provided any unlawful compensation or gifts or payments to any officer, employee, or representative of any Governmental Body, or any employee, customer or supplier of the Sellers or any other Person, in each case, in violation of applicable Law; (b) made or offered to make any improper payment to any foreign official (as defined in the FCPA); or (c) taken any other action that would cause the Sellers to be in violation of any Anti-Bribery and Anti-Corruption Law.

**2.17    Financial Statements**.  The Sellers have delivered to the Purchaser correct and complete copies of (i) the unaudited balance sheet of the Sellers as of, and the consolidated statements of operations, changes in members' equity and cash flows for, the fiscal year ended on December 31, 2020 and (ii) the unaudited balance sheet of the Sellers as of, and the consolidated statements of operations and cash flow for, the nine month period ended on November 30, 2021 (collectively, the "***Financial Statements***").  The Financial Statements have not been prepared in accordance with GAAP but presently fairly, in all material respects, the

financial position of the Sellers as of the respective dates thereof and for the periods indicated therein (subject to normal and recurring year-end adjustments and the absence of footnotes).

**2.18   Absence of Changes**.  Except as a result of or in connection with the Bankruptcy Case, (a) there has not been a Material Adverse Effect and (b) the Sellers have not taken any action that, if taken following November 30, 2021, would have violated Section 5.1.

**2.19   Insurance**.  The Sellers are in material compliance with the terms and provisions of its policies of insurance, all such policies are in full force and effect and all premiums due and payable with respect to such policies have been paid.  The Sellers have not received a written notice of cancellation or termination of any such policy.  Except for the Insurance Claims, there are no pending claims or, to the Seller's Knowledge, incidents that would give rise to a claim under any such policy.

**2.20   Disclaimer   of   Other   Representations   and   Warranties**. NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO PURCHASER OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ADVISORS OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA), EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 2 OR IN ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY, NEITHER THE SELLERS, ANY AFFILIATE OF A SELLER OR ANY OF THEIR RESPECTIVE ADVISORS OR ANY OTHER PERSON MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY CONSENTS OR APPROVALS REQUIRED IN CONNECTION THEREWITH), THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES, THE EXCLUDED ASSETS, OR ANY INFORMATION PROVIDED OR MADE AVAILABLE TO THE PURCHASER IN CONNECTION THEREWITH (INCLUDING ANY FORECASTS, PROJECTIONS, ESTIMATES OR BUDGETS), INCLUDING ANY WARRANTY WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ALL OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

### ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.

The Purchaser represents and warrants, to and for the benefit of the Sellers, as follows:

**3.1   Authority; Binding Nature of Agreement**.  This Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms, subject to the Enforceability Exceptions.

**3.2   Due Authorization.** The Purchaser has all requisite power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by the Purchaser of this Agreement have been duly approved and authorized by all necessary action.

# ARTICLE 4
# BANKRUPTCY COURT MATTERS

**4.1** **Bankruptcy Actions**.

**(a)** The Sellers and the Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval pursuant to the Bid Procedures Order. The Purchaser acknowledges that the Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Sellers and other interested parties, providing information about the Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

**(b)** The Sellers shall use reasonable best efforts to cause the Bankruptcy Court to enter the Bid Procedures Order approving Bid Procedures acceptable to both the Purchaser and Sellers and consistent with the provisions and obligations set forth in Section 4.1(c) and 4.1(d) below, as soon as practicable after full execution of this Agreement. If the Bankruptcy Court does not approve the Bid Procedures in their entirety, or if the Purchaser does not accept any modified terms approved by the Bankruptcy Court, then the Purchaser shall have the right to terminate this Agreement and neither party shall have any further obligation under this Agreement except for Sellers' obligation to return the Deposits as provided for in Section 7.2.

**(c)** If the Purchaser is not the Successful Bidder (as defined in Section 4.1(e) at the Auction, if any is held, or if the Sellers defaults under this Agreement pursuant to Section 9.4, Sellers shall, subject to Bankruptcy Court approval in connection with the approval of the Bid Procedures, pay to the Purchaser the Break-Up Fee as set forth in Section 7.3 as and for consideration of the Purchaser conducting its due diligence and entering into this Agreement subject to higher and better offers pursuant to the Auction, to compensate the Purchaser for its legal, accounting, and other professional costs and expenses, as well as the Purchaser's internal management time, incurred in connection with the proposed sale.

**(d)** *Competing Bid Requirements.*

**(i)** A competing bid must be in the form of cash in an amount equal to or greater than the sum of the Purchase Price, plus (1) the amount of the Break-Up Fee, plus (2) Fifty Thousand Dollars ($50,000) (the "***Opening Bid***"), plus the value of Assumed Liabilities under this Agreement, and otherwise meet the financing and other requirements set forth in the Bid Procedures, including such requirements set forth in Section 4.1(d)(ii) (such bid, a "***Qualified Competing Bid***"). If there is a Qualified Competing Bid, Seller shall hold an auction for the Acquired Assets (the "***Auction***") within five (5) Business Days of the Bid Deadline, provided, however, if the fifth (5th) day is not a Business Day, then the first Business Day following the fifth (5th) day, and as more fully described in the Bid Procedures (the "***Auction Date***"). At the Auction, the first subsequent bid must exceed the Opening Bid by at least Fifty Thousand Dollars ($50,000). Thereafter and continuing until there is only one (1) bidder remaining, each bidder must increase the subsequent bid in an amount of at least Fifty Thousand Dollars ($50,000) to remain a bidder in the Auction. To determine the winning bid at any such

Auction, the Sellers shall evaluate the value to be provided under the bids, including the net economic effect upon Sellers' estate, taking into account the Break-Up Fee owed to the Purchaser and the obligations assumed by the Purchaser under this Agreement.

(ii) To be deemed a Qualified Competing Bid, a bidder must comply with the Bid Procedures, including, without limitation: (1) submit its bid using an Asset Purchase Agreement substantially in the form of this Agreement, with a copy marked to show changes, if any, from this Agreement; (2) submit its bid by no later than 5:00 p.m. PST thirty (30) days after the entry of the Bid Procedures Order (the "*Bid Deadline*"); (3) not include any contingencies to closing the transaction in its bid, including, without limitation, financing, inspection, and due diligence contingencies; (4) be able to close the transaction no later than fifteen (15) days after entry of the Sale Order as further explained in the Bid Procedures; (5) provide at the time of its bid (A) a representation that the bidder has the financial ability to perform and provide evidentiary documentation demonstrating such financial ability to close (e.g., financial statements and bank statements that show available cash necessary to close the transaction) that are satisfactory to the Sellers in its reasonable discretion; and (B) a representation that the bidder is duly authorized to submit the bid and close the transaction and has already obtained all necessary approvals (e.g., board approvals), plus, if requested by Sellers, supporting documents satisfactory to Sellers in its reasonable discretion; and (6) submit with its bid a good-faith deposit in the amount of One Hundred Thousand Dollars ($100,000).

(e) If an Auction is conducted, and the Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "*Successful Bidder*"), the Purchaser shall be required to serve as a back-up bidder (the "*Backup Bidder*") and keep the Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and the Sellers may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement as such terms may have been improved upon in the Auction.

(f) Notwithstanding anything herein to the contrary, the Purchaser acknowledges that the Sellers and their respective Affiliates and their respective professional advisors may, subsequent to the entry of the Bid Procedures Order, continue (i) soliciting inquiries, proposals, or offers for the Acquired Assets in connection with any Alternative Transaction, (ii) responding to requests for information or due diligence inquiries, or making management available for such purposes, to Persons in connection with any Alternative Transaction and (iii) furnishing any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing. Notwithstanding any other provision of this Agreement to the contrary, the Purchaser acknowledges and agrees that the Sellers and their respective Affiliates may enter into a definitive agreement providing for an Alternative Transaction.

(g) The Sellers shall promptly serve true and correct copies of the motion seeking entry of the Sale Order and all related pleadings in accordance with the Bid Procedures

Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable Order of the Bankruptcy Court.

(h)     The Purchaser shall promptly take all actions as are reasonably requested by the Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of the Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating the Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

**4.2     Cure Costs**.  Subject to entry of the Sale Order, the Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Sellers and assigned to the Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

**4.3     Bankruptcy Court Filings**.  The Sellers shall use reasonable best efforts to obtain entry of the Bid Procedures Order and the Sale Order.  The Bid Procedures Order shall, among other things, approve the Break-Up Fee.  The Sale Order shall, among other things, (a) approve and direct, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances), and (iii) the performance by the Sellers of its obligations under this Agreement; (b) authorize, empower and direct the Sellers to assume and assign to the Purchaser the Assigned Contracts; (c) find that the Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that the Purchaser is not a successor to the Sellers, and grant the Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that the Purchaser shall have no Liability or responsibility for any Liability or other obligation of the Sellers arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that the Purchaser has provided adequate assurance (and as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; (f) find that the Purchaser shall have no Liability for any Excluded Liability; and (g) find that there was no violation of section 363(n) of the Bankruptcy Code.  The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.  At Closing,

the Purchaser shall pay $3,000,000 of the Purchase Price directly to Avnet, Inc. in full satisfaction of the Avnet Secured Claim.

**4.4    Approval**.  The Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Bid Procedures Order and the Sale Order).  Nothing in this Agreement shall require the Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE 5
## COVENANTS AND AGREEMENTS

**5.1    Conduct of Business of the Sellers**

(a)     Until the earlier of the termination of this Agreement pursuant to Article 7 and the Closing, except (w) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (x) as required by applicable Law, Order or a Governmental Body, (y) as required or restricted by the terms of the DIP Loan Agreement, or (z) with the prior written consent of the Purchaser, the Sellers shall (i) operate the Acquired Assets only in the Ordinary Course and in all material respects in compliance with all applicable Laws, (ii) use reasonable best efforts to maintain the Acquired Assets in good working order (normal wear and tear excepted), and (iii) use reasonable best efforts to maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers, vendors and others having business relationships with the Sellers in connection with the operation of the Acquired Assets.

(b)     Until the earlier of the termination of this Agreement pursuant to Article 7 and the Closing, except (w) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (x) as required by applicable Law, Order or a Governmental Body, (y) as required or restricted by the terms of the DIP Loan Agreement, or (z) with the prior written consent of the Purchaser, the Sellers shall not:

(i)     issue any notes, bonds or other debt securities, or otherwise incur any indebtedness for borrowed money or otherwise become liable for any such indebtedness of any other Person, in each case, other than Excluded Liabilities;

(ii)     terminate (other than by expiration), amend or modify (other than by automatic extension or renewal) in any material respect the terms of any Assigned Contract; provided, however, that the Sellers may terminate, amend or modify purchase orders in the Ordinary Course;

(iii)     settle or compromise any pending or threatened Action if such settlement or compromise would create Liabilities that are not Excluded Liabilities;

(iv)     acquire any material assets that would become Acquired Assets or sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any

Acquired Assets, other than (A) sales in the Ordinary Course, (B) licenses of Intellectual Property granted on a non-exclusive basis, or (C) pursuant to existing Contracts;

(v)     subject any portion of the Acquired Assets to any Encumbrance, except for Permitted Encumbrances;

(vi)     (A) increase wages or salary of any employee except in the Ordinary Course consistent with cost of living increases, (B) grant any bonuses to any employee except in the Ordinary Course pursuant to the Seller Plans or other applicable Contracts, or (C) increase other compensation or material benefits of any employee;

(vii)     hire any new employee;

(viii)     establish, enter into, terminate, adopt or amend any Seller Plan;

(ix)     fail to maintain any insurance policy in effect on the date hereof or amend any such policy (other than extensions, replacements or amendments thereof in the Ordinary Course);

(x)     amend the DIP Loan Agreement in any material respect;

(xi)     make, change or rescind any Tax election, amend any Tax Return, omit to take any action, enter into any settlement or compromise of any claim, notice, audit report or assessment in respect of any Taxes, adopt or change any method of Tax accounting, enter into any Tax allocation, sharing or closing agreement, surrender any right to claim a Tax refund, consent to any extension or waiver of the statute of limitations applicable to any Tax claim or assessment, or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Purchaser in respect of any Tax period ending after the Closing Date;

(xii)     make any expenditure except in accordance with the DIP Budget; or

(xiii)     authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)     Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Sellers intend to liquidate and sell the Excluded Assets, and that the Sellers shall be permitted to take, or appoint a third party to take, all reasonable actions in connection therewith, including entering into liquidation agreements and other Contracts, selling Excluded Assets at discounted prices, and using Sellers' Intellectual Property to advertise such sales and liquidation.

(d)     Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that the Sellers may determine their need to take measures or will sustain impacts on their respective business as a result of COVID-19, and nothing herein shall prevent the Sellers from taking all commercially reasonable measures in good faith in order to preserve their respective business, operations, assets, Liabilities, prospects or any portion thereof as a result

thereof, nor shall any such impact sustained by the Acquired Assets be deemed as a breach of this Agreement.

(e)     Nothing contained in this Agreement is intended to give the Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Acquired Assets prior to the Closing in violation of applicable Laws.

5.2     **Access to Information**.  Until the earlier of the termination of this Agreement pursuant to Article 7 and the Closing, the Sellers (in its sole discretion) will provide the Purchaser and its professional advisors with reasonable access, upon reasonable advance notice and during regular business hours, to the books and records of the Sellers and their respective Affiliates, in order for the Purchaser and its professional advisors to access such information regarding the Sellers and their respective Affiliates as the Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of the Seller, (ii) such access will occur in such a manner as the Sellers reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, and (iii) nothing herein will require the Sellers to provide access to, or to disclose any information to, the Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws; provided that, in the event that the Sellers withhold access or information in reliance on the foregoing clause (A) or (B), the Sellers shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to the Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

5.3     **Intentionally Omitted**.

5.4     **Reasonable Efforts; Cooperation.**

(a)     Subject to the other terms of this Agreement, each Party shall, and shall cause its professional advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, advisable or permitted under applicable Law to cause the transactions contemplated hereby to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its professional advisors in connection with any step required to be taken as a part of its obligations hereunder.

(b)     The obligations of the Sellers pursuant to this Agreement, including this Section 5.4, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Code or the Bankruptcy Code (including in connection with the Bankruptcy Case), and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bid Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

5.5     **Further Assurances**.  From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be

21-61491-tnap     Doc 136     FILED 01/20/22     ENTERED 01/21/22 00:11:05     Page 50 of 109

executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

5.6     **Receipt of Misdirected Assets**. From and after the Closing, if the Sellers or any of their respective Affiliates receives any right, property or asset that is an Acquired Asset, the Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to the Purchaser, and such asset will be deemed the property of the Purchaser held in trust by the Sellers for the Purchaser until so transferred. From and after the Closing, if the Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, the Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Sellers, and such right, property or asset will be deemed the property of the Sellers held in trust by the Purchaser for the Sellers until so transferred.

