# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Squirrels Research Labs LLC, *et al.*[1] | ) | Case No. 21- 61491 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Judge Russ Kendig |

### Squirrels Research Labs LLC's
### Plan of Liquidation Dated February 21, 2022

This Plan of Liquidation dated February 21, 2022 (the "Plan") is being filed by one of the above-captioned debtor and debtor in possession (each a "Debtor," and collectively, the "Debtors") under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). While the case of this Debtor is being jointly administered with affiliate The Midwest Data Company LLC ("MWDC"), this Plan is proposed by and applies to Debtor, Squirrels Research Labs LLC ("SQRL") alone, and it is contemplated that MWDC will file its own plan of liquidation or reorganization, as is appropriate.

Most of the Debtor's physical assets have been liquidated pursuant to the Sale.[2] This Plan provides for the orderly liquidation of the remaining assets of the estate over time, and for the proceeds to be allocated in accordance with the terms of the Plan and distributed to holders of Allowed Claims. On the Effective Date, all of the Debtor's assets will be vested in the Liquidating Debtor.

The Liquidating Debtor will, among other things, liquidate the assets, resolve any Disputed Claims, prosecute any Causes of Action, except for Avoidance Actions against the Debtor's President, wind down, and make distributions under the Plan. With respect to Avoidance Actions against the Debtor's President, Fred Schwieg, the current the Subchapter V Trustee, will be vested with the authority to prosecute these particular Avoidance Actions, if any. The Liquidating Debtor will be dissolved as soon as practicable after the final distribution is made pursuant to the Plan.

Subject to the restrictions set for in section 1193 of the Bankruptcy Code and any applicable Federal Rules of Bankruptcy Procedure, the Debtor expressly reserves the right to alter, amend, or modify the Plan, one or more times before its substantial consummation.

---

[1] The "Debtors" in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Squirrels Research Labs LLC (9310), case no. 21-61491 and The Midwest Data Company LLC (1213), case no. 21-61492.

[2] All Capitalized terms not otherwise defined in the text of this Plan shall have the meanings ascribed to them in Article 11 of this Plan.

1

# Article 1:    Background

## 1.01    Description and History of the Debtor's Business

SQRL is an Ohio limited liability company, headquartered in North Canton, Ohio. Prior to the Petition Date, SQRL created, manufactured, and repaired hardware, including DataCenter Accelerator Boards, used in cryptocurrency mining machines. Debtor's business operations were housed in two locations: 8050 Freedom Avenue, North Canton, Ohio 44720 pursuant to a lease with One Haines Company, LLC and 7579 Freedom Avenue, NW, North Canton, Ohio 44270 pursuant to a lease with One Skymax Company, LLC.

The Debtor SQRL also entered into a lease for space located at 8100 Cleveland Ave., North Canton, Ohio pursuant to a lease with GS8100 LLC. However, operations at this location never commenced due to delays by the power company.

MWDC is also an Ohio limited liability company headquartered in North Canton, Ohio. MWDC provides hosting services for cryptocurrency mining machines to customers, some of whom purchased cryptocurrency mining machines from SQRL. Prior to the Petition Date, MWDC provided these hosting services from its locations at 8050 and 7579. Post-petition, MWDC has continued to provide these hosting services from these locations. MWDC will need to move its operations from 8050 Freedom Avenue, as the Lease Agreement with One Haines Company LLC was assumed and assigned to the purchaser pursuant to the Sale. SQRL understands that MWDC is presently evaluating business locations, including, among others, the Debtors' prior leased locations at 7579 Freedom and 8100 Cleveland Ave.

On the Petition Date, David Stanfill owned or controlled 16.7% of the membership units in SQRL and 40% of the membership units in MWDC.

## 1.02    Events Leading to Chapter 11 Filing and Overview of Debtor's Financial Structure

Prior to the Petition Date, SQRL executed and delivered to Avnet, Inc. ("Avnet"): (i) a promissory note in the original principal amount of $4,621,092.50 dated March 26, 2019 (the **"Initial Note"**) and (ii) a Security Agreement dated as of March 20, 2019, granting a lien in the collateral described therein (the **"Avnet Collateral"**) in favor of Avnet to secure payment of amounts invoiced by Avnet (the **"Security Agreement"**).

Debtor SQRL began the process of seeking counterparts for a recapitalization or sale of the company's assets in late 2020 on account of then-existing capital constraints arising from a global shortage of computer chips and other critical components required for the manufacturing of cryptocurrency mining equipment.  As a result of the COVID-19 pandemic, the world-wide supply chain for, among other things, computer chips was severely disrupted, leading to lengthy delays in SQRL obtaining components required for its products.  The foregoing supply chain disruptions have continued to date, thereby significantly detrimentally impacting SQRL's ability to manufacture cryptocurrency mining equipment.

SQRL's efforts in seeking additional capital or a sale of substantially all assets resulted in the execution and delivery of a Membership Unit Purchase Agreement with Fleur-de-Lis, LLC ("FDL") dated as of December 31, 2020, whereby FDL was to purchase 51% of the membership interests in SQRL from SQRL's treasury for $10 million on or before January 30, 2021.  FDL thereafter breached the Membership Unit Purchase Agreement by failing to pay any of the $10 million purchase price on or before January 30, 2021.  SQRL filed a complaint for damages and

injunctive relief against FDL and others in the Stark County Court of Common Pleas on March 1, 2021 (the "FDL Action"). The FDL Action remains pending. The Debtor has removed the FDL Action to the United States Bankruptcy Court for the Northern District of Ohio.

Also, during 4th quarter of 2020 and throughout the 1st quarter of 2021, SQRL negotiated numerous settlements with trade vendors and suppliers resulting in approximately $617,000 of trade debt to suppliers being settled and compromised for approximately $324,000, plus the release of certain consigned goods and delivery of components previously ordered. In addition, SQRL also negotiated a settlement of certain obligations with an equipment lessor resulting in a reduction of monthly costs from approximately $90,000 per month to approximately $53,000 per month with corresponding extensions of the terms of said leases and increased balloon payments to be due at the ends of the lease terms.

Faced with severe liquidity constraints, SQRL raised capital from existing members and certain new members throughout the first and second quarters of 2021 in order to pay the obligations to vendors described in the preceding paragraph and the obligations to Avnet, as described below.

In early 2021, SQRL commenced negotiations with Avnet, who had historically been a major supplier of key components critical to SQRL's business. At that time, SQRL's outstanding indebtedness to Avnet under the Initial Note had increased by virtue of ongoing orders to approximately $8,191,000. SQRL and Avnet were able to reach a framework for the restructuring of SQRL's account with Avnet, the principal terms of which were: (i) a payment of $369,300 to Avnet on account of the then-existing balance due under the Initial Note on or before March 31, 2020, (ii) monthly payments thereafter pursuant to an amended and restated promissory note executed by SQRL and delivered to Avnet dated April 8, 2021 in the original principal amount of $7,864,779.76 (the "Amended and Restated Note"), which Amended and Restated Note remained secured by the lien granted by the Security Agreement, and (iii) a purchase by SQRL and shipment by Avnet of 3,676 VU35P and VU33P FPGA chips for $2,630,700 immediately thereafter. Avnet did not thereafter deliver the full amount of SQRL's order of the VU35P and VU33P FPGA chips, and instead only delivered 3,611 VU35P chips. SQRL nonetheless made the initial monthly payment to Avnet and monthly payments under the Amended and Restated Note through the payment due for June, but thereafter defaulted in making monthly payments to Avnet. Avnet declared SQRL in default under the terms of the Amended and Restated Note and the Security Agreement on August 20, 2021, thereby freezing SQRL's use of cash collateral and ability to pay operating expenses.

