*Execution Version*

**THIS ACCOUNT SETTLEMENT AND SALE SUPPORT AGREEMENT IS NOT A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH SOLICITATION WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING UPON OR AGAINST ANY OF THE PARTIES HERETO.**

## ACCOUNT SETTLEMENT AND SALE SUPPORT AGREEMENT

This **Account Settlement and Sale Support Agreement** (including the exhibits attached hereto, this "**Agreement**") is made and entered into as of the Agreement Effective Date (as defined herein) by and among Squirrels Research Labs, LLC, an Ohio limited liability company with an address of 121 Wilbur Dr. NE, N. Canton, Ohio 44720 ("**SQRL**"), The Midwest Data Company LLC, an Ohio limited liability company with an address of 121 Wilbur Dr. NE, N. Canton, Ohio 44720 ("**MWDC**"), Avnet, Inc., a New York corporation with an address of 2211 South 47th Street, Phoenix, Arizona 85034 ("**Avnet**") and Instantiation LLC, a Delaware limited liability company with an address of 434 Dorado Beach E, Dorado, Puerto Rico 00646 (each a "**Party**" and, collectively, the "**Parties**").

## RECITALS

**WHEREAS**, SQRL executed and delivered to Avnet: (i) a promissory note in the original principal amount of $4,621,092.50 dated March 26, 2019 (the "**Initial Note**") and (ii) a Security Agreement dated as of March 20, 2019 granting a lien in the collateral described therein in favor of Avnet to secure payment of amounts invoiced by Avnet (the "**Security Agreement**"); and

**WHEREAS**, the Initial Note was amended and restated pursuant to a promissory note executed by SQRL and delivered to Avnet dated April 8, 2021 in the original principal amount of $7,864,779.76 (the "**Amended and Restated Note**"), which Amended and Restated Note is secured by the lien granted by the Security Agreement; and

**WHEREAS**, as of the Agreement Effective Date (as defined below), SQRL remains obligated to Avnet under the Amended and Restated Note in the principal amount of $7,864,779.76, plus accrued and accruing interest, fees, costs, and other charges (including attorneys' fees and costs) (all such amounts, collectively, the "**Avnet Claim**"); and

**WHEREAS**, SQRL, as seller, and Instantiation, as buyer, entered into a Letter of Intent dated August 31, 2021 for the proposed purchase and sale of the SQRL assets identified and described therein, including SQRL assets subject to the liens, claims and encumbrances of Avnet (collectively, the "**Avnet Lien**") granted pursuant to the Security Agreement (such assets, the "**Avnet Collateral**"); and

WHEREAS, SQRL and MWDC, as sellers, and Instantiation, as buyer, have entered into that certain Asset Purchase Agreement of even date herewith (collectively with the exhibits attached thereto, the "**APA**"), a copy of which is attached hereto as Exhibit A; and

WHEREAS, in order to effect the Sale-Related Transactions (as defined below), SQRL and MWDC will commence voluntary cases (the "**Bankruptcy Cases**") under subchapter V of chapter 11 of the United States Bankruptcy Code, 11 U.S.C. Sections 101 *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division (the "**Bankruptcy Court**"); and

WHEREAS, the Parties desire to express to each other their mutual support and commitment with respect to: facilitating: (i) a debtor-in-possession financing facility to be provided by Instantiation to MWDC in the original principal amount of $350,000 upon terms and conditions reasonably acceptable to MWDC, SQRL, Instantiation, and Avnet described and set forth in the DIP Loan documents attached hereto as Exhibit B (the "**DIP Loan**", and the documents evidencing and memorializing same, the "**DIP Loan Documents**"); and (ii) a value-maximizing sale of the SQRL and MWDC assets described and set forth in the APA, including the Avnet Collateral, as set forth upon the terms and conditions described in this Agreement (such transaction, the "**Sale Transaction**", and collectively with the DIP Loan, the "**Sale-Related Transactions**"); and

WHEREAS, the Parties have engaged in good faith, arm's length negotiations regarding the principal terms of the Sale-Related Transactions (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, including all exhibits attached hereto and any schedules, supplements, appendices, annexes and attachments to such exhibits) and the resolution of the Avnet Claim (the "**Avnet Settlement**"), by which SQRL and MWDC can effect: (i) the Avnet Settlement and (ii) the Sale-Related Transactions; and

WHEREAS, the Parties are prepared to perform their respective obligations under this Agreement subject to the terms and conditions set forth herein; and

WHEREAS, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court, the terms of this Agreement set forth the Parties' entire agreement concerning their respective obligations.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, including the financial accommodations provided by Avnet to SQRL hereunder, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

Section 1. **Agreement Effective Date.** This Agreement shall become effective and binding upon each Party immediately upon the execution and delivery of counterpart signatures to this Agreement by each Party to each other Party (the "**Agreement Effective Date**").

Section 2. **Exhibits Incorporated By Reference.** Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits. In the event of any inconsistency between this Agreement (without reference to the attached exhibits) and any particular exhibit, the terms of said exhibit

shall govern. This Agreement (without reference to the attached exhibits) may be interpreted with reference to the definitions set forth in said exhibit, to the extent such terms are used herein.

**Section 3. The Avnet Settlement.** The principal terms of the Avnet Settlement are as follows and shall be incorporated into appropriate definitive documentation satisfactory to Avnet in its reasonable discretion:

(a) The Avnet Claim shall be reduced in amount solely to the extent necessary to render SQRL eligible for relief under subchapter V of chapter 11 of the Bankruptcy Code (the "**Reduced Avnet Claim**"), which amount shall be agreed to in writing by Avnet prior to the commencement of the Bankruptcy Cases and shall be memorialized in relevant papers filed in the Bankruptcy Cases, including the DIP Loan Documents.

(b) SQRL acknowledges and agrees that (i) the value of the Avnet Collateral is not less than **$3,000,000.00** and (ii) pursuant to Section 506 of the Bankruptcy Code, the Reduced Avnet Claim is a secured claim in the amount of not less than **$3,000,000.00** (the "**Avnet Secured Claim**") and an unsecured claim for the remainder.

(c) The Avnet Secured Claim and Avnet Lien shall be at all times senior in priority to any other liens on, or security interests in, the Avnet Collateral and to any other claims against SQRL in the Bankruptcy Cases, including any liens, security interests or superpriority or ordinary administrative claims granted under the DIP Loan Documents;

(d) SQRL acknowledges that: (i) it is in default under the Amended and Restated Note; (ii) absent this Agreement, the entire amount of the Avnet Claim was and is due and owing to Avnet; (iii) the Avnet Claim is not subject to reduction under applicable law or to any defense to payment or enforcement; and (iv) the Avnet Lien is a valid, perfected and continuing lien not subject to avoidance under applicable law.

(e) Avnet will not, from and after the Agreement Effective Date, assert or file any claim in the Bankruptcy Cases in excess of the amount of the Reduced Avnet Claim, and neither SQRL, MWDC, nor Instantiation will (i) object to the allowance of the Reduced Avnet Claim in full; (ii) object to allowance of the Avnet Secured Claim as a secured claim in an amount of not less than **$3,000,000.00**; (iii) object to payment of the Avnet Secured Claim as provided herein, or (iv) contest either (A) the amount, validity, extent or priority of the Avnet Lien securing the Avnet Secured Claim or (B) the dollar amount of the Avnet Secured Claim.

(f) Effective upon Avnet's receipt of not less than three million dollars ($3,000,000.00) in immediately available funds from the proceeds of the Sale Transaction, an Alternate Transaction, and/or other liquidation of the Avnet Collateral, Avnet will release its liens and security interests in the Avnet Collateral.

(g) Avnet will consent to the sale of the Avnet Collateral (i) through the Sale Transaction or an Alternate Transaction and (b) to the extent not so sold, to other liquidation by SQRL satisfactory to Avnet in Avnet's reasonable discretion, *provided, however*, that the proceeds of any sale or liquidation of the Avnet Collateral pursuant to the immediately preceding clauses (i) and (ii) shall all first be remitted to Avnet until the Avnet Secured Claim is paid in full, and neither SQRL, MWDC, nor Instantiation shall contest such allocation.

(h) <u>Releases</u>.

  (i) Effective upon the Agreement Effective Date, in consideration of Avnet's compromise of the Avnet Claim, its release of the Avnet Lien to the extent described above, and the other undertakings of Avnet hereunder, SQRL on behalf of itself, its owners, members, officers, directors, partners, employees, representatives, agents, contractors, independent contractors, predecessors, successors, parents, subsidiaries, affiliated entities, heirs and assigns; MWDC on behalf of itself, its owners, members, officers, directors, partners, employees, representatives, agents, contractors, independent contractors, predecessors, successors, parents, subsidiaries, affiliated entities, heirs and assigns, and Instantiation on behalf of itself, its owners, members, officers, directors, partners, employees, representatives, agents, contractors, independent contractors, predecessors, successors, parents, subsidiaries, affiliated entities, heirs and assigns (collectively, the "**SQRL Releasing Parties**"), fully, finally, and irrevocably release Avnet and each of its owners, members, officers, directors, partners, employees, representatives, agents, contractors, independent contractors, predecessors, successors, parents, subsidiaries, affiliated entities, heirs and assigns (collectively, the "**Avnet Released Parties**") from and waive any and all claims, demands, damages, costs, expenses, lawsuits, obligations, promises, administrative actions, charges, and causes of action, both known and unknown, in law or in equity, of any kind whatsoever that SQRL or MWDC had or may now have against any Avnet Released Party arising at any time prior to and through the Agreement Effective Date, *provided, however*, that nothing herein shall release Avnet from its obligations under this Agreement.

  (ii) Effective upon Avnet's receipt of not less than three million dollars ($3,000,000.00) in immediately available funds from the proceeds of the Sale Transaction, an Alternate Transaction, and/or other liquidation of the Avnet Collateral, Avnet, on behalf of itself, its owners, members, officers, directors, partners, employees, representatives, agents, contractors, independent contractors, predecessors, successors, parents, subsidiaries, affiliated entities, heirs and assigns (collectively, the "**Avnet Releasing Parties**" and, together with the SQRL Releasing Parties, the "**Releasing Parties**"), fully, finally, and irrevocably releases SQRL, MWDC, Instantiation, and their respective assets (including, for the avoidance of doubt, any and all proceeds of the insurance claims related to or concerning the Avnet Collateral (including without limitation the Insurance Claims)) and each of their owners, members, officers, directors, partners, employees, representatives, agents, contractors, independent contractors, predecessors, successors, parents, subsidiaries, affiliated entities, heirs and assigns (collectively, the "**SQRL Released Parties**" and, together with the Avnet Released Parties, the "**Released Parties**") from and waives any and all claims, demands, damages, costs, expenses, lawsuits, obligations, promises, administrative actions, charges, and causes of action, both known and unknown, in law or in equity, of any kind whatsoever that Avnet had or may now have against any SQRL Released Party arising at any time prior to and through the Agreement Effective Date, *provided, however*, that nothing herein shall release SQRL, MWDC, or Instantiation from their respective obligations under this Agreement.

  (iii) Each Releasing Party, on behalf of itself and each of its respective owners, members, officers, directors, partners, employees, representatives, agents, contractors, independent contractors, predecessors, successors, parents, subsidiaries, affiliated entities, heirs and assigns, covenants and agrees: (x) never to bring, file, institute, prosecute, maintain, participate in, or recover upon, either directly or indirectly, or encourage or benefit from the institution of,

4

any proceeding, claim, suit, action, complaint, dispute, controversy, charge, litigation or arbitration against any of the applicable Released Parties for or relating to any claims released pursuant to this Section 3(h) (the "**Covenant Not To Sue**"), (y) that the release set forth in this Section 3(h) may be pleaded by a Released Party as a full and complete defense to any action or proceeding with respect to a Released Claim that is contrary to the terms of the release set forth herein, and may be asserted as a basis for abatement of, or injunction against, said action or proceeding with respect to a claim released pursuant to this Section 3(h) and as a basis for a cross-complaint for damages therein; and (z) that in the event that a Releasing Party breaches the Covenant Not To Sue, any Released Party aggrieved shall be entitled to recover not only the amount of any judgment that may be awarded in favor of such Released Party, but also for such other damages, costs and expenses as may be incurred by such Released Party, including court costs and reasonable and documented attorneys' fees, in preparing the defense of, defending against or seeking and obtaining abatement of, or injunction against, such action or proceeding, and establishing and maintaining the applicability of the release set forth herein or any other provision hereof.

(i)     <u>DIP Loan</u>. Avnet will not assert in the Bankruptcy Cases that the use of cash advanced to MWDC or SQRL under the DIP Loan and pursuant to the DIP Loan Documents is prohibited under section 363(c)(2) of the Bankruptcy Code.

### Section 4.  Definitive Documentation

(a)     The Sale-Related Transactions will be implemented pursuant to various documents and agreements.  The definitive documents and agreements (collectively, the "**Sale Documents**") shall include:

(i)     the APA attached hereto as Exhibit A by and between SQRL and MWDC, as sellers, and Instantiation, as buyer, for the purchase and sale of, among other things, the Avnet Collateral, and the assets of MWDC specified therein, together with all exhibits, schedules and attachments thereto;

(ii)    the DIP Loan Documents attached hereto as Exhibit B by and between MWDC, as borrower, and Instantiation, as lender, for the financing of, among other things, administrative expenses of the Bankruptcy Cases from and after the commencement of the Bankruptcy Case through consummation of the Sale Transaction or an Alternate Transaction (as defined below);

(iii)   a motion (the "**DIP Financing Motion**") by MWDC seeking the Bankruptcy Court's approval of the DIP Loan and the DIP Loan Documents pursuant to Sections 105, 362, 363, and 364 of the Bankruptcy Code;

(iv)    a final order of the Bankruptcy Court approving the DIP Loan and DIP Loan Documents (the "**DIP Financing Order**") and any necessary interim orders regarding the same;

(v)     a motion (the "**Bid Procedures Motion**") by SQRL and MWDC seeking the Bankruptcy Court's approval of bidding procedures governing the marketing and solicitation by SQRL and MWDC of competing offers for the sale of their respective assets

pursuant to Section 363 of the Bankruptcy Code, the timing, terms and conditions of any such competing offer(s) and compensation to Instantiation in the event of any successful overbid for the purchase of SQRL and MWDC assets that is ultimately approved by the Bankruptcy Court and subsequently consummated (an "**Alternate Transaction**");

(vi) A final order of the Bankruptcy Court approving the Bid Procedures Motion (the "**Bid Procedures Order**");

(vii) a motion (the "**Sale Motion**", which may be combined with the Bid Procedures Motion) by SQRL and MWDC seeking the Bankruptcy Court's approval of the Sale Transaction or an Alternate Transaction pursuant to section 363(b) of the Bankruptcy Code; and

(viii) a final order of the Bankruptcy Court approving the Sale Transaction or an Alternate Transaction (the "**Sale Order**").

(b) The DIP Loan Documents and Sale Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties and covenants materially consistent with the terms of this Agreement. Each of the DIP Loan Documents and Sale Documents shall be in form and substance reasonably acceptable to each of the Parties and each of the Parties agrees that it shall act in good faith and use and undertake all commercially reasonable efforts to negotiate and finalize the terms of the DIP Loan Documents and Sale Documents.

**Section 5. Milestones.** The following milestones (the "**Milestones**") shall apply to this Agreement, unless extended or agreed to in writing by each of the Parties (which writing may be in the form of emails exchanged between counsel to the Parties), and all of the Milestones (except for the Milestone described in Section 5(a) below) shall be incorporated into the DIP Loan Documents:

(a) no later than November 29, 2021, SQRL and MWDC shall file voluntary petitions for relief under subchapter V of chapter 11 of the Bankruptcy Code with the Bankruptcy Court;

(b) no later than December 1, 2021, SQRL and MWDC shall file the DIP Financing Motion, the Bid Procedures Motion, and the Sale Motion;

(c) the Bankruptcy Court shall have entered the Bid Procedures Order no later than December 15, 2021;

(d) the Bankruptcy Court shall have entered (i) an interim order approving the DIP Financing Motion no later than December 7, 2021, and (ii) the DIP Financing Order no later than December 23, 2021;

(e) the Bankruptcy Court shall have entered the Sale Order no later than January 25, 2022; and

(f) the Sale Transaction (or an Alternate Transaction) shall have been fully consummated and closed no later than February 28, 2022.

## Section 6. Commitments Regarding the Sale Transaction

6.01. Commitments of Avnet

(a)  Avnet intends to be and is bound under this Agreement with respect to the Avnet Claim and any other claims currently held or hereafter acquired by Avnet or any of its affiliates.  Subject to the terms and conditions of this Agreement, during the period beginning on the Agreement Effective Date and ending on the Termination Date (as defined below) (such period, the "**Effective Period**"), Avnet hereby covenants and agrees:

(i)  to support the Sale-Related Transactions and not take any actions inconsistent with this Agreement;

(ii)  to not directly or indirectly object to, delay, impede or take any other action to interfere with the implementation or consummation of the Sale-Related Transactions;

(iii) to cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with SQRL, MWDC, and Instantiation and to use commercially reasonable efforts to support and consummate the Sale-Related Transactions and to execute any document and give any notice, instruction or direction reasonably necessary to support, facilitate, implement, consummate, or otherwise give effect to the Sale-Related Transactions, the negotiation of the DIP Loan Documents and the Sale Documents with the other Parties and the consummation of the Sale-Related Transactions in a manner consistent with this Agreement, *provided, however*, that Avnet shall not be required to provide any indemnities or similar undertakings to any entity;

(iv)  to support, and in good faith take all actions reasonably necessary to obtain, entry of the DIP Financing Order and the Sale Order and consummate the Sale-Related Transactions, consistent with this Agreement;

(v)  except to the extent expressly contemplated under this Agreement, to not exercise any right or remedy for the enforcement, collection or recovery of the Avnet Claim or any other claim held by Avnet against SQRL.

(b)  The foregoing sub-clause (a) of this Section 6.01 will not limit any of the following rights of Avnet:

(i)  rights in any applicable bankruptcy, insolvency, foreclosure, collection or similar proceeding initiated prior to the Agreement Effective Date, including the right to appear as a party in interest in any such proceeding or in the Bankruptcy Cases, in each case provided that such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay or prevent the timely consummation of the Sale Transaction in accordance with the Milestones;

(ii)  rights under either of the Amended and Restated Note or the Security Agreement, or any other contract, stipulation or applicable law, and nothing herein shall constitute a waiver or amendment of any provision thereof, provided that the exercise of such rights is not inconsistent in any respects with the terms of this Agreement and does not hinder, delay or prevent consummation of the Sale-Related Transactions;

7

(iii)   rights to consult with any other party in interest in the Bankruptcy Cases, provided that such action is not inconsistent with this Agreement and does not hinder, delay or prevent consummation of the Sale-Related Transactions;

(iv)   rights to object to any proof of claim or to any settlement or proposed allowance of any proof of claim to the extent consistent with this Agreement; or

(v)   rights to enforce any right, remedy, condition, consent or approval requirement under this Agreement, the DIP Financing Order or any of the Sale Documents.

