Exhibit 1 to Objection

2004 EXAM

SQUIRRELS RESEARCH LABS,)
LLC, )
 )
Plaintiff, )
 )
vs. ) Case No. 21-61491
 )
DEBTOR, )
 )
Defendant. )

FILED 2024 JUN 27 PM 4:43

\- - - - -

THE 2004 EXAM OF SQUIRRELS RESEARCH LABS, LLC
DAVID STANFILL
THURSDAY, MARCH 2, 2022

\- - - - -

The 2004 Exam of SQUIRRELS RESEARCH LABS, LLC, through its representative, DAVID STANFILL, called by the Plaintiff for examination pursuant to the applicable rules, taken before me, the undersigned, Aimee N. Szinte, Notary Public within and for the State of Ohio, taken remotely via Zoom, commencing at 1:30 p.m. the day and date above set forth.

APPEARANCES:

On behalf of the Plaintiff:

Scott Heasley, Esq.
Meyers Roman Friedberg & Lewis
28601 Chagrin Boulevard
Suite 600
Woodmere, Ohio 44122
Sheasley@meyersroman.com

On behalf of the Defendant:

Julie Zurn, Esq.
Brouse McDowell
600 Superior Avenue East
Suite 1600
Cleveland, Ohio 44114
Jzurn@brouse.com

-----

DAVID STANFILL 2004 EXAM INDEX

| EXAMINATION BY: | | PAGE NO. |
|---|---|---|
| MR. HEASLEY | ................. | 4 |

| EXHIBIT | MARKED |
|---|---|
| Exhibit 1 | 29 |
| Exhibit 3 | 24 |
| Exhibit 4 | 80 |
| Exhibit 9 | 99 |
| Exhibit 11 | 125 |
| Exhibit 12 | 131 |
| Exhibit 13 | 131 |
| Exhibit 14 | 112 |
| Exhibit 16 | 110 |
| Exhibit 22 | 114 |

DAVID STANFILL, of lawful age, called by the Plaintiff for examination pursuant to the Applicable Rules of Civil Procedure, having been first duly sworn, as hereinafter certified, was examined and testified as follows:

2004 EXAMINATION OF DAVID STANFILL

BY-MR.HEASLEY:

Q Good afternoon, Mr. Stanfill. My name is Scott Heasley. I represent Torea Consulting in this matter.

I'm going to ask you a series of questions today. I will state on the record we are recording this via Zoom and I actually figured out a setting where it will only be recorded on my computer and not on the Zoom cloud, so that will give us some extra security.

So Mr. Stanfill, have you ever been deposed before?

A Yes.

MS. ZURN: Mr. He's Heasley, may I interrupt for one minute to clarify. We're here pursuant to a 134 motion and he's here in his capacity as Defendant representative.

MR. HEASLEY: Yes. Thank you for

that.

Q How many times have you been deposed, sir?

A I'm not sure of the exact, but individually in domestic matters.

Q Do you know when the last time you were deposed was?

A It has been several years.

MS. ZURN: Unless you were counting the 341 meeting.

MR. HEASLEY: That's what I was going to ask.

MS. ZURN: Well, I think he views that as a term of art in some ways.

MR. HEASLEY: Right. So I was going to clarify that.

Q So I'm going to go over some ground rules because Aimee, the court reporter, is going to be taking down everything we say today. So the first thing we have to do is answer out loud or if you could please answer out loud.

You understand?

A Yes.

Q Because we can see each other on this nice Zoom, but obviously if we shake our heads, Aimee would probably make some notation about

that.

So, in addition, we also have to take turns speaking. So I will ask you a series of questions and you may anticipate my question and start to answer it, but if you could let me finish the question, that would be helpful to Aimee and me as well. Okay?

A Yes.

Q Same thing goes for your answers. I will do my best to not cut in on your responses. It may occur just because of the Zoom medium here, so.

I'm going to ask you a series of questions today and will you please let me know if you do not understand one of my questions?

A Yes, I will.

Q Thank you for that. Because, otherwise, when we review this deposition transcript at a later date, everyone is going to assume that you understood my question and you're answering that question.

Does that make sense?

A It does.

Q Another rule is that we can take breaks whenever you would like to take a break. The only rule with that is you would have to answer

my last question prior to taking that break.

Does that make sense?

A Yes.

Q Is there anything today that would impede your ability to understand my questions and answer them truthfully?

A No. Not that I'm aware of.

Q And you here for a corporate representative of Squirrels, I'll call it?

MS. ZURN: Well, let's be clear about which entity he's here on behalf of.

MR. HEASLEY: Sure. So I was getting to go that, Julie.

Q Are you here as a corporate representative of Squirrel? Yes or no?

A No, I'm not.

Q Are you here as a corporate representative of Midwest?

MS. ZURN: I don't know what you're referring to when you say Midwest. Are you referring to the Midwest Data Company?

MR. HEASLEY: Yes.

A I am here as a representative of the Midwest Data Company, yes.

MR. HEASLEY: And Julie, is a

Squirrel Research Laboratory corporate representative forthcoming or no?

MS. ZURN: Mr. Stanfill is here on behalf of Squirrels Research Labs, LLC, if that is the entity that you intended to inquire today.

Q Okay. So you are here as both the corporate representative of Midwest Data Company, LLC and Squirrels Research Laboratory?

MS. ZURN: No. Squirrels Research Labs, LLC, Mr. Heasley.

MR. HEASLEY: Okay.

Q So Mr. Stanfill, when I say Squirrels, I mean Squirrels Research Labs, LLC. Okay?

A I acknowledge your short notation.

Q And when I say Midwest, I will mean Midwest Data Company, LLC. Okay?

A Yes.

Q What did you do prepare for your 2004 Exam today?

A Nothing other than sorting the documents, exhibits that you've referenced.

Q You didn't review any other documents prior to receiving my exhibits today?

A Nothing explicit in preparation for this

meeting.

Q Other than your attorneys, did you talk to anyone about the 2004 Exam today?

A Other than the existence of the exam, no.

Q Who did you speak to about the existence of the exam?

A My wife and certainly some of my business colleagues who needed to know my schedule as they were trying to schedule other things today.

Q So let's go through some background information.

Could you please stale and spell your full name?

A Yes. My name is David Stanfill. D A V I D, Stanfill is S T A N F I L L.

Q So Mr. Stanfill, I'm going to let you know, so on my Zoom screen you are to the left of me, so if I'm looking off to the left, it's because your face is over there. I'm not trying to give you the stink eye. I'll just put that out there.

What's your current home address?

A 772 Treat Boulevard, B L V D, in Tallmadge, Ohio, T A L L M A D G E, 44278.

Page 10

Q What's your current business address?
A You'll have to be more specific.
MS. ZURN: Objection.
Q Okay. Well, do you go to an office on a day-to-day basis?
A I go to multiple different locations depending on the day.
Q Okay. Which locations do you go to?
MS. ZURN: Objection.
Q You can answer.
A It will depend on which business I am representing on that day and what is on my calendar and agenda.
Q For Midwest, where do you go for Midwest?
A For Midwest currently I primarily work from home.
Q What about Squirrels?
A At present for Squirrels Research Labs I also primarily work from home, although I have gone to -- prior to the lease assignment to the buyer in the I believe 363 sale, I would go to the primary Squirrels Research Labs location at 8050 Freedom Avenue.
Q What's your highest level of education?
A I have a Bachelor's degree.

Page 11

Q When and where did you receive that?
A Kent State University around 2008.
Q Did you have a major?
A Computer science.
Q Do you hold any advanced degrees?
A I do not.
Q Have you ever studied to obtain an advanced degree?
A Yes. I did some preliminary work on my Master's.
Q When and where was that?
A I did some preliminary work at Kent State University and I took some online courses at MIT.
Q Can you repeat that acronym again, the second one? You said Kent State University and where else?
A I took some online courses that were offered through MIT.
Q Do you hold any certificates related to your profession?
A Not that I recall.
Q Where are you currently employed?
A I'm currently employed by Squirrels Research Labs. Or sorry. I have incorrectly answered that. I'm currently employed by Squirrels, LLC.
Q Any other companies?
A No. That is the only company I'm currently employed by.

Page 12

Q What is your job title for Squirrels, LLC?
A I am the CTO at present.
Q How long have you worked at Squirrels, LLC?
A Since its formation in 2012.
Q What are your job duties?
A Primarily to work on the strategy and advise the engineering team for the software that they produce there.
Q Prior to working at Squirrels, LLC, have you worked at any other companies?
A Yes.
Q What company or companies did you work for immediately prior to or during the time you've worked at Squirrels, LLC?
MS. ZURN: Mr. Heasley, I'm going to object because Mr. Stanfill is here in his capacity as the Debtor representative, so I'm not sure how much further into Mr. Stanfill's background you need to go in order to qualify him to opine about the state of the Debtor's finances and records.

Page 13

Q Can you please answer my question, Mr. Stanfill?
A For the sake of answering the question, prior to Squirrels, LLC I worked at Napkin Studio, LLC which was later acquired by Squirrels, LLC or merged into it. And during my tenure of working at Squirrels, LLC I was also employed directly by Squirrels Research Labs.
Q What did you do at Squirrels Research Labs?
A I was the CEO.
Q What were your job duties?
A I was an engineering focused CEO, so primarily directing the design and engineering development of the hardware and related software to support that hardware that Squirrels Research Labs made and sold.
Q Had you ever worked at Midwest?
A Not as an employee.
Q Have you done any work for Midwest as a non-employee, like a contractor?
A I have never done any compensated work for Midwest. I work as an -- or I held the role of CEO in Midwest as an uncompensated officer and owner.