5.7     **Confidentiality**. Following the completion of the Auction, the Sellers agree to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Acquired Assets which is in such Seller's possession or of which such Seller is aware. Each Seller hereby further agrees, unless disclosure is required by applicable Law, to use reasonable best efforts to safeguard such confidential information and to protect it against disclosure, misuse, loss and theft. In furtherance and not in limitation of the foregoing, such Seller shall not, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Acquired Assets, provided that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 5.7 or information not otherwise known by such Seller that becomes available to such Seller from a Person other than the Purchaser not subject to an obligation of confidentiality to the Purchaser or the Acquired Assets, or (b) any of the discussions or negotiations conducted with the Purchaser in connection with this Agreement, provided that such Seller shall be entitled to disclose (i) any information required to be disclosed by such Seller to the Bankruptcy Court, parties in interest in the Bankruptcy Case, or other Persons bidding on assets of the Seller, (ii) any information required to be disclosed by such Seller pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), legal proceeding or Governmental Body, or (iii) any information to such Seller's professional advisors on a need-to-know basis; provided that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required.

5.8     **Casualty Loss**. Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, the Sellers shall notify the Purchaser promptly in writing of such fact, and (i) in the case of condemnation or taking, the Sellers shall assign or pay, as the case may be, any proceeds thereof to the Purchaser at the Closing, and (ii) in the case of fire, flood or other casualty, the Seller shall assign the insurance proceeds therefrom to the Purchaser at the Closing.

5.9     **Intentionally Omitted**.

**5.10    Notification of Certain Matters**.

(a)    The Sellers shall give to the Purchaser, and the Purchaser shall give to the Sellers, copies of notices or other communications received by the Sellers or the Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement that are not filed with the Bankruptcy Court.

(b)    Each Party shall promptly advise the other in writing of any matter hereafter arising or events or conditions arising prior to Closing, which, if existing or known at the date hereof and not set forth on the Schedules, would have constituted a breach of or inaccuracy in a representation made by such Party such that the conditions under Article 6, as the case may be, would not be satisfied.

**ARTICLE 6**
**CONDITIONS TO CLOSING**

**6.1    Conditions Precedent to the Obligations of the Purchaser and the Sellers**. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver) on or prior to the Closing Date, of each of the following conditions:

(a)    no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

(b)    the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order and such orders shall not have been reversed, modified, amended or stayed.

**6.2    Conditions Precedent to the Obligations of the Purchaser**. The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the Sellers shall have delivered to the Purchaser a certified copy of the Sale Order;

(b)    each of the representations and warranties made by the Sellers in Article 2 (other than Sections 2.1, 2.2, 2.4(a)-(d) and 2.14) shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct has not had, and would not, individually or in the aggregate, reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) the representations and warranties set forth in Sections 2.1, 2.2, 2.4(d)-(d) and (f) and 2.14 shall be true and correct in all respects as of the Closing Date

(disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date);

(c)     the Sellers shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by the Sellers on or prior to the Closing;

(d)     the Sellers shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Section 1.8; and

(e)     since the date of this Agreement, there shall not have been a Material Adverse Effect.

**6.3     Conditions Precedent to the Obligations of the Sellers**.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     each of the representations and warranties made by the Purchaser in Article 3 shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

(b)     the Purchaser shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Purchaser by the Closing; and

(c)     the Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 1.9.

**6.4     Waiver of Conditions**.  None of the Purchaser or the Sellers may rely on the failure of any condition set forth in this Article 6 to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE 7
## TERMINATION

**7.1     Termination of Agreement**. This Agreement may be terminated only in accordance with this Section 7.1.  This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of the Sellers and the Purchaser;

**(b)** the issuance by any other Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 7.1(b) if the issuance of such Order was caused by the breach or action or inaction of such Party;

**(c)** by written notice of the Purchaser or the Sellers to the other Party, if the Closing shall not have occurred on or before February 28, 2022 (the "***Outside Date***"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 7.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

**(d)** by written notice of the Purchaser or the Sellers to the other Party, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of any Sellers is appointed in the Bankruptcy Case;

**(e)** by written notice from the Sellers to the Purchaser, upon a breach of any covenant or agreement on the part of the Purchaser, or if any representation or warranty of the Purchaser will have become untrue, in each case, such that the conditions set forth in Section 6.3(a) or 6.3(b) would not be satisfied; provided that (i) if such breach is curable by the Purchaser then the Sellers may not terminate this Agreement under this Section 7.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Sellers notify the Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 7.1(e) will not be available to the Sellers at any time that the Sellers are in material breach of any covenant, representation or warranty hereunder;

**(f)** by written notice from the Purchaser to the Sellers, upon a breach of any covenant or agreement on the part of the Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 6.2(b) or 6.2(c) would not be satisfied; provided that (i) if such breach is curable by the Seller then the Purchaser may not terminate this Agreement under this Section 7.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Purchaser notifies the Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 7.1(f) will not be available to the Purchaser at any time that the Purchaser is in material breach of any covenant, representation or warranty hereunder;

**(g)** Intentionally Omitted;

**(h)** by written notice from the Purchaser to the Sellers, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by January 25, 2022, (ii) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect or (iii) the Sellers have failed to comply with the Sale Order;

**(i)** Intentionally Omitted;

**(j)** by written notice from the Sellers to the Purchaser, if the Sellers or the board of directors (or similar governing body) of the Seller, based upon the written advice of the Sellers' outside legal counsel, determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Seller's or governing body's fiduciary duties; or

**(k)** by written notice from the Sellers to the Purchaser, if (i) the Sellers enter into one or more Alternative Transactions with one or more Persons other than the Purchaser or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Purchaser, in each case, and such Alternative Transaction is consummated.

**7.2** **Effect of Termination**. In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party, except that the Sellers shall return to the Purchaser the Deposit; provided that this Section 7.2, Section 7.3 and Article 9 shall survive any such termination.

**7.3** **Termination Fee**.

**(a)** In the event that this Agreement is terminated by the Sellers pursuant to Section 7.1(j) or Section 7.1(k), then the Sellers shall pay to the Purchaser an amount in cash equal to 3.0% of the Purchase Price (the "***Break-Up Fee***"); provided, however, that in the event the Sellers have insufficient funds at the time of the termination of this Agreement pursuant to Section 7.1(j) or Section 7.1(k) to pay both the full amount of the Break-Up Fee and the full amount of the Avent Secured Claim then the Purchaser shall have a secured claim (junior only to the Avnet Secured Claim) with respect to the unpaid portion of the Break-Up Fee. Any payment of the Break-Up Fee pursuant to the first sentence of this Section 7.3(a) in connection with the consummation of an Alternative Transaction or the consummation of any other transaction in which the Avnet Secured Claim has been or will be repaid in full shall be a super-priority administrative expense claim senior to all other administrative expense claims under section 364(c)(1) of the Bankruptcy Code. In the event that this Agreement is terminated pursuant to Section 7.1(k), any payments of the Break-Up Fee shall be payable from, and shall at the time of closing be paid out of, the proceeds of the closing of the applicable Alternative Transaction.

**(b)** Each of the Sellers and the Purchaser acknowledges and agrees that: (i) the agreements contained in this Section 7.3 are an integral part of the transactions contemplated by this Agreement; (ii) the Break-Up Fee is not a penalty, but is liquidated damages, in a reasonable amount that will compensate the Purchaser in the circumstances in which such amount is payable, for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision; and (iii) without these agreements, neither the Sellers nor the Purchaser would have entered into this Agreement.

**(c)** As collateral security for the prompt and complete payment when due (whether at stated maturity, by acceleration or otherwise) of the Break-Up Fee pursuant to the terms of Section 7.3(a) (the "***Secured Obligations***"), the Sellers hereby mortgage, pledge and hypothecate to the Purchaser, and grants to the Purchaser an Encumbrance on and security interest in, all of such Seller's right, title and interest in, to and under all of the assets and

properties of such Seller (collectively, "***Collateral***"); provided, however, that the Encumbrance and security interest granted pursuant to this Section 7.3(c) shall in all events be junior to the liens and security interests securing the Avnet Secured Claim. The security interest granted pursuant to this Section 7.3(c) constitutes a valid and continuing perfected security interest in favor of the Purchaser in all Collateral. The Sellers hereby authorize the Purchaser to file one or more UCC-1 financing statements in the appropriate filing office to reflect the security interest granted pursuant to this Section 7.3(c).

**ARTICLE 8**
**TAXES**

**8.1     Transfer Taxes**. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "***Transfer Taxes***") shall be borne 50% by the Sellers and 50% by the Purchaser, and the Purchaser shall timely file all Tax Returns related to any Transfer Taxes. The Sellers and the Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.

**8.2     Allocation of Purchase Price**. For U.S. federal and applicable state and local income Tax purposes, the Purchaser, the Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other items treated as part of the purchase price for applicable income Tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "***Allocation Methodology***"). As soon as commercially practicable, the Purchaser shall provide a proposed allocation to the Sellers setting forth the allocation of the Purchase Price (and other amounts treated as Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "***Allocation***"). If the Sellers deliver a written objection within thirty (30) days after receipt of the draft Allocation proposed by the Purchaser, then the Purchaser and the Sellers shall negotiate in good faith to resolve any such objection. Any resolution by the Sellers and the Purchaser shall be conclusive and binding on the Parties once set forth in writing (any such conclusive and binding Allocation, the "***Final Purchase Price Allocation***"). If the Sellers and the Purchaser cannot resolve such dispute within thirty (30) days of the Purchaser's receipt of the Sellers' objection, the Final Purchase Price Allocation shall be determined pursuant to Section 9.13. The Parties and their respective Affiliates shall file all Tax Returns in accordance with the Allocation Methodology and the Final Purchase Price Allocation (if any). None of the Parties shall take any Tax related action inconsistent with the Final Purchase Price Allocation (if any) unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

**8.3     Cooperation**. The Purchaser and the Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

**8.4     Preparation of Tax Returns and Payment of Taxes.**

**(a)**     Except as otherwise provided by Section 8.1, the Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on

or before the Closing Date other than with respect to any Assumed Tax and (ii) all income Tax Returns of the Sellers for all Tax Periods. Except to the extent any Tax reflected on a return required to be prepared and filed by the Sellers pursuant to this Section 8.4 is constitutes an Assumed Liability, the Sellers shall be responsible for paying any Taxes due with respect to Tax Returns that the Sellers are obligated to prepare and file under this Section 8.4(a).

(b)     The Purchaser shall prepare and timely file all other Tax Returns with respect to the Acquired Assets that are not addressed by Section 8.4(a). With respect to any Straddle Period, the Purchaser shall prepare such Tax Returns consistent with past practice of the Sellers, and shall provide the Sellers with a draft of such Tax Returns at least thirty (30) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by the Sellers with respect to such Tax Returns; provided that such changes are consistent with past practice of the Sellers and applicable Law. The Purchaser shall be responsible for paying any Assumed Tax reflected on any Tax Return that the Purchaser is obligated to prepare and file under this Section 8.4(b).

## ARTICLE 9
## MISCELLANEOUS

9.1     **Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and nothing in this Section 9.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. The Purchaser and the Sellers acknowledge and agree, on their own behalf and on behalf of their respective Affiliates, as the case may be, that the agreements contained in this Section 9.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing, and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 9.1, none of the Parties would enter into this Agreement.

9.2     **Indemnity; Expenses**. Whether or not the Closing takes place, the Sellers shall indemnify, and hold harmless, the Purchaser and its Affiliates and their respective representatives and agents from all Liability (including reasonable expenses of counsel) arising from any Action instituted in the Bankruptcy Case in connection with the transactions contemplated hereby. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 7.3), all fees, costs and expenses (including fees, costs and expenses of professional advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs

and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to Section 8.1 and (b) all Cure Costs will be allocated pursuant to Section 1.3(b) and Section 4.2.

**9.3** **Notices**. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), one Business Day after delivery to such courier; (c) if otherwise actually personally delivered, when delivered; (d) if delivered by electronic mail before 5:00 p.m. (local time at the location of recipient) on a Business Day, when transmitted and receipt is confirmed; and (e) if delivered by electronic mail after 5:00 p.m. (local time at the location of recipient), when transmitted and receipt is confirmed, at 9:00 a.m. (local time at the location of recipient) on the following Business Day, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

> Notices to Purchaser:
>
> Instantiation LLC
> 434 Dorado Beach E
> Dorado, Puerto Rico 00646
> Attention:     Sam Cassatt
> Email:          sam@aligned.capital
>
> with a copy to (which shall not constitute notice for purposes of this Section 9.3):
>
> Sheppard, Mullin, Richter & Hampton LLP
> Four Embarcadero Center
> 17th Floor
> San Francisco, California 94111
> Attention:     Jason R. Schendel and Jeannie Kim
> Email:          jschendel@sheppardmullin.com
>                    jekim@sheppardmullin.com

SMRH:4884-5558-9128.6

Notices to Sellers:

Squirrels Research Labs, LLC
121 Wilbur Drive NE
North Canton, OH 44720
Attention:     David Stanfill, President
Email:        david@squirrelsresearch.com

and

The Midwest Data Company LLC
121 Wilbur Drive NE
North Canton, OH 44720
Attention:     David Stanfill, President
Email:        david@squirrelsresearch.com

with a copy to (which shall not constitute notice for purposes of this Section 9.3):

Brouse McDowell, a Legal Professional Association
388 S. Main Street, Suite 500
Akron, OH  44311
Attention:     Marc B. Merklin
Email:        MMerklin@brouse.com

**9.4**    **Remedies**.

    **(a)**    **Default by Purchaser**. The parties agree that the Purchase Price has been determined not only by a consideration of the value of the property per se but also by a consideration of the value of the various covenants, conditions and warranties of this Agreement as they relate to the property. The consideration of such values, sometimes measurable in relation to known external standards and sometimes determined only by subjective business judgments of the parties, are all interrelated and affected by the Parties' ultimate agreement upon the Purchase Price. The Parties have discussed and negotiated in good faith upon the question of the damages that would be suffered by Sellers in the event this Agreement terminates prior to the close of escrow due to a buyer material default.  It shall be a material default by Purchaser under this Agreement (a "***Purchaser's Default***") if any of the Purchaser's representations and warranties are materially untrue or the Purchaser shall fail to perform or comply with any of its covenants, acts and agreements contained in this agreement in any material respect when required to be performed hereunder and such failure shall continue for five (5) Business Days after Sellers give Purchaser written notice of such failure, except that if such failure relates to any material covenant or agreement to be performed at the Closing, there shall be no notice required or grace or cure period allowed. If a Purchaser's Default occurs and provided no material default by a Seller has occurred that has not been cured, then such Seller shall have the right to terminate this Agreement immediately by giving written notice to the Purchaser, in which event, the Parties have endeavored to reasonably estimate such damages and they hereby agree that, by reason of the aforesaid considerations, (i) such damages are and will be impracticable or extremely difficult to fix, (ii) liquidated damages in the amount of any Deposits actually delivered by the

Purchaser are and will be reasonable, (iii) in the event of such default, Sellers shall receive such Deposits as liquidated damages, and (iv) in consideration of the payment of such liquidated damages, Sellers shall be deemed to have waived all other claims for damages.

(b) **Default by Seller**. If this transaction fails to close as a result of a Seller's material default, which such Seller fails to cure within five (5) Business Days after receipt of written notice describing in reasonable detail the nature of such material default, then the Purchaser's sole and exclusive remedy shall be to (i) terminate this Agreement by giving Sellers written notice of the Purchaser's election to immediately terminate this Agreement and receive an administrative claim in the Bankruptcy Case pursuant to section 503(b) of the Bankruptcy Code in the amount of the Breakup Fee or (ii) assert and seek judgment against Seller for specific performance, and if such judgment is not obtained, then exercise such remedy under Section 9.4(b)(i) hereof.