As a result, the Debtor was forced to freeze its operations and terminated the employment of all employees effective as of August 27, 2021. As a result of the freeze, the Debtor was unable to make its final payroll to employees, including the withheld deferred amounts as elected by certain employees and matching contributions pursuant to the Squirrels 401(K) & Profit Sharing Plan. MWDC used its funds to pay the final payroll, not including the withheld deferred amounts and the matching contributions.

In addition, beginning in the second quarter of 2021, an existing customer/client began initiating orders with third parties for cryptocurrency mining machines to be manufactured by SQRL which orders were made outside of the standard procedures for initiating orders. Due to the supply chain disruptions described above, SQRL was unable to obtain sufficient component parts to satisfy the foregoing orders in a timely manner, and, upon information and belief, the

3

unauthorized party or parties initiating those orders did not advise any of the ordering parties that SQRL would be unable to meet the production schedule promised. The foregoing has led to threats of litigation against, among others, MWDC and SQRL.

On the night of July 15, 2021, an area of the SQRL main warehouse, located at 8050 Freedom, that contained more than 1000 operating FPGAs experienced a fire. The fire originated on racks of equipment containing operating liquid cooled JungleCat modules and some direct impact occurred in that area. As the fire grew, it caused liquid cooling lines that were under substantial pressure to burst, which led to water spray, steam, and soot expanding through the entire warehouse area.

This affected all operating equipment in the room, as well as permeable SQRL inventory and non-operating inventory in the area. This liquid and steam self-extinguished the fire, however heavy smoke and soot filled the area as well as the open liquid cooling reservoir for the operating equipment. The loss of cooling fluid also caused the failure of at least one cooling pump from running dry. The emergency responders cut power to half of the SQRL and MWDC building to manage the incident, and in doing so inadvertently shut off the external liquid cooling radiator fans associated with equipment on the far side of the building, encompassing more than 2000 additional operating units. The power outage also affected more than 1000 air cooled operating units in a different area of the building. The units that were operating on the other side of the building experienced an extreme overheat/boiling event that distorted and damaged cooling pipes and fittings and led to leaks and liquid damage in that area. As a result, all equipment in the 8050 Freedom facility experienced outages for extended periods of time.

In addition, the loss of power and subsequent equipment damage affected the main fiber link and internet router as well as command and control servers that served both the 8050 and 7579 properties. This equipment was housed in a smaller room inside the warehouse with an open door. The loss of this equipment caused more than 3000 additional FPGAs in the 7579 building to lose network communication. The 7579 property internet connection was fed directly from 8050 by a peer-to-peer fiber link, and the 8050 command and control servers also operated that equipment.

In total, nearly all SQRL and MWDC hosted equipment was brought offline by the incident.

Following the incident, SQRL and MWDC's mutual insurance company, Cincinnati Insurance, coordinated the dispatch of a team from AREPA to provide cleanup and recovery services. From the period of the incident through late August 2021, AREPA teams fully disassembled all electronic equipment, FPGA modules heatsinks, cooling systems, power distribution equipment, and other items of technology affected by the fire, smoke, and soot. Due to the proprietary nature of the equipment and SQRL being the OEM, AREPA required the support of the SQRL repair, rework, production, testing, and support technicians to instruct them on handling, disassembly, cleaning, testing, reassembly, and inspection of the equipment. This prevented SQRL staff from performing their ordinary duties of building, installing, and maintaining other equipment. This loss of operations and services led to loss of sales in progress, as well as impacted significantly MWDC hosted customers.

4

Upon the assertion of default and freezing of cash collateral in late August, 2021, SQRL staff was no longer able to assist AREPA. As a result, AREPA also left the premises prior to full recovery of the facilities or equipment. This also delayed SQRL and MWDC in finalizing a claim for final causality loss and business interruption as the business remained inactive.

The Debtors believe they have a combined coverage limit, for casualty and business interruption related to the above-described events, in excess of $10,000,000.00. Insurance Claims are in process for this business interruption and physical damage but remain unresolved as of the date of this Plan.

Shortly after the July 15, 2021 fire, an existing customer/client asserted a direct claim against the Debtors' insurance carrier for alleged damages and for loss of cryptocurrency mining revenues and has subsequently threatened litigation against, among others, MWDC and SQRL.

As of November 22, 2021, SQRL remained obligated to Avnet in the principal amount of $7,864,779.76 plus accrued and accruing interest, fees, costs, and other charges (including attorneys' fees and costs) (the "Avnet Claim").

Prior to the Petition Date, the Debtors received an offer to purchase certain of their assets, as set forth in the Asset Purchase Agreement dated as of November 23, 2021 from Instantiation LLC. On the same date, Avnet, SQRL, MWDC, and Instantiation, LLC entered into an Account Settlement and Sale Support Agreement whereby those parties agreed, as of the Effective Date thereof, that in order to support the Chapter 11 process, Instantiation LLC will provide debtor in possession financing to MWDC in the original principal amount of $350,000 as described in the DIP Loan documents evidencing and memorializing same necessary to fund these Chapter 11 cases and the related sale process, and seek to purchase the Debtors' assets. In addition, Avnet agreed to support the Sale, not object to the debtor-in-possession financing to be provided by Instantiation, and SQRL and Avnet agreed to a resolution of the amount and treatment of the Avnet Claim, such that the Avnet Claim is reduced to the amount $5,751,000 (the "Reduced Avnet Claim"). In addition, SQRL agreed therein that the value of the Avnet Collateral is not less than $3,000,000.00 and pursuant to section 506 of the Bankruptcy Code, the Reduced Avnet Claim is a secured claim in the amount of not less than $3,000,000.00 (the "Avnet Secured Claim") and an unsecured claim for the remainder.

### 1.03 <u>Overview of Events During the Bankruptcy Case</u>

Immediately upon the filing of this case, the Debtors filed a motion for joint administration, a motion to authorize MWDC to obtain debtor in possession financing from Instantiation and a motion to establish bid and sale procedures for the sale of assets to Instantiation. The Court heard the motions on an expedited bases on December 1, 2021. Due and appropriate notice of the motions and the expedited hearing date were provided.

**Joint Administration**

The Court entered an order authorizing the joint administration of these cases for procedural purposes only on December 1, 2021.

**DIP Financing**

The Court entered an Interim Order: (I) Authorizing Secured Postpetition Financing on a Superpriority Basis Pursuant To Section 364 of the Bankruptcy Code; (II) Modifying the Automatic Stay; and (III) Granting Related Relief on December 2, 2021 (the "Interim Order").

The Interim Order authorized MWDC to borrow a maximum of $350,000 on a secured basis, with up to $279,000 in the Interim Period, provided for a Carve Out for professional fees, including fees of the Subchapter V Trustee, Debtors' counsel and other estate professionals. A final order was entered on December 9, 2021 authorizing the post-petition borrowing up to $350,000 and granting a superpriority claim for Advances (the "Superpriority Claim") and liens on MWDC Assets (the "DIP Liens") subject to a carveout for, *inter alia,* (1) the payment of fees and expenses of professionals retained by Debtors up to an aggregate amount not to exceed $150,000 and (2) fees payable to the Subchapter V Trustee up to an aggregate amount not to exceed $50,000. Advances to date total $250,000.