6.02.   Commitments of Instantiation

(a)   Subject to the terms and conditions of this Agreement, during the Effective Period, Instantiation hereby covenants and agrees:

(i)   to provide the DIP Loan to MWDC in the amount, and upon the terms and conditions, as set forth in the DIP Loan Documents, as same may be further modified or amended by the DIP Financing Order;

(ii)   to prepare or cause to be prepared the DIP Loan Documents, the Sale Documents and any related documents, and distribute such documents concurrently to the other Parties, and afford reasonable opportunity to comment and review to the respective legal and financial advisors for the other Parties, as applicable, in advance of any filing of same with the Bankruptcy Court;

(iii)   to support the Sale-Related Transactions and not take any actions inconsistent with this Agreement;

(iv)   to not directly or indirectly object to, delay, impede or take any other action to interfere with the implementation or consummation of the Sale-Related Transactions;

(v)   to cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with SQRL, MWDC, and Avnet and to use commercially reasonable efforts to support and consummate the Sale-Related Transactions and to execute any document and give any notice, instruction or direction reasonably necessary to support, facilitate, implement, consummate, or otherwise give effect to the Sale-Related Transactions, including the negotiation of the DIP Loan Documents and the Sale Documents with the other Parties and the consummation of the Sale-Related Transactions in a manner consistent with this Agreement;

(vi)   to support, and in good faith take all actions necessary or reasonably requested by SQRL, MWDC, or Avnet to obtain entry of the DIP Financing Order and the Sale Order and consummate the Sale-Related Transactions; and

(vii)   to timely oppose, including by way of joinder, any objections filed with the Bankruptcy Court to the DIP Financing Motion, the Bid Procedures Motion, and the Sale Motion.

(b)  The foregoing sub-clause (a) of this Section 6.02 will not limit any of the following rights of Instantiation:

(i)  rights in any applicable bankruptcy, insolvency, foreclosure, collection or similar proceeding initiated prior to the Agreement Effective Date, including the right to appear as a party in interest in any such proceeding and the Bankruptcy Cases, in each case provided that such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay or prevent the timely consummation of the Sale-Related Transactions in accordance with the Milestones;

(ii)  rights to consult with any other party in interest in the Bankruptcy Cases, provided that such action is not inconsistent with this Agreement and does not hinder, delay or prevent consummation of the Sale-Related Transactions;

(iii)  rights to object to any proof of claim or to any settlement or proposed allowance of any such proof of claim to the extent consistent with this Agreement; or

(iv)  rights to enforce any right, remedy, condition, consent or approval requirement under this Agreement, any of the DIP Loan Documents, the DIP Financing Order and the Sale Documents.

6.03.  <u>Commitments of SQRL and MWDC</u>

(a)  Subject to the terms and conditions of this Agreement, during the Effective Period, SQRL and MWDC hereby covenant and agree:

(i)  to prepare or cause to be prepared the Sale Documents (other than the APA) and any related documents, and distribute such documents concurrently to the other Parties, and afford reasonable opportunity to comment and review to the respective legal and financial advisors for the other Parties, as applicable, in advance of any filing of same with the Bankruptcy Court;

(ii)  to file, as soon as reasonably practicable, but in no event later than the dates set forth in the Milestones (as such Milestones may otherwise be extended with the consent of the other Parties) the DIP Financing Motion, the Bid Procedures Motion and the Sale Motion;

(iii)  to timely object to any motion filed with the Bankruptcy Court by a party seeking the entry if an order (A) seeking the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing the Bankruptcy Cases;

(iv)  to timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating SQRL or MWDC's exclusive right to file and/or solicit acceptances of a plan of reorganization or liquidation, as applicable;

(v) from and after the Agreement Effective Date, to operate their businesses consistent in all material respects with the manner in which said businesses are operating as of the

Agreement Effective Date, and confer with the other Parties and their respective legal and financial advisors, as reasonably requested, on operational matters and the general status of ongoing operations; and

(vi) subject in all respects to SQRL and MWDC's obligations with respect to a proposed Alternate Transaction as debtors-in-possession and the provisions of Section 6.03(b) below, to not seek to amend or modify either of the DIP Loan Documents or the Sale Documents in a manner that is inconsistent in any material respects with this Agreement.

(b) Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement or any of the DIP Loan Documents or Sale Documents shall require SQRL, MWDC, their managers or officers to take or refrain from taking any action that any such person or persons determines in good faith would be inconsistent with its fiduciary duties under applicable law, provided that any such action or inaction that results in a Termination Event (as defined in Section 10.04 below) hereunder shall be subject to the provisions set forth in Section 10 hereto. Notwithstanding the foregoing, SQRL and MWDC acknowledge that their entry into this Agreement and performance of their obligations hereunder, including their agreement to the terms of the Avnet Settlement and their performance of their obligations thereunder, are, and will be, consistent with, and not in violation of, the fiduciary duties of SQRL, MWDC, their managers and officers under applicable law, whether as debtors in possession under the Bankruptcy Code or otherwise.

(c) If SQRL and MWDC receive a proposal or expression of interest in undertaking an Alternate Transaction, SQRL and MWDC shall promptly notify the respective counsel to the other Parties of the receipt of such proposal or expression of interest, with such notice to include the identity of the person or group of persons involved as well as the terms of such proposed Alternate Transaction and a written copy of any such proposal for an Alternate Transaction.

(d) SQRL and MWDC acknowledge and agree that this Agreement is an agreement to extend financial accommodations to SQRL and is not subject to rejection under Section 365 of the Bankruptcy Code, and SQRL shall not seek such rejection.

**Section 7. No Transfer of Avnet Claim.**

(a) During the Effective Period, Avnet shall not sell, pledge, assign, transfer, permit the participation in, or otherwise dispose of any ownership (including any beneficial ownership) in the Avnet Claim in whole or in part.

(b) This Agreement shall in no way be construed to preclude Avnet from acquiring additional claims of creditors of SQRL; provided, however, that (i) Avnet shall notify counsel to the other Parties of such acquisition, within five (5) business days following such acquisition, including the amount of such acquisition, which notice may be deemed to be provided by the filing in the Bankruptcy Cases of a statement as required by Rule 3001 of the Federal Rules of Bankruptcy Procedure; and (ii) such additional creditor claims shall automatically and immediately upon acquisition by Avnet be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the respective counsel to the other Parties) and be deemed included in the Avnet Claim.

10

## Section 8.  Representations and Warranties.

8.01 <u>Mutual Representations, Warranties and Covenants</u>.  Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) *Power and Authority*.  Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part.

(b) *No Conflict*.  The execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(c) *No Consent or Approval*.  Except as expressly provided in this Agreement, no consent or approval is required by or from any other person or entity in order for it to effectuate the Sale-Related Transactions contemplated by, and perform its respective obligations under, this Agreement.

(d) *Enforceability*.  This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(e) *Governmental Consents*.  The execution, delivery and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

(f) *Representation*.  It has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereby.

8.02.  <u>Additional Representations and Warranties of Avnet</u>.  Avnet represents, warrants and covenants to each other Party that the following statements are true, correct and complete as of the date of this Agreement:

(a) it is the sole owner of the Avnet Claim;

11

(b) other than pursuant to this Agreement, the Avnet Claim is free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind that would materially and adversely affect in any way Avnet's performance of its obligations contained in this Agreement at the time such obligations are required to be performed hereunder; and

(c) it has made no prior assignment, sale, participation, grant, conveyance, pledge, or other transfer, in whole or in part, any portion of its right, title or interests in the Avnet Claim that would render it otherwise unable to comply with this Agreement and perform its obligations hereunder.

**Section 9.    Acknowledgement.**    Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of a plan of reorganization or liquidation for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such solicitation will be made only in compliance with all applicable provisions of the Bankruptcy Code.

**Section 10.  Termination Events.**

10.01.  <u>Mutual Consent</u>.  This Agreement may be terminated by the mutual written consent of all of the Parties.

10.02.    <u>Avnet Termination Events</u>.  Avnet may terminate this Agreement (and the obligations and commitments of all Parties hereto) upon two (2) business days prior written notice delivered to each of the other Parties in accordance with Section 13.09 hereof, upon the occurrence and continuation of any of the following events (each, an "**Avnet Termination Event**"):

(a) upon the failure to meet any of the Milestones, unless the failure to meet the Milestones has been caused by a breach of this Agreement by Avnet;

(b) (i) the occurrence of a material breach by any Party of any of the representations, warranties, covenants, obligations or commitments set forth in this Agreement, or the failure of any Party to act in a manner materially consistent with this Agreement, which breach or failure to act (A) would materially and adversely impede or interfere with the implementation or consummation of the Sale-Related Transactions in accordance with the Milestones and on the terms and conditions set forth in this Agreement and (B) is uncured as of the expiration of the two (2)-business-day period described in the preamble to this Section 10.02; or (ii) the breach in any material respect by SQRL, MWDC, or Instantiation of any of its respective undertakings, representations, warranties or covenants affecting Avnet, the Avnet Claim, the Reduced Avnet Claim, or the Avnet Secured Claim set forth in (A) the DIP Financing Order; (B) the Sale Order; (C) the DIP Loan Documents; or (D) the Sale Documents which remains uncured for the period(s) set forth in such DIP Financing Order, Sale Order, DIP Loan Documents or Sale Documents for the curing of any such material breach, as applicable;

(c)  the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of any of the Sale-Related Transactions in a way that cannot be reasonably remedied by SQRL and MWDC or would have a material adverse effect on consummation of any of the Sale-Related Transactions,

QB\71290521.1

unless SQRL, MWDC, or Instantiation have sought a stay of such injunction, judgment, decree, charge, ruling, or order within fifteen (15) business days after the date of such issuance, and such injunction, judgment, decree, charge, ruling, or order is reversed or vacated within twenty (20) business days after the date of such issuance;

(d) the Bankruptcy Court enters an order (i) directing the appointment of (A) an examiner with expanded powers to operate SQRL and MWDC's business pursuant to section 1104 of the Bankruptcy Code or (B) a trustee in either or both Bankruptcy Cases, (ii) converting either or both Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing either or both Bankruptcy Cases;

(e) any of the Parties files a pleading or other paper seeking authority to (i) amend, modify or withdraw any of the DIP Loan Documents or the Sale Documents without the prior written consent of Avnet or (ii) reject this Agreement under Section 365 of the Bankruptcy Code;

(f) the Bankruptcy Court grants relief, or, by declining to grant relief sought by any of the Parties, causes a circumstance, that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would be reasonably expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Sale-Related Transactions or an Alternate Transaction, unless SQRL, MWDC, or Instantiation have sought a stay of such relief within ten (10) business days after the date of such issuance, and such order is stayed, reversed or vacated within twenty (20) business days after the date of such issuance;

(g) if SQRL or MWDC gives notice of a termination pursuant to Section 10.03(c); or

(h) any of the DIP Loan Documents or Sale Documents are filed by SQRL or MWDC in form or substance not reasonably acceptable to Avnet;

10.03. <u>SQRL/MWDC Termination Events</u>. SQRL or MWDC may terminate this Agreement (and the obligations and commitments of all Parties hereto) upon two (2) business days prior written notice delivered to each of the other Parties in accordance with Section 13.09 hereof, upon the occurrence and continuation of any of the following events (each, a "**SQRL/MWDC Termination Event**"):

(a) the breach in any material respect by one or more of the other Parties of any of the undertakings, representations, warranties or covenants of such Party set forth herein which remains uncured for a period of five (5) business days after the receipt by the breaching Party of written notice of such breach from SQRL or MWDC;

(b) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final non-appealable ruling, judgment or order enjoining the consummation of any of the Sale-Related Transactions, which ruling, judgment, or order has not been stayed, reversed or vacated within twenty (20) business days after the date of such issuance; and

(c) action by SQRL or MWDC taken pursuant to Section 6.03(b) of this Agreement.

13

10.04.  <u>Instantiation Termination Events</u>.  Instantiation may terminate this Agreement (and the obligations and commitments of all Parties hereto) upon two (2) business days prior written notice delivered to each of the other Parties in accordance with Section 13.09 hereof, upon the occurrence and continuation of any of the following events (each, an "**Instantiation Termination Event**"):

(a)  any of the DIP Loan Documents or Sale Documents are filed by SQRL or MWDC in form or substance not reasonably acceptable to Instantiation;

(b)  this Agreement, any of the DIP Loan Documents or any of the Sale Documents is amended or modified, or any terms and conditions in any DIP Loan Documents or Sale Documents are waived, in any manner that is adverse to consummation of any of the Sale-Related Transactions, and such amendment, modification or waiver disproportionally affects the rights, obligations, or interests of Instantiation;

(c)  upon the failure to meet any of the Milestones, unless the failure to meet the Milestones has been caused by a breach of this Agreement by Instantiation;

(d)(i)  (i) the occurrence of a material breach by any Party of any of the representations, warranties, covenants, obligations or commitments set forth in this Agreement, or the failure of any Party to act in a manner materially consistent with this Agreement, which breach or failure to act (A) would materially and adversely impede or interfere with the implementation or consummation of the Sale-Related Transactions in accordance with the Milestones and on the terms and conditions set forth in this Agreement and (B) is uncured as of the expiration of the two (2)-business-day period described in the preamble to this Section 10.04; or (ii) the breach in any material respect by SQRL or MWDC of any of their undertakings, representations, warranties or covenants set forth in (A) the DIP Financing Order; (B) the Sale Order; (C) the DIP Loan Documents; or (D) the Sale Documents which remains uncured for the period(s) set forth in such DIP Financing Order, Sale Order, DIP Loan Documents or Sale Documents for the curing of any such material breach, as applicable;

(e)  the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of any of the Sale-Related Transactions in a way that cannot be reasonably remedied by SQRL or MWDC or would have a material adverse effect on consummation of any of the Sale-Related Transactions, unless SQRL, MWDC, or Avnet have sought a stay of such injunction, judgment, decree, charge, ruling, or order within fifteen (15) business days after the date of such issuance, and such injunction, judgment, decree, charge, ruling, or order is reversed or vacated within twenty (20) business days after the date of such issuance;

(f)  the Bankruptcy Court enters an order (i) directing the appointment of (A) an examiner with expanded powers to operate SQRL or MWDC's business pursuant to section 1104 of the Bankruptcy Code or (B) a trustee in the Bankruptcy Cases, (ii) converting both the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Bankruptcy Cases;

(g) any of the Parties files a pleading or other paper seeking authority to amend, modify or withdraw any of the DIP Loan Documents or Sale Documents without the prior written consent of Instantiation, and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such Party that such motion or pleading is inconsistent with this Agreement;

(h) the Bankruptcy Court grants relief, or, by declining to grant relief sought by any of the Parties, causes a circumstance, that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would be reasonably expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of any of the Sale-Related Transactions, unless SQRL, MWDC, or Avnet have sought a stay of such relief within ten (10) business days after the date of such issuance, and such order is stayed, reversed or vacated within twenty (20) business days after the date of such issuance; and

(i) an Alternate Transaction is approved by entry of a final and non-appealable order of the Bankruptcy Court and such Alternate Transaction has been fully consummated.

10.05. <u>Termination Upon Consummation of the Sale-Related Transactions</u>. Except as set forth in Section 13.10, this Agreement shall terminate automatically without any further required action or notice upon the closing and complete consummation of all of the Sale-Related Transactions.

10.06. <u>Effect of Termination</u>.

(a) Notwithstanding anything in this Agreement to the contrary, no Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.

(b) The date on which termination of this Agreement is effective as to any Party (the "**Terminating Party**") shall be referred to as the "**Termination Date**". Upon the occurrence of the Termination Date and subject to Section 13.10, this Agreement shall be of no further force and effect as to the Terminating Party and such Terminating Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Sale-Related Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, *provided that*, in no event shall any termination relieve any Terminating Party from liability for its material breach or material non-performance of its obligations hereunder prior to the date of such termination.

(c) Notwithstanding anything to the contrary in this Agreement, this Section 10.06 shall not be construed to prohibit any of the Parties from contesting whether any such termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this Agreement that arose or existed prior to the Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict any right of any Party, or the ability of any Party, to protect and preserve its rights (including rights under this Agreement), remedies and interests, including its claims against any other Party.

10.07.  Automatic Stay.  SQRL and MWDC acknowledge that the giving of any notice of termination by any other Party pursuant to this Agreement or the exercise of any rights in compliance with any provision hereto shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code; *provided that*, nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this Agreement.

**Section 11.**  [Intentionally omitted.]

**Section 12.  Amendments and Waivers.**  The terms and conditions of this Agreement, including any exhibits, annexes or schedules to this Agreement, may not be waived, modified, amended or supplemented without the prior written consent of SQRL, MWDC, Avnet and Instantiation.

**Section 13.  Miscellaneous.**

13.01.  Entire Agreement.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.

13.02.  Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

13.03.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OHIO APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that, after commencement of the Bankruptcy Cases, it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court (or court of proper appellate jurisdiction) (the **"Chosen Court"**).  Solely in connection with claims arising under this Agreement, each Party: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter.

13.04.  Trial By Jury Waiver.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.05.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

QB\71290521.1

13.06.  <u>Rules of Construction</u>.  When a reference is made in this Agreement to a section or exhibit, such reference shall be to a section or exhibit, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or."  "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information required to be provided "in writing" shall include electronic mail.  Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to "day" means a calendar day.

13.07.  <u>Interpretation; Representation by Counsel</u>.  This Agreement is the product of negotiations among the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (i) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (ii) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel.

13.08.  <u>Successors and Assigns; No Third-Party Beneficiaries</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity other than as permitted herein.