Page 14

Q What job duties did you have as the uncompensated CEO of Midwest?
A I was responsible for overseeing the general business of Midwest's posting operation.
Q Are you familiar with the messaging application called Discord?
A Yes, I am.
Q What is Discord?
A As far as I know, it's a text chat and messaging application.
Q I'm sorry. What kind of messaging application?
A A text chat and messaging application.
Q And do you use Discord to send messages?
MS. ZURN: Objection.
Q You can answer.
A I have used and have a Discord account, yes.
Q How many different user names did you have on Discord?
MS. ZURN: Objection. Again, Mr. Stanfill is only going to answer with respect to his role as the Debtor representative.
MR. HEASLEY: Okay.
Q Can you please answer my question?
A Within the scope of Ms. Zurn's objection, I

Page 15

have one prior user name. I have had at least one other user name that I used explicitly to watch messages on channels where I didn't want my presence to be known.
Q How did you do that?
A Because you can see on Discord if someone joins a certain group or channel and there are various protocols and other things that we would develop for that we didn't necessarily want to know myself or parties associated with miners were paying attention to their protocols.
Q Was your user name on Discord GPD Hoarder?
A It was not.
Q What was your user name on Discord?
A GPU Hoarder would have been.
Q So I will tell you this. I'm having issues with my speaker on my computer, so that's why I'm leaning forward so much. Can you go slowly through that each letter. G what?
A G P U, H O A R D E R.
Q Very good. I was off by a letter. Sorry about that everybody.
So how long did you use Discord?
MS. ZURN: Objection.

Page 16

Q You can answer.
A Approximately four years.
Q Why do you use that app?
A It seemed to be where a lot of people that were interested in the same sort of technical things I was interested in were having conversations.
Q Would you talk about cryptocurrency on Discord?
A Yes.
Q Did you negotiate transactions related to cryptocurrency on Discord?
MS. ZURN: Objection. Are you asking him if he's -- are you asking whether he was engaging in cryptocurrency transactions on behalf of Squirrels Research Labs, LLC or the Midwest Data Company, LLC or if he was doing so personally? Because if you're inquiring as to what he was doing personally, that's beyond the scope of today's deposition.
MR. HEASLEY: Well, I'll ask my questions, you can object and we'll make a note of that.
Q So let's start with Squirrels. Have you negotiated transactions on behalf of Squirrels on Discord? Yes or no?
A Yes. I have negotiated transactions on behalf

Page 17

of Squirrels Research Labs on Discord.
Q Have you negotiated transactions on Discord on behalf of Midwest?
A I don't recall. That would not have been commonplace.
Q Have you completed transactions personally on Discord?
MS. ZURN: Objection. And this one I'm directing him not to answer as it is beyond the scope of a 2004 Examination for the finances and records of the Debtor. He is not here on a personal basis. If that's how you want to depose him, then he has the right to have personal counsel present.
MR. HEASLEY: Okay. I'll research time so we can address that with the Judge if necessary. I'll just ask for another one. If you're going to play these games, that's fine.
Q Can you fell me a little bit about what Midwest does?
A It hosts crypto and data processing equipment and cryptocurrency mining equipment for any party that needs a third-party to host it for them because they cannot --

Page 18

Q When did the company start -- I'm sorry. I cut you off. Go ahead.
A No problem. I was following you.
Because they cannot or because they do not want to host it for themselves.
Q Thank you. Sorry. Let's reboot.
When did Midwest start, sir?
A I believe that it was started in fall of 2019.
Q What is the most amount of employees Midwest ever had, if that question makes any sense?
A Midwest did not have any direct employees.
Q So did anyone perform work for Midwest; subcontractors, agents, anything like that?
A Employees of Squirrels Research Labs did work for Midwest.
Q Do you know approximately how many Squirrels Research Labs employees did work for Midwest?
A It would vary significantly over time.
Q Do you have any idea the greatest number of employees, 10, 15, 20 when things were really churning?
A There may have been 20 people actively doing something related to Midwest in the most active period.
Q Okay. And I think you mentioned you were the

Page 19

President and CEO of Midwest, right?
A Yes.
Q Were there any other officers or executives of Midwest?
A I don't directly recall details, but yes, I believe in the Operating Agreement there would have been officers.
Q And what are the names of those officers? Do you recall any of them?
A The active officer would have been Jessica Gritzan in a COO role.
Q So when I asked you about what Midwest does, you said that they host equipment for various third-parties, right?
A Yes.
Q Did Midwest have any kind of system or list in place of the various equipment it was storing for third-parties?
A To my knowledge there was a spreadsheet that I believe has been provided to your client or you which is where this information was generally kept.
Q So when you say equipment; computer servers, computers? What kind of equipment was being stored by Midwest?

Page 20

A Primarily Midwest hosted -- you used the term stored. I'm going to rephrase that. Hosted products that had been sold by SQRL, and that primarily was FPGA based accelerator boards, sometimes the server chassis that they were built up into, sometimes just accelerator boards or stand-alone systems.
MR. HEASLEY: If we can take a break for five minutes, I'm having significant problems with my speaker still, so if we can take a break. I know we're just getting started. If you bear with me for a minute, I'll be right back. Okay?
Off the record.
(Recess taken.)
MR. HEASLEY: Back on the record. Thanks for your patience, everyone.
Q So we were talking a little bit about Midwest and the type of equipment it hosts. That's the term of art you used before we took the break?
A Yes. I would use the term hosting and that would be, as you said, the term of art. Other terms would be co-location would be an industry term that would describe it.
Q In terms of the square footage at Midwest, I'm

Page 21

trying to get a feel for how much of this equipment you hosted. Do you know about how many square feet of hosting space you had?
A It's hard to say exactly how many square feet how it was encompassed, because I will give you some small elaboration here that we hosted multiple kind of equipment with different cooling systems, some air cooled, some liquid cooled, and those required different areas and support infrastructure, and that space was essentially sublet from Squirrels Research Labs.
There was and is an explicit lease at one point where Midwest Data Company leased space directly. That's certainly a document we could provide that would have the square footage of what its direct space leasing would be. It was around 10,000 square feet.
Q Okay. So Squirrels Research Labs, what did that company do?
A Squirrels Research Labs designed, marketed and sold hardware, so circuit boards for high performance computing. Data center accelerators are the primary customer from the cryptocurrency mining market.

Q When did Squirrels Research Labs start?
A It was formed in May of 2018.
Q So Midwest hosted equipment. Squirrels Research Labs designed equipment hardware?
A Yes. Designed and manufactured, if I left that out.
Q And did Squirrels also mine and trade in cryptocurrency?
A Squirrels Research Labs mined cryptocurrency in certain situations and did not regularly -- I'll clarify the answer to trading cryptocurrency. Squirrels Research Labs traded cryptocurrency to almost exclusively, there maybe some small exceptions, to US dollars for the sake of converting it into a normal business currency.
Q What about mining cryptocurrency?
A Squirrels Research Labs in the course of its existence mined cryptocurrency at various times pursuant to various agreements it had.
Q Do you know about how many mining agreements you had?
A I don't recall the exact amount, but I will answer that the primary cryptocurrency mining was with just one or two large I guess you

could term them profit sharing agreements.
Q And who were those profit sharing agreements with?
A There was one profit sharing agreement with a group called JS Mining and there were other profit sharing agreements with other customers, the business names of which I don't fully recall right at this moment.
Q When did Squirrels start mining cryptocurrency?
MS. ZURN: Objection.
A Squirrels Research Labs initially mined cryptocurrency at its formation with GPUs.
Q Who was in charge of supervising Squirrels mining of cryptocurrency?
A I wouldn't say anyone was explicitly in charge of it. There were different teams that worked different parts of it. At formation I was in charge of it.
Q Anyone else that you would know that would know a lot about Squirrels mining of crypto besides you?
A Daniel Mezzazaras would be the party that operated, managed in the past, Richard, I don't recall his last name, had been involved in managing some cryptocurrency mining prior to

his leaving the company.
Q Was there a gentleman named Greg involved with the cryptocurrency?
MS. ZURN: Objection. You can answer if you understand the question.
A No. Not involved in the currency. The currency mining.
Q So was there an employee or agent for Squirrels or Midwest whose first name was Greg?
A There was a contractor named Greg.
Q What is Greg's last name?
A Palmeda, I believe.
Q Do you know what state he currently resides in?
A To the best of my knowledge, Texas.
Q So what were Greg's job duties as a contractor -- well, first of all, let's ask this. Which one of the entities that you're representing today did he work as a contractor for?
A He worked as a contractor for Squirrels Research Labs. His work may have occasionally benefited Midwest Data Company, but he worked primarily as a contractor for Squirrels Research Labs.
Q What work did he do?
A He came up from Texas and assisted us with

building the physical infrastructure for operating the cryptocurrency mining equipment that was utilized by both Squirrels Research Labs and the Midwest Data Company.
Q Tell me what you mean by physical infrastructure. Was he building shelves and things in layman's terms?
A Shelves, electrical wiring, running physical cables, network cables, liquid cooling systems, welding, a lot of welding. That was his main responsibility was stainless steel welding for manifolds, fixtures, cooling systems associated with our liquid cooling infrastructure.
Q Do you know a gentleman named Michael Maranda?
A I do, yes.
Q Who is Michael Maranda?
A Michael Maranda was a customer and later became a shareholder in Squirrels Research Labs.
Q Have you met Michael Maranda in person?
A I have, yes.
Q Well, tell me a little bit about your first meeting. Was the first meeting in person or online?
A My first meeting was via telephone.
Q When was that?