**9.5** **Binding Effect; Assignment**. This Agreement shall be binding upon the Purchaser and, subject to the terms of the Bid Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, the Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of the Purchaser and the Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void; provided, however, upon prior written notice to the Sellers, the Purchaser shall have the right to assign its rights and/or delegate its obligations hereunder (a) to any Affiliates and (b) after Closing, to any subsequent purchaser of all or any portion of the equity interests or assets of the Purchaser or the Acquired Assets.

**9.6** **Amendment and Waiver**. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by the Purchaser and the Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**9.7** **Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**9.8** **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

**9.9** **Construction**. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this

Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

**9.10     Schedules**. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules to the extent reasonably apparent.  Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement.   The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, any updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course.  In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement.  The information contained in this Agreement, in the Schedules and exhibits is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

**9.11     Complete Agreement**. This Agreement, together with the Schedules and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the other transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the other transactions contemplated by this Agreement.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

**9.12     Specific Performance**. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event

that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 9.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor the Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 9.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to the Sellers pursuant to this Section 9.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Sellers from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any Action, in each case in accordance with this Section 9.12, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such Action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such Action, as the case may be. In no event will this Section 9.12 be used, alone or together with any other provision of this Agreement, to require any Sellers to remedy any breach of any representation or warranty of any Sellers made herein.

9.13    **Jurisdiction and Exclusive Venue**. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Court of Chancery (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court located within Wilmington, Delaware) (the courts described in clauses (a) and (b), the "***Chosen Courts***"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non-conveniens. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 9.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

### 9.14  Governing Law; Waiver of Jury Trial.

(a)  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND EACH PARTY THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. THE PROVISIONS OF THIS SECTION 9.13 SHALL BE ENFORCEABLE BY EACH DEBT FINANCING SOURCE, ITS AFFILIATES AND THEIR RESPECTIVE SUCCESSORS AND PERMITTED ASSIGNS.

### 9.15  Counterparts.

This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Delivery of an executed counterpart of the signature page to this Agreement or any agreement or instrument contemplated hereby by email, facsimile, portable document format (pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (including DocuSign) shall be as effective as delivery of a manually executed counterpart of this Agreement. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will

raise the use of a DocuSign, .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of DocuSign, .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

9.16    **Publicity**. Neither the Sellers nor the Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the reasonable judgment of the Purchaser or the Sellers, as the case may be, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that the Party intending to make such release shall use its reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

9.17    **Bulk Sales Laws**. The Parties intend that, pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets contemplated hereby shall be free and clear of any Encumbrances (other than Permitted Encumbrances) including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

9.18    **No Solicitation**.  This Agreement and the transactions contemplated herein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act of 1933 ("*Securities Act*") or the Securities Exchange Act of 1934 (the "*Exchange Act*") and the Seller will not solicit acceptances of any plan of reorganization from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

9.19    **Release.**

(a)    Effective upon the Closing, the Sellers on behalf of themselves and their respective Affiliates and each of their respective directors, officers, control persons (as defined in Section 15 of the Securities Act or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, professional advisors, legal representatives, shareholders, partners, estates, successors and assigns solely in their capacity as such, and any of their respective agents, attorneys, financial advisors, professional advisors, legal advisors, Affiliates, directors, managers, officers, control persons, shareholders, members or employees, in each case, solely in their capacity as such (each a "*Related Party*", and collectively, the "*Related Parties*") acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against the Purchaser or any of its Related Parties that

directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder (any and all such direct or derivative claims, collectively, the "*Seller Released Claims*"); and, should any Seller Released Claims nonetheless exist, the Seller on behalf of itself and its Related Parties hereby (i) releases and discharges the Purchaser and its Related Parties from any liability whatsoever on such Seller Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder, and (ii) releases, remises, waives and discharges all such Seller Released Claims against the Purchaser and its Related Parties; provided that nothing herein shall release the Purchaser of its obligations under this Agreement and the other documents and agreements contemplated herein.

      **(b)**      Effective upon the Closing, the Purchaser on behalf of itself and its Affiliates acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against the Sellers or any of its Related Parties that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder (any and all such direct or derivative claims, collectively, the "*Purchaser Released Claims*"); and, should any Purchaser Released Claims nonetheless exist, the Purchaser on behalf of itself and its Affiliates hereby (i) releases and discharges the Sellers and each of its Related Parties from any liability whatsoever on Purchaser Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder, and (ii) releases, remises, waives and discharges all such Purchaser Released Claims against the Sellers and each of their Related Parties; provided that nothing herein shall release the Sellers of its obligations (A) under this Agreement and the other documents and agreements contemplated herein or (B) for indemnification of any individuals serving as a director or manager of any Sellers or under any directors and officers insurance policy.

      **(c)**      Without limiting in any way the scope of the release contained in this Section 9.19 and effective upon the Closing, each Party, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown claims. Each Party hereby affirms its intent to waive and relinquish such unknown claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto.

**9.20    Amendment and Restatement**.  This Agreement amends certain provisions of the Original APA in their entirety so as to reflect and give effect to such amendments.  All amendments to the Original APA effected by this Agreement shall have effect from the date of this Agreement, and all other covenants, agreements, terms and provisions of this Agreement, shall have effect from the date of the Original APA.

**ARTICLE 10**
**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

**10.1    Certain Definitions.**

"***Action***" means any Order, action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"***Affiliate***" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"***Alternative Transaction***" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of the Sellers or any portion of its equity interests or any material portion of its assets (in any form of transaction, whether by merger, sale of assets or equity or otherwise) with any party other than the Purchaser or its Affiliates; provided, however, that the foregoing shall not include (a) sales of goods and services in the Ordinary Course and (b) any sale of the Excluded Assets pursuant to *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the Bankruptcy Rules.

"***Anti-Bribery and Anti-Corruption Law***" means, collectively: (a) the U.S. Foreign Corrupt Practices Act ("***FCPA***"); (b) the UK Bribery Act 2010; and (c) any other anti-bribery or anticorruption laws, statutes, and regulations applicable to the Acquired Assets.

"***Assumed Taxes***" means any Liability for Taxes arising from the ownership or operation of the Acquired Assets for any taxable period (including any portion thereof) beginning after the Closing Date (including the portion of any Straddle Period after the Closing Date).  In the case of any Straddle Period, (a) property taxes for the period following the Closing Date shall be equal to the amount of such property taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that is for the period following the Closing Date and the denominator of which is the number of days in the entire

Straddle Period, and (b) Taxes (other than property taxes) for the period following the Closing Date shall be computed as if such taxable period began on the day following the Closing Date.

"*Auction*" has the meaning ascribed to such term in the Bid Procedures Order and Section 4.1(d).

"**Avnet Secured Claim**" means the claim of Avnet, Inc. against SQRL in the Bankruptcy Case, which claim shall be treated as an allowed claim that is fully secured under 11 U.S.C. §506(a) in the amount of three million dollars ($3,000,000).

"*Bid Procedures*" means the bidding and sale procedures approved by the Bankruptcy Court, including the Competing Bid Requirements set forth in Section 4.1(d).

"*Bid Procedures Order*" means a final order of the Bankruptcy Court, in form and substance reasonably acceptable to the Purchaser and Sellers, meeting the requirements of Section 4.1, and which, among other things establishes a date by which Qualified Competing Bids must be submitted.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks in Canton, Ohio are generally authorized or required by Law to be closed.

"*Business Intellectual Property*" means Intellectual Property used or held out for use by the Sellers prior to the Closing in connection with the Acquired Equipment including without limitation the copyrights, software code, and designs but excluding, for the avoidance of doubt, the Registered IP.

"*Cash and Cash Equivalents*" means all of the Sellers' cash (including petty cash and checks received on or prior to the Closing), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"*Code*" means the United States Internal Revenue Code of 1986.

"*Consent*" means any approval, consent, ratification, permission, waiver or other authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"*Contract*" means any written contract, purchase order, station agreement, tower lease, service order, sales order, indenture, note, bond, Lease, sublease, mortgage, agreement, guarantee, purchase order, license, collective bargaining agreement, or other agreement that is binding upon a Person or its property.

"*COVID-19*" means SARS-CoV-2 or COVID-19, any evolutions thereof or related or associated epidemics, pandemics or disease outbreaks and any future epidemics, pandemics or disease outbreaks.

"**DIP Budget**" means the pro forma budget delivered to the Purchaser specifying the Sellers' operating budget, in form and substance reasonably satisfactory to the Purchaser, with any modifications thereto made (a) in accordance with the DIP Loan Agreement or (b) with the written approval of the Purchaser, not to be unreasonably withheld, conditioned or delayed.

"**DIP Financing Motion**" means the motion filed by MWDC seeking the Bankruptcy Court's approval of the DIP Loan and the DIP Loan Agreement pursuant to Sections 105, 362, 363, and 364 of the Bankrtupcy Code, in form and substance reasonably satisfactory to the Purchaser.

"**DIP Final Order**" means a final order entered by the Bankruptcy Court which, among other things, approves the DIP Loan and the DIP Loan Agreement on a final basis, in form and substance reasonably satisfactory to the Purchaser.

"**DIP Interim Order**" means an interim order entered by the Bankruptcy Court which, among other things, approves the DIP Loan Agreement on an interim basis, in form and substance reasonably satisfactory to the Purchaser.

"**DIP Loan Agreement**" means that certain Loan and Security Agreement, dated on or about the date hereof, by and between the Purchaser, as lender, and MWDC, as borrower.

"**DIP Loan**" means debtor-in-possession financing facility made available by the Purchaser to MWDC pursuant to the DIP Loan Agreement.

"**Documents**" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, listener registries, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"**Encumbrance**" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, encroachments, Orders and conditional sale or other title retention agreements and other rights of first refusal or first offer, activity and use limitations, title defects, and any other restrictions of any kind.

"**Environmental Laws**" all applicable Laws including any common law cause of action concerning (a) pollution or protection of the environment, or worker health and safety (solely to the extent relating to exposure to Hazardous Substances) or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, release or threatened release of Hazardous Substances.

"**_Equipment_**" means any and all machinery, equipment, auxiliary and translator facilities, transmitting towers, transmitters, broadcast equipment, antennae, cables, supplies, vehicles, furniture, fixtures, appliances, servers, traffic systems, graphic systems, audio boards, switchers, radar systems, microwaves, transponders, relays, backup generators, computers, computer hardware and peripherals, information technology infrastructure, telephone systems, office equipment, cameras, production equipment, inventory, leasehold improvements, spare parts and other tangible personal property of every kind and description, together with all rights against the manufacturers and/or suppliers of any of the foregoing.

"**_ERISA_**" means the Employee Retirement Income Security Act of 1974.

"**_GAAP_**" means United States generally accepted accounting principles as in effect from time to time applied consistently throughout the periods involved.

"**_Governmental Authorization_**" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"**_Governmental Body_**" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"**_Hazardous Substance_**" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

"**_Intellectual Property_**" means all intellectual property rights anywhere in the world arising under or associated with: (a) patents and patent applications; (b) trademarks, service marks, trade dress, trade names, logos, slogans, domain names, and other designations of origin, and all registrations and applications for registration therefor, together with all goodwill associated therewith; (c) copyrights (and any other equivalent rights in works of authorship (including rights in Software as a work of authorship and rights in programs and programming materials)); (d) trade secrets and industrial secrets, and rights in know-how and other confidential or proprietary business or technical information in each case that derive independent economic value from not being generally known ("**_Trade Secrets_**"); (e) rights in domain names, uniform resource locators, Social Media Accounts, social media identifiers and other names and locators associated with Internet addresses and sites; (f) engineering data, advertising studies, databases, marketing and demographic data, advertiser, exhibitor and vendor lists, credit and sales reports; and (g) other similar or equivalent intellectual property rights anywhere in the world.

"**_Knowledge of the Seller_**", "**_Seller's Knowledge_**", "**_Seller has Knowledge_**" and words of similar import mean the actual knowledge of David Stanfill after due inquiry.

"**_Law_**" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted,

adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"*Liability*" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"*Material Adverse Effect*" means any event, change, occurrence, or effect (each, an "*Effect*") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided, however, that none of the following, and no Effect arising out of, or resulting from, the following, shall constitute, or be taken into account, individually or in the aggregate, in determining whether or not there has been, a Material Adverse Effect: (a) Effects in, arising from or relating to general business or economic conditions affecting the industry in which the Sellers operate, (b) Effects in, arising from or relating to national or international political or social conditions, including rioting, domestic disturbance or the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (c) Effects in, arising from or relating to financial, banking, or securities markets (including (i) any disruption of any of the foregoing markets, (ii) any change in currency exchange rates, (iii) any decline or rise in the price of any security, commodity, Contract or index and (iv) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement), (d) Effects in, arising from or relating to changes in GAAP, (e) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body, (f) Effects in, arising from or relating to (i) the taking of any action at the request of the Purchaser or its Affiliates, (ii) the failure to take any action if such action is prohibited by this Agreement, (iii) the Purchaser's failure to consent to any of the actions restricted in Section 5.1 or (iv) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of the Purchaser, including the impact thereof on the relationships, contractual or otherwise, of the business of the Sellers with employees, customers, lessors, suppliers, vendors or other commercial partners, (g) Effects that arise from any seasonal fluctuations in the Sellers' business and operations, (h) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with the Purchaser or its Affiliates or professional advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (i) the effect of any action taken by the Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or any breach by the Purchaser of this Agreement, (j) the matters set forth on the Schedules and any changes or developments in, or effects or results

arising from or relating to, matters expressly set forth on the Schedules, (k) (i) the commencement or pendency of the Bankruptcy Case; (ii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions contemplated hereby or thereby, (B) the reorganization of the Sellers, or (C) the assumption or rejection of any Assigned Contract; and (iii) any Order of the Bankruptcy Court or any actions or omissions of the Sellers in compliance therewith, or (m) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including COVID-19), including any Law, directive, pronouncement or guideline issued by a Governmental Body, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place", curfews or other restrictions that relate to, or arise out of, a national health concern, epidemic or pandemic (including COVID-19) or any change in such Law, directive pronouncement or guideline thereof following the date of this Agreement or any material worsening of such conditions threatened or existing as of the date of this Agreement or any quarantine, stay-at-home orders, shelter-in-place orders, or trade restrictions related thereto or any other force majeure; provided, further, however, that any Effect referred to in clauses (a), (b) or (c) may be taken into account in determining whether or not there has been or may be a Material Adverse Effect to the extent such Effects have a materially disproportionate adverse effect on the Acquired Assets, taken as a whole, as compared to other participants engaged in the industries and geographies in which the Sellers operate the Acquired Assets.

"*Order*" means any injunction, order, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"*Ordinary Course*" means the ordinary and usual course of operations of the Sellers in connection with the use and operation of the Acquired Assets prior to the Closing consistent with past practice, taking into account the commencement and pendency of the Bankruptcy Case and recent past practice in light of COVID-19; provided, that, any action taken, or omitted to be taken, in good faith on a commercially reasonable basis that relates to, or arises out of, COVID-19 shall be deemed to be in the Ordinary Course.