### Sale of Assets

On December 1, 2021, the Court entered the Bidding Procedures Order establishing procedures for the auction and sale of certain MWDC and SQRL assets, as defined therein, designating Instantiation as the stalking horse bidder, and granting related relief [Docket #40]. No competing bids were submitted before the bid deadline set in the Bidding Procedures Order and thus, no auction was held. The Court held a hearing on the Debtors' motion to approve the Sale on January 11, 2022 and entered an order authorizing the Sale on January 18, 2022. The Sale closed on January 27, 2022. MWDC received $10,000 in proceeds from the Sale. Avnet has received full payment of the Avnet Secured Claim.

### Bar Date

On December 21, 2021, the Court entered an Order Establishing General and Government Claims Bar Dates. The General Bar Date in this case is February 20, 2022 and the Government bar Date is May 22, 2022.

### Payment of Certain Priority Claims

The Debtor has filed a motion with the Court seeking authority to pay the priority claims of certain employees pursuant to sections 507(a)(4) and (a)(5) of the Bankruptcy for the withheld deferred amounts as elected by certain employees and matching contributions pursuant to the Squirrels 401(K) & Profit Sharing Plan.

## 1.04  Projected Recoveries

There remain unencumbered assets in the Debtor's estate, primarily comprised of various causes of action, including those arising pursuant to Chapter 5 of the Bankruptcy Code, to be administered for the benefit of the estate.

The Debtor is in the process of investigating prepetition transactions. If you received a payment or other transfer within 90 days, or if you are an insider of the Debtor, within 1 year, of the bankruptcy or other transfer avoidable under the Code, the Debtor may seek to avoid such transfer.

The Recoveries in this case will consist of the proceeds of the liquidation of all assets in the Debtor's estate. The Debtor categorizes those Recoveries into several different general categories, including, Causes of Action, including Avoidance Actions, Insurance Claims, and the liquidation and collection of receivables and other assets excluded from the Sale. Evaluations to date lead the Debtor to the following estimate of the value of the Recoveries:  the Debtor estimates that the maximum proceeds from the liquidation and collection of receivables and other assets, excluding the Insurance Claims will total approximately $150,000. The debtor is

further seeking recovery from the Insurance Claims against coverage limits of up to $10 million. In addition, the Debtor is seeking or will seek potentially in excess of $10 million in recoveries from the FDL Action, Avoidance Actions and other causes of action against third parties. While the results of litigation cannot be predicted with certainty and it is possible that other causes of action may be identified, the following is a summary of the unencumbered assets remaining the Debtor's estate, including without limitation, various causes of action, including without limitation preference, fraudulent conveyance and other avoidance actions filed or with the potential to be filed in this case:

**FDL Action**

The FDL Action is the result of a failed sale transaction. The Debtor is seeking damages against FDL for the failure to close the transaction that had an initial sale price of $10,000,000. The Debtor believes its claim against FDL has value. Prior to the Petition Date, the Debtor filed a complaint against FDL in the Stark County, Ohio Court of Common Pleas. FDL filed an answer and counterclaim against the Debtor. The Debtor has filed a Notice of Removal of that action to the United States Bankruptcy Court for the Northern District of Ohio. That action is pending before this Court in Adversary Proceeding No. 22-6003.

**Avoidance Actions** –

1. **Preference Actions – payments or transfers of an interest of the Debtor in property within 90 days prior to filing on account of an antecedent debt with an aggregate value of more than $6,825**

   a. The Debtor has not identified any such transactions that fall outside of the ordinary course of its business.

2. **Preference Actions – payments or transfers of an interest of the Debtor in property made to an Insider within 1 year prior to Petition Date on account of an antecedent debt with an aggregate value of more than $6,825**

   a. Cash transfers made to reimburse Insiders – estimated amount at issue $20,000

      i. Debtor is reviewing its records to determine the amounts and dates of the transfers and to determine whether it believes it can establish the elements of a preferential transfer under section 547 of the Bankruptcy Code.

3. **Fraudulent Conveyances – payments or transfers made within 2 years prior to the Petition Date not in exchange for reasonably equivalent value**

   a. DAS Loan – A loan was made to the Debtor's President by a third party who owed retail sales funds to SQRL. As a part of a settlement between the third party and SQRL on matters unrelated to the loan reached in January 2020, SQRL assumed the note receivable in the liquidated amount of $83,720. The amount due from the Debtor's President of $80,554.50 (less payments of $3,250 that had been made to date and accrued interest) under the note was set off against reimbursements SQRL owed the insider on July 8, 2021.

7

       i.  Debtor is continuing to evaluate the transaction, including whether the set off against reimbursements owed by SQRL constitutes reasonably equivalent value in exchange for satisfaction of the note due SQRL.

b.  Purchase of shares from Sidney Keith – In or around May, 2020, SQRL agreed to repurchase shares from Sidney Keith for $152,000, with payment for the shares being made in installments over time. The shares were then contemporaneously made available by SQRL to Kyle Slutz and Dave Jimenez in exchange for reduction in their accounts payable balance with SQRL in the amount of $152,000.

       i.  Installment payments were to be made to Mr. Keith such that payment of the last $22,800 due falls within 1 year prior to the Petition Date. The Debtor is continuing to evaluate the transaction to determine whether it can establish the elements of a preferential transfer under section 547 of the Bankruptcy Code.

      ii.  In addition, in terms of a potential cause of action under section 544 or 548 of the Bankruptcy Code, the Debtor is continuing to evaluate the transaction, including whether the transaction was made for reasonably equivalent value, as the consideration for the subsequent sale/exchange of the shares purchased from Keith was the reduction in accounts payable owed by SQRL to other shareholders.

c.  Transfer of HAAS CNC Machine to the Debtor's President. On July 13, 2020, SQRL sold a HAAS VF-2SS Vertical Machining Center to Debtor's President for $31,000 as reflected in a Bill of Sale dated July 13, 2020. Ownership of the machine transferred to Debtor's President on July 13, 2020. In exchange, though the Bill of Sale recites receipt of $31,000 by wire transfer, SQRL reduced the amount due the Debtor's President in reimbursements by $31,000.

       i.  The Debtor believes the HAAS CNC Machine to have had a value equivalent to $31,000 on the date of transfer in satisfaction of $31,000 in reimbursement owed to the Debtor's President.

      ii.  In terms of a potential cause of action under section 544 or 548 of the Bankruptcy Code, the Debtor is continuing to evaluate the transaction, including whether the reduction in the reimbursement amount owed to the Debtor's President constitutes reasonably equivalent value in exchange for the transfer of the Machine.

d.  Debtor is evaluating various sales, including without limitation sales to MM LLC and TorEA Consulting, where it appears transactions may have taken place outside of the ordinary course of business and the price paid for hardware purchased may have been significantly less than fair market value for the hardware resulting, potentially, in a constructively fraudulent transfer.

e.  Debtor is evaluating the payment of commissions / margins for channel sales to determine whether those payments give rise to a viable cause of action under Chapter V of the Bankruptcy Code.

8

4. Fraudulent Conveyances – payments or transfers made within 4 years prior to the Petition Date not in exchange for reasonably equivalent value

   - None have yet been identified by the Debtor

**D2A Note Receivable**

In addition, SQRL is owed approximately $145,000 pursuant to a note receivable from D2A Enterprises (the "D2A Note Receivable"). D2A Enterprises is a purpose specific real estate holding company, owned by David Stanfill, Andrew Gould, and David Jimenez. In October, 2020, D2A enterprises agreed to provide GS8100 LLC (a company in which D2A owns a 30% stake) a loan of $2.4 million in order to purchase the real property located at 8100 Cleveland Ave., North Canton, OH. Contemporaneously, SQRL entered into a lease for the property and pursuant to the lease, SQRL would be provided $1 million in tenant improvement funds to purchase equipment and build out a datacenter facility in the property. Due to delays with the power company, no equipment ever operated at this facility and no rent was ever paid. GS8100 did extend $850,000 in tenant improvement advances to SQRL.