13.09.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a) if to SQRL:

Squirrels Research Labs, LLC
121 Wilbur Drive NE
North Canton, OH 44720
Attention:  David Stanfill, President
Email address:  david@squirrelsresearch.com

QB\71290521.1

with copy (which shall not constitute notice pursuant to this Section 13.09)
to:

Brouse McDowell LPA
388 South Main Street, Suite 500
Akron, OH 44311-4407
Attention:  Marc B. Merklin
Email address:  mmerklin@brouse.com

(b) if to MWDC:

The Midwest Data Company LLC
121 Wilbur Drive NE
North Canton, OH 44720
Attention:  David Stanfill, President
Email address:  david@squirrelsresearch.com

with copy (which shall not constitute notice pursuant to this Section 13.09)
to:

Brouse McDowell LPA
388 South Main Street, Suite 500
Akron, OH 44311-4407
Attention:  Marc B. Merklin
Email address:  mmerklin@brouse.com

(c) if to Avnet:

Avnet, Inc.
2211 South 47th Street
Phoenix, AZ 85034
Attention: Dennis Losik and Michael Walker
Email address:  Dennis.Losik@avnet.com; Michael.Walker@avnet.com

with copy (which shall not constitute notice pursuant to this Section 13.09)
to:

Quarles & Brady LLP
One Renaissance Square
Two North Central Avenue
Phoenix, AZ 85004
Attention:  Isaac Gabriel
Email address:  Isaac.gabriel@quarles.com and
                          Christopher.combest@quarles.com

18

(d) if to Instantiation:

434 Dorado Beach E
Dorado, Puerto Rico 00646
Attention: Sam Cassatt
Email address: sam@aligned.capital

with copy (which shall not constitute notice pursuant to this Section 13.09) to:

Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center
17th Floor
San Francisco, California 94111
Attention: Jason R. Schendel and Jeannie Kim
Email: jschendel@sheppardmullin.com
jekim@sheppardmullin.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.

13.10. <u>Survival</u>. Notwithstanding the termination of this Agreement pursuant to Section 10, the agreements and obligations of the Parties in Sections 13.01 through 13.18 shall survive.

13.11. <u>Independent Analysis</u>. Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

13.12. <u>No Waiver</u>. If any of the Sale-Related Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

13.13. <u>Relationship Among Parties</u>.

(a) Notwithstanding anything to the contrary herein, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint, (ii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect our negate this Agreement; and (iii) none of the Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, including as a result of this Agreement or the transactions contemplated herein.

(b) Notwithstanding anything to the contrary herein, this Agreement and the transactions contemplated hereby shall not create any fiduciary duties between and among the Parties, or other duties or responsibilities to each other, or any of SQRL or MWDC's creditors or other stakeholders.

QB\71290521.1

13.14.   Specific Performance.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise if any other such right, power, or remedy by such Party or any other Party.

13.15.   Several, Not Joint and Several, Obligations.   Except as otherwise expressly set forth herein, the agreements, representations, warranties, liabilities and obligations of the Parties under this Agreement are, in all respects, several and not joint and several.

13.16.   Severability and Construction.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect.   Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.17.   Remedies Cumulative.   All rights, powers, and remedies provided under the Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.   Settlement Discussions.   This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.   Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of any of the Sale-Related Transactions or the payment of damages to which a Party may be entitled under this Agreement.

*[The remainder of this page is intentionally left blank; signature page follows]*

QB\71290521.1

DocuSign Envelope ID: 2D5A9552-BD38-4156-A742-E352C9575185

**IN WITNESS WHEREOF,** the Parties have executed this Agreement, respectively, on the dates set forth below.

**AVNET, INC.**

By: _Dennis Losik_      November 23, 2021
         102E62E5AB1D453...

        Name: Dennis Losik
        Title: Senior Vice President, Credit

**SQUIRRELS RESEARCH LABS, LLC**

By: _David Stanfill_      November 23, 2021
         2B7ED7B7CDB8402...

        Name: David Stanfill
        Title: President

**THE MIDWEST DATA COMPANY LLC**

By: _David Stanfill_      November 23, 2021
         2B7ED7B7CDB8402...

        Name: David Stanfill
        Title: President

**INSTANTIATION LLC**

By: _Sam Cassatt_      November 23, 2021
         49B8F8551025463...

        Name: Sam Cassatt
        Title: Managing Member

*[Account Settlement and Sale Support Agreement - Signature Page]*

## **EXHIBIT A**

Asset Purchase Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*") is entered into as of November 22, 2021 (the "*Effective Date*") by and among INSTANTIATION LLC (the "*Purchaser*"), SQUIRRELS RESEARCH LABS LLC ("*SQRL*"), and THE MIDWEST DATA COMPANY LLC ("*MWDC*" and, together with SQRL, each a "*Seller*" and collectively, the "*Sellers*"). The Purchaser and the Sellers are referred to herein individually as a "*Party*" and, collectively, as the "*Parties*".

### RECITALS

WHEREAS, the Sellers are in the business of the development of high-performance computing and blockchain hardware technology and related businesses (the "*Acquired Business*");

WHEREAS, the Sellers intend to commence a voluntary petition for relief (the "*Bankruptcy Case*") under subchapter V (§§ 1181-1195) of chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division at Canton (the "*Bankruptcy Court*"); and

WHEREAS, the Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from the Sellers, and the Sellers desire to sell, convey, assign, and transfer to the Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (collectively, the "*Bankruptcy Rules*"), all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order.

NOW, THEREFORE, for and in consideration of the foregoing and their mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

### ARTICLE 1
### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1     **Purchase and Sale of Acquired Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, the Sellers shall sell, transfer, assign, convey, and deliver to the Purchaser, and the Purchaser shall purchase, acquire, and accept from the Sellers, all of the Sellers' right, title and interest in and to the following assets, properties and rights of the Sellers, free and clear of all Encumbrances other than Permitted Encumbrances (the "*Acquired Assets*") but excluding in all cases the Excluded Assets:

(a)     all Cash and Cash Equivalents, all bank accounts (including the bank accounts listed on <u>Schedule 1.1(a)</u>), and all deposits (including maintenance deposits, customer

deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Sellers;

(b)    all accounts receivable of the Sellers (the "***Acquired AR***");

(c)    all leasehold, subleasehold or license interests in real property (including the leasehold, subleasehold, or license interests set forth on <u>Schedule 1.1(c)</u>) and any and all buildings, structures, fixtures and other improvements thereon owned or leased by the Sellers (the "***Leased Real Property***");

(d)    all of the Sellers' tangible assets (including Equipment) (the "***Acquired Tangible Assets***");

(e)    all Contracts listed on <u>Schedule 1.1(e)</u> and all other Contracts that the Purchaser, in its discretion by written notice to the Sellers, designates as "Assigned Contracts", to the extent assignable under applicable Law and contractual restrictions after giving effect to the Sale Order (the "***Assigned Contracts***");

(f)    all goodwill, payment intangibles and general intangible assets and rights of the Sellers;

(g)    all Business Intellectual Property, including all rights to collect royalties and proceeds in connection therewith;

(h)    all causes of Action, lawsuits, judgments, claims and demands of any nature, whether arising by way of counterclaim or otherwise (collectively, the "***Assigned Claims***");

(i)    copies of all Documents including, to the extent permitted by applicable Law, the employee and personnel records of the Transferred Employees; <u>provided</u> that the Sellers may retain copies of any Documents transferred pursuant to this <u>Section 1.1(i)</u> to the extent required by Law;

(j)    all of the Sellers' customer data, lists and information (excluding from the foregoing any credit card numbers or related payment source, social security numbers, or other personally identifiable information, the transfer of which would contravene applicable privacy Law) (the "***Customer Information***");

(k)    to the extent transferable under applicable Law after giving the effect to the Sale Order, all of the rights, interests and benefits accruing under all Permits, and all pending applications and renewals therefor (collectively, the "***Assigned Permits***");

(l)    the insurance claims described on <u>Schedule 1.1(l)</u> (the "***Insurance Claims***");

(m)    all of Seller's financial accounting Documents; and

**(n)** all other or additional assets, properties, privileges, rights and interests of the Sellers relating to the Acquired Business, the Assumed Liabilities or the Acquired Assets (other than Excluded Assets) of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement.

**1.2    Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, in no event shall the Sellers be deemed to sell, transfer, assign, or convey, and the Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests and rights of such Seller (collectively, the "***Excluded Assets***"):

**(a)** all Protected Information that such Seller is prohibited by or would otherwise contravene applicable Law from transferring to the Purchaser;

**(b)** any records, documents or other information relating to employees of the Sellers who are not Transferred Employees, and any materials containing information about any Transferred Employee, disclosure of which would violate applicable Law;

**(c)** all Contracts other than the Assigned Contracts (the "***Excluded Contracts***");

**(d)** all Documents that are minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers) and any other Tax information or records of such Seller, corporate seal, checkbooks, and canceled checks;

**(e)** such Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between such Seller and the Purchaser in connection with the transactions contemplated hereby, or any other agreement between such Seller and the Purchaser entered into on or after the date hereof; and

**(f)** all Tax attributes that are not transferred by the operation of applicable Tax Law; and

**(g)** the causes of Action set forth on <u>Schedule 1.2(g)</u> attached hereto.

**1.3    Assumption of Certain Liabilities**.  On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, the Purchaser shall irrevocably assume from the Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and the Sellers shall irrevocably convey, transfer, and assign to the Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "***Assumed Liabilities***"):

**(a)** all Liabilities of the Sellers under the Assigned Contracts that become due from and after the Closing but excluding Liabilities arising out of the Sellers' performance of the Assigned Contracts prior to Closing;

**(b)**      all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "***Cure Costs***");

**(c)**      all Liabilities arising out of the conduct of the business or the ownership, use or operation of the Acquired Assets, in each case, from and after the Closing; and

**(d)**      all Liabilities arising from the Assigned Permits but excluding Liabilities arising out of the conduct of the business or the Sellers' performance of the Assigned Permits prior to Closing.

Notwithstanding anything to the contrary contained herein, "Assumed Liabilities" shall not include any Liabilities in respect of any Action or other contested claims against the Sellers, other contingent Liabilities, fees of the Sellers' professional advisors, management incentive plans or other Liability not incurred in the Ordinary Course, or any indebtedness, obligation or other claim (as defined in the Bankruptcy Code) of any kind arising from any financing including any Liability under the DIP Loan Agreement, any other DIP financing, credit facility, revolver, borrowing, debt or securities of any kind.   All such Liabilities shall constitute "Excluded Liabilities".

**1.4      Excluded Liabilities**. The Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place on or prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "***Excluded Liabilities***").

**1.5      Assumption/Rejection of Certain Contracts**.

**(a)**      <u>Assumption and Assignment of Executory Contracts</u>. The Sellers shall provide reasonably timely written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which a Seller is a party that are Assigned Contracts as of the Closing and take all other actions reasonably necessary to cause such Assigned Contracts to be assumed by a Seller and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the Sellers shall assign or cause to be assigned to the Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes (if available), all included on an exhibit attached to either a notice filed in connection with the motion for approval of the Sale Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth the applicable Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by such Seller based on such Seller's books and records or as otherwise determined by the Bankruptcy Court.  At the Closing, such Seller shall, pursuant to the Sale Order, assume and assign to the Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to the

Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code. At the Closing, the Purchaser shall assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract constituting Assumed Liabilities pursuant to section 365 of the Bankruptcy Code.

        **(b)**    <u>Non-Assignment</u>. Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, the Purchaser to the extent that such Contract (i) is rejected or terminated by a Seller in accordance with the terms of this Agreement or is terminated by any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by the Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to the Purchaser of a Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by the Purchaser as an Assigned Contract hereunder. In the event that any Assigned Contract is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 1.5(b), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing (or the remaining term of such Contract or the closing of the Bankruptcy Case, if shorter), the Sellers and the Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by the Purchaser, including subcontracting, licensing, or sublicensing to the Purchaser any or all of the Sellers' rights and obligations with respect to any such Assigned Contract, under which (1) the Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on the Sellers or its Affiliates) under such Assigned Contract with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) the Purchaser shall assume any related burden and obligation (including performance) with respect to such Assigned Contract constituting Assumed Liabilities. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Assigned Contract after the Closing, such Assigned Contract shall promptly be transferred and assigned to the Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code.

        **1.6**    **Purchase Price**. The consideration payable by the Purchaser to the Sellers for the Acquired Assets shall be equal to $3,010,000 in cash (the "***Purchase Price***") plus assumption of the Assumed Liabilities; provided, that of the Purchase Price, $10,000 is allocated to and shall be paid to MWDC in respect of the Acquired Assets to be sold by MWDC to the Purchaser pursuant to this Agreement. Within five (5) Business Days of the execution of this Agreement, the Purchaser shall deliver to the Sellers $25,000 (the "***Deposit***"), which amount shall be applied to the Purchase Price at the Closing.

        **1.7**    **Closing**. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "***Closing***") will take place by telephone conference and electronic exchange of documents at 10:00 a.m. Canton, Ohio time on the second

(2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article 6 (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree. The date on which the Closing actually occurs is referred to herein as the "***Closing Date***".

      **1.8**    **Closing Deliveries by the Sellers**.  At or prior to the Closing, the Sellers shall deliver to the Purchaser:

      **(a)**    all required documentation for Transfer Taxes, duly executed by the Sellers;

      **(b)**    each instrument of assignment and assumption of the Leased Real Property and other unexpired leases and executory contracts as set forth on Schedule 1.1(c), in each case, in form and substance approved by the Purchaser (the "***Assignments and Assumptions of Leases***"), duly executed (and acknowledged as applicable) by the Sellers;

      **(c)**    copies of all reasonable and customary instruments, certificates, documents and other filings (if applicable) necessary to release the Acquired Assets from Encumbrances, including any applicable UCC termination statements and releases of mortgages, in form and substance appropriate for recording;

      **(d)**    a copy of the Sale Order, as entered by the Bankruptcy Court;

      **(e)**    a duly executed certificate from each Seller, satisfying the requirements of Treasury Regulation 1.1445-2(b)(2);

      **(f)**    a duly executed IRS Form W-9 with respect to each Seller;

      **(g)**    a copy of the resolutions adopted by the board of directors (or similar governing body) of the Sellers evidencing the authorization of the execution of this Agreement and the consummation of the transactions contemplated by this Agreement, certified by an authorized officer of the Sellers;

      **(h)**    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Sellers certifying that the conditions set forth in Sections 6.2(b) and 6.2(c) have been satisfied; and

      **(i)**    such other documents as the Purchaser may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

      **1.9**    **Closing Deliveries by the Purchaser**.  At the Closing, the Purchaser shall deliver to the Sellers:

      **(a)**    The Purchase Price;

      **(b)**    each Assignment and Assumption of Leases, duly executed (and acknowledged, as applicable) by the Purchaser;

(c)     a copy of the resolutions adopted by the board of directors (or similar governing body) of the Purchaser evidencing the authorization of the execution of this Agreement and the consummation of the transactions contemplated by this Agreement, certified by an authorized officer of the Purchaser;

(d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Purchaser certifying that the conditions set forth in Sections 6.3(a) and 6.3(b) have been satisfied; and

(e)     such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

**1.10    Withholding**.  The Purchaser shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement to the extent required by applicable Law. Prior to making any withholding, the Purchaser must notify the Sellers at least five (5) Business Days prior to the effective date of any potentially applicable withholding requirement that the Purchaser believes applies, and each of the Parties agrees to take commercially reasonable efforts to cooperate to eliminate or reduce any such deduction or withholding. To the extent that amounts are withheld and paid to the applicable Governmental Body, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Schedules delivered by the Sellers to the Purchaser concurrently herewith, the Sellers, jointly and severally, represent and warrant to the Purchaser as follows as of the date hereof and as of the Closing Date (except where a representation or warranty is limited to a specific date, in which case such representation and warranty is given only as of such specific date):

**2.1    Organization and Qualification**. Such Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, in the case of (b) and (c), except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**2.2    Authorization of Agreement**. The execution, delivery, and performance of this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement and each of the documents and agreements contemplated hereby

to which such Seller is a party by such Seller. Subject to requisite Bankruptcy Court approvals, this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party has been duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of the Purchaser, this Agreement and each of the documents and agreements contemplated hereby to which such Seller is a party constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar applicable Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) (the "***Enforceability Exceptions***").

2.3  Conflicts; Consents.

(a)  Assuming that requisite Bankruptcy Court approvals are obtained, the execution, delivery and performance by the Sellers of this Agreement and each of the documents and agreements contemplated hereby to which the Sellers is a party and the consummation by the Sellers of the transactions contemplated hereby and thereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of the Sellers; (ii) violate any Law applicable to the Sellers; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any property or asset of the Sellers under, any Assigned Contracts; except, in the case of clauses (ii) and (iii), for any such violations, breaches, defaults or other occurrences as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

(b)  The Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body in connection with the execution, delivery and performance by the Sellers of this Agreement and each of the documents and agreements contemplated hereby to which each Seller is a party or the consummation by such Seller of the transactions contemplated hereby and thereby, except (i) requisite Bankruptcy Court approvals, (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not and could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, or (iii) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

2.4  **Title to Properties**.

(a)  Schedule 1.1(c) contains a correct and complete list of the Leased Real Property as of the date hereof. Subject to requisite Bankruptcy Court approvals, and assumption by the Sellers of the applicable lease in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, the Sellers have a valid leasehold estate in the Leased Real Property, free and clear of all Encumbrances, other than Permitted Encumbrances. The Sellers have not leased to or otherwise granted to any Person the right to use or occupy any Leased Real Property except as could not,

individually or in the aggregate, reasonably be expected to materially impair the use or occupancy of such Leased Real Property in the operation of the Acquired Business.

(b)     Subject to requisite Bankruptcy Court approvals and assumption by such Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, such Seller owns good title to, or holds a valid leasehold interest in, all of the material tangible property (including the Equipment) used or held for use in the conduct of the Acquired Business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property as could not, individually or in the aggregate, reasonably be expected to be material to the operation of the Acquired Business.

(c)     The Acquired Assets include all of the properties and assets required to operate, in all material respects, the Acquired Business in the Ordinary Course as currently operated by such Seller.

(d)     After giving effect to the Closing, the Purchaser will hold good title to, or will hold a valid leasehold interest in, the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) pursuant to the Sale Order.