Page 26

A This would have been in March of 2021, immediately pre-pandemic.
MS. ZURN: Mr. Heasley, could you identify -- could you ask your question again? I think that Mr. -- I think there was an audio difficulty.
MR. HEASLEY: Oh, sure. No problem.
Q So I wanted to know when you first connected with Michael Maranda on the telephone, you mentioned. Do you know generally when that was?
A I believe this was in March of 2021.
Q And how did that telephone call come about?
A We were working on a -- the terms of a deal with Avnet. And as part of the terms of that deal, we needed to purchase a certain amount of chips, microchips from Avnet as a supplier, and a third-party suggested that I talk to Mr. Maranda who might have interest in purchasing some portion of the minimum order quantity.
Q So your audio cut out on me, but I think I understood. So maybe I can ask -- so you wanted to buy some microchips from Avnet I

Page 27

think you said, right?
A Yes. Well, I will be more clear. We were negotiating an agreement with Avnet. Part of the terms of that agreement required us to buy a certain minimum order quantity of Xilinx, FPGA chips to be more explicit, and I was put in touch with Mr. Maranda by a colleague as a potential party who may purchase some of that minimum order quantity to help us reach that quantity.
Q And did you wind up following through on that plan?
A We did end up reaching that order quantity, yes.
Q Okay. We'll get back to Mr. Maranda here in a little bit. I just wanted to touch base to start.
So as I mentioned, my client is Torea Consulting, T O R E A. The company is run by a gentleman named Paul Billinger. Do you know him?
A I don't know him deeply personally, but I know who he is, yeah.
Q Did you connect with Paul on Discord?
A I've certainly had some Discord conversations

Page 28

with Paul, yes.
Q Do you know when your correspondence with Paul started on Discord?
A I don't know the first time I talked to him. No, I don't.
Q Do you recall the circumstances under which you connected with Paul?
A I don't recall the circumstances of our first conversation, no.
Q Do you recall generally what business dealings Squirrels Research Labs had with Torea?
A I know that he was a customer of Squirrels Research Labs hardware and that he had some part in their operation at Squirrels Research Labs.
Q Very good.
And do you know how much hardware Torea purchased from Squirrels?
A I don't personally know the exact total amount purchased. I know he had purchased hardware and also sold hardware that we shipped out on his behalf. And because of these matters, I'm aware of the 267 number as being a material number of what he was believed to have had.
Q So it would have been 267 cryptocurrency mining

Page 29

cards, right?
A Yes.
- - - - -
(Plaintiff's Exhibit 1 was marked.)
- - - - -
Q Okay. I'm going to show you -- well, I'll display on my screen once I share it here, Exhibit 1. I don't know if you have that in front of you. You can look at it up there or up there, whatever you would like.
A I will do both to save my vision here.
Q Fair enough. So I'll be zooming in too.
So I know I just sent this to you today, but do you recognize this as a Squirrels Research Labs invoice?
A Yes. I generally recognize the form and structure.
Q So this invoice is dated April 16, 2020.
Do you see that?
A Yes, I do.
Q And the amount of the invoice is $60,000.
Do you see that?
A I do, yes.
Q So I know a little bit about cryptocurrency, but not nearly as much as you. So the

Page 30

description of the I think equipment here, what did Paul Billinger purchase from Squirrels?
A He purchased -- according to this invoice he purchased five Forest Kitten complete mining boxes, which would have been a small, low cost host box with five of the SQRL Forest Kitten mining cores or accelerators, as I tend to call them, in it. And it looks like he purchased 30 of those boxes, if I could read that correctly.
Q You said you would call them cores or accelerators; is that the term you just used?
A I generally used the term accelerators.
Q And is that what lay people like me would call cards or is that not a card?
A I suspect most people would call them cords or cards or something of that nature.
Q So this was on April 16 of 2020. Do you believe this could have been maybe toward the beginning of your interactions with Paul or Paul's interactions with Squirrels? Is this a decent starting date in terms of that relationship?
A It could be. I don't have any way of knowing, nor do I recall exactly what his first purchase

Page 31

from Squirrels Research Labs was or what his -- when our interaction began.
Q Was Torea or Paul one of Squirrels' larger customers in terms of hardware purchases?
A No. Not at all.
Q Was he one of the smallest ones, average? What's your take on that?
A I would say he was a medium-sized customer.
Q So there came a point in time where -- hold on one second. I'll stop sharing so we can see a little better.
Those are all the questions that I have related to Exhibit 1 for now, Mr. Stanfill.
There came a point in time when Squirrels wanted to rent Torea cards, right?
A Yes.
Q Can you tell me about that? Let me ask you some specific why.
Why did Squirrels want to rent Torea cryptocurrency cards?
A That was at the same time as the previous referenced period with Maranda where we were in the process of negotiating a deal with Avnet that required a minimum purchase or quantity of new boards. And as part of our strategy for

Page 32

achieving that minimum order quantity, we intended to offer some of our largest customers equipment that would be available immediately in order to induce purchases of additional equipment that would have some lead time.
So we intended to -- to be perfectly clear, we intended to offer them some immediate hashrate as it would be called while their equipment was built in order to help induce a sale.
Q You just used a term I'm not familiar with and I was going to ask. Thank you.
Hashrate. Explain that. What does that term mean?
A In quite literal terms, each of these boards is doing calculations. Each of those calculations you could view it as a simple -- if I ask you to multiply two numbers, you would call that one calculation. In this case the calculation is more complex, but an individual unit of calculation is called a hash. And these boards will do some number of millions or, in some cases, billions or trillions of hashes per second.
So when I refer to hashrate, it is

Page 33

referring to providing a certain number of amount of computational power usually denoted per second.
Q So I'm going to see if I can summarize the transactions you just mentioned and we'll take it step by step.
So as an initial matter you had some third-parties who had ordered hardware from Midwest. Is that an accurate first step in our process?
A I don't believe that's accurate.
Q Okay.
A You better rephrase your question.
Q Sure. That's fine.
So you said I think, if I'm not wrong, you said there were some third-parties that were purchasing something from either Squirrels or Midwest and then there was going to be a delay delivering whatever you were going to be selling them.
Am I in any way in the right ballpark?
A No. Your statements are incorrect and misleading.
There were customers who we intended to induce the purchase of additional hardware

Page 34

with -- and all of the hardware we sold, at least the first sale of the hardware, was built to order. We weren't buying hardware and inventorying it on the shelf in those cases and then selling it from the shelf. We were selling built to order hardware.

That built to order hardware has some lead time. If we take the beginning of an FPGA chain, there is days or weeks backlog before then it's turned into an operational unit.

So because we had a deadline in the deal with Avnet to make the cash in a minimum order quantity purchase of these additional chips, and you'll certainly ask about that, so that deadline was in the end of March of 2021. And in order to induce some of those large customers to pay upfront for those purchases, we elected to offer them or came up with the idea to offer them immediately available hashrate, such that they could see instant effect of their new purchase. And this was done transparently.

And so as one of our host customers who had equipment that was operating in our facility, it seemed reasonable that we could

Page 35

approach Mr. Billinger and ask if he would be willing to trade us cash payment for his hashrate for us to rent it during that period.

Q And Mr. Billinger took you up on this offer, right?

A Yes. That was my understanding.

Q And can you tell me a little bit about the terms that you and the Squirrels team reached with Paul and Torea regarding rental payments?

A So I did not have any direct interaction with -- I am going to use the letters PBI, if that's okay to refer to Mr. Billinger.

Q That's fine.

A I did not have any direction interaction with PBI at this time that I recall. I had -- upon coming up with this concept, I had asked a member of our staff, Fiona King, who had a regular relationship with PBI, to propose this deal and propose certain payment terms.

My initial payment term was $3.50 per day per card, which was in line with the cost of those boards at that time. And I had asked Ms. King to present that and she had responded to me that we had gotten a positive response to take us up on that offer.

Page 36

Q And I think you said Fiona King?

A Yes.

Q And is her Discord FKRL_LIMS?

A Yes.

Q So it's your recollection that the initial terms were $3.50 per card per day?

A Yes.

Q Was that the initial proposal or was that the bottom line deal that had been finalized?

A That was the offer I made that I was told was accepted. And I was made aware later, and I've seen in the Discord documents that have been produced of Fiona's messages that that was further -- attempts were made to further negotiate that after the initial acceptance was relayed to me.

Q And was a different deal than the $3.50 per card per day, was that negotiated and finalized on Discord?

A I did not make any final negotiations beyond that point. But there were additional conversations that were had to indicate that PBI had indicated then the market conditions had gone up and that the price needed to be more per day, which I believe I acknowledged,

Page 37

but it was still a U.S. dollar per day figure.

Q And there came a time when Squirrels took control of the Torea cards, right?

A Yes.

Q 267 of them, right?

A Yes, to my knowledge.

Q And rental payments were not made in a timely manner, were they?

A I'm not aware of the exact specifics, but I understand there's some dispute about the timeliness of the rental payments.

Q What is your understanding of the nature of those disputes?