"*Permitted Encumbrances*" means (a) utilities and current Taxes not yet due and payable, or the amount or validity of which are being contested in good faith by appropriate proceedings, or the nonpayment of which is permitted or required by the Bankruptcy Code, (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments of public record against any of the Acquired Assets, (c) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable or the amount or validity of which are being contested in good faith by appropriate proceedings, (d) such other Encumbrances or title exceptions as the Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (e) any Encumbrances that will be removed or released by operation of the Sale Order, (f) Encumbrances included in the Assumed Liabilities, and (g) liens that will be released at Closing.

"**_Person_**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

"**_Protected Information_**" means "personally identifiable information" within the meaning of section 363(b) of the Bankruptcy Code included as part of the Acquired Assets.

"**_Sale Motion_**" means the motion of the Sellers seeking approval and entry of the Bid Procedures Order and the Sale Order in form and substance approved by the Purchaser.

"**_Sale Order_**" means the order of the Bankruptcy Court to be entered by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance approved by the Purchaser, which order, amongst other approvals, (a) approves the sale of the Acquired Assets to the Purchaser free and clear of all Encumbrances and Liabilities pursuant to Section 363(f) of the Bankruptcy Code other than the Assumed Liabilities as set forth herein, and (b) approves the direct payment by Purchaser to Avnet, Inc. of $3,000,000 of the Purchase Price in full satisfaction of the Avnet Secured Claim.

"**_Seller Plan_**" means (a) "employee benefit plan" within the meaning of Section 3(3) of ERISA, (b) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (c) employment, severance, retention or other similar agreement, and (d) bonus, incentive, deferred compensation, profit-sharing, post- termination health or welfare, vacation, severance or termination pay or other material compensation or benefit plan, program, policy, agreement or other arrangement, in all cases, other than any plan or arrangement sponsored or maintained by a Governmental Body.

"**_Social Media Account_**" means an account registration with a social media platform, such as Facebook, Instagram, Twitter, Pinterest, Google, TikTok and the like, and includes handle names.

"**_Straddle Period_**" means any Tax period beginning on or before, and ending after, the Closing.

"**_Tax_**" or "**_Taxes_**" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

"**_Tax Return_**" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

    **10.2**    **Rules of Interpretation**. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules, the exhibits and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder:

**(a)** Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

**(b)** The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

**(c)** Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

**(d)** The words "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

**(e)** When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

**(f)** Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

**(g)** The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

**(h)** All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

**(i)** All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

**(j)** Any document or item will be deemed "delivered," "provided" or "made available" by the Sellers, within the meaning of this Agreement if such document or item is (i) actually delivered or provided to the Purchaser or any of the Purchaser's professional advisors or (ii) made available upon request, including at the Sellers' offices.

**(k)** Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

**(l)**     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

**(m)**     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

**(n)**     The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**(o)**     This Agreement is in the English language, and while this Agreement may be translated into other languages, the English language version shall control. All notices, demands, requests and other documents or communications under or in connection with this Agreement will be in English or will be accompanied by a certified English translation (in which case the English version will prevail in the event of a conflict except to the extent the communication contains or consists of an official document issued by a Governmental Body in a language other than English).

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement to be signed effective as of the date first above written by their duly authorized agents.

**SELLERS:**                                          **BUYER:**

SQUIRRELS RESEARCH LABS LLC          INSTANTIATION LLC

By: _____          By: _____
Name: David Stantill                                   Name: Sam Cassatt
Title:   Authorized Signatory                       Title: Managing Member


THE MIDWEST DATA COMPANY LLC

By: _____
Name: David Stantill
Title:   Authorized Signatory

*Signature page to Second Amended and Restated Asset Purchase Agreement*

SMRH:4884-5558-9128.6

## Schedule 1.1(a)

## Specific Acquired Equipment

See Attachment 1.1(a) entitled "SQRL_Assets_8_31_2021_BidFinal.xlsx".

SMRH:4884-5558-9128.6

| Item | Location | Qty |
| --- | --- | --- |
| Acorn Cle101 | 4-5-1/4-5-G | 3,086 |
| Acorn Fan 2010 | 4-5-1 | 17,087 |
| QSFP | 1-2-1 | 3,358 |
| Nest Fans | 4-3-1 | 3,526 |
| Acorn Cle215+ Heatsink | 4-5-1/4-5-G | 7,441 |
| Acorn 101 ready to ship | Green shelf | 623 |
| Thermal Pads 4mm-Gray | 4-2-1 | 11,500 |
| Thermal Pads 2mm-Gray | 4-2-1 | 12,375 |
| Thermal Pads 3mm- Gray | 4-2-1 | 11,000 |
| Cooling Fin/BCU Passive- New | 1-3-2 | 320 |
| VRM Heatsink-for Acorns | shipstation | 5,524 |
| Acorn Cle215 Heatsink | 4-5-1/4-5-G | 2,961 |
| BCU Backplates | 1-2-2 | 1,563 |
| Heatsink | 1-2-2 | 3,096 |
| Fan Plate BCU Active | 1-3-1 | 1,535 |
| BCU Duct | 1-3-1 | 1,426 |
| Heat Conduction Adhesive EC090211 (Expired) | 4-2-1 | 42 |
| 11 Tubes Solder paste | 8050 Northside Dock | |
| RED TOTE OF M2 THUNDERBOLD ADAPTORS APPROX 10 QTY | 8050 Old Warehouse Area | |
| BCU Waterblocks | 1-3-1 | 10 |
| approximately 800 ESD miscellaneous chip trays | 8050 Production SMT Room | |
| 6 Canister Solder Paste | 8050 Northside Dock | |
| Miscellanous 10GA Copper Wire in Pink Totes | 8050 Northside Dock | |
| 5x Acorn 215 | 8050 Northside Dock | |
| Acorn 215+ ready to ship | Green shelf | 3 |
| 2x TPS 543E20 EVM-799 Evaluation Kits | 8050 Northside Dock | |
| SCRAP PDU Internal Parts | 8050 Office Construction Area | |
| MISC DEV ACORN NESTS (4) | 8050 Old Warehouse Area | |
| 15 bittmain power supplies (bad) | 8050 Midwest Air DC | |
| 11 HP Power supplies (bad) | 8050 Midwest Air DC | |
| 3x Acorn 101 | 8050 Northside Dock | |

| Item | Location | Qty |
|---|---|---|
| BOX OF CAMO SPRAY PAINT APPROX 30 CANS | 8050 Old Warehouse Area | |
| Acorn 215 ready to ship | Green shelf | 1 |
| Miscellanous Large Wood Pallets | 8050 Northside Dock | |
| FF12NF Broken Juki Feeder | 8050 Northside Dock | |
| K601432 24MM Broken Juki Feeder | 8050 Northside Dock | |
| 1 Acorn 215+ | 8050 Northside Dock | |
| 6 cans Rustoleoum Spray Paint | 8050 New Liquid Room | |
| 4 Cans Galvinizing Spray Paint | 8050 New Liquid Room | |
| 4x Empty STM32 Boxes | 8050 Northside Dock | |
| Acrylic from BCU Waterblock (Scrap) | 1-3-1 | 305 |
| M.2 PCIE adaptor | 1-2-G | 4,074 |
| M.2pcIe cable | shipstation | 5,886 |
| Thermal Pads 1.5mm- Gray | 4-2-1 | 18,000 |
| 13 boxes MX Waterblocks and Back Plates | 8050 Production Assembly Room | |
| Thermal Pads .5mm-Gray | 4-2-1 | 23,750 |
| Unshielded Ram (Ballistix 4GB DDR4 dimms) | 4-4-1 | 742 |
| 10 boxes FK Passive Heatsinks | 8050 Production Assembly Room | |
| Shielded Ram (Ballistix 4GB DDR4 dimms) | 4-4-1 | 659 |
| 10x 30 port manifolds | Skymax Midwest Liquid DC | |
| Liebert EPA150C PDUs (qty 13) Misc/Rough Condition | 8050 New Liquid Room | |
| PARMSCO 5X170FL-316L SERIAL 02168 FILTER TANK | 8050 Old Warehouse Area | |
| Generac 750kw dual-engine generator (1 engine blown) | 8050 Old Outdoor Fixtures | |
| Generac 750kw dual-engine generator (1 engine blown) | 8050 Old Outdoor Fixtures | |
| Generac 600kw dual-engine generator (1 engine blown) | 8050 Old Outdoor Fixtures | |
| KISS-102 ss-047 IR2SDI Selective Solder Machine | 8050 Production SMT Room | |
| Q SFP/used | 1-2-1 | 195 |
| GENERAC SYSTEM CONTROLLER AND GENERAC GTS SYSTEM PANEL | 8050 Old Warehouse Area | |
| DH-A2E Automated Rework system and tool kit | 8050 Production SMT Room | |
| Slayers (240v Crypto PDUs) | 3-5-G | 6 |
| Brady i5100 printer and 2 spools of labels | 8050 Production SMT Room | |
| 2 STAINLESS STEEL 4" X 30"1 DISTRIBUTION MANIFOLD | 8050 Old Warehouse Area | |

| Item | Location | Qty |
|---|---|---|
| 50 HP Red Fire Pump Westinghouse Serial 7412 | 8050 Northside Dock | |
| 15 stencils | 8050 Production Assembly Room | |
| 6 boxes JCM thermal pads | 8050 Production Assembly Room | |
| 2 boxes +2 pink totes used AlphaNovaTech Heatsinks | 8050 Production Assembly Room | |
| Gardner Denver Electa-Screw Air Compressor/Dryer-Dryer non functional- serial | 8050 Northside Dock | |
| Ingersol Rand Air Dryer Serial 23231657 | 8050 Northside Dock | |
| Hard Drive for FK Host Box | 4-4-1 | 13 |
| MAMCorp MC301 Small Oven | 8050 Production SMT Room | |
| 2x DI Water Tanks | 8050 Northside Dock | |
| Heatsink 8.8mmx8.8mmx5mm | 1-2-2 | 465 |
| Palletized Stainless Dishwasher(maytag)/Rheem Water Heater and Tank | 8050 Northside Dock | |
| GOULDS PUMP 50HP AND SIEMENS MOTOR SERIAL 721F965.103-SIEZED/NOT W | 8050 Old Warehouse Area | |
| 1 Liebert PPA 150C -Rough Condition | 8050 Clean New DC | |
| 1 box open 35P waterblocks | 8050 Production Assembly Room | |
| 7 Stencils | 8050 Production SMT Room | |
| 6600lb Pake Red Pallet Jack | 8050 Northside Dock | |
| GB AX370 Gaming motherboard w/4 sticks ballistic RAM | 8050 Production SMT Room | |
| Eaton Disconnects and Sheet Metal for 10HP Pump Pkgs | 8050 New Liquid Room | |
| 2x Red 10HP Pump Package | 8050 New Liquid Room | |
| 9 boxes 4" and 2" PVC/ 1 Box Spa Manifolds | 8050 New Liquid Room | |
| 1 box used FK heatsinks | 8050 Production SMT Room | |
| JVC soldering station 205842-300 | 8050 Production SMT Room | |
| 4 36" stencils | 8050 Production SMT Room | |
| Miscellanous Damaged PCIE Cables and Breakouts-Approx 12 | 8050 New Liquid Room | |
| Miscellanous C13 Cables Approx 6 | 8050 New Liquid Room | |
| Approximately 20 SQRL Breakout boards | 8050 Production Assembly Room | |
| Molex 2002182200A Hand Crimp applicator | 8050 Production Assembly Room | |
| EVGA 600W Power supply | 8050 Production SMT Room | |
| 0520195040 Xtronic Rework station | 8050 Production SMT Room | |
| 2 box CAT6 1000' Partially Used | 8050 New Server Closet | |
| amput model 457 scale | 8050 Production SMT Room | |

| Item | Location | Qty |
|---|---|---|
| APC Pro1300 | 8050 New Server Closet | |
| Milwaukee Hole Saw Bits | 8050 Production Assembly Room | |
| Vornado Fan | 8050 Production SMT Room | |
| Box CAT6 Cable 1000' Partially Used | 8050 New Liquid Room | |
| Miscellaneous Shelf 3/4" Strain Reliefs (15) and Wire Nuts (500pcs-partiall used) | 8050 New Liquid Room | |
| 2 totes cut vinyl tubing | 8050 Production Assembly Room | |
| 4 reels SQRL Stickers | 8050 Production Assembly Room | |
| LTR System tape rolls with SQRL and QC Stickers | 8050 Production Assembly Room | |
| 11 SQRL Breakouts with 6 SQRL PCIE Cables | 8050 Production Assembly Room | |
| White Rolling 40 gal trash can | 8050 New Liquid Room | |
| misc small hand tools | 8050 Production SMT Room | |
| approx 20L isopropyl alcohol | 8050 Production Assembly Room | |
| Box of Amazon copy paper | 8050 Production SMT Room | |
| Miscellaneous Network and C13 Power Cables-qty 10 | 8050 New Liquid Room | |
| 2 sets keyboards/mice | 8050 Production SMT Room | |
| Miscellaneous Zip ties | 8050 New Liquid Room | |
| Misc Paper Towels and Cleaners | 8050 Old Warehouse Area | |
| Trash Bags | 8050 Old Warehouse Area | |
| Towels | 8050 Old Warehouse Area | |
| BROKEN (Burnt) Disassembled 50HP GOULDS PUMP | 8050 Old Warehouse Area | |
| APPROX 12 DAMAGED/DEAD CVP 13 IN BAGS | 8050 Old Warehouse Area | |
| 4x Emerson /Liebert CW Cooling Cracs | 8050 Clean New DC | |
| KE2080L W TR5 Tray Handler Serial 2007.05.21 and Serial 5D0-I1198 | 8050 Production SMT Room | |
| KE2070L Serial 2000-542338 273-j3619 | 8050 Production SMT Room | |
| Waterpipes | 1-6-G | 11,200 |
| Barb Assemblies for vinyl tube | 1-4-1 | 5293 |
| Fan/Bcu Active 9BMB12P2J619 | 1-3-2 | 1,198 |
| Approximately 732 HP common slot PSUs | Skymax Midwest Liquid DC | |
| 3x Drycooler | Skymax Midwest Liquid DC | |
| Approximately 732 HP common slot breakout boards + PCIe cables | Skymax Midwest Liquid DC | |
| Acorn Nest X2G ready to ship | Green shelf | 188 |