Some portion of the loan from D2A to GS8100, approximately $1.6 million of the $2.4 million, passed through the SQRL bank account at the time of the transaction as a part of the wire to the title company of the full amount of the purchase price. The $1.6 million came from a combination of Crypto (which SQRL exchanged for David Jimenez) and cash (from Squirrels LLC).

In addition, SQRL loaned $350,000 to D2A as a part of this transaction, giving rise to the D2A Note Receivable. All but the remaining balance noted above has been paid by D2A. D2A has indicated to the Debtor the remaining Note Receivable balance will be paid to the Debtor on or before the Effective Date.

**Insurance Claims**

As discussed more fully in Article 1.02 of the Plan, the Debtor and MWDC suffered a significant interruption in their business activities. Debtors have a claim for physical damage and business interruption against their insurer, Cincinnati Insurance. Though the Insurance Claims have not yet been liquidated, the Debtor believes the Insurance Claims will result in a recovery for the estate.

**Other Assets**

In addition, to the assets identified with specificity in this Article 1.04, there remain other assets including without limitation, the assets excluded from the Sale, that will be liquidated. While the results of the liquidation of these assets cannot be predicted with certainty, the Debtor estimates that the liquidation of these other assets will be of nominal value to the estate.

Collectively all proceeds from the Causes of Action, including without limitation, the Avoidance Actions, and the liquidation of the Insurance Claim, Note Receivable and any other asset of the Debtor are referred to herein as the "Recoveries"

**1.05   Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity-interest holders would receive in a chapter 7 liquidation. The Debtor believes the Recoveries will

9

result in payment of Allowed Administrative and Priority Claims in full, and allow a pro-rata distribution to holders of Allowed Unsecured Creditors. If no plan of liquidation is confirmed, this Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code and the Debtor's remaining assets liquidated pursuant to that chapter. Under either a chapter 7 or a chapter 11 liquidation, the goal is to maximize the recovery for the estate and its creditors through liquidation of assets. However, because of the numerous uncertainties and time delays associated with liquidations of assets, it is not possible to predict with certainty the outcome of any chapter 7 or chapter 11 liquidation. Notwithstanding, the Debtor believes that the Plan provides a more efficient vehicle to accomplish the goal of liquidating the Debtor's assets to maximize the recovery for the benefit of the Debtor's estate and its creditors.

In addition, the conversion of the case to chapter 7 will add an additionally layer of administrative expense, as the conversion of this case would require the retention of new professionals and likely duplication of effort for work already performed by the professionals retained in the Chapter 11 Case. Any proceeds realized from the administration and liquidation would be first used to pay all of the administrative costs and expenses incurred from and after the date of conversion to chapter 7, including chapter 7 trustee fees and the fees and costs of any professionals retained by the chapter 7 trustee. Because of this additional layer of expense, the Debtor believes the conversion of the case to chapter 7 will result in a lesser distribution to creditors than the distribution contemplated under the Plan.

Liquidation of the assets through this Plan will result in a greater distribution to creditors than if the case were converted to a chapter 7 and the costs of a chapter 7 trustee had to be borne by the estate. A copy of the liquidation analysis required by 11 U.S.C. § 1190 is attached to the Plan as **Exhibit A**.

### 1.06    Projections of Ability to Make Future Plan Payments

The Debtor is liquidating under this Plan and will not require further reorganization. The Debtor believes it will have enough cash on hand, upon collection of the note receivable, and liquidation of other assets, to pay amounts due on the Effective Date.

The payments due under the Plan will be made using the Recoveries at such time as the Disbursing Agent determines payments should be made under the Plan. Payments will be made by the Disbursing Agent first to holders of Allowed Administrative Expense Claims and holders of Allowed Priority Tax Claims, then to holders of Allowed Claims in Classes 1 & 2. Finally, the Disbursing Agent will make disbursements to holders of Allowed Claims in Class 4, pro rata, from the Recoveries. The timing of the Recoveries cannot be predicted with certainty, but the Debtor believes the Recoveries will result in a distribution to creditors as set forth herein and as shown on the Liquidation Analysis, but without the additional expense of a conversion to a different chapter. **Nothing in the projections should be deemed or construed as: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's rights to dispute any claim on any grounds; or (c) a promise to pay any claim.**

21-61491-tnap    Doc 169    FILED 02/21/22    ENTERED 02/21/22 21:15:22    Page 10 of 26

## Article 2:    Plan Summary

This Plan provides for the orderly liquidation of the remaining assets of the estate over time, and for the proceeds to be allocated in accordance with the terms of the Plan and distributed to holders of Allowed Claims.

This Plan provides for:

2 classes of priority claims;
1 class of secured claims;
1 class of non-priority unsecured claims; and
1 class of equity security holders.

This Plan provides for full payment of administrative expenses and priority claims. Holders of Allowed Unsecured Claims in Class 4 are expected to receive a percentage distribution of their Allowed Claim which percentage amount will depend on the amount of Allowed Claims in Class 4. All creditors and equity security holders should refer to Articles 3 through 5 of this Plan for information regarding the precise treatment of their claim. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney if you have one. (If you do not have an attorney, you may wish to consult one.)**

## Article 3:    Classification of Claims and Interests

| | | |
|---|---|---|
| **3.01** | **Class 1** | This class consists of all Allowed Claims entitled to priority under § 507(a)(4) and (a)(5) of the Bankruptcy Code. |
| **3.02** | **Class 2** | This class consists of all Allowed Claims entitled to priority under § 507(a)(7) of the Bankruptcy Code. |
| **3.03** | **Class 3** | This Class consists of the secured claim of Avnet, Inc. ("Avnet"). |
| **3.04** | **Class 4** | This Class consists of all non-priority unsecured claims not otherwise classified and allowed under § 502 of the Bankruptcy Code. |
| **3.05** | **Class 5** | This Class consists of the equity interests of the Debtor |

## Article 4:    Treatment Of Administrative Expenses, Priority Tax Claims, And Quarterly And Court Fees

| | | |
|---|---|---|
| **4.01** | **Unclassified claims** | Under section § 1123(a)(1), allowed administrative expenses and Priority Tax Claims are not in classes. |
| **4.02** | **Administrative expenses** | If this Plan is consensually confirmed under § 1191 of the Bankruptcy Code, Administrative Expenses allowed under § 503 of the Bankruptcy Code will be paid in full on the later of Effective Date of this Plan or when such claim arises, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. |

11

If this Plan is not consensually confirmed under § 1191 of the Bankruptcy Code, Administrative Expenses allowed under § 503 of the Bankruptcy Code will be paid as follows consistent with section 1191(e) of the Bankruptcy Code: (1) Expenses arising in the ordinary course of business after the Petition Date shall be paid in full on the Effective Date, or according to the terms of the obligation, if later. All other administrative claims will be paid pro-rata from the Recoveries at such time as the Disbursing Agent makes disbursement with other administrative claims and in the order of priority set forth in §§ 503 and 507 of the Bankruptcy Code.