**2.5     Contracts**.

(a)     Except as set forth on Schedule 2.5(a), Contracts entered into by the Sellers after the date hereof in compliance with the terms of this Agreement, and Contracts that are not primarily related to the Acquired Business, such Seller is not a party to any:

(i)     collective bargaining agreement with any labor union;

(ii)     Contract under which such Seller has borrowed any money or issued any note, indenture or other evidence of similar indebtedness or guaranteed such indebtedness of others;

(iii)     license of any Intellectual Property (other than licenses of commercially available, off-the-shelf software and other than licenses entered into in the Ordinary Course);

(iv)     lease or other Contract under which such Seller is lessee of, or holds or operates any personal property owned by any third party;

(v)     Contract or group of related Contracts with the same party for the purchase of products or services (other than purchase orders entered into in the Ordinary Course);

(vi)     Contract that materially limits or purports to limit the ability of the Acquired Business to compete in any line of business or with any Person or in any geographic area;

(vii)     Contract relating to any acquisition or disposition by such Seller of any business (whether by asset or stock purchase or otherwise) or any merger, consolidation or

similar business combination transaction, in each case, pursuant to which such Seller has any outstanding obligation to pay any purchase price thereunder;

        **(viii)**    Contract relating to any joint venture or partnership; or

        **(ix)**    agreement in writing to enter into any of the foregoing.

        **(b)**    Subject to requisite Bankruptcy Court approvals and assumption by such Seller of the applicable Contract in accordance with applicable Law and except as a result of the commencement of the Bankruptcy Case or as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, as of the date hereof, each of the Assigned Contracts is in full force and effect and is a valid, binding and enforceable obligation of such Seller and, to the Knowledge of such Seller, each of the other parties thereto, except as may be limited by the Enforceability Exceptions. Except, as a result of the commencement of the Bankruptcy Case, or as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, such Seller is not in material default, or is alleged in writing by the counterparty thereto to have materially breached or to be in material default, under any Assigned Contract, and, to the Knowledge of such Seller, the other party to each Assigned Contract is not in material default thereunder. As of the date hereof, none of the Assigned Contracts has been canceled or otherwise terminated, and such Seller has not received any written notice from any Person regarding any such cancellation or termination except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

        **2.6**    **Litigation**. Other than the Bankruptcy Case and the Actions set forth on <u>Schedule 2.6</u>, there are no Actions pending or, to the Seller's Knowledge, threatened against or by the Sellers or any of its Affiliates with respect to the Acquired Business, at law or in equity, or before or by any Governmental Body. Other than in connection with the Bankruptcy Case, the Sellers are not subject to any outstanding Order.

        **2.7**    **Permits; Compliance with Laws**.

        **(a)**    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, the Sellers hold and is in compliance with all permits, certificates, licenses, approvals, registrations and authorizations that are material to the Acquired Business and required in connection with the conduct of its business as operated by the Sellers under applicable Laws (the "***Permits***"). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, all of the Permits are valid and in full force and effect and no Action is pending, or, to the Seller's Knowledge, threatened, which seeks to revoke, limit or otherwise affect any such Permit.

        **(b)**    During the prior five (5) years the Sellers have not received any written notice of any Action against it alleging any failure to comply in any material respect with any Laws, except in each case as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business. No investigation by any Governmental Body with respect to each Seller or any of its Affiliates is pending or, to the Seller's Knowledge, threatened, and during the prior five (5) years the Sellers have not received any written notice of any such investigation, except, in each case, for any such investigation that could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

### 2.8 Environmental Matters.

**(a)** The Sellers are in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining all material permits, licenses and authorizations required under applicable Environmental Laws, except in each case for any noncompliance that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

**(b)** The Sellers have not during the prior five (5) years received written notice from any Governmental Body regarding any actual or alleged violation of or liability under Environmental Laws that could, individually or in the aggregate, reasonably be expected to be material to the Acquired Business; and

**(c)** To the Knowledge of the Sellers, no Hazardous Substance has been released by the Sellers in violation of, and in a manner that would result in liability for the Sellers under, any Environmental Law, except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

### 2.9 Intellectual Property.

**(a)** Schedule 2.9(a) sets forth a correct and complete list of all material registered Intellectual Property, and all applications for registrations of Business Intellectual Property, in each case, filed with the United States Patent and Trademark Office and owned by the Sellers (collectively, "***Registered Intellectual Property***").

**(b)** The Business Intellectual Property is owned by the Sellers free and clear of all Encumbrances, other than Permitted Encumbrances. The Business Intellectual Property is subsisting and, to the Knowledge of the Seller, enforceable.

**(c)** To the Knowledge of the Sellers, the Acquired Business does not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person, except where such infringement, misappropriation or violation could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

**(d)** To the Knowledge of the Sellers, no third party infringes, misappropriates or otherwise violates any Business Intellectual Property, except where such infringement, misappropriation or violation could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

**(e)** The Sellers have used efforts that are reasonable under the circumstances to maintain the secrecy of the material Trade Secrets included in the Business Intellectual Property, except where such failure could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

### 2.10 Data Security. 
Except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, the Sellers maintain commercially reasonable policies and procedures regarding data privacy, protection and security designed to protect any personally identifiable information of any individuals, including any customers, prospective

customers, employees and/or other third parties directly related to the Acquired Business collected by the Sellers. Except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business, to the Knowledge of the Sellers, the transactions contemplated by this Agreement will not result in a breach of such Seller's published privacy policies in effect as of the date hereof. The Sellers and their respective Affiliates are in compliance in all material respects with all Laws relating to data loss, theft and breach of security notification obligations.

2.11    **Seller Plans**. Sellers have no Liabilities under any Seller Plans.

2.12    **Employees**.

(a)    The Sellers have delivered to the Purchaser a correct and complete list of all Business Employees as of the date hereof, specifying their position, location, annual salary, date of hire and target bonus (including any incentive or retention payment opportunity in connection with Bankruptcy Case). With respect to the Business Employees, the Sellers are in compliance in all material respects with all applicable Laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, layoffs and immigration compliance, except for such non-compliance that is not material to the Acquired Business. With respect to the Business Employees, there are no administrative charges or court complaints pending or, to the Seller's Knowledge, threatened against the Sellers or any of its Affiliates before the U.S. Equal Employment Opportunity Commission or any other Governmental Body concerning alleged employment discrimination or any other matters relating to the employment of labor, in each case, that could reasonably be expected to be material to the Acquired Business.

(b)    There is no unfair labor practice charge or complaint pending or, to the Seller's Knowledge, threatened against the Sellers or any of its Affiliates before the National Labor Relations Board or any similar foreign, state or local body with respect to any Business Employees. To the Knowledge of the Sellers, during the prior five (5) years, and other than work stoppages or slowdowns resulting from the COVID-19 pandemic and associated "stay-at-home", "shelter-in-place" and similar orders of Governmental Bodies, the Sellers have not experienced any union organizing or decertification activities, work stoppage, slowdowns or other material labor disputes with respect to Business Employees, and, to the Knowledge of the Seller's no such activities or disputes are underway or threatened.

2.13    **Tax Matters**.

(a)    All Tax Returns required to be filed under applicable Law by the Sellers with respect to the Acquired Assets or the Acquired Business have been filed and such Tax Returns are correct and complete in all material respects.

(b)    All Taxes shown as due from the Sellers with respect to the Acquired Assets or the Acquired Business have been paid, except (i) to the extent nonpayment of which is permitted or required by the Bankruptcy Code and (ii) for Taxes that are being disputed by the Sellers in good faith.

(c)    No written notice from any Governmental Body of proposed adjustment, deficiency or underpayment of material Taxes with respect to the Sellers, the Acquired Assets or

the Acquired Business has been received by any Seller that has not since been satisfied by payment or been withdrawn. No Seller has waived any statute of limitations or agreed to any extension of time during which a material Tax or deficiency assessment may be made with respect to the Acquired Assets or the Acquired Business.

(d)     To the Seller's Knowledge, there are no Encumbrances for Taxes on the Acquired Assets or the Acquired Business, other than Permitted Encumbrances.

(e)     The Sellers have collected or withheld all amounts required to be collected or withheld by the Sellers for all Taxes in compliance with applicable Law, and all such amounts have been paid to the appropriate Governmental Body or set aside in appropriate accounts for future payment when due, in each case, in accordance with applicable Law.

(f)     To the Seller's Knowledge, no Governmental Body has in the last five (5) years made a claim that the Sellers, the Acquired Assets or the Acquired Business are or may be subject to taxation by a jurisdiction in which Tax Returns are not filed by, or with respect to, the Sellers, the Acquired Assets or the Acquired Business, as applicable.

2.14     **Brokers**. There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of the Sellers that would become the obligation of the Purchaser or its Affiliates after the Closing.

2.15     **Compliance with Applicable Sanctions and Embargo Laws**.

(a)     Neither the Sellers nor any of their respective Affiliates is (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), the OFAC Consolidated Sanctions List or in any Executive Order issued by the President of the United States and administered by OFAC, or a person or entity prohibited by any OFAC sanctions program or a person or entity whose property and interests in property subject to U.S. jurisdiction are otherwise blocked under any U.S. laws, Executive Orders or regulations; (ii) an entity owned, directly or indirectly, individually or in the aggregate, fifty percent or more by one or more persons described in subsection (i); (iii) a person or entity listed on the Sectoral Sanctions Identifications ("**SSI**") List maintained by OFAC or otherwise determined by OFAC to be subject to one or more of the Directives issued under Executive Order 13662 of March 20, 2014, or an entity owned, directly or indirectly, individually or in the aggregate, fifty percent or more by one or more persons or entities that are subject to the SSI List restrictions; or (iv) a person or entity named on the U.S. Department of Commerce, Bureau of Industry and Security Denied Persons List, Entity List, or Unverified List.

(b)     Neither the Sellers nor any of its respective Affiliates has violated any applicable sanctions, embargo, or export control laws or regulations, except as could not, individually or in the aggregate, reasonably be expected to be material to the Acquired Business.

2.16     **Compliance with Applicable Anti-Bribery and Anti-Corruption Law**. Neither the Sellers nor any of its respective Affiliates has, directly or indirectly: (a) made, offered, or paid any illegal contributions, payments, bribes, kickbacks, expenditures, gifts or similar payments or

provided any unlawful compensation or gifts or payments to any officer, employee, or representative of any Governmental Body, or any employee, customer or supplier of the Sellers or any other Person, in each case, in violation of applicable Law; (b) made or offered to make any improper payment to any foreign official (as defined in the FCPA); or (c) taken any other action that would cause the Sellers to be in violation of any Anti-Bribery and Anti-Corruption Law.

2.17   **Financial Statements**.  The Sellers have delivered to the Purchaser correct and complete copies of (i) the unaudited balance sheet of the Sellers as of, and the consolidated statements of operations, changes in members' equity and cash flows for, the fiscal year ended on December 31, 2020 and (ii) the unaudited balance sheet of the Sellers as of, and the consolidated statements of operations and cash flow for, the nine month period ended on September 30, 2021 (collectively, the "***Financial Statements***").  The Financial Statements have not been prepared in accordance with GAAP but presently fairly, in all material respects, the financial position of the Sellers as of the respective dates thereof and for the periods indicated therein (subject to normal and recurring year-end adjustments and the absence of footnotes).

2.18   **Absence of Changes**.  Except as a result of or in connection with the Bankruptcy Case, (a) there has not been a Material Adverse Effect and (b) the Sellers have not taken any action that, if taken following September 30, 2021, would have violated Section 5.1.

2.19   **Insurance**.  The Sellers are in material compliance with the terms and provisions of its policies of insurance, all such policies are in full force and effect and all premiums due and payable with respect to such policies have been paid.  The Sellers have not received a written notice of cancellation or termination of any such policy.  Except for the Insurance Claims, there are no pending claims or, to the Seller's Knowledge, incidents that would give rise to a claim under any such policy.  The sale and transfer of the Insurance Claims contemplated by this Agreement is not prohibited by any legal, contractual, or other restriction.  For the avoidance of doubt, and without limiting the generality of the foregoing, the Sellers are free to assign and sell the Insurance Claims to the Purchaser in compliance with the Sellers' insurance policies.

2.20   **Bank Accounts**.  Schedule 1.1(a) is a list as of the date hereof of Sellers' bank accounts (including any deposit accounts, securities accounts and any sub-accounts).

2.21   **Disclaimer of Other Representations and Warranties**. NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO PURCHASER OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ADVISORS OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA), EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 2 OR IN ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY, NEITHER THE SELLERS, ANY AFFILIATE OF A SELLER OR ANY OF THEIR RESPECTIVE ADVISORS OR ANY OTHER PERSON MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY CONSENTS OR APPROVALS REQUIRED IN CONNECTION THEREWITH), THE ACQUIRED ASSETS, THE ACQUIRED BUSINESS, THE ASSUMED LIABILITIES, THE EXCLUDED ASSETS, OR ANY INFORMATION PROVIDED OR MADE AVAILABLE TO THE PURCHASER IN CONNECTION THEREWITH (INCLUDING ANY FORECASTS, PROJECTIONS,

ESTIMATES OR BUDGETS), INCLUDING ANY WARRANTY WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ALL OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.

The Purchaser represents and warrants, to and for the benefit of the Sellers, as follows:

**3.1     Authority; Binding Nature of Agreement**.  This Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms, subject to the Enforceability Exceptions.

**3.2     Due Authorization.** The Purchaser has all requisite power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by the Purchaser of this Agreement have been duly approved and authorized by all necessary action.

## ARTICLE 4
## BANKRUPTCY COURT MATTERS

**4.1     Bankruptcy Actions**.

(a)     The Sellers and the Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval pursuant to the Bid Procedures Order. The Purchaser acknowledges that the Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Sellers and other interested parties, providing information about the Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(b)     The Sellers shall use reasonable best efforts to cause the Bankruptcy Court to enter the Bid Procedures Order approving Bid Procedures acceptable to both the Purchaser and Sellers and consistent with the provisions and obligations set forth in Section 4.1(c) and 4.1(d) below, as soon as practicable after full execution of this Agreement. If the Bankruptcy Court does not approve the Bid Procedures in their entirety, or if the Purchaser does not accept any modified terms approved by the Bankruptcy Court, then the Purchaser shall have the right to terminate this Agreement and neither party shall have any further obligation under this Agreement except for Sellers' obligation to return the Deposits as provided for in Section 7.2.

(c)     If the Purchaser is not the Successful Bidder (as defined in Section 4.1(e) at the Auction, if any is held, or if the Sellers defaults under this Agreement pursuant to Section 9.4, Sellers shall, subject to Bankruptcy Court approval in connection with the approval of the Bid Procedures, pay to the Purchaser the Break-Up Fee as set forth in Section 7.3 as and for consideration of the Purchaser conducting its due diligence and entering into this Agreement subject to higher and better offers pursuant to the Auction, to compensate the Purchaser for its

21-61491-tnap    Doc 210-1    FILED 04/11/22    ENTERED 04/11/22 14:16:20    Page 37 of 92

legal, accounting, and other professional costs and expenses, as well as the Purchaser's internal management time, incurred in connection with the proposed sale.

(d)     *Competing Bid Requirements*.

(i)     A competing bid must be in the form of cash in an amount equal to or greater than the sum of the Purchase Price, plus (1) the amount of the Break-Up Fee, plus (2) the aggregate amount require to pay in full all amounts then owed under the DIP Loan Agreement (including interest, penalties, and fees), plus (3) Fifty Thousand Dollars ($50,000) (the "***Opening Bid***"), plus the value of Assumed Liabilities under this Agreement, and otherwise meet the financing and other requirements set forth in the Bid Procedures, including such requirements set forth in Section 4.1(d)(ii) (such bid, a "***Qualified Competing Bid***").  If there is a Qualified Competing Bid, Seller shall hold an auction for the Acquired Assets (the "***Auction***") within five (5) Business Days of the Bid Deadline, provided, however, if the fifth (5th) day is not a Business Day, then the first Business Day following the fifth (5th) day, and as more fully described in the Bid Procedures (the "***Auction Date***").  At the Auction, the first subsequent bid must exceed the Opening Bid by at least Fifty Thousand Dollars ($50,000).  Thereafter and continuing until there is only one (1) bidder remaining, each bidder must increase the subsequent bid in an amount of at least Fifty Thousand Dollars ($50,000) to remain a bidder in the Auction.  To determine the winning bid at any such Auction, the Sellers shall evaluate the value to be provided under the bids, including the net economic effect upon Sellers' estate, taking into account the Break-Up Fee owed to the Purchaser and the obligations assumed by the Purchaser under this Agreement.

(ii)    To be deemed a Qualified Competing Bid, a bidder must comply with the Bid Procedures, including, without limitation: (1) submit its bid using an Asset Purchase Agreement substantially in the form of this Agreement, with a copy marked to show changes, if any, from this Agreement; (2) submit its bid by no later than 5:00 p.m. PST thirty (30) days after the entry of the Bid Procedures Order (the "***Bid Deadline***"); (3) not include any contingencies to closing the transaction in its bid, including, without limitation, financing, inspection, and due diligence contingencies; (4) be able to close the transaction no later than fifteen (15) days after entry of the Sale Order as further explained in the Bid Procedures; (5) provide at the time of its bid (A) a representation that the bidder has the financial ability to perform and provide evidentiary documentation demonstrating such financial ability to close (e.g., financial statements and bank statements that show available cash necessary to close the transaction) that are satisfactory to the Sellers in its reasonable discretion; and (B) a representation that the bidder is duly authorized to submit the bid and close the transaction and has already obtained all necessary approvals (e.g., board approvals), plus, if requested by Sellers, supporting documents satisfactory to Sellers in its reasonable discretion; and (6) submit with its bid a good-faith deposit in the amount of One Hundred Fifty Thousand Dollars ($150,000).

(e)     If an Auction is conducted, and the Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "***Successful Bidder***"), the Purchaser shall be required to serve as a back-up bidder (the "***Backup Bidder***") and keep the Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated.  If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful

Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and the Sellers may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement as such terms may have been improved upon in the Auction.

**(f)** Notwithstanding anything herein to the contrary, the Purchaser acknowledges that the Sellers and their respective Affiliates and their respective professional advisors may, subsequent to the entry of the Bid Procedures Order, continue (i) soliciting inquiries, proposals, or offers for the Acquired Assets in connection with any Alternative Transaction, (ii) responding to requests for information or due diligence inquiries, or making management available for such purposes, to Persons in connection with any Alternative Transaction and (iii) furnishing any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing. Notwithstanding any other provision of this Agreement to the contrary, the Purchaser acknowledges and agrees that the Sellers and their respective Affiliates may enter into a definitive agreement providing for an Alternative Transaction.

**(g)** The Sellers shall promptly serve true and correct copies of the motion seeking entry of the Sale Order and all related pleadings in accordance with the Bid Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable Order of the Bankruptcy Court.

**(h)** The Purchaser shall promptly take all actions as are reasonably requested by the Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of the Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating the Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

**4.2     Cure Costs**. Subject to entry of the Sale Order, the Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Sellers and assigned to the Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

**4.3     Bankruptcy Court Filings**. The Sellers shall use reasonable best efforts to obtain entry of the Bid Procedures Order and the Sale Order. The Bid Procedures Order shall, among other things, approve the Break-Up Fee. The Sale Order shall, among other things, (a) approve and direct, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances), and (iii) the performance by the Sellers of its obligations under this Agreement; (b) authorize, empower and direct the Sellers to assume and assign to the Purchaser

the Assigned Contracts; (c) find that the Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that the Purchaser is not a successor to the Sellers, and grant the Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that the Purchaser shall have no Liability or responsibility for any Liability or other obligation of the Sellers arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that the Purchaser has provided adequate assurance (and as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; (f) find that the Purchaser shall have no Liability for any Excluded Liability; and (g) find that there was no violation of section 363(n) of the Bankruptcy Code. The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code. At Closing, the Purchaser shall pay $3,000,000 of the Purchase Price directly to Avnet, Inc. in full satisfaction of the Avnet Secured Claim.