A At the time I was not incredibly -- I was not sitting behind a desk. We were doing very active production and I was running midnight shifts in the facility, physically running the machines to produce the batch of equipment, so I was not heavily hands-on on this topic.

I directed our team to pay as agreed with regards to this. I later came under the understanding that PBI was unhappy with some aspects of the payment, whether it was timing related, but I was under the impression that it was primarily currency and amount related. And

Page 38

that was because the currency and amount was not in line with what I had initially approved, it sounded like, or it appeared that my staff was unsure of how to proceed with payments.
Q Lets break that down a little bit.
First you said there was an issue in terms of timing. So late payments, right?
A Yeah. It does appear that there were periods in which we weren't prompt in our payments.
Q Okay. Then there was also an issue involving currency. So what do you mean by that?
A My impression was that the deal was frequently attempted to be renegotiated based on market conditions, so rewritten in whatever way would benefit PBI to our detriment.
And a particular problematic nature for our operation was that he insisted on being paid in Ethereum, which is a cryptocurrency. If you want me to elaborate on Ethereum, we can do that. But for our purposes now I can say that he wanted to be paid in Ethereum.
This was of some issue for us because we did not hold a treasury of Ethereum. We were primarily operating business in U.S. dollars and almost all of our cryptocurrency was

Page 39

regularly converted to U.S. dollars and we did not have a regular expedited mechanism of converting U.S. dollars back into Ethereum.
Q You got me. You bated me.
Tell me what Ethereum is. I'm here to learn. Go ahead.
A Just for the clarity of the record here, Ethereum is a cryptocurrency in some ways very similar to Bitcoin or other cryptocurrency that is able to be accumulated in a wallet, able to be transmitted between parties, able to be exchanged, for example, with other so-called fiat traditional currencies such as U.S. dollars or with other cryptocurrency.
Q So I believe you were referring to Squirrels did not hold any treasury of Ethereum. You said that a minute ago, correct?
A Yes. We did not regularly hold any large balances of cryptocurrency unless they were what we needed to support some operation. I'll give that clarity.
Q Very good. Sorry for interrupting.
Was that communicated to Paul in Torea or PBI as you refer to him?
A I don't believe it was initially communicated.

Page 40

I believe, but I'm not sure, that it may have been communicated at some point later as this particular sticking point became the predominant sticking point of the disagreements here.
Q Don't you think that should have been communicated from the outset?
A From my perspective, our agreement was in U.S. dollars.
Q And then you said there was an issue with timing, currency and amount.
So what was the issue with amount?
A The issue with amount stemmed from the issue with currency; namely, that from at least the perspective of the deal I had approved, the amount was in U.S. dollars. There was some discussion that the amount should reflect market conditions. I was amicable to that, as we had expressed the intention it should be -- we had no intention of taking advantage of Mr. Billinger in any fashion. It was meant to be a simple trade that benefited us and was fine for him.
And so at the time at which payments were due, my understanding from my staff was that

Page 41

Mr. Billinger or Torea, I'll stick to Torea here, Torea wanted payment in Ethereum, which we were working to accommodate. But then it further became apparent that the amount of payment was expected to be enumerated in Ethereum earnings despite -- when it was paid rather in USD earnings.
So to be specific about that, let's use the $3.50 a day for simple math here. If we had agreed to $3.50 U.S. per day and ten days had passed, and that would be $35 if my math is holding. During that period the Ethereum to U.S. dollar price could be quite volatile, and so from our perspective we owed $35 U.S. and if Mr. Billinger wanted that paid in Ethereum, then we could certainly accommodate that. We would then need to convert $35 U.S. into Ethereum at the time of payment providing the same value at time of payment.
My understanding was there was an attempt to rewrite the deal to say that it should have reflected the earnings in Ethereum, plus any accumulation in conversion value of that Ethereum over that subsequent ten days. So if Ethereum to the U.S. dollar went up 10 percent

Page 42

over that ten days, we would be expected to effectively pay $3.85 per card was the messaging that my team was getting from Torea.

And this generated, naturally, a bit of dispute, because this would represent a windfall for Torea with no benefit to us relative to the deal.

Q So let's break down a couple things here. I want to ask you some follow up questions to that. So I appreciate the detail.

You mentioned several times the deal you approved. So you said that the deal you approved was $3.50 per card per day, right?

A Yes. That was the initial deal I had approved.

Q And how did you go about approving that? Did you say, "Hey, Fiona, it's 3.50"? Did you e-mail her, text message her? How did you communicate those terms?

A I don't remember the medium, but I communicated to Fiona, "How does $3.50 a day sound?" And I generally -- generally the negotiations I do and the sales that I do, I am not a sales person, that's not my job, are very friendly deals. They're not -- what's the term I'm looking for. It's not a high stakes, high

Page 43

intensity negotiation. It's meant to be a very friendly, "Do we have a deal? Yes."

So I communicated to Fiona to make that initial offer. She communicated back to me that that offer was accepted and I went on to do whatever else that I had on my plate at that time.

As I mentioned in my previous portion of the statement, it later was communicated to me that Torea wanted to adjust that because market conditions were changing. I expressed that I was amicable to that U.S. dollar amount increasing to reflect that, and that was the extent of my approval.

So from that point I had simply directed the team to make it happen and moved on. You know, this was a relatively small, very small blip in the radar of everything that I was in at the time.

Q So when you were communicating with your team about this deal, were you doing it electronically?

A Most likely in some forms, although a large portion of our team was on-site at that time with the production, so there was a lot of

Page 44

communication in person.

MS. ZURN: Mr. Heasley, when we can take five minutes for a restroom break, I would appreciate it.

MR. HEASLEY: Let's do that because I can get my speakers fixed, so let's take five minutes. 2:35 we'll come back.

(Recess taken.)

Q Mr. Stanfill, you're still under oath.

We just took a break for a few minutes. I'm going to follow up on your last few statements.

MS. ZURN: Sorry. Go ahead. I apologize.

MR. HEASLEY: No problem.

Q So you mentioned Fiona King. Where was Fiona King working at the time this deal was consummated on Discord?

A She primarily worked I believe from the UK.

Q So you would have had to communicate -- no. Being in the UK, does that sort of refresh your recollection in terms of obviously you wouldn't have called across the office to her, but do you think you would have communicated in electronic format with her?

Page 45

A Yes. And as I mentioned in my previous answer, electronic was referenced primarily with Fiona King. The rest of the staff was almost entirely on-site at the time.

Q In terms of the electronic, would you have used Discord?

A Not with Fiona. No.

Q What would you have used?

A Primarily we would have used Slack at that time.

Q Okay. Slack.

Do you save your Slack messages on your account where you could see Slack messages with Fiona about this deal?

MS. ZURN: Mr. Heasley, Mr. Stanfill can answer the question, but I want to remind you we provided written responses to your examination and in that we did indicate that the Debtor no longer has access to their Slack account.

MR. HEASLEY: Okay.

Q Let me ask this, Mr. Stanfill. When the Slack account was up and running, is it an electronic platform where the messages are saved or instantly deleted like some messaging

Page 46

applications?
A I'm not directly familiar with Slack's message retention policy, but it's certainly not instant, if there's any sort of retention policy at all.
Q So in your answer before the break you said you didn't want to take advantage of Paul and Torea.
Do you remember saying that?
A Yes.
Q Okay. And so in terms of not taking advantage of Paul and Torea, if you said you were going to rent cards and then didn't pay rent in a timely manner, that would be one form of taking advantage of Torea, wouldn't it?
A I think it would depend on exactly what you mean by a timely manner.
Q Okay. Late. A day late. Would that be taking advantage of Torea if you paid them rent a day late?
A I think if there's a dispute as to the amount owed, then it has to be reconciled before payment.
Q So do you believe there was a good faith dispute related to the amount of rent that was

Page 47

due and owing related to these cards?
A Oh, absolutely in this case.
Q And what was the nature of that dispute?
A It was the dispute between the terms we initially agreed on, the currency that was to be enumerated in, and then Mr. -- Torea's request for payment that basically asked us to pay him under the terms of a different deal that he structured that basically maximized his advantage from the market condition which I felt was not in the good faith spirit of the agreement we had made.
Q All right. Well, did you tender $3.50 per card per day in a timely manner for renting these cards?
A I did not personally make any tender of payment with regards to the rentals, but I believe we made an initial payment promptly and then I believe that there was a subsequent payment made, both of which were made in Ethereum in attempts to be cooperative with Mr. Billinger's request for payments in Ethereum in a pretty commensurate manner. I wouldn't say it was day for day, but it was good faith.
Q There came a point in time when Squirrels

Page 48

decided it wanted to try to buy these cards from Torea or Mr. Billinger, right?
A Yes.
Q And how did that come about?
A My staff came to me and was very aggravated and frustrated with the deal and felt that they were constantly having -- fighting a battle and it was very distracting from all of the very, very busy production activity we were trying to accomplish. And they asked me to, you know, asked me to intervene and make some solution.
Up until that point, I hadn't had any involvement in it. It was just left to my team to handle and they had my directives to handle it as per our agreement. And so I reached out to Mr. Billinger and attempted to negotiate some sort of way to put an end to this debate and move us forward.
Q Okay. And so you made a deal with we'll just call it Mr. Billinger or Paul?
A Sure.
Q To buy the 267 cards, right?
A Yes.
Q Okay. And what were the terms of that deal?
A So we negotiated that deal back and forth and