| Item | Location | Qty |
|---|---|---|
| 3 Pallets Ladder Racking | 8050 Clean New DC | |
| CryptoSlayer (*122) | Skymax Midwest Liquid DC | |
| Approximately 550 HP common slot PSUs | 8050 New Midwest Liquid DC | |
| 360 JCC2P A1B PCB | 8050 Northside Dock | |
| Approximately 550 HP common slot breakout boards + PCIe cables | 8050 New Midwest Liquid DC | |
| 750KvA 480/208 Transformer ST0320A59631-1-1 | 8050 New Liquid Room | |
| Nest Risers | 1-3-G | 2165 |
| 10 boxes new AlphaNovaTech heatsinks | 8050 Production Assembly Room | |
| (83) 8mm Feeders | 8050 Production SMT Room | |
| Fan Stock Fk Host Box DF922B12V | 3-4-G | 2,450 |
| Vapor Phase-VP800 Serial 42 | 8050 Production SMT Room | |
| Liebert 10 fan Drycooler | 8050 Old Outdoor Fixtures | |
| Fan F-5010HH12B | 3-7-G | 465 |
| qty 26 Miscellaneous 24x24 PCB Stencils | 8050 Northside Dock | |
| Intel Waterblock | 1-6-1 | 160 |
| FK back plates | 3-7-1 | 992 |
| Barb Assemblies for PEX Tubing- BRASS | 3-6-1 | 1129 |
| Liebert 10 fan Drycooler | 8050 Old Outdoor Fixtures | |
| Thermal Paste | 4-2-1 | 24,400 |
| JCC4P V2 Partials Serials C20S0000-13/44/29/30/06/48/55/56/07/08/09/36/37/ | 8050 Northside Dock | |
| Pallet of approx 50 misc single phase PDU's | 8050 Clean New DC | |
| 1 boxes used vinyl tubing and brass barbs | 8050 Production Assembly Room | |
| (1)-2 shelf juki feeder cart | 8050 Production SMT Room | |
| 2U EPYC SERVER BLUE LIGHT (MUSHROOM HILL) | 8050 Old Warehouse Network Closet | |
| 600 32gb BetterPC MicroSD | 8050 Production Assembly Room | |
| FK Fans | 3-7-1 | 833 |
| Crown Forklift Serial 9A125557 w/ 52 in forks | 8050 Northside Dock | |
| FK/4P Double Brackets | 3-6-1 | 3,993 |
| USBCables | 1-2-6 | 858 |
| 750Watt POWER Supplies | 3-5-G | 61 |
| 8 48 port network switches | 8050 Midwest Air DC | |

| Item | Location | Qty |
|---|---|---|
| 13P Waterblock | 1-6-1 | 141 |
| Approximately 81 48 port used network switches | Skymax Midwest Liquid DC | |
| Big Cat 3 (Lancool Custombuilt server) | 8050 New Server Closet | |
| Big Cat 4 (Lancool Custombuilt server) | 8050 New Server Closet | |
| Medium Cat (Lancool Custombuilt server) | 8050 New Server Closet | |
| Big CAT SERVER (Lancool custom server) | 8050 Old Warehouse Network Closet | |
| GKG G5 Serial 6L123067 | 8050 Production SMT Room | |
| Cooling Fin/BCU Passive- USED | 1-3-2 | 98 |
| 1x Small Drycooler | Skymax Midwest Liquid DC | |
| Fan B97 9BMB12P2K01 | 3-4-1 | 182 |
| 8 boxes backplates | 8050 Production Assembly Room | |
| FSP60-15m FK heatsinks | 3-7-1 | 582 |
| 8 stationary and 13 wheeled and 1 short flat cart | 8050 Production SMT Room | |
| 13 boxes FK Fans | 8050 Production Assembly Room | |
| 14 boxes vinyl barbs | 8050 Production Assembly Room | |
| AF24FS (2) | 8050 Production SMT Room | |
| GOULDS PUMP  25HP SERIAL 09S823Y134G1 | 8050 Old Warehouse Area | |
| Qty 17 4x8 Translucent Lexan | 8050 Northside Dock | |
| 1 box chrome vinyl barbs | 8050 Production Assembly Room | |
| 1 box chrome banjo bolts | 8050 Production Assembly Room | |
| Qty 4 Fixed Reel Carts | 8050 Production SMT Room | |
| Approximately 50 48 port used network switches | 8050 New Midwest Liquid DC | |
| Power Supplies | 3-6-G | 99 |
| Pallet of approx 23 single phase PDUs | 8050 Clean New DC | |
| qty 88MM Feeder | 8050 Production SMT Room | |
| FSP60-25m USED | 3-7-G | 458 |
| 90'power adaptor | 1-2-G | 436 |
| Fan QFR1212HE-00ELR | 3-4-G | 352 |
| Intel Backplate | 1-6-1 | 235 |
| qty 93 Miscellaneous SMT Part Trays | 8050 Northside Dock | |
| Active FK-USED(Heatsink) | 4-5-2 | 37 |

| Item | Location | Qty |
|------|----------|-----|
| FF24NS (4) | 8050 Production SMT Room | |
| 120mm Fan Guards -Black | 3-5-1 | 7,500 |
| Thermal Pad for waterblock backplate | 4-1-1 | 750 |
| Laptop screw cases w/screws | 1-1-1 | 45 |
| Box of 319 USB Cables | 8050 Production Assembly Room | |
| bin of banjo trays | 8050 Production Assembly Room | |
| bin of banjos for manifolds | 8050 Production Assembly Room | |
| 3 open boxes of manifold banjos | 8050 Production Assembly Room | |
| Pump (Active) | Skymax Midwest Liquid DC | |
| LSH100 VFD serial 5507B220313- 50 AMP | 8050 Northside Dock | |
| CF03HPR Feeders (2) | 8050 Production Assembly Room | |
| FF16NS(4) | 8050 Production SMT Room | |
| 2X4 INCH INLINE INDUSTRIES BALL VALVES | 8050 Old Warehouse Area | |
| Thermal Pads 4mm-Black | 4-1-1 | 520 |
| FF12NS (13) | 8050 Production SMT Room | |
| Bracket-single | 4-3-1 | 2,147 |
| 20HP Stainless Pump Baldor | 8050 Northside Dock | |
| 26 boxes (50pcs each) Manifold Sets | 8050 Production Assembly Room | |
| Thermal Pads FK backplate | 4-1-1 | 540 |
| Delrin Top for waterblock | 1-6-1 | 90 |
| Switching power supply with Misc. cablesand connectors | 3-5-G | 8 |
| Passive Fk -USED (Heatsink) | 4-5-2 | 24 |
| Better PC Clamps | 1-4-1 | 11,500 |
| Screws/ steal M2 5x5 | 4-3-1 | 21,000 |
| Nest Risers-USED | 1-3-G | 215 |
| Heatsink for BCU 22mmx22mmx10mm #x001590197 | 1-2-2 | 355 |
| Miscellaneous 4" PVC Piping valves/gauges (installed) | 8050 Northside Dock | |
| (34) 8MM Feeders | 8050 Production SMT Room | |
| 4 IBC TOTES 250 GAL | 8050 Old Warehouse Area | |
| 13P Backplate | 1-6-1 | 109 |
| 2 molex crimp applicators | 8050 Production Assembly Room | |

| Item | Location | Qty |
|---|---|---|
| Back plate for motherboard | 1-1-1 | 225 |
| Generac EM-SC Control Panel | 8050 Northside Dock | |
| 2x IBC 250 Gal Totes | 8050 Northside Dock | |
| 6 pin Female-2male 8Pin Y-splitter 18AWG | 3-3-G | 612 |
| FK Active power cord (fans) | 3-7-1 | 728 |
| 72 JCCL2 A6 PCB | 8050 Northside Dock | |
| Fan 120m QFR212HE-00 | 3-4-1 | 36 |
| Juki Nozzles-1 blue bin (15 cases) | 8050 Production Assembly Room | |
| 6 boxes 100' vinyl tube (unopened) | 8050 Production Assembly Room | |
| 6PDUS ON TEST STATIONS | 8050 Old Warehouse Area | |
| COUNTY-S Reel Counter | 8050 Production Assembly Room | |
| Miscellaneous Copper and Aluminum Raw Stock | 8050 Northside Dock | |
| Air Compressor Air nozzle, blow off, and hose | 8050 Northside Dock | |
| approx 100 SQRL Breakouts-Taped | 8050 New Liquid Room | |
| Box of C19 Power Cords/Extensions | 8050 Clean New DC | |
| 200 approx c13 power cables | 8050 Midwest Air DC | |
| Box of open manifold bars | 8050 Production Assembly Room | |
| bin of vinyl barbs (silver) | 8050 Production Assembly Room | |
| bin of vinyl barbs (pex) | 8050 Production Assembly Room | |
| 10 ESD Mats | 8050 Production Assembly Room | |
| 1 tote ARM SOC boards-Janek | 8050 Production Assembly Room | |
| 1 large bin + 1 box thermal paste packets | 8050 Production Assembly Room | |
| 3 small trays m2 m2.5 m3 spring screws | 8050 Production Assembly Room | |
| Newest Juki Tray Handler | 8050 Production SMT Room | |
| RF4M AND JCC2N PROTO | 8050 Old Warehouse Area | |
| 1 4" TCI CHECK VALVE | 8050 Old Warehouse Area | |
| Pump (Bad Seal | Skymax Midwest Liquid DC | |
| FSP60-25m New | 3-7-1 | 54 |
| 1 box 90 degree power adapters (qty 457) | 8050 Production Assembly Room | |
| FF24FS Feeder | 8050 Production SMT Room | |
| 24MM PEM Feeder | 8050 Production SMT Room | |

| Item | Location | Qty |
|------|----------|-----|
| FF24FS Feedee | 8050 Production SMT Room | |
| FF24NS | 8050 Production SMT Room | |
| Cooling Fin/BCU Passive Rev.2 upgraded | 1-3-2 | 6 |
| Thermal Pads 2.5mm -Black | 4-1-1 | 150 |
| Mitsubishi AC Server motor HC-RP153-s2 | 8050 Northside Dock | |
| 2x CF081PR Juki Feeders | 8050 Northside Dock | |
| 2x C8L1R Juki Feeder | 8050 Northside Dock | |
| 4x Juki Tray Feeders | 8050 Northside Dock | |
| 1 pallet 4 PDUs | 8050 Clean New DC | |
| 1 RED PAKE 6600 PALLET JACK | 8050 Old Warehouse Area | |
| 4" STAINLESS CHECK VALVE (NEW) | 8050 Old Warehouse Area | |
| 4 PDUS 110-113 | 8050 Old Warehouse Area | |
| Surface 1943 Serial 019174611266 | 8050 Production SMT Room | |
| Thermal Pads 3mm-Black | 4-1-1 | 180 |
| 33/35 Air Heatsink | 3-6-1 | 8 |
| Menards Residential Pallet Racking (lt Brown) | 8050 Northside Dock | |
| Harmsco 1200FL Filter-110949 | 8050 Northside Dock | |
| SATA cables | 1-1-1 | 364 |
| 8MM Large Reel Feeder (3) | 8050 Production SMT Room | |
| Pink Bin of Vinyl Tubing Assembled | 8050 Production Assembly Room | |
| FF16NS (1) | 8050 Production SMT Room | |
| FS16NS Feeder | 8050 Production SMT Room | |
| FF16NS (1) | 8050 Production SMT Room | |
| FF16NS (1) | 8050 Production SMT Room | |
| BCU/SQRL Risers | shipstation | 67 |
| 4 4" BUTTERFLY VAVLES (NO HANDLES) | 8050 Old Warehouse Area | |
| Box of Vinyl and Brass assembled | 8050 Production Assembly Room | |
| 1 plastic tub G1 quarter block offs medium | 8050 Production Assembly Room | |
| 1 VU9P Reball Kit w. 3 stencils .6mm falls, solder wick and hand T12 Soldering sta | 8050 Production SMT Room | |
| Xtronic Hot Air rework station (broken) 0120185040 | 8050 Production SMT Room | |
| Heat Conduction Adhesive EC0910905 (Expired) | 4-2-1 | 6 |

| Item | Location | Qty |
|---|---|---|
| Female Fan Cables-BCU | 3-3-G | 138 |
| Thermal Pads 2mm-Black | 4-1-1 | 90 |
| Bitmain APW3++12-1600 switching power supply | 3-5-G | 2 |
| GENERAC POWER SYSTEMS OF1304 CONTROL PANEL | 8050 Old Warehouse Area | |
| G7200 NOCO Battery Chargers 2x | 8050 Northside Dock | |
| MX21SMF53-A6 Serial M20S000055-Damaged | 8050 Northside Dock | |
| Boxes of Uline Shelf Vericals (44 aprox) | 8050 New Liquid Room | |
| Tray of FK Fan Cables | 8050 Production Assembly Room | |
| tray of phosphate clamps | 8050 Production Assembly Room | |
| PowerBackplane | 3-5-G | 1 |
| FK host box fan Guards 80mm chrome | 3-7-G | 1,205 |
| 12 square 50Amp Breakers 3 pull | 8050 New Liquid Room | |
| CF081ER Juki Feeder (qty 2) | 8050 Production Assembly Room | |
| Bitmain Power supply-small | 3-5-G | 2 |
| 7" Touch Screens | 1-1-1 | 4 |
| HL-L2350 Brother Laser Printer | 8050 Production SMT Room | |
| 6 pin female-2male 6pin Y-splitter Cable 18awg | 3-3-G | 164 |
| Fan Extensions-4pin | 4-4-1 | 42 |
| JCM35 J21S003138-No FPGA | 8050 Northside Dock | |
| FF44NS Juki Feeder | 8050 Northside Dock | |
| 1x Adapter V7 Breakout | 8050 Northside Dock | |
| JCM35 J21S003821-No FPGA | 8050 Northside Dock | |
| JCM35 JS21003822-No FPGA | 8050 Northside Dock | |
| JCM35 J21S003823-No FPGA | 8050 Northside Dock | |
| DELL PC Optiplex 755 Serial H605ZF1 for Juki Systems | 8050 Northside Dock | |
| Miscellaneous 2" PVC Fittings | 8050 New Liquid Room | |
| approx 60 single and 3 pull breakers | 8050 New Liquid Room | |
| 6 bags spring screws | 8050 Production Assembly Room | |
| 3 miscellaneous M2 M2.5 M3  spring screw bins | 8050 Production Assembly Room | |
| FF12NS Feeder (2) | 8050 Production SMT Room | |
| PALLET MISC 8GA SOOW POWER CUT OFF | 8050 Old Warehouse Area | |

| Item | Location | Qty |
|------|----------|-----|
| PCI Back Plates | 3-5-1 | 4 |
| Porter Cable Small Vertical Band Saw 037454 | 8050 Northside Dock | |
| 2JCMP8 Power Programmer | 8050 Production Lab Room | |
| Miscellaneous Brass Pex Fittings | 8050 Northside Dock | |
| 2 weiss hand sheet metal crimps | 8050 Production Assembly Room | |
| Perfect Prime Digital Thermometer w/probes | 8050 Production SMT Room | |
| Linksys 16 Port Switch | 8050 Production SMT Room | |
| Pallet 4" PVC Pipe Fittings and Valves and Water Filters | 8050 Northside Dock | |
| approx 54 single pull square breakers | 8050 New Liquid Room | |
| Juki Bolt In Reel holder | 8050 Production Assembly Room | |
| open box of vinyl barbs | 8050 Production Assembly Room | |
| 1 box misc brass barbs (open) | 8050 Production Assembly Room | |
| 1 box open chrome manifold bars | 8050 Production Assembly Room | |
| 1 dewalt toolkit w/hammers and misc hand tools | 8050 Production Assembly Room | |
| Small Uline Rolling Cart | 8050 Production Assembly Room | |
| Zyxel GS1900-24 | 8050 New Server Closet | |
| Box and Pile of JC Clip on Fans | 8050 Production SMT Room | |
| 1 tubster rolling cart | 8050 Production SMT Room | |
| 4" 2 TO 1 STAINLESS WELDED T (LIEBERT) | 8050 Old Warehouse Area | |
| Test Back Plates | 3-7-G | 3 |
| Uline Cart | 8050 Production Assembly Room | |
| 1 short black wire rack | 8050 Production Lab Room | |
| 1 blue uline cart | 8050 Production Lab Room | |
| Black Rolling Cart Uline | 8050 Production Assembly Room | |
| 1 small black rolling cart (Uline) | 8050 Production Assembly Room | |
| 1 short black rolling cart | 8050 Production SMT Room | |
| Screw 2.5x4 Phil/Pan/zinc | 4-2-1 | 12,000 |
| Wire Rack Shelving 12x36 | 8050 Northside Dock | |
| 6 Stainless Steel 1" Ball Valves | 8050 Northside Dock | |
| 4"X5" ADAPTER- CARBON STEEL | 8050 Old Warehouse Area | |
| CF081PR Feeder | 8050 Production Assembly Room | |