The Debtor estimates that it will owe its counsel at least $50,000 in legal fees as of the Effective Date, owe the Subchapter V Trustee $3,000 in fees as of the Effective Date, and owe to its accountant $5,000 in fees as of the Effective Date, which amounts are to be paid up to $150,000 for debtor's professionals and $50,000 for the Subchapter V Trustee from the Carve Out under the DIP Loan to MWDC.

| 4.03 | Priority Tax Claims | The Internal Revenue Service filed a priority tax claim as follows (the "Tax Claims"): |
|---|---|---|

The IRS filed a proof of claim, Claim No. 1 on December 2, 2021, in the amount of $900, claiming priority in the amount of $300. (the "IRS Priority Tax Claim").

The Debtor disputes certain of the amounts of the Tax Claims, but for purposes of the budget of this Plan, are making the assumption that these are the amounts owed on the Tax Claims. The projected disposable income may increase or decrease to the extent the Tax Claims or other governmental priority claims are lower than the amounts stated in the respective proofs of claim.

The priority portion of the Tax Claims will bear interest at 3% and will be paid pro rata from the Recoveries to each agency in a monthly amount to account for pro rata distribution of any Allowed Tax Claim upon the earlier of 36 months from the Effective Date or within 5 years after the Petition Date and the unsecured portions of the Tax Claims will be treated as set forth in Class 4.

12

| | | |
|---|---|---|
| **4.04** | **Statutory fees** | All unpaid fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan will be paid on or before the Effective Date. |
| **4.05** | **Prospective quarterly fees** | As a Subchapter V debtor, the Debtor is not required to pay quarterly fees under 28 U.S.C. § 1930(a)(6) or (a)(7). If these are subsequently reimposed, they will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Bankruptcy Code. |

## Article 5:    Treatment Of Claims And Interests Under The Plan

The Liquidating Debtor reserves the right to pay any claim at any time in accordance with the terms of this Plan,(i.e., at the percentage distribution designated in the Plan including accrued and unpaid interest, if any) without prepayment penalty. Without violating the automatic stay, the Confirmation Order, or other provisions of the Bankruptcy Code, creditors holding Secured Claims or Priority Claims that will be paid in full hereunder may, in their discretion, send invoices containing payment amount and balances as set forth herein. The Classes, the treatment of each Class, and the voting rights of each Class are set forth below.

### 5.01    Class 1 – Priority Claims under 507(a)(4) and (a)(5) -- Unimpaired and Deemed to Accept

This Class consists of all Allowed Priority Claims under § 507 (a)(4) and (5) of the Bankruptcy Code. Specifically, the Debtor believes there are holders of priority claims pursuant to Bankruptcy Code sections 507(a)(4) and 507(a)(5). The total amount of Priority Claims shown on Debtor's schedules is $165,219.78, of that amount the Debtor believes the total of claims in Class 1 consists of less than $4,000 in amounts that were designated by the former employees as elective deferral amount to be contributed to 401(k) plan and the Debtor's matching contributions. In addition, Class 1 contains claims in the total amount of $40,950 in deferred compensation owed to insiders. The insiders owed deferred insider compensation to the extent they would otherwise be entitled to a priority claim in Class 1 have agreed to have their claims treated as non-priority general unsecured claims pursuant to Class 4.

**Treatment**

The Debtor has filed a motion seeking authority to pay the claims in Class 1 prior to confirmation of this Plan. If this motion is granted, the Debtor will have paid the Allowed Claim in this Class in full prior to confirmation. In the event the motion requesting authority to pay certain of the Allowed Claims in this Class in full prior to Confirmation is not granted, unless it agrees to a different treatment, any claimant holding an Allowed Claim in this Class shall be paid in full, in cash, upon the later of the Effective Date, the date on which such claim is Allowed, or the date the Disbursing Agent determines, in its discretion, that the Recoveries in the Fund are sufficient to make disbursement to this Class and Class 2 in full. To the extent that the Allowed amount of any Class 1 Claim exceeds the priority limitation of Bankruptcy Code sections 507(a)(4) or (a)(5), as applicable, the Holder of such claim shall have an Allowed Class 4 Claim to the extent of the excess.

**5.02    Class 2 – Priority Claims under 507(a)(7) – Unimpaired and Deemed to Accept**

This Class consists of all Allowed Priority Claims under § 507 (a)(7) of the Bankruptcy Code. Specifically, the Debtor believes there are holders of priority claims pursuant to Bankruptcy Code sections 507(a)(7). The total amount of Priority Claims shown on Debtor's schedules is $165,219.78, of that amount the Debtor believes the total of claims in Class 2 is approximately $120,269.78.

**Treatment**

Unless it agrees to a different treatment, any claimant holding an Allowed Claim in this Class shall be paid in full, in cash, upon the later of the Effective Date, the date on which such claim is Allowed, or the date the Disbursing Agent determines, in its discretion, the Recoveries in the Fund are sufficient to make disbursement to this Class and Class 1 in full. To the extent that the Allowed amount of any Class 2 Claim exceeds the priority limitation of Bankruptcy Code sections 507(a)(7), the Holder of such claim shall have an Allowed Class 4 Claim to the extent of the excess.

**5.03    Class 3 – Secured Claim of Avnet -- Unimpaired and Deemed to Accept the Plan**

This Class consists of Avnet's claim. Pursuant to the Account Settlement and Sale Support Agreement dated November 23, 2022, Avnet and SQRL agreed the amount of the Reduced Avnet Claim is $5,751,000, which claim is a secured claim pursuant to section 506 of the Bankruptcy Code in the amount of not less than $3,000,000.00 and an unsecured claim for the remainder.

**Treatment**

Avnet's Allowed Claim will be paid as follows:

Avnet has received $3,000,000 from the proceeds of the Sale in full satisfaction of the Avnet Secured Claim.

As the amount of Avnet's Reduced Claim exceeds the value of the collateral that secured it, Avnet has an unsecured claim for difference, which deficiency shall be treated as a Class 4 Claim.

**5.04    Class 4 – General Unsecured Claims -- Impaired and entitled to vote on this Plan**

This Class consists of all unsecured Allowed Claims not otherwise classified or provided for in other provisions in this Plan. Only creditors holding Allowed Claims shall, as provided for in 11 U.S.C. §502(a), be entitled to receive a distribution according to the Treatment provided for in this Class. Subject to the provisions of § 502, untimely claims are disallowed, without the need for formal objection, unless allowed by court order.

**Treatment**

Allowed Claims in Class 4 will be paid  pro-rata from the Fund established with the Recoveries, after and subject to the payment of Allowed Administrative Expenses and Allowed Priority Tax Claims provided for in Article 4 of this Plan, and payments to all other Classes above that are expressly provided for above, but pro-rata with the Unsecured portions of those Allowed Claims as provided in the Class treatments disclosed above. No interest shall accrue on any Claims in this Class. Disbursements to the holders of Allowed Claims in this Class shall be made at such time as the Disbursing Agent, in its discretion, not more often than once per

quarter, determines that distributions to holders of Allowed Claims in Class 4 should be made. For more detail on the timing and method of distributions to Class 4, see Article 13 herein.

**5.05**    **Class 5 – Equity holders -- Impaired and deemed to reject the Plan**

This Class consists of all Equity Interests of the Debtor.

**Treatment**

The Holder of Class 5 Equity Interests shall not be entitled to distributions of any kind on account of such Equity Interests.