4.4    **Approval**. The Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Bid Procedures Order and the Sale Order). Nothing in this Agreement shall require the Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE 5
## COVENANTS AND AGREEMENTS

5.1    **Conduct of Business of the Sellers**

(a)    Until the earlier of the termination of this Agreement pursuant to Article 7 and the Closing, except (w) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (x) as required by applicable Law, Order or a Governmental Body, (y) as required or restricted by the terms of the DIP Loan Agreement, or (z) with the prior written consent of the Purchaser, the Sellers shall (i) conduct the Acquired Business only in the Ordinary Course and in all material respects in compliance with all applicable Laws, (ii) use reasonable best efforts to maintain the Acquired Business and the Acquired Assets in good working order (normal wear and tear excepted), (iii) use reasonable best efforts to keep available the services of their respective Business Employees subject to the Sellers' right to make sound business terminations, and (iv) use reasonable best efforts to maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers, vendors and others having business relationships with the Sellers in connection with the operation of the Acquired Business.

(b)    Until the earlier of the termination of this Agreement pursuant to Article 7 and the Closing, except (w) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (x) as required by applicable Law, Order or a Governmental Body, (y) as

required or restricted by the terms of the DIP Loan Agreement, or (z) with the prior written consent of the Purchaser, the Sellers shall not:

    **(i)** issue any notes, bonds or other debt securities, or otherwise incur any indebtedness for borrowed money or otherwise become liable for any such indebtedness of any other Person, in each case, other than Excluded Liabilities;

    **(ii)** terminate (other than by expiration), amend or modify (other than by automatic extension or renewal) in any material respect the terms of any Assigned Contract; provided, however, that the Sellers may terminate, amend or modify purchase orders in the Ordinary Course;

    **(iii)** settle or compromise any pending or threatened Action if such settlement or compromise would create Liabilities that are not Excluded Liabilities;

    **(iv)** acquire any material assets that would become Acquired Assets or sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any Acquired Assets, other than (A) sales in the Ordinary Course, (B) licenses of Intellectual Property granted on a non-exclusive basis, or (C) pursuant to existing Contracts;

    **(v)** subject any portion of the Acquired Assets to any Encumbrance, except for Permitted Encumbrances;

    **(vi)** (A) increase wages or salary of any employee except in the Ordinary Course consistent with cost of living increases, (B) grant any bonuses to any employee except in the Ordinary Course pursuant to the Seller Plans or other applicable Contracts, or (C) increase other compensation or material benefits of any employee;

    **(vii)** hire any new employee;

    **(viii)** establish, enter into, terminate, adopt or amend any Seller Plan;

    **(ix)** fail to maintain any insurance policy in effect on the date hereof or amend any such policy (other than extensions, replacements or amendments thereof in the Ordinary Course);

    **(x)** amend the DIP Loan Agreement in any material respect;

    **(xi)** make, change or rescind any Tax election, amend any Tax Return, omit to take any action, enter into any settlement or compromise of any claim, notice, audit report or assessment in respect of any Taxes, adopt or change any method of Tax accounting, enter into any Tax allocation, sharing or closing agreement, surrender any right to claim a Tax refund, consent to any extension or waiver of the statute of limitations applicable to any Tax claim or assessment, or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Purchaser in respect of any Tax period ending after the Closing Date;

    **(xii)** make any expenditure except in accordance with the DIP Budget; or

**(xiii)** authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

**(c)** Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Sellers intend to liquidate and sell the Excluded Assets, and that the Sellers shall be permitted to take, or appoint a third party to take, all reasonable actions in connection therewith, including entering into liquidation agreements and other Contracts, selling Excluded Assets at discounted prices, and using Sellers' Intellectual Property to advertise such sales and liquidation.

**(d)** Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that the Sellers may determine their need to take measures or will sustain impacts on their respective business as a result of COVID-19, and nothing herein shall prevent the Sellers from taking all commercially reasonable measures in good faith in order to preserve their respective business, operations, assets, Liabilities, prospects or any portion thereof as a result thereof, nor shall any such impact sustained by the Acquired Business be deemed as a breach of this Agreement.

**(e)** Nothing contained in this Agreement is intended to give the Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Acquired Business prior to the Closing in violation of applicable Laws.

**5.2    Access to Information**. Until the earlier of the termination of this Agreement pursuant to Article 7 and the Closing, the Sellers (in its sole discretion) will provide the Purchaser and its professional advisors with reasonable access, upon reasonable advance notice and during regular business hours, to the books and records of the Sellers and their respective Affiliates, in order for the Purchaser and its professional advisors to access such information regarding the Sellers and their respective Affiliates as the Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of the Seller, (ii) such access will occur in such a manner as the Sellers reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, and (iii) nothing herein will require the Sellers to provide access to, or to disclose any information to, the Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws; provided that, in the event that the Sellers withhold access or information in reliance on the foregoing clause (A) or (B), the Sellers shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to the Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

**5.3    Employee Matters**.

**(a)** The Purchaser shall extend to substantially all employees of the Sellers that are engaged in the operation of the Acquired Business (the "***Business Employees***") an offer of employment in a position that is comparable to such Business Employee's position immediately prior to the Closing (including level of responsibility, primary location of employment, and authority) on the terms set forth in this Section 5.3 ("***Transfer Offer***") that, if accepted, shall

become effective upon the Closing. Business Employees who accept such Transfer Offers and begin employment with the Purchaser in accordance with this Section 5.3(a) as of the Closing shall be referred to herein as "***Transferred Employees***." Nothing herein shall be construed as a representation or guarantee by the Sellers or any of their respective Affiliates that any or all of the Business Employees will accept the offer of employment from the Purchaser or will continue in employment with the Purchaser following the Closing. The Purchaser shall use reasonable best efforts under applicable Law to effect the transfer of employment to the Purchaser or its Affiliates of each such Transferred Employee who has accepted that offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of the Sellers or any of their respective Affiliates.

(b)     On the Closing Date, the Purchaser shall provide each Transferred Employee with a base salary or base wage rate and commission rate that is no lower than that provided to such Transferred Employee as of the date hereof.

(c)     The Sellers shall bear all the Liabilities and costs relating to, and shall indemnify and hold harmless the Purchaser and its Affiliates from and against, any claims made by any Business Employees for any severance or other separation payments or benefits arising out of the termination of the employment by any Seller.

(d)     The provisions of this Section 5.3 are for the sole benefit of the Parties to this Agreement and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Business Employees or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 5.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement.

## 5.4    Reasonable Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement, each Party shall, and shall cause its professional advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, advisable or permitted under applicable Law to cause the transactions contemplated hereby to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its professional advisors in connection with any step required to be taken as a part of its obligations hereunder.

(b)     The obligations of the Sellers pursuant to this Agreement, including this Section 5.4, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bid Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

**5.5    Further Assurances**.  From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

**5.6    Receipt of Misdirected Assets**. From and after the Closing, if the Sellers or any of their respective Affiliates receives any right, property or asset that is an Acquired Asset, the Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to the Purchaser, and such asset will be deemed the property of the Purchaser held in trust by the Sellers for the Purchaser until so transferred.  From and after the Closing, if the Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, the Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Sellers, and such right, property or asset will be deemed the property of the Sellers held in trust by the Purchaser for the Sellers until so transferred.

**5.7    Confidentiality**.  Following the completion of the Auction, the Sellers agree to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Acquired Business which is in such Seller's possession or of which such Seller is aware.  Each Seller hereby further agrees, unless disclosure is required by applicable Law, to use reasonable best efforts to safeguard such confidential information and to protect it against disclosure, misuse, loss and theft.  In furtherance and not in limitation of the foregoing, such Seller shall not, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Acquired Business, provided that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 5.7 or information not otherwise known by such Seller that becomes available to such Seller from a Person other than the Purchaser not subject to an obligation of confidentiality to the Purchaser or the Acquired Business, or (b) any of the discussions or negotiations conducted with the Purchaser in connection with this Agreement, provided that such Seller shall be entitled to disclose (i) any information required to be disclosed by such Seller to the Bankruptcy Court, parties in interest in the Bankruptcy Case, or other Persons bidding on assets of the Seller, (ii) any information required to be disclosed by such Seller pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), legal proceeding or Governmental Body, or (iii) any information to such Seller's professional advisors on a need-to-know basis; provided that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required.

**5.8    Casualty Loss**.  Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, the Sellers shall notify the Purchaser promptly in writing of such fact, and (i) in the case of condemnation or taking, the Sellers shall assign or pay, as the case may be, any proceeds thereof to the Purchaser at the Closing, and (ii) in the case of fire, flood or other casualty, the Seller shall assign the insurance proceeds therefrom to the Purchaser at the Closing.

**5.9    Change of Name**.  Promptly following the Closing, the Sellers shall discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by the Sellers) and shall not subsequently change its name to or otherwise use or employ any name which includes the word "Squirrels" or "Midwest Data Company" without the prior written consent of the Purchaser, and the Sellers shall cause the name of the Sellers in the caption of the Bankruptcy Case to be changed.

**5.10    Notification of Certain Matters**.

        **(a)**    The Sellers shall give to the Purchaser, and the Purchaser shall give to the Sellers, copies of notices or other communications received by the Sellers or the Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement that are not filed with the Bankruptcy Court.

        **(b)**    Each Party shall promptly advise the other in writing of any matter hereafter arising or events or conditions arising prior to Closing, which, if existing or known at the date hereof and not set forth on the Schedules, would have constituted a breach of or inaccuracy in a representation made by such Party such that the conditions under Article 6, as the case may be, would not be satisfied

**5.11    Insurance Claims**.  In the event that, notwithstanding Section 1.1(l), some or all of the Insurance Claims are not transferred and assigned to Purchaser, Sellers shall take, and shall cause their representatives, affiliates, and agents to take, all actions reasonably requested by Purchaser in connection with the liquidation, realization, investigation, and prosecution of all of such Insurance Claims.  Upon receipt of any proceeds arising from such Insurance Claims, Sellers shall immediately transfer the full amount of such proceeds to the Purchaser.

## ARTICLE 6
## CONDITIONS TO CLOSING

**6.1    Conditions Precedent to the Obligations of the Purchaser and the Sellers**. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver) on or prior to the Closing Date, of each of the following conditions:

        **(a)**    no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

        **(b)**    the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order and such orders shall not have been reversed, modified, amended or stayed.

**6.2    Conditions Precedent to the Obligations of the Purchaser**. The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the Sellers shall have delivered to the Purchaser a certified copy of the Sale Order;

(b)     each of the representations and warranties made by the Sellers in Article 2 (other than Sections 2.1, 2.2, 2.4(a)-(d) and 2.14) shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct has not had, and would not, individually or in the aggregate, reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) the representations and warranties set forth in Sections 2.1, 2.2, 2.4(d)-(d) and (f) and 2.14 shall be true and correct in all respects as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date);

(c)     the Sellers shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by the Sellers on or prior to the Closing;

(d)     the Sellers shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Section 1.8;

(e)     each Consent set forth on Schedule 6.2(e) shall have been obtained without any change in the terms and conditions of any Permit or Contract to which such Consent relates from those in effect on the date hereof that is materially adverse to the Purchaser or the Acquired Business; and

(f)     since the date of this Agreement, there shall not have been a Material Adverse Effect.

6.3     **Conditions Precedent to the Obligations of the Sellers**.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     each of the representations and warranties made by the Purchaser in Article 3 shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

**(b)** the Purchaser shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Purchaser by the Closing; and

**(c)** the Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 1.9.

6.4    **Waiver of Conditions**.  None of the Purchaser or the Sellers may rely on the failure of any condition set forth in this Article 6 to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

# ARTICLE 7
# TERMINATION

7.1    **Termination of Agreement**.  This Agreement may be terminated only in accordance with this Section 7.1.  This Agreement may be terminated at any time prior to the Closing:

**(a)** by the mutual written consent of the Sellers and the Purchaser;

**(b)** the issuance by any other Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 7.1(b) if the issuance of such Order was caused by the breach or action or inaction of such Party;

**(c)** by written notice of the Purchaser or the Sellers to the other Party, if the Closing shall not have occurred on or before February 28, 2022 (the "***Outside Date***"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 7.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

**(d)** by written notice of the Purchaser or the Sellers to the other Party, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of any Sellers is appointed in the Bankruptcy Case;

**(e)** by written notice from the Sellers to the Purchaser, upon a breach of any covenant or agreement on the part of the Purchaser, or if any representation or warranty of the Purchaser will have become untrue, in each case, such that the conditions set forth in Section 6.3(a) or 6.3(b) would not be satisfied; provided that (i) if such breach is curable by the Purchaser then the Sellers may not terminate this Agreement under this Section 7.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Sellers notify the Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 7.1(e) will not be available to the Sellers at any time that the Sellers are in material breach of any covenant, representation or warranty hereunder;

(f)     by written notice from the Purchaser to the Sellers, upon a breach of any covenant or agreement on the part of the Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 6.2(b) or 6.2(c) would not be satisfied; provided that (i) if such breach is curable by the Seller then the Purchaser may not terminate this Agreement under this Section 7.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Purchaser notifies the Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 7.1(f) will not be available to the Purchaser at any time that the Purchaser is in material breach of any covenant, representation or warranty hereunder;

(g)     by written notice from the Purchaser to the Sellers, if (i) the DIP Financing Motion, the Bid Procedures Motion and the Sale Motion shall not have been filed by December 1, 2021, (ii) the Bid Procedures Order shall not have been entered by the Bankruptcy Court by December 15, 2021, (iii) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Bid Procedures Order, (iv) following its entry, the Bid Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect or (v) the Sellers have failed to comply with the Bid Procedures Order;

(h)     by written notice from the Purchaser to the Sellers, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by January 25, 2022, (ii) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect or (iii) the Sellers have failed to comply with the Sale Order;

(i)     by written notice from the Purchaser to the Sellers, if (i) the DIP Interim Order shall not have been entered by the Bankruptcy Court by December 7, 2021, (ii) the DIP Final Order shall not have been entered by the Bankruptcy Court by December 23, 2021, (iii) following its entry, either DIP Interim Order or the DIP Final Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect or (iv) the Sellers are in default under the DIP Loan Agreement;

(j)     by written notice from the Sellers to the Purchaser, if the Sellers or the board of directors (or similar governing body) of the Seller, based upon the written advice of the Sellers' outside legal counsel, determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Seller's or governing body's fiduciary duties; or

(k)     by written notice from the Sellers to the Purchaser, if (i) the Sellers enter into one or more Alternative Transactions with one or more Persons other than the Purchaser or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Purchaser, in each case, and such Alternative Transaction is consummated.

7.2     **Effect of Termination**. In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party, except that the Sellers shall return to the Purchaser the Deposit; provided that this Section 7.2, Section 7.3 and Article 9 shall survive any such termination.

7.3     **Termination Fee**.

**(a)**     In the event that this Agreement is terminated by the Sellers pursuant to Section 7.1(j) or Section 7.1(k), then the Sellers shall pay to the Purchaser an amount in cash equal to the sum of (a) 3.0% of the Purchase Price plus (b) all of the Purchaser's documented out-of-pocket costs and expenses (including legal fees) incurred in connection with the transactions contemplated by this Agreement, up to a maximum amount of $200,000 (collectively, the "***Break-Up Fee***"); provided, however, that in the event the Sellers have insufficient funds at the time of the termination of this Agreement pursuant to Section 7.1(j) or Section 7.1(k) to pay both the full amount of the Break-Up Fee and the full amount of the Avent Secured Claim then the Purchaser shall have a secured claim (junior only to the Avnet Secured Claim) with respect to the unpaid portion of the Break-Up Fee.  Any payment of the Break-Up Fee pursuant to the first sentence of this Section 7.3(a) in connection with the consummation of an Alternative Transaction or the consummation of any other transaction in which the Avnet Secured Claim has been or will be repaid in full shall be a super-priority administrative expense claim senior to all other administrative expense claims under section 364(c)(1) of the Bankruptcy Code.  In the event that this Agreement is terminated pursuant to Section 7.1(k), any payments of the Break-Up Fee shall be payable from, and shall at the time of closing be paid out of, the proceeds of the closing of the applicable Alternative Transaction.

**(b)**     Each of the Sellers and the Purchaser acknowledges and agrees that: (i) the agreements contained in this Section 7.3 are an integral part of the transactions contemplated by this Agreement; (ii) the Break-Up Fee is not a penalty, but is liquidated damages, in a reasonable amount that will compensate the Purchaser in the circumstances in which such amount is payable, for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision; and (iii) without these agreements, neither the Sellers nor the Purchaser would have entered into this Agreement.

**(c)**     As collateral security for the prompt and complete payment when due (whether at stated maturity, by acceleration or otherwise) of the Break-Up Fee pursuant to the terms of Section 7.3(a) (the "***Secured Obligations***"), the Sellers hereby mortgage, pledge and hypothecate to the Purchaser, and grants to the Purchaser an Encumbrance on and security interest in, all of such Seller's right, title and interest in, to and under all of the assets and properties of such Seller (collectively, "***Collateral***"); provided, however, that the Encumbrance and security interest granted pursuant to this Section 7.3(c) shall in all events be junior to the liens and security interests securing the Avnet Secured Claim.  The security interest granted pursuant to this Section 7.3(c) constitutes a valid and continuing perfected security interest in favor of the Purchaser in all Collateral.  The Sellers hereby authorize the Purchaser to file one or more UCC-1 financing statements in the appropriate filing office to reflect the security interest granted pursuant to this Section 7.3(c).

<div align="center">

**ARTICLE 8**
**TAXES**

</div>

**8.1     Transfer Taxes**. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other Taxes and recording charges payable by reason of the sale of the Acquired Assets and the Acquired Business or the assumption of the Assumed

Liabilities under this Agreement or the transactions contemplated hereby (the "*Transfer Taxes*") shall be borne 50% by the Sellers and 50% by the Purchaser, and the Purchaser shall timely file all Tax Returns related to any Transfer Taxes. The Sellers and the Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.