Page 49

ultimately came to a price per board that he was willing to accept. And I forget the exact price. I apologize. I don't have that in front of me. But we came to the terms of the price per board per day. And I do know that that was on the 12th of April. Or not price per board per day. I apologize. Price per board to buy the boards.
Q Well, what method were you going to use to pay, Ethereum or U.S. dollars?
A He had requested payment in Ethereum at that time, which I had agreed to in terms of the currency again.
Q And you didn't pay in full to purchase the 267 cards in a timely manner, did you?
A At the time in which we negotiated, I had advised Mr. Billinger that it would not be immediately available and there was no time set for when we would explicitly pay it.
Q Did you make any payments related to purchasing the 267 cards?
A Yes.
Q How many payments and how much were they for?
A I believe there was one payment, and this was made directly by me, again, in the continued

spirit of trying to operate in good faith due to a delay in getting funds in Ethereum on our side, I made a payment of I believe 24 Ethereum.
Q So we've been very particular about this. When you say I, do you mean you, yourself, in your personal capacity?
A Yes. I personally used my own Ethereum to make a payment to Mr. Billinger because the SQRL were unable to get Ethereum to make the payment until some time had passed and I understood Mr. Billinger had some frustrations about that.
Q And did you make promises to Mr. Billinger regarding how much -- how soon the rest of the purchase amount would be tendered?
A I don't recall the details of that. I'm sure that I let him know that we were working on getting it paid.
Q And that it would be paid within the next few days? I'm sorry. Finish your answer, sir. I cut you off. I did not mean to.
A I don't recall any specific agreement as to when the rest would be paid, but I certainly recall representing that we were going to try to get it handled promptly.

Q And do you recall telling Mr. Billinger that you would make the final payment in a few days?
A I don't at this moment recall the exact words that I used.
Q Did you tell him that the final additional payment would be forthcoming in the near future?
A I said something along those lines. Again, I don't recall the exact words, but I did say something along those lines.
Q And that final payment was not made in the near future or right after you said that, right?
A I don't know that I can answer that as directly as you're asking, because we made several attempts to make payments that were rejected.
Q Tell me about those. When was the first payment you attempted to make that was rejected?
A So as I recall, as the -- as we reached I think it was sometime around early May, end of April, our attempts to get Ethereum hit a road block and we made an attempt to make a payment in U.S. dollars, again attempting to operate in good faith. We had no intention of doing anything other than completing this transaction

in good faith.
Q Okay. You said a minute ago that you had told Torea you would pay in Ethereum, right?
A Yes.
Q Okay. So then you attempted to make a U.S. dollar payment in late April or early May. Is that the time frame?
A Yes. Yes. As Ethereum -- we could not get Ethereum at the time in a timely manner, so we made the attempt to make the payment in U.S. dollars.
Q Did you communicate to Paul Billinger that that was the issue; you were having trouble acquiring Ethereum and that's why you were trying to pay in U.S. dollars?
A I did not personally make that communication. We internally had discussed that communication and I was under the impression that communication had been made, but I did not personally.
Q Okay. And who was the person that was supposed to communicate that?
A It would have been either Fiona King or Amanda McConnell that was handling the financial side.
Q So an attempt was made. That was one attempt.

Were there any other attempts to make payment?
A By that time, yes. Short answer.
Q When was that?
A That would have been at various times over the next two months, but by that time we were communicating via counsel because of the unexpected escalation by Mr. Torea in the matter.
Q What do you mean by that?
A I only mean that we felt that we were communicating in good faith to resolve the matter and were surprised to get a lawyer communication from Mr. Torea which forced us into a legal stance.
Q Very good.
And so how many times were offers made in this two-month period?
MS. ZURN: Objection.
Q Okay. You can answer.
MS. ZURN: Objection. You can answer if you know.
A I don't recall the exact number of times, but there were multiple communications lawyer to lawyer making offers of payment in addition to

the payment offers we had made prior to the lawyers becoming involved.
Q Were the offers of payment in U.S. dollars?
A The initial offer of payments were in U.S. dollars and later in Ethereum as requested.
Q What do you mean as requested?
A Mr. Billinger had requested or reiterated or demand would be a more appropriate way to say it that the payment be in Ethereum. We argued against that, given the inequitable nature of that at the time with regards to the exchange rates and market volatility. And ultimately we, in an attempt to simply resolve the matter, we determined that, you know, we would be willing to eat the losses and make the payment in Ethereum.
Q Okay. And do you understand why Paul was asking to be paid in Ethereum?
MS. ZURN: Objection. You can answer.
A I do not personally understand why. We had theories. We didn't understand why.
Q Okay. Well, because -- could it be because that's the deal you made? You said you would pay him in Ethereum and he asked to be paid in

Ethereum. Does that make sense?
A I suppose it made sense the way that you are saying it. You know, we have never thought about things that way because we are a U.S. dollars centered business and cryptocurrency are only their U.S. dollar value in our business and that's generally how we've always treated it.
Q Let's talk a little bit more about the cards.
Do you know where the 267 Torea cards were housed prior to this rental agreement?
A They would have been housed in the Squirrel facility.
Q Very good.
Which address would that have been?
A That that would have been the 8050 Freedom Avenue address.
Q And you'll have to remind me. I know there's the two different addresses. Is the Freedom Avenue the building where the fire was?
A Yes, it is.
Q Very good.
Prior to the fire were the 267 Torea cards ever moved to a different location?
A I don't know the answer to that. There were no

boards that were physically tagged to say these are the Torea 267.
Q Why not?
A That was never how the hosting and hardware operation was ran. Any clients of the operation owned a count of equipment and we maintained a surplus to that count because of maintenance, warranty replacements and other things that were covered under our regular hosting agreements. So we only assigned specific hardware to a customer at the time of shipment at the end of their contracts, similar to how --
Q Similar to how what operates?
A How Amazon Web Services operates. If you own any reserves in this instance you own a specific piece of hardware, but you don't own or you're not assigned a physical box. They move your assignment as needed for maintenance and hardware reasons.
Q So in terms of these mining cards, can you show me with your hands how big the dimensions of a mining card, a typical mining card?
A A typical mining card itself is maybe this big; about 6 inches by 4 inches by 2 inches, kind of

rough dimensions.
Q Very good. And Aimee, and I thank you for the court reporter, because you spelled it out in great detail. I appreciate that.
So I think you mentioned earlier in your testimony some of these cards were water cooled. Do you remember saying that?
A Yes. We have some cards in our facility that are water cooled.
Q So can you describe that kind of setup? Are these cards dipped in some kind of solution to keep it cool while it's processing?
A No. It is a board or a card or a pair of cards on a carrier that has a liquid inlet pipe and a liquid outlet pipe where cold liquid is circulated in a closed cavity against the chips and then the hot liquid is removed, the heat is removed from the chips and carried through the exhaust tube out to other processing equipment that removes the heat and returns cold liquid.
Q What if a card is not water cooled, are there other methods that are used to keep it cool?
A Yes. If it's not water cooled, it would be air cooled. So that would either have fans directly attached as an integral part of the

Page 58

card or they would have a large heat sink and fans in the server chassis to force air through the card, called server style passive heat sink or active heat syncs would be the nomenclature.

Q So let's talk about the fire now.
So there was a fire at 8050 Freedom Avenue, right?
A Yes.
Q I'm guessing you know the day by heart by now.
What date was that?
A I believe it was July 15. I could be off by a day or so, but.
Q And that would have been July 15, 2021, right?
A That is correct.
Q How did you find out about the fire?
A I was returning from a dinner in Cleveland, which is about 45 minutes away from our facility, when I got a call from a colleague of mine who had been informed by another tenant in the same building that there was smoke coming out from one of the doors in one of the rooms. So we went directly down to the facility and intersected the heat fire safe and all of the other people that were at the facility at that time in response.

Page 59

Q So tell me what happened next. The fire is discovered. Then what?
A The smoke was discovered. The fire was discovered. The fire department did their procedures to deal with the facility and the fire.
The fire itself was self extinguished because it burned through the liquid cooling tubes that I just was discussing which actually put out the fire and caused a lot of steam and soot, but the fire department then had concerns about other electrical equipment and hot spots.
They shut off power to various parts of the building and went about isolating the scene and otherwise making sure that it was safe and secure.
Q So was the cause of the fire ever identified?
A I don't know that I've seen any formal report. I have not seen any formal report that identifies the exact cause of the fire, but we were generally aware of the area and the mechanism of it happening.
Q So tell me about that. What area and what mechanism?
A It appeared to originate -- again, appeared. I

Page 60

am not a fire investigation expert. It appeared to originate in some so-called breakout boards and power -- PCI power cables that had caught fire, melted their insulation and gave way to a larger fire in surrounding combustible material.
Q Do you know who investigated the fire?
A The fire department certainly did. The insurance company, which would have been Cincinnati Insurance, had their staff. And I don't know if they had an outside investigation staff or not, but those were the primary parties involved from my standpoint.
Q At the time of the fire Squirrels was having financial problems, right?
A We weren't -- I think it's difficult to say whether we were having financial problems yet. We were starting to have shipment problems.
Q Tell me about the shipment problems, please.
A We had, you know, we are in the business of manufacturing electronics which depend on a myriad of hundreds of different individual components. It is common knowledge at this point that following the pandemic, and in the subsequent years continuing to this day, there

Page 61

have been, as a result, some significant silicon shortages effecting numerous different individual components and chips.
At the time the most significant was that our primary supply of FPGA chips, which are the most expensive central portion of the boards we sell and, more importantly, the irreplaceable portion of the boards we sell, was heavily effected to the degree that orders that we had already placed and had been confirmed and had committed delivery dates were short shipped and balance shipments were given various substantial lead times before they would potentially arrive.
Q So what you describe as shipment problems would have also created some serious financial problems for Squirrels, right?
A Yes. It was almost certainly going to force a reevaluation of the business model if your business is to build and sell hardware. You cannot build and sell hardware if you can't source the raw materials to build it.
Q So we were talking about Squirrels a lot. Would the same thing go for Midwest as well, the financial problems?