| Item | Location | Qty |
|------|----------|-----|
| CF03HPR Feeder | 8050 Production Assembly Room | |
| CF081PR Feeder (1) | 8050 Production SMT Room | |
| CF081E Feeder | 8050 Production SMT Room | |
| Juki 14MM? Feeder | 8050 Production SMT Room | |
| CF081E Feeder | 8050 Production SMT Room | |
| 8MM Large Reel Feeder | 8050 Production SMT Room | |
| keyboards | 1-1-1 | 5 |
| Schlage Light Commercial Keypad Leverlock | 8050 Northside Dock | |
| Waterblocks  33/35 | 1-4-G | 4 |
| 23 qty 12V Unbranded Power Supplies- Unknown Condition | 8050 Northside Dock | |
| 6 pin Female-8 pin Male 18 AWG | 3-3-G | 64 |
| Acorn Fin Heatsink | 4-5-1 | 20 |
| qty 4 Box-All AIDETEK Parts Boxes | 8050 Northside Dock | |
| JCC2PR-A1 Serial G20S000009- condition unknown | 8050 Northside Dock | |
| FK Serial F21S003305/3304 Back Only Panel | 8050 Northside Dock | |
| bag of phosphate clamps | 8050 Production Assembly Room | |
| open box of pex barbs | 8050 Production Assembly Room | |
| container g 1/4 block offs | 8050 Production Assembly Room | |
| Small container M3 Screws | 8050 Production Assembly Room | |
| 5 bags o rings | 8050 Production Assembly Room | |
| 3 bags FK spring screws | 8050 Production Assembly Room | |
| FF12NS Feeder | 8050 Production SMT Room | |
| FF12NS (1) | 8050 Production SMT Room | |
| FF12NS | 8050 Production SMT Room | |
| FF12NS | 8050 Production SMT Room | |
| FF12NS | 8050 Production SMT Room | |
| FF12NS | 8050 Production SMT Room | |
| FF12NS | 8050 Production SMT Room | |
| FF12NS | 8050 Production SMT Room | |
| FF12NS | 8050 Production SMT Room | |
| FF12NS | 8050 Production SMT Room | |

| Item | Location | Qty |
|---|---|---|
| misc soldering supplies, soldering tips and cleaners | 8050 Production SMT Room | |
| 3 boxes broken waterblocks | 8050 Production SMT Room | |
| 3DK-1221 Brother Labels | 8050 Production Assembly Room | |
| Silicon Labs Clock Builder/Programmer | 8050 Northside Dock | |
| 2 black esd trash can | 8050 Production Lab Room | |
| 1 dewalt hand screwdriver with charger | 8050 Production Assembly Room | |
| Box Sample 4xQSFP | 8050 Northside Dock | |
| Box of Uline Static Shield bags large (S-5301BX) S-13005 | 8050 Production Assembly Room | |
| Thermal Pads 1.5mm- Black | 4-1-1 | 40 |
| 1x DELL VGA Monitor- for Juki- LCD11027-B | 8050 Northside Dock | |
| 1 Pluggable USB Microscope | 8050 Production Lab Room | |
| 1 tray 1.5mm o rings | 8050 Production Assembly Room | |
| 1 tray 2mm o rings | 8050 Production Assembly Room | |
| 1 small container spring screws | 8050 Production Assembly Room | |
| 2 bags 1 tray waterblocks hex bolts | 8050 Production SMT Room | |
| miscellaneous Risers | 4-4-1 | 25 |
| PEX Crimping too | 8050 Northside Dock | |
| Bittman Power Supply for CVP | 3-5-G | 20 |
| Screw 2m 4x4 Phil/Pan m/s Zinc | 4-2-1 | 6,000 |
| 3 USB Scanners | 8050 Production Lab Room | |
| FK screws | 3-7-1 | 5,400 |
| Cobalt Angle Air Die Grinder | 8050 Northside Dock | |
| Miscellanous Box HEX Bolts | 8050 Northside Dock | |
| Box of Miscellaneous Shelf Feet | 8050 Northside Dock | |
| SQRL Breakout and Riser | 8050 Northside Dock | |
| AMScope Microscope Lenses | 8050 Northside Dock | |
| Box of PVC Cement | 8050 New Liquid Room | |
| 2x approx 10' 1.5" Blue Sealtite | 8050 New Liquid Room | |
| 3 sets keyboard mice | 8050 Production Lab Room | |
| 2 bins O rings 1.5 and 2 mm | 8050 Production Assembly Room | |
| cushioned floor mat | 8050 Production Assembly Room | |

| Item | Location | Qty |
|---|---|---|
| small esd floor mat | 8050 Production Assembly Room | |
| 5 miscellaneous hand tools (screw drivers, pliers) | 8050 Production Assembly Room | |
| 1 small tray phosphate clamps | 8050 Production Assembly Room | |
| 6 sets milwaukee #1 phillips bits | 8050 Production Assembly Room | |
| 1 box scrap delrin waterblock tops aproximately 50 | 8050 Production Assembly Room | |
| small bin silver spring clamps | 8050 Production Assembly Room | |
| LG Monitor 805USL852637 Model 27UD59-D | 8050 Production SMT Room | |
| air hose and nozzle (new) | 8050 Production SMT Room | |
| 1 TERRA-D5100 USB SCANNER | 8050 Old Warehouse Area | |
| 1x HP1200W supply | 8050 Northside Dock | |
| small ESD Trash Can- Black | 8050 Production Assembly Room | |
| 2 bags ESD gloves | 8050 Production Assembly Room | |
| ESD Tweezer kit | 8050 Production Assembly Room | |
| 1 xtronics flourescent light | 8050 Production Assembly Room | |
| 6 pin Male-2 Female 6 pin Y -splitter 16 AWG | 3-3-G | 22 |
| 2 USB Scanner | 8050 Production Lab Room | |
| Brother QL Label Printer | 8050 Production Assembly Room | |
| brother PT-400 label maker | 8050 Production SMT Room | |
| 3"x4" Stainless Steel Adaptor- Bolt on | 8050 Northside Dock | |
| 6 pin-8 pin LONG 16AWG | 3-3-G | 25 |
| Miscellaneous Power (3x) Cables | 8050 Northside Dock | |
| Uline 5' Power Protector Qty 2 | 8050 Northside Dock | |
| Central Pnumatic Air Nibbler | 8050 Northside Dock | |
| 1 bag ESD jackets | 8050 Production Assembly Room | |
| 1 DLINK DGS-108 8 PORT SWITCH | 8050 Old Warehouse Area | |
| SATA 90' | 1-1-1 | 21 |
| Brighton Stainless Steel X Cap screws (3 boxes) | 8050 Northside Dock | |
| 2 plastic bins | 8050 Production Assembly Room | |
| 10 rolls colored dots | 8050 Production Assembly Room | |
| 5 rolls masking tape | 8050 Production Assembly Room | |
| 8MM embossed large reel | 8050 Production SMT Room | |

| Item | Location | Qty |
|------|----------|-----|
| 8mm Embossed Feeder | 8050 Production SMT Room | |
| 1 48" dust mop | 8050 Production SMT Room | |
| 1 uline broom and dust pan | 8050 Production SMT Room | |
| Mops | 8050 Old Warehouse Area | |
| USB Scanner D5100 | 8050 Northside Dock | |
| 3 packs sharpies | 8050 Production Assembly Room | |
| 1 bag Kimtech W4 Wipes | 8050 Production Assembly Room | |
| 1 package Kimtech wipes | 8050 Production Assembly Room | |
| 1 package Kimtech Delicate wipes | 8050 Production Assembly Room | |
| PEX Angle Guides | 8050 Northside Dock | |
| Miscellaneous Keyboard | 8050 Northside Dock | |
| 20 AAA batteries | 8050 Production Assembly Room | |
| small phosphate spring clamp | 8050 Production Assembly Room | |
| Broken Black Box Fan | 8050 Production SMT Room | |
| Power supply pads | 1-2-2 | 92 |
| 3 packages cotton rounds | 8050 Production Assembly Room | |
| 1 package Cholorox wipes | 8050 Production Assembly Room | |
| Thermal Pads 1mm-Gray | 4-2-1 | |
| 50 Empty Xilinx boxes | 8050 Northside Dock | |
| Cascade Cart N Clamp Serial PTI546899-18 Forklift Attachment | 8050 New Liquid Room | |
| 2 Pallets Strut | 8050 Clean New DC | |
| 20 Pallets Raised Floor | 8050 Clean New DC | |
| 7 Pallets Floor/Racking Hardware | 8050 Clean New DC | |
| Forest Kitten -Passive Heatsink | 4-5-2 | 0 |
| Backplate  33/35 | 1-5-1 | 0 |
| Manifolds | 1-5-G | 0 |
| 8pin-8pin 1ft 18AWG | 3-3-G | 0 |
| 6 pin-8 pin LONG 18AWG | 3-3-G | 0 |
| Forest Kitten -Active Heatsink | 4-4-2 | 0 |
| SQRL Breakout Boards | 1-5-1 | 0 |

| Item | Location | Qty on hand |
|------|----------|-------------|
| PEX8780-AB80BI G | | 459 |
| IFLR2727EZER72NM01 | 8050 Component Storage | 50000 |
| XC7A100T-L2FGG484E | 8050 Component Storage | 414 |
| SRP2510A-R22M | REEL BOX 6 | 141000 |
| PEX8733-CA80BC G | | 240 |
| TLC59116FIRHBR | 8050 Component Storage | 8683 |
| ACSA02-41SURKWA-F01 | 8050 Component Storage | 6516 |
| MLC1240-901MLC | BIN A10 | 7000 |
| S25FL256SAGBHV200 | 8050 Component Storage | 2623 |
| F950J107MPAAQ2 | BIN C01 | 27000 |
| DFE201610P-1R0M=P2 | BIN A14 | 18230 |
| PCA9555APW118 | REEL BOX A | 5621 |
| PCA9555APW,118 | 8050 Component Storage | 5131 |
| CSD875885 | REEL BOX D | 2500 |
| XC7A200T-3FBG484E | | 20 |
| TLNS227M004R3000 | 8050 Component Storage | 2336 |
| APXG160ARA561MHA0G | 8050 Component Storage | 2845 |
| XC7A100T-L2FGG484E | | 16 |
| CSD87588N | 8050 Component Storage | 1200 |
| XC7A200T-3FBG484E | 8050 Component Storage | 1040 |
| XCKU5P-L1SFVB784I | 8050 Component Storage | 115 |
| XC7A200T-L2FBG484E | 8050 Component Storage | 281 |
| ACORN 215+ REV A4 | BOTTOM SHELF | 184 |
| ACORN 215 A4 | BOTTOM SHELF | 70 |
| ACORN 101 REV A4 | BOTTOM SHELF | 64 |
| PEX8733-CA80BC G | 8050 Component Storage | 4550 |
| GSB4111312HR | BOTTOM L SHELF | 5448 |
| ERA1ARW6651C | BIN A24 | 15950 |
| 20021121-00010C4LF | 8050 Component Storage | 6337 |
| DF52-20S-0.8H | 8050 Component Storage | 2007 |
| DF52-20S-0.8H(21) | REEL BOX D | 5289 |
| DF52-2832PCF | REEL BOX D | 10000 |
| OZCG0050AF2C | 8050 Component Storage | 14000 |
| 78720002 | REEL BOX D | 15000 |
| MT25QU256ABA8E12-SIT | 8050 Component Storage | 2018 |
| IHLP4040DZERR19M01 | 8050 Component Storage | 8500 |
| LTC4352CDD#TRPBF | 8050 Component Storage | 8001 |
| IS43TR16512BL-125KBLI | SHELF B | 9153 |
| MT25QU512ABB8E12-0SIT | SHELF B | 22500 |
| 2R5TPE470M7 | 8050 Component Storage | 95990 |
| MT25QU512ABB8E12 | 8050 Component Storage | 5348 |
| LTC7150SIY#PBF | 8050 Component Storage | 6782 |

| Item | Location | Qty on hand |
|---|---|---|
| LTC3636EUFD#PBF | 8050 Component Storage | 6510 |
| SEAF-40-05.0.S-10-2-A-K-TR | 8050 Component Storage | 2750 |
| TDA214175 | 8050 In Production | 10000 |
| IRPS5401MXI03TRP | 8050 In Production | 6000 |
| MT25QU512ABB8E12 | 8050 In Production | 2500 |
| STM32F746BET6 | 8050 Component Storage | 1190 |
| TDA21470AUMA1 | 8050 In Production | 5000 |
| IS43TR16256AL-125KBL | 8050 Component Storage | 2446 |
| NB6N14SMNR2G | 8050 Component Storage | 2832 |
| TDA21470AUMA1 | 8050 on Feeders | 4500 |
| MT40A512M16JY-083E | 8050 Component Storage | 1368 |
| 16SVPF180M | 8050 Component Storage | 32284 |
| 781715006 | 8050 Component Storage | 34913 |
| 45971-4115 | 8050 In Production | 1400 |
| GRM21BC80G476ME15L | 8050 Component Storage | 120000 |
| DSC1123DI2-200.0000T | BIN A23 | 6000 |
| STM32F756BET6 | 8050 Component Storage | 720 |
| MAX6101EUR+T | 8050 In Production | 19320 |
| ZRB18AR60J476ME01L | BIN A17 | 48000 |
| SM3ZS067U410AMR1000 | 8050 Component Storage | 11560 |
| STM32F302R8T6 | 8050 Component Storage | 3504 |
| SRP6030CA-R18M | 8050 In Production | 19197 |
| SRP6030CA-R18M | 8050 Component Storage | 19019 |
| SI53340-B-GM | 8050 In Production | 5555 |
| MCP9804-E/MC | 8050 In Production | 5606 |
| BSO301SP | 8050 Component Storage | 3500 |
| CL21A226MOCLRNC | 8050 Component Storage | 120000 |
| PA0512.700NLT | 8050 In Production | 8077 |
| T520B337M2R5ATE045 | 8050 Component Storage | 18000 |
| C1005X5R1A104KT000F | 8050 Component Storage | 120000 |
| SRP4020TA-1R5M | 8050 In Production | 12000 |
| CL32B226KAJNFNE | 8050 In Production | 22000 |
| GRM155C81E105KE11D | 8050 In Production | 100000 |
| LM5050MK-1/NOPB | BIN B09 | 4990 |
| 9774070151R | 8050 Component Storage | 7253 |
| SI53305-B-GM | 8050 Component Storage | 1325 |
| AI-1027-TWT-5V-R | 8050 Component Storage | 2919 |
| BLM03HG601SN1D | 8050 Component Storage | 41342 |
| IRPS5401MX103TRP | 8050 on Feeders | 1000 |
| GRT155R61C474KE10D | 8050 Component Storage | 34520 |
| ASDMB-125.000MHZ-LY-T | 8050 In Production | 1925 |
| HCB0750-700L | 8050 Component Storage | 2730 |