## Article 6:    Allowance and Disallowance of Claims

**6.01**    **Disputed claim**

A disputed claim is a claim that has not been allowed or disallowed and as to which either:

    (i) A proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

    (ii) No proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**6.02**    **Delay of distribution on a disputed claim**

No distribution will be made on account of a disputed claim unless and until it is allowed.

**6.03**    **Settlement of disputed claims**

From and after the Effective Date, the Liquidating Debtor will have the power and authority to object to Claims, and may settle and compromise a disputed Claim or Cause of Action of $20,000 or less without any further notice or approval of the Bankruptcy Court. With respect to Causes of Action and Claims in excess of $20,000, the Liquidating Debtor will have the power and authority to object to Claims, and may settle and compromise a disputed Claim or Cause of Action of more than $20,000 with court approval and compliance with Federal Rule of Bankruptcy Procedure 9019.

## Article 7:    Provisions for Executory Contracts and Unexpired Leases

**7.01**    **The Debtor assumes the following executory contracts and unexpired leases as of the Effective Date of the Plan:**

Pursuant to section 1123(b)(2) of the Bankruptcy Code, a plan may, subject to section 365 of the Bankruptcy Code, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease not previously rejected.

**Unexpired Leases**

On the Petition Date, SQRL was a party to three separate leases for non-residential real property. Prior to the Petition Date, the Debtor entered into a lease with One Haines LLC for non-residential real property located at 8050 Freedom Ave. in North Canton, OH. As a part of the Sale, the lease for the 8050 location was assumed and assigned to the purchaser, as were the power agreements with AEP.

Prior to the Petition Date, the Debtor entered into a lease with One Skymax Company, LLC for non-residential real property located at 7579 Freedom Ave., North Canton, OH and a lease with GS8100, LLC for non-residential real property located at 8100 Cleveland Ave. North Canton, OH. Debtor SQRL has determined to reject both of these leases.

**Other Executory Contracts**

On the Petition Date, Debtor SQRL was party to the Account Settlement and Sale Support Agreement. SQRL has determined to assume this agreement.

On the Petition Date, Debtor SQRL was a party to an Insurance Contract with Cincinnati Insurance. SQRL does not believe the Insurance Contract is an executory contract as that phrase is used in section 365 of the Bankruptcy Code. In an abundance of caution, however, and in the event the Insurance Contract is determined to be executory in nature, the Debtor hereby assumes the Insurance Contract.

On the Petition Date, Debtor SQRL was party to a Non Disclosure/Confidentiality Agreement with Avnet. SQRL has determined to assume this agreement.

## 7.02    <u>All Other Executory Contracts and Unexpired Leases</u>

Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, either before the effective date of this Plan, or that are specifically identified in section 7.01 as being assumed, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 45 days after the Effective Date.

## Article 8:    Means for Implementation of the Plan

*Liquidating Debtor- creation and vesting of assets*

On the Effective Date, automatically and without further action, all remaining assets of the Debtor, whether allocated to Fund or otherwise, shall vest in the Liquidating Debtor for the sole and express purpose of making distributions to holders of Allowed Claims pursuant to the terms and conditions of the Plan. The Liquidating Debtor, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, shall be deemed the successor in interest to the Debtor and be appointed the representative of the Estate for and have all the duties, powers, standing and authority necessary to implement the Plan and to administer the assets of the Estate for the benefit of holders of Allowed Claims. Without limiting the foregoing, the Liquidating Debtor shall be vested with and shall be responsible for (i) the distribution of assets to holders of Allowed Claims; (ii) the prosecution and enforcement of the Avoidance Actions and other Causes of Action; (iii) the liquidation of remaining physical assets and collection of notes receivable; and (iv) the prosecution of objections to Claims.

Notwithstanding the above paragraph, with respect to Avoidance Actions, if any, against the Debtor's President, Fred Schwieg, the current Subchapter V Trustee, shall be vested with the necessary duties, powers, standing and authority to prosecute and enforce these particular Avoidance Actions, proceeds of which shall be deposited in the Fund and become assets of the Fund.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, pursuant to section 1123(b) of the Bankruptcy Code, the Liquidating Debtor shall retain and may enforce any Causes of Action, including Avoidance Actions, that the Debtor may hold against any entity, whether or not filed prior to the Confirmation Date. Any and all Recoveries, including proceeds from the Causes of Action, including the Avoidance Actions, shall be deposited in the Fund and become assets of the Fund.

*Dissolution*

Upon the latest of (a) the distribution of all of the assets, including the assets of the Fund, (b) the resolution of all objections to Claims, (c) the resolution of all Causes of Action, and (d) the payment of all professionals and the Subchapter V Trustee, the Liquidating Debtor shall dissolve.

*Fund*

Upon or as soon as practicable after the Effective Date, the Liquidating Debtor shall establish the Fund. The establishment of the Fund shall be approved in connection with the entry of the Confirmation Order by the Bankruptcy Court. On the Effective Date, the Debtor shall be deemed to have transferred, conveyed and assigned all assets to the Fund within the Liquidating Debtor. The Liquidating Debtor shall be deemed a successor in interest to and shall be appointed representative of the estate of the Debtor within the meaning of Section 1123(b)(3)(B) of the Bankruptcy Code.

*Disbursing Agent*

The Disbursing Agent shall be Brouse McDowell, LPA in its capacity to act as disbursing agent. The Disbursing Agent fees shall be subject to approval of the Liquidating Debtor. Notwithstanding the foregoing, no fee application for the Disbursing Agent's fees shall be necessary after confirmation of the Plan unless the Liquidating Debtor objects to the Disbursing Agent's fees.

*Cancellation of Obligations*

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates, and other documents evidencing obligations of the Debtor other than as allowed under the Plan, shall be canceled and shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtor thereunder or in any way related thereto shall be discharged.

*Corporate Governance, Directors and Officers, and Corporate Action*

Prior to, on or after the Effective Date, as applicable, all matters provided for hereunder that would otherwise require approval of shareholders, members, managers, partners, or directors of the Debtor or shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date, as applicable, pursuant to applicable state law, without any requirement of further action by shareholders, members, directors, managers or partners of the Debtor.

Upon the Effective Date, the Liquidating Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions hereof, including on the Effective Date.

According to 11 U.S.C. § 1129(a)(5), it is disclosed that the Debtor's President shall serve as manager of the Liquidating Debtor after Confirmation of this Plan without compensation until such time as the Liquidating Debtor identifies a successor to the Debtor's President, if any, or the Liquidating Debtor is dissolved.

*Subchapter V Trustee Duties*

In addition to his duties under the Bankruptcy Code, if this plan is confirmed under section 1191(b) of the Bankruptcy Code, and notwithstanding that he may be discharged of his duties as a subchapter v trustee under the Bankruptcy Code in the event this Plan is confirmed under section 1191(a), as of the Effective Date, the Subchapter V Trustee is authorized to investigate the potential Avoidance Actions against the Debtor's President. Any Avoidance Actions that are against the Debtor's President, and are determined by the Subchapter V Trustee to be in the best interests of the creditors and the Debtor's estate to recover, shall be pursued by the Subchapter V Trustee, or any professional retained by the Subchapter V Trustee for that purpose. For the avoidance of doubt, any claims, rights, or causes of action, which belong to the Debtor, are not against Debtor's President and are determined to be in the best interest of the creditors and the Debtor's estate to recover shall be pursued by the Liquidating Debtor, or any professional retained by order of this Court for that purpose.