      **8.2**    **Allocation of Purchase Price**. For U.S. federal and applicable state and local income Tax purposes, the Purchaser, the Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other items treated as part of the purchase price for applicable income Tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "*Allocation Methodology*"). As soon as commercially practicable, the Purchaser shall provide a proposed allocation to the Sellers setting forth the allocation of the Purchase Price (and other amounts treated as Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "*Allocation*"). If the Sellers deliver a written objection within thirty (30) days after receipt of the draft Allocation proposed by the Purchaser, then the Purchaser and the Sellers shall negotiate in good faith to resolve any such objection. Any resolution by the Sellers and the Purchaser shall be conclusive and binding on the Parties once set forth in writing (any such conclusive and binding Allocation, the "*Final Purchase Price Allocation*"). If the Sellers and the Purchaser cannot resolve such dispute within thirty (30) days of the Purchaser's receipt of the Sellers' objection, the Final Purchase Price Allocation shall be determined pursuant to Section 9.13. The Parties and their respective Affiliates shall file all Tax Returns in accordance with the Allocation Methodology and the Final Purchase Price Allocation (if any). None of the Parties shall take any Tax related action inconsistent with the Final Purchase Price Allocation (if any) unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

      **8.3**    **Cooperation**. The Purchaser and the Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

      **8.4**    **Preparation of Tax Returns and Payment of Taxes.**

      **(a)**    Except as otherwise provided by Section 8.1, the Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date other than with respect to any Assumed Tax and (ii) all income Tax Returns of the Sellers for all Tax Periods. Except to the extent any Tax reflected on a return required to be prepared and filed by the Sellers pursuant to this Section 8.4 is constitutes an Assumed Liability, the Sellers shall be responsible for paying any Taxes due with respect to Tax Returns that the Sellers are obligated to prepare and file under this Section 8.4(a).

      **(b)**    The Purchaser shall prepare and timely file all other Tax Returns with respect to the Acquired Assets that are not addressed by Section 8.4(a). With respect to any Straddle Period, the Purchaser shall prepare such Tax Returns consistent with past practice of the Sellers, and shall provide the Sellers with a draft of such Tax Returns at least thirty (30) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by the Sellers with respect to such Tax Returns; provided that such changes are consistent with

past practice of the Sellers and applicable Law. The Purchaser shall be responsible for paying any Assumed Tax reflected on any Tax Return that the Purchaser is obligated to prepare and file under this Section 8.4(b).

<div align="center">

**ARTICLE 9**
**MISCELLANEOUS**

</div>

**9.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers.** Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and nothing in this Section 9.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. The Purchaser and the Sellers acknowledge and agree, on their own behalf and on behalf of their respective Affiliates, as the case may be, that the agreements contained in this Section 9.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing, and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 9.1, none of the Parties would enter into this Agreement.

**9.2     Indemnity; Expenses.** Whether or not the Closing takes place, the Sellers shall indemnify, and hold harmless, the Purchaser and its Affiliates and their respective representatives and agents from all Liability (including reasonable expenses of counsel) arising from any Action instituted in the Bankruptcy Case in connection with the transactions contemplated hereby. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 7.3), all fees, costs and expenses (including fees, costs and expenses of professional advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to Section 8.1 and (b) all Cure Costs will be allocated pursuant to Section 1.3(b) and Section 4.2.

**9.3     Notices.** All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), one Business Day after delivery to such courier; (c) if otherwise actually personally delivered, when delivered; (d) if delivered by electronic mail before 5:00 p.m. (local time at the location of recipient) on a Business Day, when transmitted and receipt is confirmed; and (e) if delivered by electronic mail after 5:00 p.m. (local time at the location of recipient), when transmitted and receipt is confirmed, at 9:00 a.m. (local time at the location of recipient) on the

following Business Day, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

Notices to Purchaser:

Instantiation LLC
434 Dorado Beach E
Dorado, Puerto Rico 00646
Attention:     Sam Cassatt
Email:          sam@aligned.capital


with a copy to (which shall not constitute notice for purposes of this Section 9.3):

Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center
17th Floor
San Francisco, California 94111
Attention:     Jason R. Schendel and Jeannie Kim
Email:          jschendel@sheppardmullin.com
                     jekim@sheppardmullin.com

Notices to Sellers:

Squirrels Research Labs, LLC
121 Wilbur Drive NE
North Canton, OH 44720
Attention:     David Stanfill, President
Email:          david@squirrelsresearch.com


and

The Midwest Data Company LLC
121 Wilbur Drive NE
North Canton, OH 44720
Attention:     David Stanfill, President
Email:          david@squirrelsresearch.com

with a copy to (which shall not constitute notice for purposes of this Section 9.3):

Brouse McDowell, a Legal Professional Association
388 S. Main Street, Suite 500
Akron, OH  44311
Attention:     Marc B. Merklin
Email:          MMerklin@brouse.com


**9.4      Remedies**.

**(a)    Default by Purchaser**. The parties agree that the Purchase Price has been determined not only by a consideration of the value of the property per se but also by a consideration of the value of the various covenants, conditions and warranties of this Agreement as they relate to the property. The consideration of such values, sometimes measurable in relation to known external standards and sometimes determined only by subjective business judgments of the parties, are all interrelated and affected by the Parties' ultimate agreement upon the Purchase Price. The Parties have discussed and negotiated in good faith upon the question of the damages that would be suffered by Sellers in the event this Agreement terminates prior to the close of escrow due to a buyer material default.  It shall be a material default by Purchaser under this Agreement (a "***Purchaser's Default***") if any of the Purchaser's representations and warranties are materially untrue or the Purchaser shall fail to perform or comply with any of its covenants, acts and agreements contained in this agreement in any material respect when required to be performed hereunder and such failure shall continue for five (5) Business Days after Sellers give Purchaser written notice of such failure, except that if such failure relates to any material covenant or agreement to be performed at the Closing, there shall be no notice required or grace or cure period allowed. If a Purchaser's Default occurs and provided no material default by a Seller has occurred that has not been cured, then such Seller shall have the right to terminate this Agreement immediately by giving written notice to the Purchaser, in which event, the Parties have endeavored to reasonably estimate such damages and they hereby agree that, by reason of the aforesaid considerations, (i) such damages are and will be impracticable or extremely difficult to fix, (ii) liquidated damages in the amount of any Deposits actually delivered by the Purchaser are and will be reasonable, (iii) in the event of such default, Sellers shall receive such Deposits as liquidated damages, and (iv) in consideration of the payment of such liquidated damages, Sellers shall be deemed to have waived all other claims for damages.

**(b)    Default by Seller**. If this transaction fails to close as a result of a Seller's material default, which such Seller fails to cure within five (5) Business Days after receipt of written notice describing in reasonable detail the nature of such material default, then the Purchaser's sole and exclusive remedy shall be to (i) terminate this Agreement by giving Sellers written notice of the Purchaser's election to immediately terminate this Agreement and receive an administrative claim in the Bankruptcy Case pursuant to section 503(b) of the Bankruptcy Code in the amount of the Breakup Fee or (ii) assert and seek judgment against Seller for specific performance, and if such judgment is not obtained, then exercise such remedy under Section 9.4(b)(i) hereof.

**9.5    Binding Effect; Assignment**.  This Agreement shall be binding upon the Purchaser and, subject to the terms of the Bid Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, the Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of the Purchaser and the Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void; provided, however, upon prior written notice to the Sellers, the Purchaser shall have the right to assign its rights and/or delegate its obligations hereunder (a) to any Affiliates and (b) after Closing, to any subsequent purchaser of all or any portion of the equity interests or assets of the Purchaser or the Acquired Business.

**9.6     Amendment and Waiver**. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by the Purchaser and the Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought.  No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**9.7     Third Party Beneficiaries**.  Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**9.8     Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

**9.9     Construction**.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

**9.10     Schedules**. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules to the extent reasonably apparent.  Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, any updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course.  In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement.  The information

contained in this Agreement, in the Schedules and exhibits is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

**9.11    Complete Agreement**. This Agreement, together with the Schedules and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the other transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the other transactions contemplated by this Agreement.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

**9.12    Specific Performance**. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 9.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor the Purchaser would have entered into this Agreement.  The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 9.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to the Sellers pursuant to this Section 9.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Sellers from seeking to collect or collecting damages.  If, prior to the Outside Date, any Party brings any Action, in each case in accordance with this Section 9.12, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such Action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such Action, as the case may be.  In no event will this Section 9.12 be used, alone or together with any other provision of this Agreement, to require any Sellers to remedy any breach of any representation or warranty of any Sellers made herein.

**9.13    Jurisdiction and Exclusive Venue**. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation,

execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Court of Chancery (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court located within Wilmington, Delaware) (the courts described in clauses (a) and (b), the "**_Chosen Courts_**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non-convenives. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 9.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**9.14    Governing Law; Waiver of Jury Trial**.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND EACH PARTY THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II)

ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. THE PROVISIONS OF THIS SECTION 9.13 SHALL BE ENFORCEABLE BY EACH DEBT FINANCING SOURCE, ITS AFFILIATES AND THEIR RESPECTIVE SUCCESSORS AND PERMITTED ASSIGNS.

      **9.15    Counterparts**.  This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument.  Delivery of an executed counterpart of the signature page to this Agreement or any agreement or instrument contemplated hereby by email, facsimile, portable document format (pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (including DocuSign) shall be as effective as delivery of a manually executed counterpart of this Agreement.  Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature.  At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such Contract will raise the use of a DocuSign, .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of DocuSign, .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

      **9.16    Publicity**. Neither the Sellers nor the Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the reasonable judgment of the Purchaser or the Sellers, as the case may be, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that the Party intending to make such release shall use its reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

      **9.17    Bulk Sales Laws**. The Parties intend that, pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets contemplated hereby shall be free and clear of any Encumbrances (other than Permitted Encumbrances) including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

      **9.18    No Solicitation**.  This Agreement and the transactions contemplated herein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or

otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act of 1933 ("**Securities Act**") or the Securities Exchange Act of 1934 (the "**Exchange Act**") and the Seller will not solicit acceptances of any plan of reorganization from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

9.19 **Release.**

(a) Effective upon the Closing, the Sellers on behalf of themselves and their respective Affiliates and each of their respective directors, officers, control persons (as defined in Section 15 of the Securities Act or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, professional advisors, legal representatives, shareholders, partners, estates, successors and assigns solely in their capacity as such, and any of their respective agents, attorneys, financial advisors, professional advisors, legal advisors, Affiliates, directors, managers, officers, control persons, shareholders, members or employees, in each case, solely in their capacity as such (each a "**Related Party**", and collectively, the "**Related Parties**") acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against the Purchaser or any of its Related Parties that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder (any and all such direct or derivative claims, collectively, the "**Seller Released Claims**"); and, should any Seller Released Claims nonetheless exist, the Seller on behalf of itself and its Related Parties hereby (i) releases and discharges the Purchaser and its Related Parties from any liability whatsoever on such Seller Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder, and (ii) releases, remises, waives and discharges all such Seller Released Claims against the Purchaser and its Related Parties; provided that nothing herein shall release the Purchaser of its obligations under this Agreement and the other documents and agreements contemplated herein.

(b) Effective upon the Closing, the Purchaser on behalf of itself and its Affiliates acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against the Sellers or any of its Related Parties that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder (any and all such direct or derivative claims, collectively, the "**Purchaser Released Claims**"); and, should any Purchaser Released Claims nonetheless exist, the Purchaser on behalf of itself and its Affiliates hereby (i) releases and discharges the Sellers and each of its Related Parties from any liability whatsoever on Purchaser Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with any transaction, event, circumstances, action, failure to act or

occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder, and (ii) releases, remises, waives and discharges all such Purchaser Released Claims against the Sellers and each of their Related Parties; provided that nothing herein shall release the Sellers of its obligations (A) under this Agreement and the other documents and agreements contemplated herein or (B) for indemnification of any individuals serving as a director or manager of any Sellers or under any directors and officers insurance policy.

**(c)** Without limiting in any way the scope of the release contained in this Section 9.19 and effective upon the Closing, each Party, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown claims. Each Party hereby affirms its intent to waive and relinquish such unknown claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto.

## ARTICLE 10
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

### 10.1 Certain Definitions.

"*Action*" means any Order, action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"*Alternative Transaction*" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of the Sellers or any portion of its equity interests or any material portion of its assets (in any form of transaction, whether by merger, sale of assets or equity or otherwise) with any party other than the Purchaser or its Affiliates; provided, however, that the foregoing shall not include (a) sales of goods and services in the Ordinary Course and (b) any sale of the Excluded Assets pursuant to *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the Bankruptcy Rules.

"***Anti-Bribery and Anti-Corruption Law***" means, collectively: (a) the U.S. Foreign Corrupt Practices Act ("***FCPA***"); (b) the UK Bribery Act 2010; and (c) any other anti-bribery or anticorruption laws, statutes, and regulations applicable to the Acquired Business.

"***Assumed Taxes***" means any Liability for Taxes arising from the ownership or operation of the Acquired Business or the Acquired Assets for any taxable period (including any portion thereof) beginning after the Closing Date (including the portion of any Straddle Period after the Closing Date). In the case of any Straddle Period, (a) property taxes for the period following the Closing Date shall be equal to the amount of such property taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that is for the period following the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (b) Taxes (other than property taxes) for the period following the Closing Date shall be computed as if such taxable period began on the day following the Closing Date.

"***Auction***" has the meaning ascribed to such term in the Bid Procedures Order and Section 4.1(d).

"***Avnet Secured Claim***" means the claim of Avnet, Inc. against SQRL in the Bankruptcy Case, which claim shall be treated as an allowed claim that is fully secured under 11 U.S.C. §506(a) in the amount of three million dollars ($3,000,000).

"***Bid Procedures***" means the bidding and sale procedures approved by the Bankruptcy Court, including the Competing Bid Requirements set forth in Section 4.1(d).

"***Bid Procedures Order***" means a final order of the Bankruptcy Court, in form and substance reasonably acceptable to the Purchaser and Sellers, meeting the requirements of Section 4.1, and which, among other things establishes a date by which Qualified Competing Bids must be submitted.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which commercial banks in Canton, Ohio are generally authorized or required by Law to be closed.

"***Business Intellectual Property***" means Intellectual Property used or held out for use in the Acquired Business.

"***Cash and Cash Equivalents***" means all of the Sellers' cash (including petty cash and checks received on or prior to the Closing), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"***Code***" means the United States Internal Revenue Code of 1986.

"***Consent***" means any approval, consent, ratification, permission, waiver or other authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"**Contract**" means any written contract, purchase order, station agreement, tower lease, service order, sales order, indenture, note, bond, Lease, sublease, mortgage, agreement, guarantee, purchase order, license, collective bargaining agreement, or other agreement that is binding upon a Person or its property.

"**COVID-19**" means SARS-CoV-2 or COVID-19, any evolutions thereof or related or associated epidemics, pandemics or disease outbreaks and any future epidemics, pandemics or disease outbreaks.

"**DIP Budget**" means the pro forma budget delivered to the Purchaser specifying the Sellers' operating budget, in form and substance reasonably satisfactory to the Purchaser, with any modifications thereto made (a) in accordance with the DIP Loan Agreement or (b) with the written approval of the Purchaser, not to be unreasonably withheld, conditioned or delayed.

"**DIP Financing Motion**" means the motion filed by MWDC seeking the Bankruptcy Court's approval of the DIP Loan and the DIP Loan Agreement pursuant to Sections 105, 362, 363, and 364 of the Bankrtupcy Code, in form and substance reasonably satisfactory to the Purchaser.

"**DIP Final Order**" means a final order entered by the Bankruptcy Court which, among other things, approves the DIP Loan and the DIP Loan Agreement on a final basis, in form and substance reasonably satisfactory to the Purchaser.

"**DIP Interim Order**" means an interim order entered by the Bankruptcy Court which, among other things, approves the DIP Loan Agreement on an interim basis, in form and substance reasonably satisfactory to the Purchaser.

"**DIP Loan Agreement**" means that certain Loan and Security Agreement, dated on or about the date hereof, by and between the Purchaser, as lender, and MWDC, as borrower.

"**DIP Loan**" means debtor-in-possession financing facility made available by the Purchaser to MWDC pursuant to the DIP Loan Agreement.

"**Documents**" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, listener registries, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"**Encumbrance**" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, encroachments, Orders and conditional sale or other title retention agreements and other

rights of first refusal or first offer, activity and use limitations, title defects, and any other restrictions of any kind.

"***Environmental Laws***" all applicable Laws including any common law cause of action concerning (a) pollution or protection of the environment, or worker health and safety (solely to the extent relating to exposure to Hazardous Substances) or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, release or threatened release of Hazardous Substances.

"***Equipment***" means any and all machinery, equipment, auxiliary and translator facilities, transmitting towers, transmitters, broadcast equipment, antennae, cables, supplies, vehicles, furniture, fixtures, appliances, servers, traffic systems, graphic systems, audio boards, switchers, radar systems, microwaves, transponders, relays, backup generators, computers, computer hardware and peripherals, information technology infrastructure, telephone systems, office equipment, cameras, production equipment, inventory, leasehold improvements, spare parts and other tangible personal property of every kind and description, together with all rights against the manufacturers and/or suppliers of any of the foregoing.

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***GAAP***" means United States generally accepted accounting principles as in effect from time to time applied consistently throughout the periods involved.

"***Governmental Authorization***" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"***Governmental Body***" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"***Hazardous Substance***" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

"***Intellectual Property***" means all intellectual property rights anywhere in the world arising under or associated with: (a) patents and patent applications; (b) trademarks, service marks, trade dress, trade names, logos, slogans, domain names, and other designations of origin, and all registrations and applications for registration therefor, together with all goodwill associated therewith; (c) copyrights (and any other equivalent rights in works of authorship (including rights in Software as a work of authorship and rights in programs and programming materials)); (d) trade secrets and industrial secrets, and rights in know-how and other confidential or proprietary business or technical information in each case that derive independent economic value from not being generally known ("***Trade Secrets***"); (e) rights in domain names, uniform resource locators, Social Media Accounts, social media identifiers and other names and locators associated with Internet addresses and sites; (f) engineering data, advertising studies, databases, marketing and

demographic data, advertiser, exhibitor and vendor lists, credit and sales reports; and (g) other similar or equivalent intellectual property rights anywhere in the world.

"***Knowledge of the Seller***", "***Seller's Knowledge***", "***Seller has Knowledge***" and words of similar import mean the actual knowledge of David Stanfill after due inquiry.