Page 62

A Not directly. Midwest's business was effected by the fire that you mentioned, but the shipments would only reduce Midwest's opportunities. It would not have caused any immediate financial struggles for Midwest.
Q How many cards were destroyed in the fire?
A I don't believe that exact count has been determined as of yet for reasons that are explained in multiple documents that you have, but I'm happy to go into them if you wish. But in the order of magnitude of 100 cards, 100 to 200 cards were directly effected in a way that could result in total loss.
So I would not use the term destroyed to answer your question, but I would say, you know, stand at high risk of a loss.
Q So you said 100 to 200 cards.
How many cards was Squirrels hosting at the time of the fire?
MS. ZURN: Objection.
A I don't know that exact number, but it was in the thousands.
I would clarify that MDC was hosting. Squirrels Research Labs was not hosting, to my knowledge, any amount of cards at that time.

Page 63

It might have been holding a small number under different agreements, but primarily Midwest Data Company was hosting.
Q Of the 267 Torea cards, how many were destroyed in the fire?
A To my knowledge, the type of cards that were destroyed in the fire did not include the type of cards that Torea originally owned.
Q Where are those cards now?
A The type of cards -- the specific cards or the type of cards that Torea owned?
Q Well, I would love to know the specific ones, but I think you said earlier that you're not specific until you have to ship these out some other place.
So you can tell me, where are Torea's 267 cards as we sit here today?
A I would say that we have documents that are part of your exhibits that we've provided that give us an inclination of where they likely may have gone, but I cannot, you know, say definitively. I can only refer to the documents that I have that suggest that one of the Michael Maranda orders, of which there were many, was partially satisfied with some of the

Page 64

boards that were purchased back from Torea.
Q Okay. Which Michael Maranda order? If it's just one order, which order would that have been?
A I don't have an order number. I'm aware that it was a specific order of 400 boards that was satisfied from a couple different sources but, in part, according to a document that I had in my records, in part, it was satisfied with the Torea boards.
Q But you're not sure if all 267 were a part of this 400 that went to Michael Maranda, is that your testimony?
A Okay. I do not have -- I do not personally recall any details of this and, as I said, the boards were not specifically individually tagged. So though I'm actually somewhat glad to see that we have some record that associates the two transactions, but in that same record there is also data that suggests that some number of the boards may have been used to fulfill an additional transaction where the hardware was physically picked up.
Q Okay. What was that transaction?
A That was a transaction involving parties that

Page 65

were introduced, sales that were introduced by a known we'll call it an associate of ours from a tool and tech mining company. They had brought some parties down who were interested in purchasing boards and they made some -- had written some checks and made some purchases in which they physically took the hardware with them at the time. And this occurred --
Q I apologize. Go ahead. Sorry.
A That transaction I believe occurred on the 15th of April.
Q April 15, 2021?
A Yes.
Q And then the Michael Maranda's transaction, when would that have been?
A It occurred on the 13th of April.
Q April 13, 2021?
A Yes.
Q So I'm still a little confused, because I understood what you said earlier and I'm not trying to give you a hard time. I really just genuinely want to understand.
So earlier you said that, again, like this pencil, I'll call it a card, right. This card is a card, but we don't know if it's

Torea's or Paul Billinger's because until you have to like physically move these around, it's really not assigned to a specific finite piece of equipment, right?

A Yes.

Q And then you said the best you can tell that the 267 cards we've been talking about today were sold to third-parties in these two transactions, right?

A Yes.

Q So how do you know that given the fact of what we've been talking about?

A So to speak to that, at the time the vast majority of the hardware we produced was being purchased by Michael Maranda. I'll give you that backing context.

In addition to the several other sales that we were doing, the vast majority was being purchased by Michael Maranda. As we received orders in the course of our built to order business, we had to procure additional silicon, additional chips to support the orders we were receiving.

So I had a document. I believe the Excel sheet is titled "Allocations of Production" or

something along those lines. I had a document in my internal records which was simply assessing the orders we had received and the chip shipments that we had received and the orders that we had fulfilled to determine how many more chips we needed to have on order, how many more we needed to build to reach our production goals.

In the process of culminating that information at the time in which all of this would have been very fresh and very present, I had in a note -- there was a note in that document that said that the 400 PO order from Michael Maranda had been partially fulfilled with those 267 Torea boards. This was significant because Mr. Maranda's orders, there are other complications regarding Mr. Maranda's orders, which I'm sure you'll have some questions about, but, in general, different purchase orders had suddenly different specific hardware part numbers, description of hardware, terms and conditions, et cetera.

And so this particular order was one of the -- not the only, but one of the few orders that explicitly defined the hardware in such a

way that it encompassed the boards that Torea had rather than some other specific product.

Q Thank you for that.

You just mentioned other complications. What are you referring to there?

A As noted in some of our filings and supporting documents, the transactions that originated from the Maranda side were -- following the initial couple of transactions began to occur in a very rapid fire and outside of our ordinary process mechanism, driven primarily by the client. And so standard inventory, checks, P.O.'s, invoices, a lot of those things were not done by the client in the specific order that we would normally do them.

The client instead began simply directing orders to us or even directing premature payments ahead of orders and then after the fact assigning -- saying to apply these payments to a specific order and, you know, creating an invoice after a payment was received, just generally out of the ordinary flow of how we would normally do business because of the volume and the speed at which business was being done.

There were additionally transactions where third-parties received sales agreements or purchase orders that were not created by Squirrels Research Labs staff, but payments were directed to Squirrels Research Labs and then we were later told by the client to fulfill those orders.

Mr. Maranda began acting as a bit of a channel partner at that point beyond being a direct client, and we have our own -- had our own disagreements about how that process went, which is -- when I say we, I mean the Debtors, Squirrels Research Labs and the Midwest Data Company had our disagreements about how that process went with Mr. Maranda.

Q So why did you allow Mr. Maranda to work outside the lines here, so to speak, in terms of your process?

A He was a very aggressive gentleman.

Q So because he was aggressive, you allowed him to just do whatever he wanted in terms of orders, P.O.'s, payments?

A I shouldn't say we just allowed him to do whatever he wanted, but we made a good effort to try to keep the order and the process to the

Page 70

sales that were being brought.
There was nothing inherently bad about a channel partner bringing you sales. Certainly there are channel partners who are more difficult to work with than others and customers who are more difficult to work with than others and we generally treated it from that lane.
Q So Michael Maranda was a very aggressive person I think you just said. Is that the right term?
A Yes.
Q He was also a member of Squirrels, right?
A Yes. He became one.
Q When was that?
A I don't recall the exact date. It would have been late spring, perhaps May. It could have been as early as late April, but I believe it was May of 2021.
Q In terms of various transactions with Michael Maranda, who was in charge of negotiating the terms of those transactions?
A I would answer Michael Maranda. But as far as at the business, myself or Jessica Gritzan were the counter parties. Jessica Gritzan primarily from the standpoint of specific documents,

Page 71

Purchase Agreements, things of that nature, but from a business standpoint primarily it was directed at me to negotiate agreements.
Q Okay. Did you do that or did you just bend to Michael's will in terms of price, for instance?
A I would say that we negotiated from a generally prudent -- we negotiated those agreements from a generally prudent business standpoint, but I certainly did not have the upper hand in those negotiations.
Q How were those negotiations carried out, electronically or in person?
A Various forms. There were in person meetings, in person trips, in person calls, some e-mails. Most negotiations happened via telephone call.
Q Okay. So some of the cards went to Michael Maranda on April 13. Some of the cards went to third-parties on April 15.
Do you know who the third-parties are?
A I don't recall the names of the exact customers offhand. We would certainly have some record of those sales.
Q Could you tell me which one of the records I apparently have that would have the names of the people that purchased these cards on

Page 72

April 15, 2021, like the title of it or --
A I don't know that -- well, maybe let me be explicit here. I don't have any information that directly says that any specific customer has those specific cards. I only have the document that I referenced that indicates that some of the orders that occurred in that April 15 window may have. So I don't believe there are responsive documents explicitly.
There may be additional documents that we could provide, but there's no one-to-one connection as far as sales that occurred on or about that April 15 date.
Q Okay. And in terms of documenting this transaction, these transactions on April 15, 2021, would that have been documented via invoice, like here is an invoice for these cards?
A Yes. That would have been a standard form invoice that would have been created to correspond to the -- several of those purchases were made by check, I do know that explicitly, so there would have been an invoice to correspond to that check.
Q So is that something that you would be willing

Page 73

to pull together for me, these April 15, 2021 transactions where Torea cards were sold?
A Yeah. Certainly, you know, you're welcome to request whatever documents you want. I have no problem with that.
Q Okay. And not to be -- I mean I did request them. I asked documents related to these cards and their sale, so I'll follow up with Julie. I don't want to make a big point about it.
A Yeah. I believe, just to be matter of fact about that, we don't have any direct information that suggests that those sales were related to those cards. I have given you more information in this communication that has opened the door to say we should probably produce those as well and I have no problem doing so. But we, by no means, intentionally withheld those.
MS. ZURN: I think what Mr. Stanfill is saying, he'll clarify, but there were many transactions taking place during that time period that would have involved the sale of cards like Torea cards.
THE WITNESS: Yes.
MR. HEASLEY: Okay. Let me ask a