| Item | Location | Qty on hand |
|------|----------|-------------|
| 9774025151R | 8050 Component Storage | 5495 |
| IR35215MTRPBF | 8050 on Feeders | 1200 |
| LM27402SQ/NOPB | BIN B03 | 2700 |
| ASDMB-48.000MHZ-LC-T | 8050 Component Storage | 2982 |
| TPS40400RHLR | 8050 Component Storage | 1470 |
| GRM32ER60J107ME20L | 8050 on Feeders | 8000 |
| SMTSO-M1.6-2ET | 8050 Component Storage | 9951 |
| 93LC56BT-1/OT | 8050 Component Storage | 15000 |
| 74438336010 | 8050 Component Storage | 3000 |
| 457320001 | MIDDLE SHELF | 3657 |
| 150060GS75000 | 8050 Component Storage | 28753 |
| C0603X5R6R3-476MNE | 8050 Component Storage | 60000 |
| CL10A226MO7JZNC | 8050 Component Storage | 19829 |
| MAX1589AETT100+T | BIN A08 | 2500 |
| AK2DAF1-100.00000T | 8050 Component Storage | 866 |
| CSNL2512FT2L00 | 8050 Component Storage | 8236 |
| 626L10003G3T | 8050 Component Storage | 841 |
| TPS62020DRCR | 8050 Component Storage | 3224 |
| CL05A474KP5NNNC | REEL BOX 4 | 200000 |
| MCP4552T-503E/MF | 8050 In Production | 3000 |
| SN74LV1T08DCKR | BIN A11 | 18000 |
| GRM033C81A105ME05D | 8050 on Feeders | 27000 |
| F950J107MPAAQ2 | 8050 Component Storage | 8374 |
| CM3440Z171R-10 | 8050 Component Storage | 2858 |
| ASDMPLV-100.000MHZ-LR-T3 | 8050 In Production | 640 |
| 25SVPF330M | 8050 In Production | 3000 |
| ABM3-8.000MHZ-D2Y-T | 8050 Component Storage | 3500 |
| 470531000 | 8050 Component Storage | 4100 |
| DF13-3P-1.25DSA | 8050 Component Storage | 12937 |
| ESD224DQAR | 8050 Component Storage | 13751 |
| 104031-0811 | 8050 Component Storage | 2000 |
| CAT25512VI-GT3 | REEL BOX D | 3000 |
| DSC1103DL2-156.2500 | 8050 Component Storage | 868 |
| 781715006 | 8050 Component Storage | 5225 |
| 10118193-0001LF | 8050 Component Storage | 8548 |
| STM32F765ZIT6 | 8050 Component Storage | 240 |
| 781720410 | REEL BOX A | 60000 |
| 12103C226KAT2A | 8050 Component Storage | 2243 |
| CHS-01TA | 8050 In Production | 3000 |
| ABM3-8.000MHZ-D2Y-T | 8050 In Production | 2841 |
| CL05A106MP5NUNC | 8050 In Production | 40000 |
| CRCW0201249RFNED | 8050 In Production | 20000 |

| Item | Location | Qty on hand |
|---|---|---|
| LD39050PU25R | 8050 Component Storage | 3981 |
| C0603X6S1A224K030BC | 8050 In Production | 44148 |
| CL31B226KQHNNWE | BIN A13 | 12000 |
| ASDMPLV-200.000MHZ-LR-T | 8050 In Production | 531 |
| CL21B106KOQNNNE | 8050 Component Storage | 49868 |
| 255308430 | 8050 Component Storage | 480 |
| T521T336M016ATE050 | 8050 Component Storage | 2000 |
| AI-1027-TWT-3V-R | 8050 Component Storage | 1050 |
| UCLAMP1211T.TCT | 8050 Component Storage | 6000 |
| SI5345A-D-GM | 8050 Component Storage | 75 |
| DSC1123DI2-156.2500 | 8050 Component Storage | 735 |
| 422001 BK005 | 8050 Component Storage | 100 |
| CM5441Z101B-10 | 8050 Component Storage | 1166 |
| ACSA02-41SURKWA-F01 | 8050 In Production | 1141 |
| HCB0750-700L2 | 8050 on Feeders | 900 |
| GRM155R60J475ME47D | 8050 Component Storage | 100290 |
| SN74LVC1G3157DCKR | 8050 Component Storage | 20000 |
| CL05B224K05NNNC | 8050 Component Storage | 85191 |
| 2R5TPE470M7 | 8050 on Feeders | 2500 |
| LTC3636EUFD#PBF | 8050 In Production | 219 |
| CL31B226KQHNNWE | 8050 Component Storage | 9299 |
| GPU-8P-V | 8050 Component Storage | 3000 |
| GPU-8P-RA | 8050 Component Storage | 3000 |
| MAX34406TETG+ | 8050 Component Storage | 680 |
| C0402C104K9RAC7867 | REEL BOX 8 | 120190 |
| 24AA64T-I/MC | 8050 Component Storage | 2500 |
| 741X083471JP | BIN B06 | 40000 |
| C6908CS6-1TRMPBF | BIN A06 | 520 |
| INA381A2IDSGR | 8050 Component Storage | 6000 |
| 3522 | 8050 Component Storage | 9250 |
| 24AA04T-I/MC | 8050 Component Storage | 3680 |
| LAN8742A-CZ | 8050 Component Storage | 1040 |
| 7M48072002 | 8050 Component Storage | 1394 |
| JXD2-0015NL | 8050 Component Storage | 200 |
| ERJ2RKF3001X | BIN A08 | 50000 |
| CAT25512VI-GT3 | 8050 Component Storage | 1474 |
| ABM10-167-12.000MHZ-T3 | 8050 Component Storage | 2995 |
| CGB2A1X5R1C474K033BC | BIN A13 | 29000 |
| IRPS5401MTRPBF | 8050 In Production | 273 |
| TPS51206DSQR | 8050 In Production | 2865 |
| GRM1555C1H220JA01D | 8050 In Production | 10000 |
| LTC6908CS6-1#TRMPBF | BIN A02 | 476 |

| Item | Location | Qty on hand |
|---|---|---|
| 20021111-00008T4LF | 8050 Component Storage | 3329 |
| TCA9406YZPR | 8050 on Feeders | 2300 |
| 878321420 | 8050 Component Storage | 1210 |
| C1005X7R1C104K050BC | 8050 Component Storage | 82000 |
| CL05A106MP5NUNC | 8050 Component Storage | 20000 |
| 8500113 | 8050 Component Storage | 5000 |
| 9774070151R | 8050 In Production | 1350 |
| GRM21BC80G476ME15L | 8050 In Production | 9347 |
| 150060RS75000 | 8050 Component Storage | 8010 |
| TCA9406YZPR | 8050 Component Storage | 2201 |
| IHLP2020BZER1R0M01 | REEL BOX A | 2000 |
| SRP4020TA-3R3M | 8050 on Feeders | 2000 |
| SM3ZS067U410AMR1000 | 8050 In Production | 1000 |
| LTC4413EDD#TRPBF | 8050 Component Storage | 200 |
| F950J107MPAAQ2 | 8050 In Production | 2980 |
| ERA-1ARC103 | 8050 Component Storage | 12321 |
| 7M48072002 | 8050 on Feeders | 1015 |
| RMCF0402FT340KTR | 8050 on Feeders | 7000 |
| SRN4018-100M | 8050 Component Storage | 3875 |
| CL05B104K05NNNC | REEL BOX 8 | 140000 |
| NTTFS4C06NTWG | 8050 Component Storage | 2000 |
| 781715006 | 8050 In Production | 2000 |
| SN74AUP1T34DRYR | 8050 on Feeders | 3000 |
| UCL1C102MNL1GS | 8050 Component Storage | 2443 |
| BLM31SN500SN1L | 8050 Component Storage | 5984 |
| MSS1P6-M3/89A | BIN A08 | 9000 |
| 0287040.PXCN | 8050 Component Storage | 4071 |
| SN74AVC4T245RSVR | 8050 on Feeders | 1500 |
| NR5040T4R7N | 8050 Component Storage | 3000 |
| 0603YC105KAT2A | 8050 Component Storage | 16653 |
| BLM03HG601SN1D | 8050 on Feeders | 6000 |
| SRP4020TA-1R5M | 8050 on Feeders | 1500 |
| APHHS1005CGCK | 8050 In Production | 8000 |
| ASDMPLV-200.000MHZ-LR-T | 8050 Component Storage | 200 |
| 150040RS73240 | 8050 In Production | 3381 |
| CL21B106KOQNNNE | 8050 In Production | 18656 |
| GRPB031VWVN-RC | 8050 Component Storage | 5000 |
| TUSB2046BIRHBR | 8050 Component Storage | 300 |
| TPS82085SILT | BIN A21 | 249 |
| CL05B224K05NNNC | REEL BOX 8 | 32950 |
| RCL12250000Z0EG | 8050 on Feeders | 1500 |
| AON7400A | 8050 Component Storage | 3990 |

| Item | Location | Qty on hand |
|---|---|---|
| CSR2512B0R004F | 8050 Component Storage | 2250 |
| C1005X6S1C105K050BC | 8050 on Feeders | 12690 |
| CHS-01TA | 8050 on Feeders | 800 |
| GRM155R61C225KE11D | 8050 In Production | 10000 |
| 02013A220JAT2A | 8050 Component Storage | 10653 |
| CL05B103JA5NNNC | BIN A21 | 140000 |
| TL3315NF160Q | 8050 Component Storage | 5849 |
| CL32B226KAJNFNE | 8050 Component Storage | 1949 |
| CL10B475KQ8NQNC | BIN B07 | 16000 |
| LP5907MFX-1.8/NOPB | 8050 on Feeders | 2500 |
| GRM033R61C224KE14D | 8050 In Production | 62014 |
| 150040VS73240 | 8050 on Feeders | 2500 |
| SN74AVC4T245RSVR | 8050 In Production | 928 |
| CRM2512-JW-1R0ELF | 8050 Component Storage | 4000 |
| GSB4111312HR | 8050 Component Storage | 212 |
| TL3315NF160Q | REEL BOX D | 5000 |
| BLM31SN500SZ1L | 8050 Component Storage | 3000 |
| BKP1005HS121-T | 8050 Component Storage | 43340 |
| 757830126 | 8050 In Production | 50 |
| 781710002 | 8050 Component Storage | 2355 |
| C1005X5R1E105K050BC | 8050 In Production | 34140 |
| 9774070151R | 8050 on Feeders | 576 |
| EMK105ABJ225KV-F | 8050 In Production | 10000 |
| BLM15PX330SN1D | 8050 Component Storage | 10000 |
| 74LVC1T45GW,125 | 8050 Component Storage | 2964 |
| 9774070243R | 8050 Component Storage | 800 |
| MAX34406TETG+ | 8050 In Production | 200 |
| MAX34406TETG+ | 8050 on Feeders | 200 |
| 797581010 | 8050 Component Storage | 600 |
| 0685P9400-01 | 8050 Component Storage | 496 |
| 150040VS73240 | 8050 In Production | 2030 |
| TMP103EYFFR | 8050 Component Storage | 492 |
| AMK063AC6105KP-F | 8050 Component Storage | 6800 |
| GRM033R60G474ME90D | 8050 In Production | 15000 |
| RMCF0402FT2K40 | 8050 on Feeders | 3000 |
| 741X083472JP | 8050 Component Storage | 27561 |
| DMN5L06K-7 | 8050 Component Storage | 8001 |
| GRM155R71C104KA88J | 8050 In Production | 100000 |
| ERJ1GNF6651C | BIN B05 | 15000 |
| HR911105A | 8050 Component Storage | 604 |
| DSC1103DL2-156.2500 | 8050 In Production | 130 |
| MAKK2016T1ROM | 8050 In Production | 2939 |

| Item | Location | Qty on hand |
|---|---|---|
| MAMK2520T3R3M | 8050 In Production | 3000 |
| TPS8268120SIPR | 8050 Component Storage | 214 |
| CSD13201W10 | 8050 on Feeders | 2000 |
| L829-1J1T-43 | 8050 In Production | 50 |
| RC1005F472CS | BIN A05 | 50000 |
| 9774070243R | 8050 In Production | 601 |
| CL05A106MP5NUNC | 8050 on Feeders | 6,000 |
| GRM155C1H220GA01D | BIN B08 | 10000 |
| CL10B475KQ8NQNC | 8050 Component Storage | 8680 |
| CGA2B3X5R1A224M050BB | 8050 Component Storage | 12807 |
| RMCF0201FT11K0 | 8050 In Production | 80066 |
| C0603X5R0J224K030BB | 8050 Component Storage | 10329 |
| TL3340AF160QG | 8050 Component Storage | 610 |
| CL05B104KO3LNNC | 8050 Component Storage | 5719 |
| CRCW02011K00FNED | 8050 Component Storage | 30000 |
| 0ZCG0050AF2C | 8050 Component Storage | 3846 |
| ADC128D818CIMT/NOPB | 8050 Component Storage | 35 |
| PI6CB18401ZHIEX | 8050 In Production | 100 |
| TMP103EYFFT | 8050 on Feeders | 100 |
| MHQ0603P20NJT000 | 8050 Component Storage | 1000 |
| RB521S-30DP-TP | 8050 on Feeders | 4915 |
| ERJ-2GEJ2R2X | BIN A02 | 82500 |
| Z101B-10 | 8050 Component Storage | 116 |
| GRM21BC80G476ME15L | 8050 on Feeders | 2000 |
| CGA2B3X5R1A224M050BB | REEL BOX 7 | 10006 |
| CL05104KO5NNNC | 8050 In Production | 41579 |
| RMCF0402FT10K0 | REEL BOX 7 | 110000 |
| DF52-20P-0.8C | BIN A02 | 500 |
| 0402L035SLKR | 8050 Component Storage | 100 |
| KRL1220E-M-R015-F-T5 | 8050 on Feeders | 2000 |
| RJHSE-3381 | 8050 Component Storage | 105 |
| BLM15PX330SN1D | 8050 In Production | 4620 |
| CL03A104KQ3NNNC | 8050 Component Storage | 50670 |
| 93LC56BT-I/OT | 8050 In Production | 1013 |
| LMK063BJ224MP-F | 8050 In Production | 15000 |
| ERJ-2RKF1501X | BIN A13 | 60000 |
| 0603YC105KAT2A | BIN B02 | 4000 |
| GRM155R71C104KA88J | 8050 on Feeders | 50000 |
| FBMJ1608HS280NTR | 8050 In Production | 8308 |
| MCP4552T-503E/MF | 8050 Component Storage | 192 |
| CL05B103JA5NNNC | 8050 Component Storage | 46198 |
| CRCW02014K02FNED | 8050 on Feeders | 6000 |