## Article 9:   Default

If the Liquidating Debtor shall fail to comply with the requirement to provide timely reporting set forth in Article 13 below, the Subchapter V Trustee (or if the Subchapter V Trustee's services have been terminated under 11 U. S. C. §1183(c)(1), any party in interest) may move in the Bankruptcy Court (1) for the appointment of the Trustee to take control of the Liquidating Debtor and the Liquidating Debtor's assets; or (2) conversion to Chapter 7.

If any payment is due under this Plan and the Liquidating Debtor has pre-paid such amount, then payments on such amount shall not be deemed due under this Plan until the originally scheduled date for such payment has occurred, and any prepayment shall suspend the duty to make regular payments until such time as the total amount transferred in payment of such Allowed Claim is less than the total amount of the principal payments due on the specified payment date.

## Article 10:  Vesting

Under 11 U.S.C. § 1141(b), on Confirmation of the Plan, all property of the estate will revest in the Debtor, except as otherwise provided in the Plan or the Confirmation Order.

Under 11 U.S.C. § 1141(c), on Confirmation of the Plan, all property of the Debtor dealt with in the Plan, tangible and intangible, including, without limitation, licenses, furniture, fixtures, and equipment, will revert, free and clear of all Claims and Equitable Interests of the Debtor, except as otherwise provided in the Plan or the Confirmation Order.

## Article 11:  General Provisions

### 11.01   Definitions and rules of construction

The definitions and rules of construction outlined in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

21-61491-tnap    Doc 169    FILED 02/21/22    ENTERED 02/21/22 21:15:22    Page 18 of 26

Additional capitalized terms shall have the meanings as defined in the body of the Plan or as follows:

a. **Administrative Claimant**: Any person entitled to payment of an Administrative Expense.

b. **Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Bankruptcy Code and allowed under Section 503(b) of the Bankruptcy Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Subchapter V Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

c. **Allowed Claim**: Except as otherwise specified in this Plan, any claim against the Debtor according to Section 502 of the Bankruptcy Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not file an objection, or (ii) is allowed by a Final Order.

d. **Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

e. **Allowed Secured Claim**: Except as otherwise specified in this Plan, Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Bankruptcy Code.

f. **Avoidance Action:** Any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor or its estate under the Bankruptcy Code or applicable non-bankruptcy law, including without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

g. **Bankruptcy Court**: The United States Bankruptcy Court for the Northern District of Ohio.

h. **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

i. **Causes of Action:** All claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including, but not limited to, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code, including Avoidance) of any of the Debtor, the Debtor-in-Possession, and/or the Estate that are or may be pending on the Effective Date or

instituted by the Liquidating Debtor after the Effective Date against any entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

j. **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

k. **Class**: A category of holders of claims or interests which are substantially similar to the other Claims or interests in such class.

l. **Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

m. **Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided, however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

n. **Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan under the provisions of chapter 11 of the Bankruptcy Code.

o. **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

p. **Disbursing Agent**: Brouse McDowell, LPA in its capacity as disbursing agent.

q. **Disposable Income**: Shall have that meaning ascribed to such term under § 1191(d) of the Bankruptcy Code.

r. **Disputed Claim:** Any claim against the Debtors pursuant to Section 502 of the Bankruptcy Code that the Debtors has in any way objected to, challenged, or otherwise disputed.

s. **Equity Interest**: An ownership interest in the Debtors.

t. **Executory Contracts**: All unexpired leases and executory contracts as set forth in Section 365 of the Bankruptcy Code.

u. **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified, or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

v. **Fund**: The segregated fund to be established to house the Fund Assets and proceeds thereof.

w. **Fund Assets:** All assets of the Debtor after the Effective Date, including the Recoveries, including without limitation, the proceeds of Causes of Action, including Avoidance Actions, collections on the Note Receivable, and recovery on the Insurance Claim.

x. **Petition Date**: November 23, 2021, the date the chapter 11 petition for relief was filed.

y. **President**: David Stanfill.

z. **Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

aa. **Liquidating Debtor**: The Debtor after the Effective Date.

bb. **Sale**: The acquisition of certain assets of Squirrels Research Labs LLC and The Midwest Data Company LLC by Instantiation LLC pursuant to the Sale Order.

cc. **Sale Order**: The Order: (I) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 105 and 363; and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief entered by this Court on January 18, 2022.

dd. **Schedules**: Schedules and Statement of Financial Affairs, as may be amended, filed by the Debtors with the Bankruptcy Court listing liabilities and assets.

ee. **Subchapter V Trustee**: Frederic Schwieg, the trustee appointed according to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the Confirmation Order.

## 11.02 <u>Effective Date</u>

The effective date of this Plan is the day is the first business day that is 14 days after the Confirmation Order becomes a Final Order. If, however, a stay of the Confirmation Order is in effect on that date, the effective date will be the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Federal Rule of Bankruptcy Procedure 9006(a)(1).

## 11.03 <u>Severability</u>

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

## 11.04 <u>Binding effect</u>

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

## 11.05 <u>Captions</u>

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

## 11.06 <u>Controlling effect</u>

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Ohio govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

## 11.07 <u>Retention of Jurisdiction</u>

The Court shall retain jurisdiction to the full extent necessary to administer this case after Plan Confirmation and to adjudicate any related adversary proceedings or contested matters, including those relating to the Plan, such as concerning the Plan's construction, implementation,

or modification. Neither this provision nor anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

## Article 12: DISCHARGE

If the Debtors' Plan is confirmed under § 1191(a), on the Effective Date of the Plan, the Debtors will be discharged from any debt that arose before Confirmation of this Plan to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtors will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided in § 1141(d)(6).

If the Debtors' Plan is confirmed under § 1191(b), Confirmation of this Plan does not discharge any debt until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code. The Debtors will not be discharged from any debt: (i) on which the last payment is due after the first 3 years of the Plan, or as otherwise provided in § 1192; or (ii) excepted from discharge under § 523(a) of the Bankruptcy Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## Article 13: REPORTING, PAYMENTS AND TRUSTEE OBLIGATIONS

Unless specified otherwise in the Plan, Disbursing Agent shall make distributions on the Effective Date or on such dates as the Disbursing Agent deems appropriate, which will not be more often than once per quarter, or as soon as reasonably practicable after all FUND Assets have been liquidated on account of all Allowed Claims that are entitled to receive distributions under the Plan.

**Pro Rata Distributions**

Distributions allocated on a pro rata basis shall be calculated based solely on Allowed Claims.

**Address of Record**

The address of the holder of a Claim shall be, for the purposes of distributions made pursuant to the Plan, the address set forth in any proof of Claim filed by such holder, or, in the absence of such a proof of Claim, the address set forth in the Debtor's books and records.

**Undeliverable Distributions**

If a disbursement check remains unnegotiated for more than 120 days, it may be redistributed pro rata to other creditors, as provided for under the Plan, or may be placed with the Court's unclaimed funds register pursuant to 28 U.S.C. 2042, at the discretion of the Liquidating Debtor.

**Minimum Distributions**

Any other provision of the Plan notwithstanding, the Disbursing Agent and the Liquidating Debtor will not be required to make distributions of less than $100 in value, and each such Claim to which this limitation applies shall be discharged and its holder forever barred from asserting that Claim against the Debtor's Estate or the Liquidating Debtor

### Consideration of Disputed Claims in Determining Distribution Amounts

In determining the timing of distribution under the Plan, the Liquidating Debtor shall take into consideration the amount of distribution Disputed Claims would be entitled to receive if such Disputed Claims become Allowed Claims, and the Liquidating Debtor, may in its discretion, reserve from distributions to holders of Allowed Claims amounts equal to the distributions to which holders of Disputed Claims would be entitled if such Disputed Claims become Allowed Claims.