"***Law***" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"***Liability***" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"***Material Adverse Effect***" means any event, change, occurrence, or effect (each, an "***Effect***") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on (x) the Acquired Business or (y) the Acquired Assets and Assumed Liabilities, taken as whole; provided, however, that none of the following, and no Effect arising out of, or resulting from, the following, shall constitute, or be taken into account, individually or in the aggregate, in determining whether or not there has been, a Material Adverse Effect: (a) Effects in, arising from or relating to general business or economic conditions affecting the industry in which the Sellers operate, (b) Effects in, arising from or relating to national or international political or social conditions, including rioting, domestic disturbance or the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (c) Effects in, arising from or relating to financial, banking, or securities markets (including (i) any disruption of any of the foregoing markets, (ii) any change in currency exchange rates, (iii) any decline or rise in the price of any security, commodity, Contract or index and (iv) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement), (d) Effects in, arising from or relating to changes in GAAP, (e) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body, (f) Effects in, arising from or relating to (i) the taking of any action at the request of the Purchaser or its Affiliates, (ii) the failure to take any action if such action is prohibited by this Agreement, (iii) the Purchaser's failure to consent to any of the actions restricted in Section 5.1 or (iv) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of the Purchaser, including the impact thereof on the relationships, contractual or otherwise, of the business of the Sellers with employees, customers,

lessors, suppliers, vendors or other commercial partners, (g) Effects that arise from any seasonal fluctuations in the Sellers' business and operations, (h) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with the Purchaser or its Affiliates or professional advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (i) the effect of any action taken by the Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or any breach by the Purchaser of this Agreement, (j) the matters set forth on the Schedules and any changes or developments in, or effects or results arising from or relating to, matters expressly set forth on the Schedules, (k) (i) the commencement or pendency of the Bankruptcy Case; (ii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions contemplated hereby or thereby, (B) the reorganization of the Sellers, or (C) the assumption or rejection of any Assigned Contract; and (iii) any Order of the Bankruptcy Court or any actions or omissions of the Sellers in compliance therewith, or (m) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including COVID-19), including any Law, directive, pronouncement or guideline issued by a Governmental Body, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place", curfews or other restrictions that relate to, or arise out of, a national health concern, epidemic or pandemic (including COVID-19) or any change in such Law, directive pronouncement or guideline thereof following the date of this Agreement or any material worsening of such conditions threatened or existing as of the date of this Agreement or any quarantine, stay-at-home orders, shelter-in-place orders, or trade restrictions related thereto or any other force majeure; provided, further, however, that any Effect referred to in clauses (a), (b) or (c) may be taken into account in determining whether or not there has been or may be a Material Adverse Effect to the extent such Effects have a materially disproportionate adverse effect on the Acquired Business, taken as a whole, as compared to other participants engaged in the industries and geographies in which the Sellers operate the Acquired Business.

"*Order*" means any injunction, order, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"*Ordinary Course*" means the ordinary and usual course of operations of the Acquired Business consistent with past practice, taking into account the commencement and pendency of the Bankruptcy Case and recent past practice in light of COVID-19; provided, that, any action taken, or omitted to be taken, in good faith on a commercially reasonable basis that relates to, or arises out of, COVID-19 shall be deemed to be in the Ordinary Course.

"*Permitted Encumbrances*" means (a) utilities and current Taxes not yet due and payable, or the amount or validity of which are being contested in good faith by appropriate proceedings, or the nonpayment of which is permitted or required by the Bankruptcy Code, (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments of public record against any of the Acquired Assets, (c) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable or the amount or validity of

which are being contested in good faith by appropriate proceedings, (d) such other Encumbrances or title exceptions as the Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (e) any Encumbrances that will be removed or released by operation of the Sale Order, (f) Encumbrances included in the Assumed Liabilities, and (g) liens that will be released at Closing.

"***Person***" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

"***Protected Information***" means "personally identifiable information" within the meaning of section 363(b) of the Bankruptcy Code included as part of the Acquired Assets.

"***Sale Motion***" means the motion of the Sellers seeking approval and entry of the Bid Procedures Order and the Sale Order in form and substance approved by the Purchaser.

"***Sale Order***" means the order of the Bankruptcy Court to be entered by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance approved by the Purchaser, which order, amongst other approvals, (a) approves the sale of the Acquired Assets to the Purchaser free and clear of all Encumbrances and Liabilities pursuant to Section 363(f) of the Bankruptcy Code other than the Assumed Liabilities as set forth herein, and (b) approves the direct payment by Purchaser to Avnet, Inc. of $3,000,000 of the Purchase Price in full satisfaction of the Avnet Secured Claim.

"***Seller Plan***" means (a) "employee benefit plan" within the meaning of Section 3(3) of ERISA, (b) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (c) employment, severance, retention or other similar agreement, and (d) bonus, incentive, deferred compensation, profit-sharing, post- termination health or welfare, vacation, severance or termination pay or other material compensation or benefit plan, program, policy, agreement or other arrangement, in all cases, other than any plan or arrangement sponsored or maintained by a Governmental Body.

"***Social Media Account***" means an account registration with a social media platform, such as Facebook, Instagram, Twitter, Pinterest, Google, TikTok and the like, and includes handle names.

"***Straddle Period***" means any Tax period beginning on or before, and ending after, the Closing.

"***Tax***" or "***Taxes***" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

"***Tax Return***" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

**10.2    Rules of Interpretation**.  Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules, the exhibits and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder:

**(a)**    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

**(b)**    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified.  All exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

**(c)**    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

**(d)**    The words "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

**(e)**    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

**(f)**    Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

**(g)**    The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

**(h)**    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

**(i)**    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

**(j)**    Any document or item will be deemed "delivered," "provided" or "made available" by the Sellers, within the meaning of this Agreement if such document or item is (i) actually delivered or provided to the Purchaser or any of the Purchaser's professional advisors or (ii) made available upon request, including at the Sellers' offices.

**(k)**     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

**(l)**     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

**(m)**     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

**(n)**     The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**(o)**     This Agreement is in the English language, and while this Agreement may be translated into other languages, the English language version shall control. All notices, demands, requests and other documents or communications under or in connection with this Agreement will be in English or will be accompanied by a certified English translation (in which case the English version will prevail in the event of a conflict except to the extent the communication contains or consists of an official document issued by a Governmental Body in a language other than English).

[*Signature pages follow*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement to be signed effective as of the date first above written by their duly authorized agents.

**SELLERS:**                               **BUYER:**

SQUIRRELS RESEARCH LABS LLC      INSTANTIATION LLC

By: _____      By: _____
Name:                            Name: Sam Cassatt
Title:                           Title: Managing Member


THE MIDWEST DATA COMPANY LLC

By: _____
Name:
Title:

*Signature page to Asset Purchase Agreement*

SMRH:4834-5381-6317.3

**Schedule 1.1(a)**

**<u>Bank Accounts</u>**

JPMorgan Chase Bank Acct *******6063 (SQRL)
JPMorgan Chase Bank Acct *******3991 (SQRL)
JPMorgan Chase Bank Acct *******1770 (SQRL)
Premier Bank Acct ******96 (SQRL)
Crypto Mining accounts (2) (SQRL)
JPMorgan Chase Bank Acct *****7939 (MWDC)
JPMorgan Chase Bank Acct *****7962 (MWDC)

SMRH:4834-5381-6317.3

**Schedule 1.1(c)**

**Leasehold, Subleasehold, or License Interests**

Lease Agreement for 8050 Freedom Avenue with One Haines Company, 120-month term. Signed May 5, 2020.

Lease Agreement for 7579 Freedom ("Skymax" building) with One Skymax Company, 120-month term. Signed March 16, 2020.

Lease Agreement for Fishers Foods building with GS8100. 120-month term. Signed 9-8-2020.

SMRH:4834-5381-6317.3

**Schedule 1.1(e)**

**<u>Assigned Contracts</u>**

Hosted customer contracts including the following customers:

| |
|---|
| Jose A Rubio |
| Robert Renna |
| Jonathan Hulecki |
| Robert Oxsen |
| Marco Mendoza |
| Spencer Gabriel Singh |
| Jose A Rubio |
| Jose Nunez |
| Fabian Delmotte |
| Richard Ramazinski |
| Richard Hall |
| Jason Palmer |
| Todd Dallimore |
| Barry Gluntz |
| Yannick Vergult |
| Matthew Peterson |
| Matthew Peterson |
| Michael Erceg |
| Arran Gracie |
| Aditya Chauhan |
| Andrew Wolf |
| James Soldi |
| Aaron Strating |
| Henrik Gustafsson |
| Lance Colton |
| Artem Pylypchuk |

Instantiation LLC

SMRH:4834-5381-6317.3

**Schedule 1.1(l)**

**<u>Insurance Claims</u>**

Cincinnati Insurance Company- Date of Loss: July 15, 2021. Fire damage to building and contents at 8050 Freedom Avenue building. Unknown value of loss.

SMRH:4834-5381-6317.3

**Schedule 1.2(g)**

**Excluded Causes of Action**

SQRL v. Fleur de Lis, Case No. 2021 CV 00251, Stark County, Ohio Court of Common Pleas

Potential claims against Roehl Trading for undelivered equipment and against Alpine Mining for undelivered equipment.

Potential Claims against Michael Maranda and/or Michael Maranda LLC.

Avoidance Actions, including those causes of action brought pursuant to Chapter 5 of the Bankruptcy Code

SMRH:4834-5381-6317.3

**Schedule 2.5(a)**

## Contracts

No additional known at this time.

SMRH:4834-5381-6317.3

**Schedule 2.6**

**<u>Litigation</u>**

TorEA Consulting Ltd. vs. Squirrels Research Laboratories LLC, 2021CV1091, Stark County Common Pleas Court <u>115 Central Plaza North Canton, OH 44702</u>

Everhart Glass Co., Inc. v. Kylin Construction, LLC and Squirels Research Labs, LLC 2021-CV-01487 , Stark County Common Pleas Court <u>115 Central Plaza North Canton, OH 44702</u>

Threats of litigation have also been brought forth by counsel for Mr. Michael Maranda/Michael Maranda LLC and counsel for Mr. Karl Forsell.

**Schedule 2.9(a)**

**<u>Intellectual Property</u>**

SQRL intellectual property includes the following:
-Unregistered copyrights
-Detailed customer lists
-www.squirrelsresearch.com

SMRH:4834-5381-6317.3

**Schedule 6.2(e)**

**Third Party Consents**

None known at this time.

SMRH:4834-5381-6317.3

**EXHIBIT B**

DIP Loan Documents

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (**"Agreement"**), dated as of November 22, 2021, is between The Midwest Data Company LLC, an Ohio limited liability company ("**Borrower**"), and Instantiation LLC, a Delaware limited liability company ("**Lender**"). Lender and Borrower are referred to herein individually as a "**Party**" and, collectively, as the "**Parties**".

## RECITALS

**WHEREAS**, Borrower and Squirrels Research Labs LLC ("**SQRL**") intend to commence a voluntary petition for relief (the "**Bankruptcy Case**") under subchapter V (§§ 1181-1195) of chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Norther District of Ohio, Canton Division (the "**Bankruptcy Court**");

**WHEREAS**, upon filing the Bankrtupcy Case, Borrower will (a) become a debtor-in-possession under title 11 of the Bankruptcy Code, and (b) require post-petition financing, without which it will suffer immediate and irreparable harm, for additional working capital to fund its operations;

**WHEREAS**, Lender is willing to advance a loan not to exceed a maximum principal amount of $350,000 to Borrower pursuant to the terms of this Agreement and the other Loan Documents (the "**DIP Loan**");

**WHEREAS**, any Advances made under this Agreement shall be evidenced by a promissory note of even date herewith made by Borrower in favor of Lender in the original principal amount of $350,000 (as amended, restated, supplemented, modified, extended, or renewed from time to time, the "**Note**"), and such other documents, agreements, filings and instruments required by the Lender in Lender's sole and absolute discretion (collectively with this Agreement, the "**Loan Documents**");

**WHEREAS**, other than the financing pursuant to the post-petition financing proposed hereunder, Borrower has been unable to obtain additional needed unsecured credit, allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code, or sufficient secured credit secured by a junior security interest on encumbered property of the estate under § 364(c)(3) of the Bankruptcy Code, or a senior security interest on unencumbered property of the estate under § 364(c)(2), and Borrower believes that it cannot obtain credit from any other lender on terms better than those set forth in this Agreement;

**WHEREAS**, Borrower, in order to satisfy their need for post-petition financing, desires to borrow up to $350,000 and obtain Advances from Lender, which Advances shall be made pursuant to the terms of this Agreement and the other Loan Documents;

**WHEREAS**, on or about the date hereof, Borrower, SQRL, and Lender are entering into an Asset Purchase Agreement (the "**APA**") pursuant to which the Lender has agreed to acquire, and Borrower and SQRL have agreed to sell, subject to the terms and conditions of the APA, the Acquired Assets; and

**WHEREAS**, on or about the date hereof Borrower, SQRL, Avnet, Inc., a New York corporation ("**Avnet**"), and Lender are entering into an Account Settlement and Sale Support Agreement (the "**Support Agreement**").

## AGREEMENT

NOW THEREFORE, the parties enter into the following agreement:

1. <u>Recitals; Defined Terms</u>.

   1.1. The foregoing recitals are incorporated herein by reference.

   1.2. *Certain Definition*.

      1.2.1. "**Collateral**" means all of the property, assets or interests in property or assets of Borrower of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including all property of Borrower's bankruptcy estates (within the meaning of the Bankruptcy Code), including all causes of action, accounts, inventory, chattel paper, contract rights, instruments, documents, general intangibles (including all intellectual property, copyrights, deposit accounts, licensing agreements, patents, trademarks and trade names), machinery and equipment, real property, leases, cash, bank accounts and other investment property (but specifically excluding all causes of action arising under chapter 5 of the Bankruptcy Code, related state court provisions incorporated through chapter 5 of the Bankruptcy Code ("**Avoidance Claims**"), and the proceeds of Avoidance Claims) together with all proceeds, rents, products and profits of any of the foregoing.  For the avoidance of doubt, the Insurance Claims shall be deemed to constitute Collateral.

      1.2.2. "**Petition Date**" means the date on which Borrower and SQRL file the Bankrtupcy Case with the Bankrtupcy Court.

      1.2.3. Other capitalized terms used but not defined herein shall have the meanings ascribed thereto in (a) the APA or (b) the Delaware Uniform Commercial Code.

2. <u>Loan Advances</u>.

   2.1. Subject to the provisions of Section 11, Lender shall make advances (each such extension of credit being herein called an "**Advance**" and collectively, the "**Advances**") to Borrower under the DIP Loan up to the principal amount of $350,000.  Interest of 10% per annum (the "**Interest Rate**") shall be charged against Advances, calculated on the basis of a 360-day year and actual days elapsed.  Advances may be made at any time and from time to time upon no less than five Business Days prior notice; provided that Lender shall not be required to make any Advance that is less than $10,000 and the aggregate of all Advances under this Agreement shall in no event exceed $350,000.  Borrower shall repay all outstanding Advances, together with interest accrued at the Interest Rate, upon maturity of the DIP Loan.  Lender shall make available the entire principal balance of $350,000 during the term of this Agreement consistent with the Budget so long as an Event of Default has not been declared.

   2.2. There is no prepayment penalty for any payment of principal under the DIP Loan. All payments on the DIP Loan shall be applied first to accrued interest, then to any cost or expenses owed to Lender and then the remainder to the principal balance of the DIP Loan. Borrower may prepay any portion or all of the DIP Loan but may not make a partial prepayment of less than $10,000.  Amounts prepaid may not be reborrowed.

2.3. Lender shall keep a record of the payments made under this Agreement and the Note on its books which records shall be prima facie evidence of the amounts paid under this Agreement and the Note absent manifest error.

2.4. Borrower shall make all payments due to Lender in lawful money of the United States, in immediately available funds.

2.5. Whenever any payment due under this Agreement or the other Loan Documents shall fall due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be included in the computation of interest or fees, as the case may be.

2.6. Upon the occurrence of and during the continuance of an Event of Default, all amounts unpaid under this Agreement and the other Loan Documents shall bear interest at a default interest rate equal to the Interest Rate plus 5% per annum (such sum, the "**Default Rate**"). Interest shall continue to accrue at the Default Rate, and continue to be paid even after default, maturity, acceleration, the entry, recording or obtaining of a judgment against Borrower, bankruptcy or proceeding of any kind or nature.

2.7. If any term or provision of this Agreement or any other Loan Document is in conflict with applicable usury law, this Section 2.7 governs as to such term or provision, and this Agreement and the other Loan Documents remain in all other respects in full force and effect. If any transaction contemplated by this Agreement and the other Loan Documents would be usurious, the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged, or received under this Agreement and the other Loan Documents shall not exceed the maximum interest allowed by applicable law. Accordingly, if interest in excess of the legal maximum is contracted for, charged, or received: (a) this Agreement and the other Loan Documents shall be reformed automatically so that the effective rate of interest is reduced to the maximum rate of interest permitted by applicable law, (b) for the purpose of determining the maximum rate and to the extent permitted by applicable law, all interest contracted for, charged, or received shall be amortized, prorated, and spread throughout the full term of this Agreement and the other Loan Documents so that the effective rate of interest is uniform throughout the life of this Loan Agreement and the other Loan Documents, and (c) any excess of interest over the maximum amount allowed under applicable law shall be applied as a credit against the then unpaid principal amount of the Note.

3. <u>Loan Documents</u>. Any Advances made hereunder shall be subject to the terms of this Agreement, the Loan Documents, and any applicable order of the Bankruptcy Court approving the DIP Loan.

4. <u>Lender Records</u>. The amount of each Advance shall be recorded on the books and records of Lender, and such record shall constitute proof of such Advance, and shall be admissible in evidence on such issue.

5. <u>Borrower's Business Operations</u>. Borrower shall operate its business pursuant to the budget attached to the final DIP Order as <u>Exhibit A</u> (the "**Budget**"), and may use the Advances for the purposes described in and up to the amounts listed in the Budget (or according to deviations from the Budget expressly approved by Lender in writing) solely for the working capital and general corporate purposes of Borrower and payment of costs of administration of the Bankruptcy Case. The aggregate actual disbursements by Borrower measured on a rolling cumulative four-week basis shall be no greater than 105% of the aggregate amount of projected disbursements for such four-week period as set forth in the Budget. During the term of this Agreement, Borrower shall conduct its business in compliance with Section 5.1 of the APA.

6. <u>Reimbursement of Expenses</u>. Borrower agrees to reimburse Lender for its reasonable legal fees and expenses incurred in connection with documenting, negotiating, implementing and enforcing the DIP Loan, payable out of Advances, if elected by Lender. Alternatively, Lender may require that Borrower reimburse these sums to Lender within ten (10) Business Days following written demand for payment.

7. <u>Grant of Superpriority Administrative Expense Claim and DIP Liens</u>.