Page 74

couple more questions now.
Actually, why don't we do this. Let's take a five-minute break, take another quick break and then we'll pivot over to some more exhibits, okay. So let's say seven minutes. 3:25, okay? Thanks.
(Recess taken.)
- - - - -
(Plaintiff's Exhibit 3 was marked.)
- - - - -
Q Mr. Stanfill, I'm going to ask you some questions about Exhibit 3, so I'm going to call up the exhibit because the print is kind of small on a converted -- I don't know how good your eyes are, but we're going to zoom in on my exhibit. Hopefully that helps.
Mr. Stanfill, I've now shared the exhibit, so I'm pretty far zoomed out right now just so we can note it's Exhibit 3. The stamp is at the bottom.
Do you see that?
A Yes.
Q It's in your hand also and on the screen.
So what is this exhibit?
A This appears to be a Discord chat between SQRL,

Page 75

which is Fiona King, and PBI, which I believe is Paul Billinger.
Q And it's a little hard to see, but it's dated March 2, 2021.
Do you see that?
A Yeah. I see that starting date.
Q And based on the first few messages, this relates to renting the 267 Torea cards, right?
A Yes.
Q Let's turn to the second page of the exhibit which is at the bottom of the piece of paper in your hand, SQRL TOR0015 at the bottom of it.
A Yes. I see that.
Q Let me ask you this question first.
Fiona, whose last name is King, did she have your authority to negotiate this transaction on behalf of Squirrels?
A I would say she had the authority to communicate the offer and communicate about it. She didn't have any explicit authority to negotiate arbitrary terms or anything of that nature.
Q Did you personally communicate that to Paul Billinger at any time?
A No. I don't believe I had any communication

Page 76

with Mr. Billinger around this time.
Q So do you see the messages on March 4 that are on the screen which may be a little easier to read, but if you can read the small print there on the paper in your hand, you can you do that, but there's a message on March 4, 2021. It says, "Hi Paul."
Do you see that?
A Yes. I see that.
Q So it says, "Amanda is trying to get confirmation on amount just now, but David has been unavailable so far."
Do you see that?
A Yes.
Q "Our confirmation was $3.50 times 267 weekly in advance and adjustments made as profits spike/dip when working out the next payment."
Do you see that?
A Yes.
Q So that's not a flat 3.50 per day per card, right?
A Yes. As I alluded to earlier, we had said that we were amiable to adjusting as the market adjusted.
Q And so let's see. "Would you be able to accept

Page 77

the $3.50 meanwhile?"
Do you see that?
A Yes.
Q And PBI, which is Paul Billinger, says, "No - cards make 0.85 ETH per day, so payment should reflect this."
Do you see that?
A I do.
Q And then Fiona, SQRL_LIMS says, "Okay. She will get this arranged as soon as possible for you when she hears back."
Do you see that?
A Yes.
Q So and after this exchange is when Squirrels took control of the Torea -- 267 Torea cards, right?
A I believe we already had control over the cards prior to this March 4 exchange.
Q So in terms of the final yield between Squirrels and Torea related to Squirrels renting these cards, what is your understanding of the terms of that deal?
A My understanding was the initial deal was $3.50 per day per board and that we would be willing to make some adjustments as the market

Page 78

shifted.
Q Sorry. Go ahead.
A I was just going to reference the first message where Paul Billinger referenced 4.7. We clearly made a communication that the market had shifted, however, I had at that time not approved any changes to the payment.
So I would highlight that our team here was attempting to say -- and this is important because it goes to a repeated situation that we will talk about so I will say it here as part of this answer, they wanted to pay some portion of the money now, but they were authorized to pay to avoid there being any delay in payment and if there was a discrepancy, we could work out that difference later. That becomes a repeating theme where we're really trying to pay a large sum of the money while they can't get ahold of me or I'm not available for this negotiation, and that is not accepted, and so no transfers are made of no fault of our own. So I'm just going to put that out there on the record.
Q Okay. Well, you testified earlier that you were going to pay in Ethereum, right?

Page 79

A Not for the rentals. The rentals were always negotiated in U.S. dollars.
Q So you were going to purchase the cards with Ethereum? That was the scope of that deal?
A Yes. There was a -- the card purchase negotiation was negotiated enumerated in Ethereum. While we do not explicitly spell out that the payment would transact in Ethereum, there was understanding that that was Paul's preference, yes.
Q Did Squirrels make rental payments related to the cards?
A Yes.
Q How many?
A I am aware of at least two.
Q Do you recall when the dates of those payments were?
A I don't recall the exact dates. Both were in March though.
Q Do you know how much was paid?
A I don't recall the exact amount offhand. It is in one of the -- in our initial documentary response.
Q That's fine.
Do you know, was the payment made in

Page 80

U.S. dollars or Ethereum?
A It was transacted in Ethereum, but the amount enumerated in U.S. dollars on our end. So whatever the -- this is very common when we make a payment that is transacted in Ethereum. And, in fact, it's very common across all cryptocurrency networks that a transaction priced in U.S. dollars will be paid in a cryptocurrency with the conversion rate fixed as of the time of the transaction.

- - - - -

(Plaintiff's Exhibit 4 was marked.)

- - - - -

Q Let's look at Exhibit 4 next. It will be another Discord message string. So can you grab Exhibit 4? I'm going to scroll down to it.
A Yes. I have it here.
Q I'm showing you on the screen and you have it in your hands an Exhibit 4 which is another Discord messaging string I would call it, right?
A Yes.
MS. ZURN: Can you make it a little bit bigger, Mr. Heasley?

Page 81

MR. HEASLEY: Oh, sure.
MS. ZURN: Thank you.
Q So just as an initial matter, it appears that this Discord exchange is between you, GPU Hoarder, and Mr. Billinger, right?
A Yes.
Q And as of the date on the top message is April 12, correct?
A Yes.
Q And so glance through this string and tell me a little bit about what's going on here.
What are you communicating about?
A This was the communication regarding the discussion to purchase the boards.
Q So as of April 12, Squirrels did not own those boards, right?
A Correct.
Q As of April 12, Squirrels did not have a definitive deal in place to buy those boards from Torea, did it?
A You know, as of the beginning of the day on April 12, no.
Q Was there ever a deal finalized whereby Squirrels would buy the 267 cards?
A Yes.

Page 82

Q And when was that deal made?
A April 12.
Q April 12. Okay.
And what were the terms of that deal?
A They're enumerated in the message from PBI in the middle of the first -- I would say the second message in the second section of the first page. It reads, "Lets go with 0.6 Ethereum per (160.2), no more mining, plus the amount from the rental."
Q So 160.2, that would have been Ethereum, right?
A Yes.
Q Okay. Plus the amount owed for the rental that hadn't been paid by that point, right?
A Yes.
Q Did you agree to those terms?
A I did. It appears I said, "All right. It may be mid week and then we'll work out run time" with regards to the rental.
Q Okay. So you testified earlier that you agreed to pay ETH and here it is in black and white, right, Ethereum?
A Yes.
Q So you agreed to pay 160.2 Ethereum to buy the cards, plus the back rent charges that you

Page 83

owed?
A Yes.
Q Do you know at this point how much in back rent was owed?
A No. The nature of the back rent was still disputed.
Q So the back rent was disputed, but there's no dispute about you said here you would pay 160.2 Ethereum to buy the 267 cards, right?
A Yes.
Q Okay. And so this deal, the "all right" you mentioned, it doesn't really have times here. I don't know. It's a blast from the past.
Do you remember about what time of day you would have sent that out?
A I don't recall exactly when that was time of day.
Q Okay. So on April 12 you, meaning Squirrels, said it would pay 160.2 Ethereum.
That payment was not made in full immediately, right?
A That is correct.
Q Why not?
A We did not have those funds in Ethereum. We needed time to get those together, which I

Page 84

alluded to in the "all right" message.
Q So, "All right. It may be mid week and then we'll work out that run time."
I'm going to scroll down to it. Let me scroll down to it. Sorry.
A Sure. No problem.
Q Did I read that correctly?
A Yes.
Q What do you mean by run time in this?
A The hosted time.
Q And that would be in relation to the rent that was still due?
A Yes.
Q Okay. So, "Maybe mid week."
I'm assuming you mean mid week either that very week or the week after that, right?
A Yes. That would have been based on my current expectations of when we would have the Ethereum funds ready.
Q All right. And you didn't pay the full amount by mid week of that week or the next one, right?
A Correct.
Q Okay. But you said you would here, right?
A Yes. And --

Page 85

Q Okay.
A Go ahead.
Q No. That's fine. Yes is fine by me.
So let's see. So then there's a series of other messaging after that. You could read through them if you would like. But the next one I want to ask about is on the next page, which is on April 20.
A Yes.
Q So let's talk about that message. So April 20 GPU Hoarder, that's you, so let's start with the top.
So PBI is Paul Billinger. He says, "I'd like to get this resolved as soon as possible, either by completing the sale or getting these hashing to my address?"
Do you see that?
A Yes.
Q So the next line is you said, "It will be done here."
And by that phrase do you mean that you're still going to be paying 160.2 Ethereum and the back rent? Is that what you meant by that?
A Yes. That the deal we had would be completed.