| Item | Location | Qty on hand |
|------|----------|-------------|
| CR0201-20W-2491FT | 8050 In Production | 75000 |
| AC0201FR-076K65L | BIN A02 | 20000 |
| FSM4JSMATR | 8050 Component Storage | 1300 |
| GRM155R60J475ME47D | 8050 In Production | 10000 |
| 1718560002 | 8050 Component Storage | 1000 |
| DSF01S30SL,L3F | 8050 on Feeders | 4000 |
| C1005X5R1A104K050BA | 8050 Component Storage | 18213 |
| IHLP2020CZERR22M11 | 8050 on Feeders | 300 |
| CL21C122JBFNNNE | 8050 Component Storage | 4372 |
| 10029449-111rlf | 8050 In Production | 200 |
| ERJ-1GNF3012C | 8050 In Production | 20000 |
| FSM4JSMATR | 8050 In Production | 1200 |
| EXB28V471JX | BIN A14 | 10000 |
| B3S-1000P | 8050 Component Storage | 300 |
| GRM155R61A224KE19D | BIN A21 | 9189 |
| BLM31SN500SN1L | 8050 In Production | 920 |
| 22232031 | 8050 Component Storage | 2000 |
| RC0402JR-070RL | 8050 In Production | 10000 |
| RMCF0402FT20K0 | 8050 In Production | 10000 |
| CL21A226MOCLRNC | 8050 on Feeders | 2000 |
| C1005X7R1C104K050BC | BIN A11 | 10000 |
| TNPW04028K76BEED | BIN A24 | 1100 |
| C2012X5R1A476M125AC | 8050 Component Storage | 200 |
| JMK212BBJ476MG-T | 8050 Component Storage | 1000 |
| M20-9990246 | BIN A05 | 2000 |
| GRM155C81E105KE11D | 8050 on Feeders | 2000 |
| CR0603-10W-24R9FT | 8050 In Production | 5000 |
| ERJ-6BWFR025V | 8050 In Production | 591 |
| SN74LVC1G02DCKR | BIN A11 | 3000 |
| GRM0335C1E8R0CA01D | 8050 Component Storage | 35886 |
| 22-23-2031 | BIN B01 | 1000 |
| RJK005N03FRAT146 | BIN A01 | 994 |
| CRCW020130K1FKED | 8050 on Feeders | 4000 |
| GRM188R60J226MEAOD | 8050 on Feeders | 2000 |
| RMCF0210FT4K02 | 8050 on Feeders | 2000 |
| ERJ-1GNF1202C | 8050 Component Storage | 15000 |
| ERJ-1GNJ2R0C | 8050 In Production | 28073 |
| GRM033R61C224KE14D | 8050 on Feeders | 12000 |
| ERJ2RKF49R9X | BIN A14 | 30000 |
| CM2545X171R-10 | 8050 on Feeders | 100 |
| CSD17575Q3 | 8050 Component Storage | 100 |
| CL05B473KO5VPNC | 8050 Component Storage | 13902 |

| Item | Location | Qty on hand |
|---|---|---|
| M20-9990246 | 8050 Component Storage | 1500 |
| CRGCQ0402F39K | 8050 Component Storage | 8332 |
| SMLP34RGB2W3 | 8050 on Feeders | 200 |
| CRCW0402470RFKEDC | BI A08 | 20000 |
| C1005X7R1C104K050BC | 8050 on Feeders | 6000 |
| DF522832PF157128 | BIN A02 | 100 |
| BKP0603HM121-T | 8050 In Production | 1920 |
| NRC02F1202TRF | 8050 Component Storage | 7996 |
| GRM033R71A103KA01D | 8050 In Production | 19598 |
| PMR10EZPFV3LOO | BIN A06 | 5000 |
| ERJ2RKF2201X | BIIN A14 | 20000 |
| RC0402FR-0749R9L | 8050 Component Storage | 30000 |
| RC0402FR-0786R6L | BIN A01 | 30000 |
| BKP1005HS121-T | 8050 on Feeders | 6000 |
| ECS-250-10-37B-CTN-TR | 8050 In Production | 200 |
| LP5907MFX-1.8/NOPB | 8050 Component Storage | 275 |
| RMCF0603FT402R | 8050 In Production | 30000 |
| ERA-1AEB103C | 8050 Component Storage | 665 |
| RC1005J000CS | 8050 on Feeders | 9000 |
| ERJ-1GNF4700C | 8050 on Feeders | 8000 |
| XEL5050-471MEC | 8050 Component Storage | 50 |
| CRCW02012K49FKED | 8050 on Feeders | 2000 |
| CRGQ0402F15K | BIN A02 | 5000 |
| 741x083472JP | BIN B06 | 3700 |
| GRM0335C1E220JA01D | 8050 Component Storage | 15000 |
| CA064C104M4RAC7800 | 8050 Component Storage | 220 |
| AC0402FR-0756KL | 8050 Component Storage | 15944 |
| GRM32ER60J107ME20K | 8050 Component Storage | 100 |
| RC0402FR-076K19L | 8050 Component Storage | 20000 |
| RMCF0402FT470R | 8050 Component Storage | 20200 |
| CRGCQ0402F6K8 | 8050 Component Storage | 13708 |
| 04025A470JAT2A | 8050 on Feeders | 3000 |
| CRCW0402470RFKEDC | 8050 Component Storage | 9051 |
| RMCF0402FT42R2 | BIN A06 | 20000 |
| GCM1555C1H330JA16D | 8050 Component Storage | 1234 |
| RMCF0603FT402R | 8050 Component Storage | 20000 |
| RT2402B7TR7 | BIN A01 | 9351 |
| GRM188R60J226MEA0D | 8050 In Production | 721 |
| AC0201FR-0712KL | 8050 Component Storage | 4114 |
| RMCF0201FT2K87 | 8050 In Production | 10203 |
| RMCF0201FT49R9 | 8050 Component Storage | 10000 |
| GCM155R71H122KA37D | 8050 Component Storage | 4821 |

| Item | Location | Qty on hand |
|---|---|---|
| 500R07N101JV4T | 8050 Component Storage | 1442 |
| CL05B222KB5NNNC | 8050 Component Storage | 4915 |
| C1005X5R1E105K050BC | 8050 Component Storage | 2500 |
| C0805C102DRAC7800 | 8050 Component Storage | 2500 |
| CRCW060324R9FKEA | 8050 In Production | 5000 |
| ERJ2RKF4021X | BIN A14 | 10000 |
| ERJ2RKF1272X | BIN B04 | 10000 |
| ERJ-2RKF1000X | BIN B08 | 10000 |
| ERJ-2RKF1201X | BIN B08 | 10000 |
| GRM188R60J476ME15D | 8050 In Production | 200 |
| GRM033R61C224KE4D | 8050 Component Storage | 2584 |
| CRGCQ0402F330R | 8050 Component Storage | 10393 |
| ERJ-1GNJ2R0C | 8050 on Feeders | 8000 |
| CL05C471JB5NNNC | 8050 Component Storage | 3439 |
| APXG160A561MHA0G | MIDDLE SHELF | 2207 |
| CRCW02011K00FNED | 8050 In Production | 3338 |
| GRM033R60J104KE19D | 8050 on Feeders | 5000 |
| RMCF0201FT1K00 | 8050 on Feeders | 2100 |
| RC0201FR-074K7L | 8050 Component Storage | 4950 |
| CRCW060324R9FKEA | 8050 on Feeders | 4000 |
| CRCW020159K0FKED | 8050 on Feeders | 1000 |
| CL05B562KBNNNC | REEL BOX 2 | 2500 |
| RMCF0402FT100R | 8050 Component Storage | 12812 |
| RMCF0201FT2K20 | 8050 In Production | 6179 |
| CC0402KRX7R8BB472 | 8050 Component Storage | 10000 |
| 150040RS73240 | 8050 on Feeders | 100 |
| ERJ-M1WTF4M0U | 8050 on Feeders | 100 |
| RC0402FR-071RL | 8050 In Production | 6720 |
| TPS22990DMLT | 8050 Component Storage | 3042 |
| 45971-4115 | 8050 Component Storage | 2 |
| RMCF0201FT240R | 8050 In Production | 6000 |
| RMCF0201FT240R | 8050 on Feeders | 6000 |
| 798550667 | 8050 Component Storage | 1549 |
| CL10A226M07JZNC | 8050 on Feeders | 1500 |
| RMCF0402FT499R | 8050 Component Storage | 10000 |
| RMCF0402FT2K49 | 8050 Component Storage | 10000 |
| APHHS1005CGCK | 8050 on Feeders | 200 |
| M24C64-WMN6P | 8050 Component Storage | 100 |
| RMCF0402FT22K6 | 8050 In Production | 1934 |
| RK73H1HTTCM2490F | 8050 Component Storage | 13477 |
| GRM0335C1H160JA01D | 8050 Component Storage | 5000 |
| RMCF0201FT10K0 | 8050 on Feeders | 5000 |

| Item | Location | Qty on hand |
|---|---|---|
| GRM188R60J476ME15D | 8050 on Feeders | 100 |
| RMCF0402FT37K4 | 8050 on Feeders | 8000 |
| RMCF0402DRE071KL | 8050 Component Storage | 6000 |
| GRM1555C1H8R0DA01D | 8050 on Feeders | 2000 |
| RMCF0402FT22K6 | 8050 Component Storage | 1520 |
| RC0603FR-0724R9L | 8050 on Feeders | 6000 |
| RMCF0201FT13K0 | 8050 In Production | 4605 |
| RMCF0201FT100R | 8050 In Production | 4000 |
| RK73H1HTTC4700F | 8050 on Feeders | 1350 |
| RMCF0201FT5K49 | 8050 In Production | 3947 |
| CRGCQ0402F10R | 8050 Component Storage | 4649 |
| GRM21BR60J107ME15L | 8050 Component Storage | 20 |
| RC0402FR-071RL | 8050 on Feeders | 4000 |
| RMCF0201FT13K0 | 8050 on Feeders | 4000 |
| RMCF0201FT2K20 | 8050 Component Storage | 2988 |
| RMCF0402FT499R | 8050 In Production | 5929 |
| RMCF0402FT267K | 8050 Component Storage | 5920 |
| UCL1C102MNL1GS | 8050 on Feeders | 30 |
| RC0402FR-0720KL | 8050 Component Storage | 4980 |
| RC0402FR-074K99L | 8050 Component Storage | 4900 |
| RMCF0201FT10K0 | 8050 In Production | 3000 |
| RMCF0201FT11K0 | 8050 on Feeders | 3000 |
| RMCF0402FT30R1 | 8050 In Production | 5000 |
| RMCF0402FT2K00 | 8050 on Feeders | 5000 |
| CRGCQ0402F15K | 8050 Component Storage | 3333 |
| RC0402FR-0733K2L | 8050 on Feeders | 4000 |
| SI53305-B-GMR | REEL BOX A | 2 |
| CGA2B3X5R1A224MB | 8050 Component Storage | 371 |
| RF0402FR-0730RL | 8050 Component Storage | 4250 |
| RMCF0402FT49K9 | 8050 on Feeders | 4000 |
| RMCF0402FT130K | 8050 on Feeders | 4000 |
| RMCF0603FT402R | 8050 on Feeders | 4000 |
| ERJ2GEJ472X | BIN A01 | 2673 |
| GRM033R71A103KA01D | 8050 on Feeders | 2000 |
| RMCF0201FT12K1 | 8050 on Feeders | 2000 |
| RMCF0402FT2K87 | 8050 In Production | 3440 |
| C0402C222K5RACTU | 8050 Component Storage | 822 |
| RMCF0402FT240R | 8050 on Feeders | 3000 |
| RMCF0402FT10K2 | 8050 on Feeders | 3000 |
| MT41K512M16HA-125:A | 8050 Component Storage | 4304 |
| CL03B152KP3NNNNC | 8050 Component Storage | 1000 |
| KRL1220E-M-R015-F-T5 | 8050 Component Storage | 50 |

| Item | Location | Qty on hand |
|---|---|---|
| CL03B152KP3NNNNC | 8050 In Production | 3958 |
| RC0402FR-07100RL | 8050 on Feeders | 2000 |
| RMCF0201FT2K49 | 8050 In Production | 1142 |
| RMCF0402FT10K0 | 8050 on Feeders | 2000 |
| ST1026MP41W693HC | REEL BOX D | 10 |
| RMCF0201FT100R | 8050 on Feeders | 1000 |
| GCM155R71H122KA37D | BIN A24 | 376 |
| ASDMB-125.000MHZ-LY-T | 8050 Component Storage | 1 |
| RT2402B7TR7 | 8050 Component Storage | 586 |
| FBMJ1608HS280NTR | 8050 on Feeders | 100 |
| RMCF0201FT5K49 | 8050 on Feeders | 500 |
| 501-001582R7141 | 8050 Component Storage | 10 |
| RC0402FR-07150RL | 8050 Component Storage | 350 |
| GRM033R71A103KA01D | 8050 Component Storage | 125 |
| ST5126MP451693SC | 8050 Component Storage | 10 |
| GRM21BR060J107ME15L | 8050 on Feeders | 25 |
| RMCF0201FT2K87 | 8050 on Feeders | 50 |
| RMCF0201FT12K1 | 8050 In Production | 28 |

## Schedule 1.1(b)

### Assigned Contracts

Hosted customer contract with Purchaser.

Lease Agreement for 8050 Freedom Avenue with One Haines Company, 120-month term. Signed May 5, 2020.

Master Energy Purchase Agreement, dated October 20, 2020, between SQRL and AEP Energy, Inc./Ohio Power.

Master Energy Purchase Agreement, dated November 18, 2020, between SQRL and AEP Energy, Inc./Ohio Power.

SMRH:4884-5558-9128.6

**Schedule 1.2(h)**

**<u>Insurance Claims</u>**

Cincinnati Insurance Company – Date of Loss: July 15, 2021.  Fire damage to building and contents at 8050 Freedom Avenue building.  Unknown value of loss.

SMRH:4884-5558-9128.6

**Schedule 1.2(g)**

**<u>Excluded Causes of Action</u>**

SQRL v. Fleur de Lis, Case No. 2021 CV 00251, Stark County, Ohio Court of Common Pleas

Potential claims against Roehl Trading for undelivered equipment and against Alpine Mining for undelivered equipment.

Potential Claims against Michael Maranda and/or Michael Maranda LLC.

Avoidance Actions, including those causes of action brought pursuant to Chapter 5 of the Bankruptcy Code

**Schedule 1.2(i)**

**<u>Registered Intellectual Property</u>**

SQRL's registered intellectual property includes the following:
-Detailed customer lists
-www.squirrelsresearch.com and other domain names
-SQRL trademarks, service marks, and logos

SMRH:4884-5558-9128.6

**Schedule 2.4(a)**

**<u>Leased Real Property</u>**

Lease Agreement for 8050 Freedom Avenue with One Haines Company, 120-month term. Signed May 5, 2020.

Lease Agreement for 7579 Freedom ("Skymax" building) with One Skymax Company, 120-month term. Signed March 16, 2020.

Lease Agreement for Fishers Foods building with GS8100. 120-month term. Signed 9-8-2020.

SMRH:4884-5558-9128.6

**Schedule 2.6**

**Litigation**

TorEA Consulting Ltd. vs. Squirrels Research Laboratories LLC, 2021CV1091, Stark County Common Pleas Court 115 Central Plaza North Canton, OH 44702

Everhart Glass Co., Inc. v. Kylin Construction, LLC and Squirrels Research Labs, LLC 2021-CV-01487 , Stark County Common Pleas Court 115 Central Plaza North Canton, OH 44702

Threats of litigation have also been brought forth by counsel for Mr. Michael Maranda/Michael Maranda LLC and counsel for Mr. Karl Forsell.