### TAX REPORTING REQUIREMENTS WITH RESPECT TO DISTRIBUTIONS?

In connection with the Plan, to the extent applicable, the Disbursing Agent and the Liquidating Debtor shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding or reporting requirements. For tax purposes, distributions received by holders in full or partial satisfaction of Allowed Claims will be allocated first to unpaid interest that accrued on such Claims, if any, with any excess allocated to the principal amount of Allowed Claims.

### Setoffs

The Liquidating Debtor may pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the Equity Interest, rights and Causes of Action of any nature that the Debtors may hold against the holder of any such Allowed Claim; provided that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors and the Liquidating Debtors of any such equity interes, rights and Causes of Action that the Debtors may possess against any such holder, except as specifically provided herein.

### Non-Consensual Confirmation

If the Plan is confirmed under § 1191 (b) the following provisions shall apply:

### Quarterly Financial Reporting.

The Liquidating Debtor shall file with the Court no later than 21 days after the end of each quarter after the Effective Date, post-confirmation quarterly financial reports (the "Quarterly Reports") during the Plan term, showing the amount of Disposable Income, that is the amount of Recoveries less the amounts expended in the course of liquidating the FUNDS ASSETS, subject to distribution in accordance with the Plan ("Quarterly Income"). The Quarterly Reports shall: (i) be generated by the Liquidating Debtor or an accounting or finance professional retained by the Liquidating Debtor; (ii) detail the Liquidating Debtor's actual Disposable Income for each calendar quarter (which shall be calculated using a cash basis method of accounting and reported in accordance with Generally Accepted Accounting Principles (GAAP)); and (iii) be certified by the Liquidating Debtor.

### Remittance.

Following the filing of the Quarterly Report, the Disbursing Agent may disburse the Disposable Income to holders of Allowed Class 1, 2 and 4 Claims, as appropriate under the Plan. The Disbursing Agent and Liquidated Debtor shall have no obligation to make distributions of

less than $100 to any holder of a claim in any given quarter, and may in its discretion determine to wait until a later point in time to make distribution.

If a disbursement check remains unnegotiated for more than 120 days, it may be redistributed pro rata to other creditors, as provided for under the Plan, or may be placed with the Court's unclaimed funds register pursuant to 28 U.S.C. 2042, at the discretion of the Liquidating Debtor. In the event the Liquidating Debtor has insufficient funds to make a distribution under the Plan in any particular quarter, plan payments may be adjusted during the life of the Plan without further order of the Court to account for any Plan Payment adjustments. Any disbursements made on account of an allowed claim are deemed authorized disbursements. The Liquidating Debtor will pursue the recovery of any disbursements made on account of a claim which is subsequently withdrawn or satisfied.

**Disbursement Reports**.

The Liquidating Debtor shall file disbursement reports as prescribed by the Court and submit a copy of those reports to the United States Trustee for review, during the period in which the Disbursing Agent continues to make plan payments. Upon completion of all payments under the Plan, the Liquidating Debtor should submit a notice of completion and the Subchapter V Trustee shall prepare and submit the final report and final account of the administration of the estate to the United States Trustee for review pursuant to section 1183(b)(1).

**Notices**.

The Liquidating Debtor may limit notice of any and all reports, document, pleading or other filing related to this case to those parties directly affected and to those interested parties which have filed a notice of appearance or proofs of claim, as necessary. The Liquidating Debtor shall be under no obligation to serve parties which are neither affected by any report, document, pleading or other filing or have made no appearance whatsoever before this Court.

**Payments and Distributions on Disputed Claims**.

Except as otherwise provided in the Plan, no partial plan payments and no partial distributions will be made with respect to a Disputed Claim until the resolution by the Liquidating Debtor of such dispute by settlement or Final Order. For purposes of clarity, each class's claimants will not be entitled to a distribution until all claims within the applicable class are final. Unless otherwise agreed to by the Liquidating Debtor or as otherwise specifically provided in the Plan, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a distribution until such dispute is resolved by settlement or Final Order. The provisions of this section are not intended to restrict payment of any unclassified claims or classified classes of claims which are not disputed.

**Discharge of the Duties of the Trustee**.

If the Plan is confirmed pursuant to section 1191(a) of the Bankruptcy Code, the Subchapter V Trustee shall be discharged of his duties as of the Effective Date, except that the United States Trustee may reappoint a trustee as needed for performance of duties under sections 1183(b)(3)(C) and 1185, and except as provided in the Plan with respect to certain Avoidance Actions.

If the Plan is confirmed pursuant to section 1191(b) of the Bankruptcy Code, the Subchapter V Trustee shall not be discharged of his duties until after completion by the Debtor

24

of all payments due under the Plan, at which point the Subchapter V Trustee shall file a final report and account seeking, *inter alia*, to be discharged of his duties.

### Obligations Related to Pursuit of Causes of Action or Disputed Claims

The Subchapter V Trustee shall serve as estate representative for the purpose of pursuing certain Avoidance Action as set forth in Article 8 of the Plan.

### Length Of Plan

Unless otherwise ordered by the Court, the length of this Plan shall be five (5) years, unless the Court extends the length of the Plan for cause.

## Article 14:  TAX CONSEQUENCES OF PLAN

The Plan and the resulting tax consequences may be complex, and the tax consequences of the Plan will depend upon certain factual determinations.  No ruling has been or will, before the Effective Date, be requested from the Internal Revenue Service regarding the tax consequences of the Plan.  No assets of the Debtor have been sold or transferred since the filing of this case and as a result, no tax consequences as to such assets have arisen since the filing of this case.

**BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES THIS DISCLOSURE STATEMENT RENDERS NO TAX ADVICE ON THE TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO ANY PARTICULAR CREDITOR, TO THE DEBTOR, OR TO INTEREST HOLDERS. EACH PARTY IS URGED TO CONSULT HIS OR HER TAX ADVISOR AS TO THE TAX CONSEQUENCES OF THE PLAN TO HIM OR HER INCLUDING ANY CONSEQUENCES UNDER STATE OR LOCAL TAX LAWS**.

The following constitutes a summary of the potential tax consequences which may arise upon Confirmation of the Plan.

### 14.01   Tax Consequences to the Debtor

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year, which generally includes the amount of principal debt discharged and any interest that has been previously accrued and deducted for tax purposes but remains unpaid at the time the indebtedness is discharged. The Tax Code permits a debtor in bankruptcy to exclude its COD Income from gross income but requires the debtor to reduce certain tax attributes by the amount of the excluded COD income. The Debtors will likely realize a significant amount of COD income upon the consummation of the Plan. The Debtors will not be required to include COD Income in gross income because the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case.

### 14.02   Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests

The U.S. Federal Income Tax consequences to holders of allowed claims arising from the distributions to be made in satisfaction of their claims under a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the

21-61491-tnap    Doc 169    FILED 02/21/22    ENTERED 02/21/22 21:15:22    Page 25 of 26

holder of a claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the corporation; (d) whether such claim constitutes a security; (e) whether the holder of a claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the holder of a claim receives distributions under the bankruptcy plan in more than one taxable year. For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place. Also, where a gain or loss is recognized by the holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by several factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction for the underlying claim.

Internal Revenue Service Circular 230 Notice: To ensure compliance with Internal Revenue Service Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests to avoid penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein, and (C) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.

Dated: February 21, 2022            */s/ David Stanfill*
                                        David Stanfill, President