    7.1. As security for repayment of the DIP Loan, Borrower hereby grants and Lender shall have the following: (a) a superpriority administrative expense claim for Advances, pursuant to §364(c)(1) of the Bankruptcy Code ("**Superpriority Claim**") and (b) a fully perfected, first priority security interest in and lien under §364(c)(2) of the Bankruptcy Code on all Collateral. The liens granted under clause (b) herein shall be referred to as the "**DIP Liens**". Any Superpriority Claim and DIP Liens shall be subordinate only to the Carve Out. For the avoidance of doubt, the Superpriority Claim shall not be payable from proceeds of Avoidance Claims, and the DIP Liens shall not attach to the Avoidance Claims or proceeds thereof. The DIP Liens and the perfection thereof shall be effective by entry of the DIP Order and can be further evidenced and accomplished by a security agreement executed by Borrower and the filing of such UCC-1 Financing Statements and such other instruments, filings and actions as Lender determines to be necessary or appropriate in order to properly grant and perfect such security interests under applicable law and to otherwise protect Lender.

    7.2. For the avoidance of doubt, the security interest granted by this Agreement also secures future advances on the DIP Loan.

    7.3. Borrower authorizes Lender to file financing statements, financing statement addenda, continuation statements and financing statement amendments in such form and in such filing offices as Lender may require to perfect or to preserve, maintain or continue the perfection of the security interest in the Collateral and its priority. Borrower further agrees to execute and deliver to Lender, or to cooperate with Lender in obtaining from any third party, upon Lender's request, any control agreement, acknowledgment of bailment, or other document Lender may request in order to perfect or to preserve, maintain, or continue the perfection of any security interest in the Collateral granted to Lender and its priority. Borrower shall pay the out-of-pocket costs of filing any financing statement, financing statement addendum, continuation statement or termination statement as well as

any recordation or transfer tax required by law to be paid in connection with the filing or recording of any such document and such costs may, at Lender's election, be drawn from an Advance. A carbon, photographic, or other reproduction of this Agreement is sufficient as a financing statement. Borrower shall not file any amendments, correction statements or termination statements concerning the Collateral without the prior written consent of Lender.

7.4. Borrower authorizes Lender to request other secured parties of Borrower to provide such accountings, confirmations of collateral and confirmations of statements of account concerning Borrower as Lender may require. Borrower hereby appoints Lender or any officer of Lender as Borrower's attorney in fact for purposes of endorsing Borrower's name on any such requests to be delivered to other secured parties of Borrower, which power of attorney is coupled with an interest and irrevocable.

8. <u>Carve Out</u>. The DIP Liens shall be subject to the following carve out expenses (the "**Carve Out**"):

8.1. fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6);

8.2. up to an aggregate of $50,000 fees payable to the Subchapter V Trustee pursuant to 28 U.S.C. § 1183; and

8.3. up to an aggregate of $150,000 for all claims of the respective retained professionals of Borrower whose retention is approved by the Bankruptcy Court during the Bankruptcy Case pursuant to Sections 327 and 328 of the Bankruptcy Code (collectively, the "**Retained Professionals**") for fees and expenses which were incurred at any time on and after the Petition Date and before the Termination Date; provided that, in each case, such fees and expenses of the Retained Professionals are (i) expressly set forth in the Budget and (ii) ultimately allowed on a final basis by the Bankrtupcy Court under sections 328, 330 and 331 of the Bankruptcy Code (nothing herein shall waive the right of any party to object to the allowance of any such fees and expenses).

For the sake of clarity, in the event the DIP Loan is terminated, or there are insufficient funds to repay the DIP Loan in full, the Carve Out shall not be subject to recovery by the Lender.

9. <u>Subordination</u>. Notwithstanding anything herein or in any other Loan Document to the contrary, this Agreement, the other Loan Documents and the obligations of the Borrower (and the rights of the Lender) hereunder and thereunder are subordinate and junior in right of payment to the Avnet Secured Claim. Avnet, as holder of the Avnet Secured Claim, is intended to be a third party beneficiary of this Section 9. No amendment or modification of the provisions of this Section 9 shall be effective without the prior written consent of Avnet.

10. <u>Termination Date</u>. This Agreement shall terminate upon the earliest of: (a) the expiration of ten (10) Business Days following written notice from Lender to Borrower of the occurrence of any material breach by (i) Borrower of the terms of this Agreement, any other Loan Document, the APA, or the Support Agreement, including, for the avoidance of doubt, any Event of

Default, (ii) SQRL of the terms of the APA or the Support Agreement; (b) the closing of a sale of all or substantially all of the assets of Borrower and SQRL pursuant to a sale under Section 363 of the Bankruptcy Code in compliance with the terms of the APA; (c) the effective date of a confirmation of Borrower's plan of reorganization in connection with the Bankrtupcy Case; (d) the conversion of Borrower's bankruptcy case from a case under subchapter V of Chapter 11 to a case under Chapter 7 of the Bankruptcy Code; (e) the dismissal of Borrower's bankruptcy case, (f) appointment of a Chapter 11 trustee in Borrower's case, or (g) February 28, 2022 (the earliest such event or date, referred to herein as the "**Termination Date**").

11. <u>Effect of Termination</u>. If this Agreement is terminated pursuant to Section 10, except upon the effective date of a confirmed plan of reorganization, Lender shall have a right to seek relief from the automatic stay on shortened notice, with a hearing on such relief to be held with fourteen (14) Business Days' notice from the Lender to Borrower seeking such relief. In addition, if this Agreement is terminated pursuant to Section 10, (i) Lender shall automatically have no further obligation to Borrower other than in connection with the subordination of its lien and priority claim to the Carve-Out if not previously funded, (ii) any Advances then outstanding shall be immediately due and payable upon Lender's written notice that such termination has occurred, (iii) and, except as otherwise provided in this Agreement, Lender shall be permitted to pursue any and all available rights and remedies against Borrower and the Collateral.

12. <u>Conditions to Advances under this Agreement</u>. Each Advance by Lender to Borrower under this Agreement and the Note shall be subject to the following conditions precedent:

   12.1.    The DIP Financing Order (as such term is defined in the Support Agreement), in form and substance satisfactory to Lender in respect of the approval of the DIP Loan and creation of the court-ordered super priority claims and security interests provided for herein shall have been made by the Bankruptcy Court.

   12.2.    No Event of Default shall have occurred or be continuing.

   12.3.    The Termination Date shall not have occurred.

   12.4.    Execution, delivery, and continued effectiveness of the APA and all Loan Documents.

13. <u>Binding Effect</u>. This Agreement shall be binding upon Borrower and Lender, their respective successors, assigns and heirs, including any subsequent trustee for Borrower in reorganization or otherwise, and shall inure to the benefit of Borrower, Lender and their respective successors, assigns and heirs except that Borrower may not assign or transfer their rights hereunder without the express prior written consent of the Lender, which may be granted or withheld in the sole discretion of the Lender. The terms of this Agreement and the other Loan Documents shall be valid and enforceable obligations of Borrower jointly and severally, and all such obligations and the security interests, liens, rights and privileges granted to Lender survive the termination of this Agreement, the appointment of a trustee for Borrower in reorganization or otherwise, conversion of the bankruptcy cases to cases under Chapter 7, and the confirmation of a

subchapter V of Chapter 11 plan of reorganization. If any or all of the provisions of this Agreement are hereafter modified, vacated, or stayed by subsequent agreement, such action shall not affect the priority, validity, enforceability or effectiveness of any lien, security interest, priority or claim agreed to herein with respect to the obligation arising in the Loan Documents incurred by Borrower prior to the effective date of such subsequent agreement.

14. <u>Reasonableness of Terms</u>. The terms of the DIP Loan are fair and reasonable, were negotiated by the Parties at arm's length and in good faith, and are the best terms available to Borrower under present market conditions and Borrower's financial circumstances. Any credit extended under the DIP Loan by Lender is extended in good faith, as that term is used in Section 364(e) of the Bankruptcy Code.

15. <u>Representations and Warranties</u>. It is acknowledged that each Party has read this Agreement, the other Loan Documents, and the APA and has consulted counsel, or knowingly chose not to consult counsel, before executing the same; each Party has relied upon their own judgment and/or that of their counsel in executing this Agreement, the other Loan Documents, and the APA, and has not relied on or been induced by any representation, statement or act by any party that is not referred to in this Agreement, the other Loan Documents, or the APA; each Party enters into this Agreement, the other Loan Documents, and the APA voluntarily, with full knowledge of its significance; and this Agreement is in all respects complete and final. Borrower represents and warrants to the Lender that: it is a limited liability company duly incorporated, organized and validly existing under the laws of its jurisdiction of incorporation; it has all requisite power and authority to enter into and perform its obligations hereunder; and its execution and delivery of this Agreement, the other Loan Documents, and the APA, and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary action.

16. <u>Covenants by Borrower</u>. Borrower covenants and agrees that:

16.1.    it shall comply with all laws, rules, regulations and orders applicable to it and its assets except as prohibited under the Bankruptcy Code or other applicable laws;

16.2.    it shall maintain in good standing at all times all insurance coverage as is customarily carried by companies which are engaged in the same or similar business to the business of Borrower or as may be reasonably required by the Lender;

16.3.    it shall not seek or consent to any plan of reorganization or liquidation or any plan of arrangement without the express prior written consent of Lender;

16.4.    it shall not incur any senior indebtedness other than as expressly permitted by the Lender in writing;

16.5.    it shall not merge, amalgamate, consolidate, reorganize, or sell any assets or license any technology outside of the ordinary course of business, unless expressly permitted in writing by the Lender or approved by the Bankruptcy Court; and

16.6.     it shall permit the Lender, its representatives and agents, to have access, during normal business hours and subject to reasonable time, to its books, records, property and premises.

17. <u>Reporting Covenants</u>. Borrower shall deliver to the Lender by 5:00 p.m. (PT) on Tuesday of each week starting with the first Tuesday following the date of this Agreement:

17.1.     line-by-line variance reports (in form and scope reasonably acceptable to the Lender) by week for the immediately preceding weekly period and on a cumulative basis from the beginning of the Budget period comparing actual cash disbursements to cash disbursements forecasted in the Budget for such period on a line-by-line basis.   The variance report will include explanations of any variances of 5% or greater;

17.2.     written update on the progress of and efforts of Borrower's activities related to the sale of the Acquired Assets and Borrower's and SQRL's compliance with the term of the APA, including, but not limited to a listing of parties to be contacted, those contacted, who has expressed interest, which ones have executed a non-disclosure agreement, what materials were sent to each party and next steps in the process and data room usage reports;

17.3.     prompt notice of any breach of covenant or other obligation of Borrower under or in connection with this DIP Loan (including, for the avoidance of doubt, any breach of the terms of the Loan Documents or the APA by Borrower, SQRL, or any of their respective Affiliates);

17.4.     promptly, upon receipt, copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of Borrower with the Bankruptcy Court; and

17.5.     such further reports and information as Lender may reasonably request from time to time.

18. <u>Events of Default</u>. The occurrence of any one or more of the following events shall constitute an Event of Default which can be declared by Lender in writing:

18.1.     The non-payment by Borrower or SQRL of any costs, or any other amount due under this Agreement, the other Loan Documents, or the APA, or the failure or Borrower or SQRL to perform as required under the Loan Documents or the APA (whether monetary or non-monetary in nature), in each case, to the extent such non-payment or non-performance is not cured by Borrower and/or SQRL within two (2) Business Days' notice thereof;

18.2.     Any expenditures in excess of the amount allocated to such item under the Budget;

18.3.     The entry of any Bankruptcy Court order that adversely affects the DIP Loan or Lender's rights, remedies, liens, priorities, benefits and protections under any or all of the Bankruptcy Court orders or the DIP Loan.   In the event of a dispute regarding the

materiality of the adverse effect of such order, the Bankruptcy Court shall determine the dispute through a motion and an adversary proceeding will not be required.

Upon the occurrence of an Event of Default and at all times after the Termination Date, any right of Borrower to receive any Advance or other extension of credit from the Lender shall be immediately terminated, and further Advances or extensions of credit (if any) made thereafter shall be in the sole and absolute discretion of Lender. Upon the occurrence of an Event of Default amounts owed by Borrower to the Lender shall become immediately due and payable, and Lender shall have the right to exercise all remedies under applicable law, including, without limitation, the right to realize on all Collateral.

19. <u>Indemnification</u>. Borrower shall indemnify, defend with counsel acceptable to Lender and hold harmless Lender, its affiliates and its officers, directors, managers, members, employees, agents, attorneys and advisors (each, an "**Indemnified Person**") from and against any and all suits, actions, proceedings, orders, claims, damages, losses, liabilities and expenses (including legal fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as a result of or in connection with credit having been extended, suspended or terminated under or in relation to the DIP Loan, or the use of the proceeds thereof, and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and any actions or failures to act in connection therewith, including the taking of any enforcement action by Lender and its representatives, and including any and all environmental liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties hereto, except to the extent that the suit, action, proceedings, orders, claims, damages, losses, liabilities and expenses arose directly from the gross negligence or willful misconduct of the Indemnified Person or breach of this Agreement by the Indemnified Person. All such indemnified amounts, if not immediately paid by Borrower upon demand, shall be secured by the Collateral.

20. <u>Amendment of Agreement</u>. This Agreement shall not be amended except by a writing signed by all Parties.

21. <u>Governing Law; Waiver of Jury Trial</u>. Section 9.14 of the APA is incorporated herein *mutatis mutandis*.

22. <u>Entire Agreement</u>. This Agreement (together with the other Loan Documents and the APA) sets forth the entire agreement between the Parties, and there are no other agreements or understandings between them related to the subject matter hereof and thereof.

23. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but such counterparts shall together constitute one and the same agreement. Execution and delivery of this Agreement by electronic exchange bearing the copies of a Party's signature shall constitute a valid and binding execution and delivery of this Agreement by such party. Delivery of an executed counterpart of the signature page to this Agreement by email, facsimile, portable document format (pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (including DocuSign) shall be

as effective as delivery of a manually executed counterpart of this Agreement. Such electronic copies shall constitute enforceable original documents.

24. <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), one Business Day after delivery to such courier; (c) if otherwise actually personally delivered, when delivered; (d) if delivered by electronic mail before 5:00 p.m. (local time at the location of recipient) on a Business Day, when transmitted and receipt is confirmed; and (e) if delivered by electronic mail after 5:00 p.m. (local time at the location of recipient), when transmitted and receipt is confirmed, at 9:00 a.m. (local time at the location of recipient) on the following Business Day, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

<div style="margin-left: 2em;">

If to Borrower:  The Midwest Data Company LLC
121 Wilbur Drive NE
North Canton, OH 44720
Attention:  David Stanfill, President
Email:  david@squirrelsresearch.com

with a copy (which shall not constitute notice pursuant to this Section 24) to:

Brouse McDowell, a Legal Professional Association
388 S. Main Street, Suite 500
Akron, OH 44311
Attention:  Marc B. Merklin
Email:  MMerklin@brouse.com

If to Lender:  Instantiation LLC
434 Dorado Beach E
Dorado, Puerto Rico 00646
Attention:  Sam Cassatt
Email:  sam@aligned.capital

with a copy (which shall not constitute notice pursuant to this Section 24) to:

Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center
17th Floor
San Francisco, California 94111
Attention:  Jason R. Schendel and Jeannie Kim
Email:  jschendel@sheppardmullin.com
jekim@sheppardmullin.com

</div>

25. <u>Bankrtupcy Approvals</u>.  This Agreement is subject to Bankruptcy Court approval, upon notice and hearing as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of Bankruptcy Procedure of the Bankruptcy Court.

26. <u>Headings</u>.  Paragraph headings in this Agreement are included herein for convenience of reference only, and shall not constitute a part of this Agreement for any other purpose.

27. <u>Lender's Approvals</u>.  Unless expressly stated to the contrary in this Agreement or the other Loan Documents, any and all matters pertaining to this loan or the making or administration thereof which require Lender's approval, consent, discretion and/or determination shall be subject to Lender's determination in its sole and absolute discretion.

*[Signatures on following page]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

BORROWER:                                 LENDER

THE MIDWEST DATA COMPANY LLC     INSTANTIATION LLC


By: _____          By: _____
Name:                                      Name: Sam Cassatt
Title:                                       Title: Managing Member

[Signature Page to Loan and Security Agreement]

PROMISSORY NOTE

Canton, Ohio

Principal Amount: $ _____                                      _____, 2021

FOR VALUE RECEIVED, the undersigned, The Midwest Data Company, LLC, an Ohio limited liability company ("Borrower"), hereby, jointly and severally, promises to pay to Instantiation LLC, a Delaware limited liability company (together with any successors and/or assigns, "Lender"), the principal amount of _____ and __/100 Dollars ($_____) or, if less, the aggregate unpaid principal amount of Advances (as defined in the Loan Agreement) of Lender to Borrower, payable at such times and in such amounts as are specified in the Loan Agreement.

The Borrower promises to pay interest on the unpaid principal amount of the Advances represented by this Note from the date made until such principal amount is paid in full, payable at such times and at such interest rates as are specified in the Loan Agreement. Demand, diligence, presentment, protest and notice of non-payment and protest are hereby waived by Borrower, for itself and its successors and assigns.

Both principal and interest are payable in United States dollars in immediately available funds to the Lender, at the Lender's address set forth in the Loan Agreement or as otherwise directed by the Lender to the Borrower from time to time.

This Note is one of the Notes referred to in, and is entitled to the benefits of, the Loan and Security Agreement, dated as of November 22, 2021 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), between Borrower and Lender.  This Note is also entitled to the benefits of the other Loan Documents and the security provided for thereby or referred to therein. Capitalized terms used herein without definition are used as defined in the Loan Agreement.

The Loan Agreement, among other things, (a) provides for the Advances made by Lender to Borrower to be evidenced by this Note, (b) contains provisions for acceleration of the maturity of the unpaid balance of the principal amount of the Advances evidenced by this Note, together with all accrued and unpaid interest and premium thereon and any costs, expenses, fees or similar amounts owing, in the manner, upon the conditions and with the effect provided in the Loan Agreement and the other Loan Documents upon the happening of certain stated events and (c) provides for prepayments on account of the principal hereof prior to the maturity of the Advances evidenced by this Note upon the terms and conditions specified in the Loan Agreement.

This Note is a Loan Document, is entitled to the benefits of the Loan Documents and is subject to certain provisions of the Loan Agreement, including Section 21 (Governing Law; Waiver of Jury Trial) thereof.

This Note is a registered obligation, transferable only pursuant to the terms of the Credit Agreement, and no assignment hereof shall be effective until recorded therein.

Section 9.14 of the APA is incorporated herein *mutatis mutandis*.

1

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place set forth above.

THE MIDWEST DATA COMPANY LLC

By: _____
Name:
Title:

[DIP PROMISSORY NOTE SIGNATURE PAGE]