Q Okay. So then you say next, "I'm sending you 24 Ethereum now as deposit, there are funds owed me that are being withheld due a VPN issue, hopefully sorted out tonight."
Do you see that?
A Yes.
MS. ZURN: Mr. Heasley, it says, "Hopefully sorted tonight." That's exactly what it says so you should read exactly what it says.
MR. HEASLEY: That's fine. No problem.
Q So what's the VPN issue?
A We had an unrelated transaction that was paying us in USDT. I mentioned that it was difficult for us to get Ethereum quickly. We did not regularly hold Ethereum or, in fact, any cryptocurrency in volume, and so the only mechanism we had to get cryptocurrency was to do a bank transaction to an exchange which would require some amount of time to clear.
We've seen it take as much as two weeks. Sometimes one week. And so rather than do that and have funds held in transaction, we knew that we had a sale coming in that was paying in

USDT and we would be able to simply use that USDT that would be immediately available cryptocurrency U.S. dollar equivalent and immediately convert it to Ethereum and provide the payment to Mr. Billinger from that transaction.
Q So why didn't that happen?
A The customer, before paying the USDT, wanted us to create a dedicated VPN for them to manage the boards that they were purchasing that were at our facility. There were issues with our IT staff in getting that VPN set up. We didn't have the right kind of router. I forget the exact details. But there was some kind of issue that was delaying that VPN and, thus, delaying that USDT payment.
Q So in another message on April 20 you drive home that point. "I should get the USDT" -- well, let me ask you this before we move on to that.
When did that deal you're talking about, when did that deal close, the one that had the VPN issue?
A I would have to check, but I don't think it ultimately closed until around the beginning of

May. It took much longer to close than I had expected, which speaks to the underlying issue here.
It certainly could have been resolved with more communication with Mr. Billinger about the backhand circumstances, however, it was not, and so we remained in a situation where we didn't have access to ready Ethereum to send.
Q Well, do you recall the customer name with this VPN issue so I could be more specific and not keep saying the VPN issue?
A We can use the name Bill. That was the first name of the gentleman.
Q Sure. Fine.
When Bill made his payment to finish up this deal in early May, you still didn't send the Ethereum to Torea, did you?
A I don't believe we sent it at that time. Well, I know that we didn't send it at that time, yes.
Q Why not?
A By the time that we got the USDT and gained access to the USDT, the Ethereum to U.S. dollar exchange rate had changed drastically.

Q And let me ask you this. You're an expert in cryptocurrency, right?
A It's a very broad field. I'm an expert in certain areas of cryptocurrency.
Q Okay. So you're very familiar with Ethereum, I would assume, right?
A I am, yes.
Q And you know that Ethereum, the value in U.S. dollars fluctuates, right?
A Yes. I'm certainly aware that it does have some fluctuations.
Q All right. And it fluctuated before 2020, right?
A Yes.
Q It fluctuated in 2020, right?
A Yes.
Q And it fluctuated in 2021, in 2022, right?
A Yes.
Q Okay. And so you decided you didn't want to pay Torea in Ethereum because the value of Ethereum had drastically changed in the time between these Discord messages and the time you closed that deal, right?
MS. ZURN: Objection.
A That's not correct.

Page 90

Q What's not correct about that?
A The statement that I decided or the entity, Squirrels Research Labs, decided that it did not want to.
Q Well, did it pay the Ethereum in May when the bill of transaction closed?
A I would respond that it was not able to. It did not have the funds to purchase Ethereum at the elevated, significantly elevated conversion rate.
Q Well, you're an expert in this field and you agreed to pay in Ethereum when you completed this deal, right?
A I completed this deal under the expectation that it was a good faith transaction based on the value of the underlying boards, not an attempt at a windfall at our bad luck of timing.
Q Okay. Well, let's talk a little more about that.
So in this message -- let's go back to the April 20 messages. You said, "I should get the USDT to convert and send as soon as the client can confirm access."
Do you see this sentence where I keep

Page 91

going?
A Yes, I do.
Q Okay. "I should get the USDT to convert and send as soon as the client can confirm access to their machines. Working on that now. I hope this will be no later than tomorrow."
Do you see that?
A Yes.
Q Okay. So you didn't -- Squirrels did not make a payment on April 21, 2021 of the outstanding amount due and owing, right?
A Correct.
Q Do you think that's an example of bad faith to not do what you just said you would do?
A No. I said that I hoped that it will be no later than tomorrow. I made no representations that I was sure or confident or a commitment that it would be no later than tomorrow. Again, I'm operating the business at this point with insufficient available cryptocurrency to complete the transaction. There's no decision not to complete the transaction.
Q Well, Ethereum was available on the open market, right? You said there wasn't Ethereum available. There was if you decided to

Page 92

purchase it, right?
A Yes. With the aforementioned delays. To give you the answer there from what we're speaking about, we knew that purchasing Ethereum with U.S. dollars from a bank account would take seven to 14 days on our side. We had direct knowledge that we were receiving cryptocurrency that we could directly convert faster than that or expected to. As a result, we did not make a bank transaction to purchase duplicative cryptocurrency, which led to additional slipping timelines as the original transaction didn't complete and then, you know, thus, put us in a position of slipping timelines if we did make a purchase, in addition to the conversion issue which was, again -- you know, I'm just stating the facts here. I'll try to just stick to facts.
Q And that's fine. I'm all about facts.
So you didn't communicate any of those facts you just told me to Paul, right?
A I did not.
Q Okay. Is that bad faith?
A Well, let me slightly adjust that answer. I communicated some issues, but clearly not the

Page 93

depth of underlying issues to Paul, certainly not in bad faith.
I was certainly just extremely busy at the time and was not giving -- I had no inclination at this time that Paul was so upset or that we had any major disagreement. You know, my mindset was it's a little delayed. We're going to get it solved here. Okay. Cool. Let me know when you send it.
There was no expectation that there was some large certainly legal precursor building here.
Q Okay. Well, the payment to complete this transaction was not forthcoming in the immediate aftermath of these messages, right?
A No, it was not.
Q Right.
And so you see on page 17, the one I think you're on, there's a number of PBI messages.
Do you see those?
MS. ZURN: I'm sorry, Mr. Heasley, page 17 of what.
MR. HEASLEY: SQRL TOR0017 which was the page we were just on which is the page

Page 94

that I just explained.
Q So do you see the series of messages, the PBI messages?
A Yes.
Q Do you notice anything about those?
A Elaborate.
Q Sure. No responses, right?
A Correct.
Q No message, "Hey Paul, we're working on it. We're waiting for that deal to close." Right? You don't see anything like that there, right?
A Correct.
Q Message after message, day after day, no responses. Do you think that's bad faith?
A I don't think it's bad faith.
Q Why not?
A At that point in time I was very rarely chatting on Discord. I was very, very actively working overnight 12-hour shifts running machines trying to build things, trying to catch up on orders that were falling further in delay. I simply wasn't interacting on Discord very often. It's not something that I check every day all the time at this point.
Q You eventually blocked Paul on Discord, right?

Page 95

A That is false.
Q Okay. Did you disable so he could not send you any more messages?
A No. I can answer the cause of that.
Q Please. Please, do.
A So on Discord the way that Discord works to my understanding is you can only send messages back and forth between parties on which you share a server. And there are many different servers for different topics. There are certainly many different servers that discuss FPDA or SQRL hardware.
I had left one of the servers because it was full of noise that was distracting from the focus that I needed at the time. I had left one of the servers to focus on my work, which happened to be apparently the only server that Paul and I shared, which made him unable to message me and I was not aware of that.
Q Thanks.
A Seeing this printed version of the document, it was actually the first time that I actually had any awareness that Paul was unable to message me.
Q Okay. So you're busy doing these other

Page 96

projects. What did you think about closing the deal with Paul? I mean you hadn't closed. You hadn't paid them in full. What was your thought process?
A I think at this point we were in the grind. We were doing a lot of things. We were managing a lot of transactions from a very aggressive client.
Time has a way of passing without you realizing it and certainly we were trying to get together the funds to conclude this transaction as quickly as possible.
Q Okay. Did anybody communicate that to Paul?
A I had believed that Amanda was communicating that. I did not regularly communicate with Paul. My interactions occurred only when there was a situation that escalated to some high level that I needed to get involved in. On a regular basis either Fiona or on billing matters usually Amanda was having that communication.
Q But you had enough communication to complete this transaction, right, to buy the cards?
A Yes.
Q Okay. So what about Fiona? Did Fiona reach

Page 97

out to Paul with updates on what was the issue with payment?
A I don't directly know if that occurred or not.
Q What about Amanda? Did Amanda reach out and give Paul updates?
A I'm not directly aware of whether or not that occurred or not other than contents of e-mails that I have in front of me here that happened at later dates.
Q So can you understand why Paul was upset?
A Yeah. Absolutely. I certainly understand the miscommunication around the situation.
Q Paul basically just wanted to be paid for what you said you would buy, right?
A Yes. And I believe from our side we had every desire to conclude that transaction and pay it and certainly had the belief that any issues stemming from the delay could be addressed. And, frankly, we didn't know what the big deal on the delay was. Delays happen in this business all of the time. We didn't have any inclination that this wasn't something that was just going to be delayed a little bit and then resolved and everyone goes on their way.
Q All right. And so in terms of this issue with