# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE SQUIRRELS RESEARCH LABS LLC, *ET AL.* <br> *Debtors* | CASE NO. 21-61491-TNAP <br> (JOINTLY ADMINISTERED) <br> CHAPTER 11 <br> SUBCHAPTER V <br> JUDGE PATTON |

**RESPONSE OF SUBCHAPTER V TRUSTEE TO OBJECTIONS TO MOTION OF SUBCHAPTER V TRUSTEE FOR AUTHORITY TO COMPROMISE CONTROVERSIES WITH DAVID STANFILL, SIDNEY KEITH, ANDREW GOULD, JESSICA GRITZAN, KYLE SLUTZ AND SQUIRRELS LLC AND JOINDER IN THE RESPONSES OF SQUIRRELS RESEARCH LABS LLC TO OBJECTIONS**

Frederic P. Schwieg subchapter V Trustee ("Trustee") in support of his Motion of

Subchapter V Trustee for Authority to Compromise Controversies with David Stanfill, Sidney

Keith, Andrew Gould, Jessica Gritzan, Kyle Slutz and Squirrels LLC ("Motion to

Compromise"), responds to (1) the Objection of Ad Hoc Committee of Creditors to the Motion

of Subchapter V Trustee for Authority to Compromise Controversies with David Stanfill, Sidney

Keith, Andrew Gould, Jessica Gritzan, Kyle Slutz and Squirrels LLC [Doc. 397][1] ("Billinger

Objection"); and (2) the Objection and Notice of Individual Property Loss Filed by Paul Pasika

[Doc. 399] ("Pasika Objection") and (3) the Objection of Sam Adams to the Motion of

Subchapter V Trustee for Authority to Compromise Controversies with David Stanfill, Sidney

Keith, Andrew Gould, Jessica Gritzan, Kyle Slutz and Squirrels LLC(Doc. 394) [Doc. 406]

("Adams Objection" and  with the Billinger Objection and the Pasika Objection the

"Objections").

The Trustee joins in and supports the Reply to Objection of Paul Billinger [Docket No..

397] [Doc. 403] and the Reply to Objection of Paul Pasika [Docket No. 399] [Doc. 404] both

---

[1] The Trustee has also received a copy of the Response of the Ad Hoc Committee of Creditors to the Debtor's Reply to Objection of Paul Billinger [ECF 403], but it has not been filed as of the preparation of this pleading. The Trustee will respond to both herein as the "Billinger Objection."

filed by the Debtor in Possession Squirrels Research Labs LLC ("SQRL" and collectively the "SQRL Replies"), and the Response of Defendants to Objection of Paul Billinger [Docket No. 397] [Doc.405].

## PROCEDURAL BACKGROUND

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334(a), (b) and (e) and General Order 2012-07 of the United States District Court for the Northern District of Ohio. This is a core proceeding in which the Court may enter a final order pursuant to 28 U.S.C. §157(b)(2)(A), (B), (K), (N) and (O).

2. On November 23, 2021 (the "Petition Date"), SQRL and its related affiliate The Midwest Data Company LLC ("MWDC" and with SQRL the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3. On November 30, 2021, the Office of the United States Trustee appointed movant as the Trustee for this bankruptcy case [Doc. 35].

4. SQRL's Amended Plan of Reorganization Dated June 22, 2022 [Doc. 237] ("Plan") was confirmed by the court on July 28, 2022 [Doc. 269].

## JOINDER IN SQRL REPLIES

5. The Trustee joins in the SQRL Replies in their entirety. In particular, the Trustee reiterates the argument in the SQRL Replies that there is no "ad hoc committee" appointed in these cases, and the arguments regarding Mr. Billinger's status as a "party in interest." In addition, to the extent that the committee claims to be "composed solely of unsecured creditors, each of whom holds a scheduled or filed claim in this estate" none of the alleged members are identified beyond Mr. Paul Billinger who as set forth in the SQRL Replies is not a creditor of this bankruptcy estate, or as far as the Trustee is aware a licensed attorney. Mr. Billinger, however owned a company called TorEA Consulting Ltd. ("TorEA")" that is a creditor of the

bankruptcy estate as well as a frequent objector to certain of the actions taken by the Debtors and objected to confirmation of the Plan [Doc. 209]. As will be set forth below a substantial number of the arguments purportedly made in the Billinger Objection have already been overruled by the Court in this case, and therefore his attempts to relitigate issues which have already been decided are barred by the doctrines of issue and claim preclusion.

6.  The Trustee Joins in the SQRL Replies to the Pasika Objection emphasizing that it merely asserts a claim and not grounds of objection to the Motion to Compromise.

## FACTUAL BACKGROUND

7.  The following summary is in part taken from the description set forth in the Plan, and the docket in this case.

8.  SQRL is an Ohio limited liability company, formed in late spring to early summer to 2018. Originally, the Debtor was owned by David Stanfill ("Stanfill"), Sidney Keith ("Keith"), Andrew Gould ("Gould"), Cory Shoaf and either Squirrels LLC ("Squirrels"), or a holding company called Scurry Holdings Group which owned or owns Squirrels and a number of releated companies that invest in or hold real estate for crytocurrncy operations in which Mr. Stanfill is or was involved.

9.  Prior to the Petition Date, SQRL created, manufactured, and repaired hardware, including DataCenter Accelerator Boards, used in cryptocurrency mining machines. Debtor's business operations were housed in two leased locations: 7579 and 8050 Freedom Avenue, North Canton, Ohio 44720. SQRL also entered into a lease for space located at 8100 Cleveland Ave., North Canton, Ohio pursuant to a lease with GS8100 LLC. However, operations at this location never commenced due to delays by the power company.

10. MWDC is also an Ohio limited liability company headquartered in North Canton, Ohio. MWDC provides hosting services for cryptocurrency mining machines to customers, some of

whom purchased cryptocurrency mining machines from SQRL. Prior to the Petition Date,

MWDC provided these hosting services from the same locations used by SQRL at 8050 and

7579 Freedom Avenue. Post-petition, MWDC moved its operations from 8050 Freedom Avenue,

as the Lease Agreement with One Haines Company LLC was assumed and assigned to the

purchaser pursuant to the Sale (described below).

### EVENTS LEADING TO CHAPTER 11 FILING AND DEBTOR'S FINANCIAL STRUCTURE

11. Prior to the Petition Date, SQRL executed and delivered to Avnet, Inc. ("Avnet"): (i) a

promissory note in the original principal amount of $4,621,092.50 dated March 26, 2019 (the

"Initial Note") and (ii) a Security Agreement dated as of March 20 , 2019, granting a lien in the

collateral described therein (the "Avnet Collateral") in favor of Avnet to secure payment of

amounts invoiced by Avnet (the "Security Agreement").

12. Debtor SQRL began the process of seeking counterparties for a recapitalization or sale of

the company's assets in late 2020 because it was experiencing capital constraints arising from a

global shortage of computer chips and other critical components required for the manufacturing

of its cryptocurrency mining equipment, as a result of the COVID-19 pandemic.

13. These efforts resulted in the execution of a Membership Unit Purchase Agreement with

Fleur-de-Lis, LLC ("FDL") dated as of December 31, 2020, whereby FDL was to purchase 51%

of the membership interests in SQRL from SQRL's treasury for $10 million on or before January

30, 2021.  FDL breached the Membership Unit Purchase Agreement by failing to pay any of the

$10 million purchase price on or before that date.  As result, SQRL filed a complaint for

damages and injunctive relief against FDL and others in the Stark County Court of Common

Pleas on March 1, 2021 (the "FDL Action"). The Debtor removed the FDL Action to the United States Bankruptcy Court for the Northern District of Ohio.[2]

14. During 4th quarter of 2020 and throughout the 1st quarter of 2021, SQRL also negotiated numerous settlements with trade vendors and suppliers.

15. SQRL raised capital from existing members and certain new members throughout the first and second quarters of 2021 in order to pay the obligations to vendors described in the preceding paragraph and the obligations to Avnet.

16. In early 2021, SQRL commenced negotiations with Avnet, who had historically been a major supplier of key components critical to SQRL's business. At that time, SQRL's outstanding indebtedness to Avnet under the Initial Note had increased by virtue of ongoing orders to approximately $8,191,000. SQRL and Avnet agreed on a restructuring of SQRL's account with Avnet, the principal terms of which were: (i) a payment of $369,300 to Avnet on account of the then-existing balance due under the Initial Note on or before March 31, 2020, (ii) monthly payments thereafter pursuant to an amended and restated promissory note executed by SQRL and delivered to Avnet dated April 8, 2021 in the original principal amount of $7,864,779.76 (the "Amended and Restated Note"), which Amended and Restated Note remained secured by the lien granted by the Security Agreement, and (iii) a purchase by SQRL and shipment by Avnet of 3,676 VU35P and VU33P FPGA chips for $2,630,700 immediately thereafter.

17. Avnet did not thereafter deliver the full amount of SQRL's order of the VU35P and VU33P FPGA chips, and instead only delivered 3,611 VU35P chips. SQRL nonetheless made the initial monthly payment to Avnet and monthly payments under the Amended and Restated

---

[2] On November 21, 2022, SQRL filed a motion to approve a compromise with FDL [Doc. 97] whereby FDL released the SQRL estate from any claims and SQRL released FDL from any counterclaims. The Court Granted that motion on December 28, 2022 [Doc. 306].

Note through the payment due for June but thereafter defaulted in making payments to Avnet. Avnet declared SQRL in default under the terms of the Amended and Restated Note and the Security Agreement on August 20, 2021, thereby freezing SQRL's use of cash collateral and ability to pay operating expenses.

18. As of November 22, 2021, SQRL remained obligated to Avnet in the principal amount of $7,864,779.76 plus accrued and accruing interest, fees, costs, and other charges (including attorneys' fees and costs) (the "Avnet Claim").

19. In addition, beginning in the second quarter of 2021, an existing customer/client began initiating orders with third parties for cryptocurrency mining machines to be manufactured by SQRL which orders were made outside of the standard procedures for initiating orders. Due to the supply chain disruptions described above, SQRL was unable to obtain sufficient component parts to satisfy the foregoing orders in a timely manner, and, upon information and belief, the unauthorized party or parties initiating those orders did not advise any of the ordering parties that SQRL would be unable to meet the production schedule promised. The foregoing has led to threats of litigation against, among others, MWDC and SQRL.

20. On the night of July 15, 2021, an area of the SQRL main warehouse located at 8050 Freedom, that contained more than 1000 operating FPGAs burned. The fire originated on racks of equipment containing operating liquid cooled JungleCat modules and some direct impact occurred in that area. As the fire grew, it caused liquid cooling lines that were under substantial pressure to burst, which led to water spray, steam, and soot expanding through the entire warehouse area.

21. This affected all operating equipment in the room, as well as permeable SQRL inventory and non-operating inventory in the area. While this liquid and steam self-extinguished the fire,

heavy smoke and soot filled the area as well as the open liquid cooling reservoir for the operating equipment. The loss of cooling fluid also caused the failure of at least one cooling pump from running dry. The emergency responders cut power to half of the SQRL and MWDC building to manage the incident, and in doing so inadvertently shut off the external liquid cooling radiator fans associated with equipment on the far side of the building, encompassing more than 2000 additional operating units. The power outage also affected more than 1000 air cooled operating units in a different area of the building. The units that were operating on the other side of the building experienced an extreme overheat/boiling event that distorted and damaged cooling pipes and fittings and led to leaks and liquid damage in that area. As a result, all equipment in the 8050 Freedom facility experienced outages for extended periods of time.

22. The loss of power and subsequent equipment damage affected the main fiber link and internet router as well as command and control servers that served both the 8050 and 7579 properties. The loss of this equipment caused more than 3000 additional FPGAs in the 7579 building to lose network communication.

23. In total, nearly all SQRL and MWDC hosted equipment was brought offline by the incident.

24. Following the incident, SQRL and MWDC's mutual insurance company, Cincinnati Insurance, coordinated the dispatch of a team from AREPA to provide cleanup and recovery services. From the period of the incident through late August 2021, AREPA teams fully disassembled all electronic equipment, FPGA modules, heatsinks, cooling systems, power distribution equipment, and other items of technology affected by the fire, smoke, and soot. Due to the proprietary nature of the equipment and SQRL being the OEM, AREPA required the support of the SQRL repair, rework, production, testing, and support technicians to instruct them

on handling, disassembly, cleaning, testing, reassembly, and inspection of the equipment. This prevented SQRL staff from performing their ordinary duties of building, installing, and maintaining other equipment. This loss of operations and services led to loss of sales in progress, as well as impacted significantly MWDC hosted customers.

25. Upon the assertion of default and freezing of cash collateral in late August 2021, SQRL staff was no longer able to assist AREPA. As a result, AREPA also left the premises prior to full recovery of the facilities or equipment. This also delayed SQRL and MWDC in finalizing a claim for final causality loss and business interruption as the business remained inactive.

26. Shortly after the July 15, 2021 fire, an existing customer/client asserted a direct claim against the Debtors' insurance carrier for alleged damages and for loss of cryptocurrency mining revenues and has subsequently threatened litigation against, among others, MWDC and SQRL.

27. As a result, the Debtor was forced to freeze its operations and terminated the employment of all employees effective as of August 27, 2021. As a result of the freeze, the Debtor was unable to make its final payroll to employees, including the withheld deferred amounts as elected by certain employees and matching contributions pursuant to the Squirrels 401(K) & Profit Sharing Plan. MWDC used its funds to pay the final payroll, not including the withheld deferred amounts and the matching contributions.

28. In late November 2021, the Debtors received an offer to purchase certain of their assets, from Instantiation LLC. On the same date, Avnet, SQRL, MWDC, and Instantiation, LLC entered into an Account Settlement and Sale Support Agreement whereby those parties agreed that in order to support the Chapter 11 process, Instantiation LLC would provide debtor in possession financing to MWDC in the original principal amount of $350,000 and seek to purchase the Debtors' assets. In addition, Avnet agreed to support the Sale, not object to the

debtor-in-possession financing to be provided by Instantiation, and SQRL and Avnet agreed to a resolution of the amount and treatment of the Avnet Claim, such that the Avnet Claim was reduced to $5,751,000 (the "Reduced Avnet Claim"). In addition, SQRL agreed therein that the value of the Avnet Collateral is not less than $3,000,000.00 and pursuant to section 506 of the Bankruptcy Code, the Reduced Avnet Claim would be a secured claim in the amount of not less than $3,000,000.00 (the "Avnet Secured Claim").

## EVENTS DURING THE BANKRUPTCY CASE
### FIRST DAY MOTIONS

29. Immediately upon the filing of this case, the Debtors filed a motion for joint administration, a motion to authorize MWDC to obtain debtor in possession financing from Instantiation and a motion to establish bid and sale procedures for the sale of assets to Instantiation.

30. The Court entered an order authorizing the joint administration of these cases for procedural purposes only on December 1, 2021.

31. The Court entered an Interim Order: (I) Authorizing Secured Postpetition Financing on a Superpriority Basis Pursuant to Section 364 of the Bankruptcy Code; (II) Modifying the Automatic Stay; and (III) Granting Related Relief on December 2, 2021 (the "Interim Order"). The Interim Order authorized MWDC to borrow a maximum of $350,000 on a secured basis, with up to $279,000 in the Interim Period, provided for a Carve Out for professional fees, including fees of the Subchapter V Trustee, Debtors' counsel and other estate professionals. A final order was entered on December 9, 2021 [Doc..

### MOTION TO SELL

32. On December 1, 2021, the Court entered the Bidding Procedures Order establishing procedures for the auction and sale of certain MWDC and SQRL assets, as defined therein,

designating Instantiation as the stalking horse bidder, and granting related relief [Doc. 40]. No competing bids were submitted before the bid deadline set in the Bidding Procedures Order and thus, no auction was held.

33. On January 10, 2022, the Debtors filed their Notice of Filing of Modification of Asset Purchase Agreement Filed by Debtor Squirrels Research Labs LLC [Doc. 124] wherein the assets being purchased by Instantiation were reduced from the original agreement.

34. On January 11, 2022, TorEA filed an untimely objection to the modification of Sale [Doc. 127] ("TorEA Sale Objection"). Among other things TorEA contended that certain offers were being made for MWDC equipment to the owners of that equipment that "the prospective Buyer is negotiating agreements directly customers and owners of specific equipment [sic] outside the scope of this process. The confusion that could result and spoilation of evidence is a risk that must be addressed prior to the closing of this piecemeal liquidation reflected in the modifications."

35. The Court held a hearing on the Debtors' motion to approve the Sale on January 11, 2022, and entered an order authorizing the sale to Instantiation ("Sale") and overruling the TorEA Sale Objection on January 18, 2022 [Doc. 131] ("Sale Order").

36. The Sale closed on January 27, 2022. MWDC received $10,000 in proceeds from the Sale. Avnet received full payment of the Avnet Secured Claim.

37. As a result of the Sale Order Installation acquired substantially all of SQRL and MWDC's manufacturing equipment, components, racks, computers, and other related equipment, substantially all of the general intangible assets used or useful in connection with the use and operation of the acquired equipment; and importantly all business intellectual property, including all rights to collect royalties and proceeds in connection therewith. Instantiation did not

acquire certain causes of action described on Schedule 1.2(g) attached to the Asset Purchase Agreement or the insurance claims described on Schedule 1.2(h).

38. On February 21, 2022, Creditor Carl Forsell ("Forsell") filed his Motion for Relief from the Sale Order for the Limited Purpose of Amending the Distribution Scheme Pending Discovery [Doc. 166] ("Forsell Motion for Relief"), arguing that the Avnet lien was not a blanket security interest and should not have been paid from the sale. Responses to the Forsell Motion for Relief were filed by the SQRL [Doc. 203], Avnet [Doc. 202] and Instantiation [Doc. 204], with a reply to the responses by Mr. Forsell [Doc. 210].

39. On April 12, 2022, the Court held a hearing on the Forsell Motion for Relief, and on April 29, 2022, entered its opinion and order denying it [Doc. 227, 228].

40. The Trustee understands that after the Sale Instantiation (or entities authorized by it) used the Debtors' IP it had acquired to manufacture thousands of data miners of the type produced by SQRL before the bankruptcy.

## 2004 EXAMINATIONS

41. On January 10, 2022, TorEA filed its Motion for 2004 Examination of Debtors Filed by Creditor Torea Consulting Ltd. [Doc. 122], seeking information about certain data cards and cryptocurrency wallets.

42. On March 2, 2022 TorEA took the 2004 examination of Mr. Stanfill.

43. On January 20, 2022, Mr. Forsell filed his Motion for 2004 Examination of the Debtors [Doc. 132], seeking information about accounting information and information regarding transfers between the Debtors and various insiders and other companies.

44. On April 13, 2022, Mr. Forsell took a 2004 examination of Mr. Stanfill.

45. On February 22, 2022, SQRL filed its Plan of Liquidation Dated February 22, 2022 [Doc. 169] and MWDC filed its Plan of Reorganization Dated February 22, 2022 [Doc. 170] ("MWDC Plan" and collectively "Plans").

46. On April 6, 2022, TorEA filed its objection to the confirmation of the Plans [Doc. 209] ("TorEA Plan Objection"). Among other things TorEA contended that"

> Upon information and belief, and based upon the 2004 Exam, Squirrels transferred ownership of these Cards first to themselves and then to an insider – Michael Maranda or his company MM, LLC ("Maranda") – all outside the ordinary course of the Debtors' businesses. The Cards, twenty-one (21) carriers for the water cooled Cards, and the cases and power supply units for 45 air cooled Cards, all under Squirrels' dominion and control under a hosting relationship, were transformed into a non-bonafide purchase and defalcation by the Debtors and its insider Maranda.

> \*\*\*

> Torea's objection to the Plan filed by MDC solely relates to the allocation of insurance proceeds under the Debtors' $10,000,0000 policy with Cincinnati Insurance. It is unclear from either Plan how the proceeds are to be allocated between the two Debtors. Due to the small number of creditors of MDC and thus the opportunity for a windfall for MDC shareholders – the Plans must address this allocation or otherwise merge the Plans to channel the insurance proceeds to creditors of Squirrels.

> While there are two Debtors here – MDC was never operated on a stand-alone basis as indicated in paragraph 5 above. A single integrated plan as opposed to two plans with contrary purposes is one way of addressing the insurance allocation issue.

47. On April 19, 2022, MWDC filed its reply to the TorEA Plan Objection [Doc. 212].

48. On April 26, 2022, the Court held a hearing on confirmation of the MWDC Plan, and on April 28, 2022, the Court entered an order confirming the MWDC Plan and overruling the TorEA Plan Objection as to MWDC [Doc. 223] ("MWDC Confirmation Order"). The hearing on confirmation of the SQRL plan was continued to June 28, 2022 [Doc. 224].

49. On June 2, 2022 SQRL filed both its reply to the TorEA Plan Objection [Doc. 240] and the Plan, and the confirmation hearing was reset to July 12, 2022. On the Trustee's motion the confirmation hearing was further continued to July 26, 2022 [Doc. 260].

50. On July 26, 2022, the Court held a hearing on confirmation of the Plan, and on July 28, 2022, the Court entered an order confirming the Plan and overruling the TorEA Plan Objection as to SQRL [Doc. 269] ("SQRL Confirmation Order").

### STARK COUNTY LITIGATION

51. On June 21, 2022 TorEA filed suit in the Stark County Court of Common Pleas Against David Stanfill and Michael Miranda alleging amongst other things fraud and conspiracy arising from the taking of cards allegedly belonging to TorEA. A copy of the complaint is attached as Exhibit A.

52. On January 31, 2024, the Stark County Court of Common Pleas granted Mr. Stanfill's motion for summary judgment and entered judgement for Mr. Stanfill and against TorEA. TorEA appealed that judgement to the Court of Appeal which affirmed the judgment of the trial court on August 29, 2024.

### CINCINNATI INSURANCE SETTLEMENT

53. On April 9, 2024, the Debtors filed their Motion of Squirrels Research Labs LLC and The Midwest Data Company LLC for Entry of an Order Approving Compromise and Settlement with Cincinnati Insurance Company [Doc. 323] ("Insurance Compromise Motion").

54. On April 26, 2024, Second Foundation Mining LLC filed an objection to the Insurance Compromise Motion [Doc. 327] ("SF Insurance Objection"). The Debtors responded to the SF Insurance Objection [Doc. 329]. On Jully 12, 2024, the Court struck the SF Insurance Objection as not having been filed by an attorney [Doc. 357].

55. On May 8, 2024, Mr. Billinger filed an objection to the Insurance Compromise Motion [Doc. 332] ("Billinger Insurance Objection") raising the same issues as the SF Insurance Objection in such a manner to indicate they were drafted by the same person. The Debtors replied to the Billinger Insurance Objection on May 15, 2024 [Doc.338].

56. On May 28, 2024, the Court entered an order approving the compromise with Cincinnati Insurance Company and setting a hearing on the allocation of the proceeds for July 16, 2024 [Doc. 341].

57. On May 31, 2024 counsel for TorEA withdrew from the bankruptcy case [Doc. 343].

58. On June 10, 2024, Mr. Billinger filed his Objection of Paul Billinger to the Settlement Agreement and Mutual Release filed by Squirrels Research Labs, LLC (Doc. 323) [Doc. 346]. On June 27, 2024, Mr. Billinger filed his Objection of Paul Billinger to the Settlement Agreement and Mutual Release filed by Squirrels Research Labs, LLC (Doc. 323) Parts 1 through 5 [Doc. 349-353]. Of significance is that in support of this response Mr. Billinger attached the transcript of the 2004 examination of Mr. Stanfill taken by TorEA in March 2022.

59. On June 27, 2024, Mr. Billinger filed (Amended) Objection of Paul Billinger to the Settlement Agreement and Mutual Release filed by Squirrels Research Labs, LLC (Doc. 323) [Doc 354] (these responses with the Billinger Insurance Objection are collectively hereinafter the "Billinger Insurance Objection").

60. On July 24, 2024, the Court entered its Order Approving Allocation of Proceeds of Compromise and Settlement Between Debtors and Cincinnati Insurance Company [Doc. 359] ("Insurance Compromise Order") overruling the Billinger Insurance Objection on the grounds that Mr. Billinger was not a party in interest or an attorney.

61. On July 26, 2024, the Mr. Billinger filed a motion for reconsideration of the Insurance Compromise Order [Doc. 360] ("Motion to Reconsider"). On August 14, 2024, SQRL filed its Objection to Motion for Reconsideration of Paul Billinger to the Order Approving Allocation of Proceeds of Compromise and Settlement Between Debtors and Cincinnati Insurance Company [Doc. 376]. On August 21, 2024, Mr. Billinger filed his Reply to Objection to Motion for Reconsideration of Paul Billinger to the Order Approving Allocation of Proceeds of Compromise and Settlement Between Debtors and Cincinnati Insurance Company (Doc. 376) [Doc. 377]. On August 23, 2024, Mr. Billinger again filed his Reply to Objection to Motion for Reconsideration of Paul Billinger to the Order Approving Allocation of Proceeds of Compromise and Settlement Between Debtors and Cincinnati Insurance Company (Doc. 376) [Doc. 378]. The Court held a hearing on the Motion to Reconsider and the related pleadings on September 3, 2024, and denied the Motion to Reconsider on September 9, 2024 [Doc. 379].

## ESSENCE OF THE BILLINGER OBJECTION

62. The Adams Objection does not contain any specific information. The Trustee suspects that Mr. Adams has been influenced by Mr. Billinger rather than having made an independent investigation of any facts. The Pasika Ojection does not raise any grounds of opposition to the Motion to Compromise. Therefore, the Trustee will concentrate on the Billinger Objection.

63. The essence of the Billinger Objection is the demand by Mr. Billinger that the Trustee, SQRL, and or the Office of the United States Trustee ("UST") undertake a massive investigation of Mr. Stanfill and his related entities, charging them with various theories of civil conspiracy and fraud. Mr. Billinger's objections can be boiled down to three general categories: one, an allegation that the bankruptcy case was improperly commenced under Subchapter V in that the total debt owed by the Debtors was well in excess of the debt limit of $7,500,000 in place at the time the case was filed; two, that the bankruptcy estate of SQRL and MWDC should be

consolidated as the two entities were never operated as a separate entity, and that other entities controlled by Mr. Stanfill should be consolidated with them; and three, that evidence derived from posts on various Internet messaging boards indicates that Mr. Stanfill is continuing to use the Debtors' IP, and or certain persons are selling "SQRL cards" thus indicating somehow that there was hidden inventory not disclosed on the Debtors' schedules.

64. As can be seen from some of the pleadings filed in this case, Mr. Billinger has been sending emails to the Trustee, counsel for the debtors, and counsel for the UST regarding the same matters. The first such communication received by the Trustee from Mr. Billinger was in November 2023, approximately the time it probably became apparent that the Stark County Court of Common Pleas was going to grant the motion for summary judgment and deny his claims against Mr. Stanfill.

65. Based on the Trustee's experience, the type of examination requested by Mr. Billinger would easily cost in excess of $100,000 and probably hundreds of thousands of dollars in professional time to complete. Based on what has been presented the Trustee doubts that it would produce any meaningful recovery for creditors, even if he had the power to undertake it.

**IMPROPER COMMENCEMENT UNDER SUBCHAPTER V AND INVESTIGATION OF THE DEBTORS**

66. Mr. Billinger's first argument that the bankruptcy case was improperly commenced because it was in excess of the Subchapter V debt limit, is of no moment. Primarily, Mr. Billinger argues that this precluded the appointment of a creditors committee to protect creditors' rights in the case. This is, of course, simply wrong. Under 11 U.S.C. §1181(b) creditors can move the Court to direct the UST to appoint a creditors committee even in a Subchapter V case. At no point did TorEA or any other creditor seek such an appointment.

67. Further, even if the case had proceeded as a regular Chapter 11 bankruptcy case, there is no certainty that the UST would have been able to appoint a committee. Finally, the fact that no

creditors committee is appointed does not prevent creditors from undertaking their own examination of the debtor's financial affairs, as both TorEA and Mr. Forsell did in this case.

68. As set forth in his Motion to Compromise the Trustee does not have the power to investigate the financial affairs of the Debtor unless specifically authorized by the Court. 11 USC §1183(b)(2). On several occasions, the Trustee told counsel for TorEA and counsel for Mr. Forsell that he had no power to investigate the Debtors' financial affairs without court authority, and if they wanted him to undertake such an investigation they should seek to give him such authority from the Court. At no point did either TorEA or Mr. Forsell do so, instead as noted above, each undertaking their own investigation of the Debtors' affairs.

69. Mr. Billinger's demand for a massive investigation of the Debtors' financial affairs is therefore at best untimely and duplicative of TorEA's own efforts as well as the efforts of Mr. Forsell.

### CONSOLIDATION OF THE BANKRUPTCY ESTATES OF SQRL AND MWDC

70. Mr. Billinger's requests that the Debtors' bankruptcy estates 'be consolidated because there were never separately operated is exactly the same argument made in TorEA's objection to the confirmation of the Plans. TorEA's objection was overruled by the Court, and Mr. Billiger's argument is therefore barred under the doctrines of issue or claim preclusion.

> Preclusion comes in two kinds: claim and issue. As both commonly prohibit the relitigation of claims and issues previously decided, they are sometimes together referred to as res judicata—that is, a matter already decided. Taylor v. Sturgell, 553 U.S. 880, 891–92, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008). "Theoreticians of [procedure] have enjoyed countless hours delighting in the intricate rules of res judicata," or preclusion. 18 Wright & Miller's Federal Practice & Procedure § 4401 (3d ed. 2025).2 For our purposes, it suffices to say just a few things.
>
> *153 "Under the doctrine of claim preclusion," a prior "final judgment forecloses 'successive litigation of the very same claim.' " Taylor, 553 U.S. at 892, 128 S.Ct. 2161 (quoting New Hampshire v. Maine, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)). A hypothetical will illustrate. Allison sues Bob in state court, claiming his reckless driving caused her injuries when their cars collided. After a bench trial, the state-court judge rules for Bob. If Allison were to then go

to another court—say, federal district court—to sue Bob again for the accident, claim preclusion would apply to bar her lawsuit.

Issue preclusion, on the other hand, "bars 'successive litigation of an issue of fact or law' " that was " 'actually litigated[,] resolved in a valid court determination[, and] essential to th[at] prior judgment,' even if the issue recurs in the context of a different claim." Id. (quoting New Hampshire, 532 U.S. at 748–49, 121 S.Ct. 1808). Back to our hypothetical. In that state-court trial, Bob countersued Allison, claiming she was driving recklessly, not him. And the judge, when ruling for Bob, found that she was. Afterward, Allison's car insurer cancels her policy. She sues to restore coverage, arguing she was not driving recklessly—that it was a true accident. Issue preclusion prohibits her from making that argument, because the legal issue of Allison's recklessness was essential to the judgment for Bob and was actually litigated—meaning resolved on the merits, not dismissed on some procedural ground—in state court.3

*In re Adams,* 151 F.4th 144, 152–53 (3d Cir. 2025)

71. Whether designated as claim or issue preclusion TorEA argued in its objections to the Plans that SQRL and MWDC had never been operated separately and that a single integrated plan was the best option for confirmation. The Court rejected that argument in confirming both Plans. Therefore Mr. Billinger cannot now seek consolidation of these estates as that issue or claim has been already decided in this case.

<u>FRAUD BY ASSOCIATION</u>

72. The evidence that Mr. Billinger relies on to suggest that there is a conspiracy by Mr. Stanfill establishes nothing other than sound corporate practice. The fact that several related businesses with common ownership may have been placed in separate legal entities is not evidence of fraud. It is common commercial law practice to place an operating company in one legal entity, while the building that it operates from is owned in a different legal entity, even though the two entities have the same common ownership. Mr. Billinger's arguments that Mr. Stanfill has a number of companies engaged in related enterprises proves nothing.

73. Similarly, the relationship between Mr. Miranda and Mr. Stanfill referred to by Mr. Billinger was raised and litigated by TorEA in the objection to the Plans and the sale to Instantiation, and in the Stark County litigation against Mr. Stanfill and Mr. Miranda. It is also

discussed in the 2004 examination taken by TorEA of Mr. Stanfill in March 2022. These claims too are barred by issue or claim preclusion in this case.

<u>USE OF THE SQRL IP AND MISSING ASSETS</u>

74. The assets and intellectual property of the Debtors were sold to Instantiation early in this bankruptcy case. TorEA filed an objection to that sale which was overruled by the Court. Mr. Forsell filed a motion for relief from the judgment approving that sale which was also overruled by the Court. Therefore, if other parties, or even Mr. Stanfill are making use of the Debtors' intellectual property, that is no longer a concern for this bankruptcy estate. The only party that could complain about such use would be Instantiation, and this argument too is barred by the doctrines of issue and claim preclusion.

75. The evidence supplied by Mr. Billinger that there were missing assets is similarly unpersuasive. Setting aside the obvious hearsay issues with regard to his evidence, statements made by certain "persons" on message boards claiming that they have "SQRL cards" proves nothing. SQRL made and sold such cards prior to filing for bankruptcy and as noted above, Instantiation manufactured thousands of such cards after it acquired the assets from the Debtors. The fact that some "person" may claim that they have one of these cards is therefore of no concern.

76. The fact that MWDC spent large amount of money on electricity is not evidence of missing crypto assets, because MWDC provided hosting services and therefore normally would be expected to have used large amounts of electricity!

77. Finally, the Billinger Objection does not explain why even if there were assets to be found, they would not be subject to the blanket lien of Avnet.

## GOULD SETTLEMENT

78. The hyperbolic nature of Mr. Billinger's objections is nowhere better demonstrated than in his objection to the settlement of the Gould adversary.

79. The Gould complaint originally sought $182,249.43 from Mr. Gould; however, Mr. Gould established that most of the payments allocated to him in the Debtor's records were on a credit card in the name of the Debtor. *In short there were no transfers to Mr. Gould* despite what the Debtor's records appeared to show. Nevertheless Mr. Billinger objects.

## CONCLUSION

The objections raised by Mr. Billinger in his objection to the Motion to Compromise are either issues that have already been litigated and determined in this case, without appeal, or do not establish any grounds for concern. The Trustee is compromising only the Avoidance Actions in accordance with his limited role as set forth in the Plan. The Billinger Objection provides no substantive evidence of any wrongdoing but instead relies on innuendo and specious reasoning to try to continue lost litigation primarily against Mr. Stanfill.  It is not intended to provide a return to creditors.

THEREFORE, the Trustee respectfully requests that this Court enter an order approving the proposed compromise and authorizing his entry into the Settlement with the Defendants.

Respectfully submitted,
/s/ Frederic P. Schwieg, Esq.
Frederic P. Schwieg, Esq. (0030418)
Attorney at Law
19885 Detroit Rd #239
Rocky River, OH 44116
(440) 499-4506
fschwieg@schwieglaw.com

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

TOREA CONSULTING, LTD. )
1 Bow Street )
Stouffville, Ontario, Canada, )
)
     Plaintiff, )
)
-vs- )
)
DAVID STANFILL )
772 Treat Boulevard )
Tallmadge, Ohio 44278, )
)
and )
)
MICHAEL MARANDA )
38 Oaklawn Avenue )
Farmingville, New York 11738, )
)
     Defendants. )

**CASE NO.:2022CV00974**

**JUDGE KRISTIN G. FARMER**

**MOTION FOR LEAVE TO FILE**
**AMENDED COMPLAINT *INSTANTER***

    **NOW COMES** Plaintiff Torea Consulting, Ltd. ("Plaintiff" or "Torea"), by and through undersigned counsel, pursuant to Civ. R. 15 and hereby moves for leave to file the attached Amended Complaint *instanter*.

### MEMORANDUM IN SUPPORT

    Plaintiff is seeking leave to amend the Complaint to refine its existing claims. The Court should grant Plaintiffs' Motion pursuant to Civ.R. 15(A), which states:

> **(A) Amendments.** A party may amend its pleading once as a matter of course within twenty-eight days after serving it or, if the pleading is one to which a responsive pleading is required within twenty-eight days after service of a responsive pleading or twenty-eight days after service of a motion under Civ.R. 12(B), (E), or (F), whichever is earlier. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court shall freely give leave when justice so requires. Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within fourteen days after service of the amended pleading, whichever is later.

```
EXHIBIT

A
```

ENTERED BY

Since "the language of Civ.R. 15(A) favors a liberal amendment policy[,] * * * a motion for leave to amend should be granted absent a finding of bad faith, undue delay or undue prejudice to the opposing party." *Hoskinson v. Lambert*, Licking Co. App. No. 06CA037, 2006-Ohio-6940, at P32, quoting *Hoover v. Sumlin* (1984), 12 Ohio St.3d 1, 6, 12 Ohio B. 1, 465 N.E.2d 377. Prejudice to an opposing party is the most critical factor to be considered in determining whether to grant leave to amend. *Frayer Seed, Inc. v. Century 21 Fertilizer & Farm Chem., Inc.* (1988), 51 Ohio App.3d 158, 165, 555 N.E.2d 654. Timeliness of the request is another factor to consider, but delay, in itself, should not operate to preclude an amendment. *Id.*

Plaintiff is seeking leave in good faith and not for purposes of unnecessary delay. No party will suffer prejudice if the Court grants Plaintiff's Motion because, among other things, the Complaint was filed on June 21, 2022. Plaintiff Torea, therefore, respectfully moves the Court for leave to file the attached Amended Complaint *instanter*.

Respectfully submitted,

*/s/ R. Scott Heasley*
R. Scott Heasley (0087235)
sheasley@meyersroman.com
Carly Glantz (0098428)
cglantz@meyersroman.com
MEYERS, ROMAN, FRIEDBERG & LEWIS
28601 Chagrin Boulevard, Suite 600
Cleveland, OH 44122
Phone: (216) 831-0042
Fax:     (216) 831-0542
*Counsel for Plaintiff Torea Consulting, Ltd.*

2

| | |
|---|---|
| **TOREA CONSULTING, LTD.**<br>1 Bow Street<br>Stouffville, Ontario, Canada, | )<br>)<br>)<br>) **CASE NO. 2022CV00974** |
| Plaintiff, | )<br>) **JUDGE KRISTIN G. FARMER**<br>)<br>) |
| -vs- | )<br>) **FIRST AMENDED COMPLAINT**<br>) |
| **DAVID STANFILL**<br>772 Treat Boulevard<br>Tallmadge, Ohio 44278, | ) (Jury Demand Endorsed Hereon)<br>)<br>)<br>)<br>) |
| and | )<br>) |
| **MICHAEL MARANDA**<br>38 Oaklawn Avenue<br>Farmingville, New York 11738, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

**NOW COMES** Plaintiff Torea Consulting, Ltd. ("Plaintiff" or "Torea"), by and through undersigned counsel, and for its First Amended Complaint hereby states and alleges as follows:

## THE PARTIES

1.     Plaintiff is an Ontario, Canada-based business entity that is registered with the Ohio Secretary of State's Office.

2.     Defendant David Stanfill ("Stanfill") is an individual of full age and majority who resides at 772 Treat Boulevard, Tallmadge Ohio, 44278. Stanfill is an executive and/or member at the business entities described below.

3.     Michael Maranda ("Maranda") is an individual of full age and majority who resides at 38 Oaklawn Avenue, Farmingville, New York 11738. Maranda is a member of one or more of the business entities described below.

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction because Plaintiff's claims arise under Ohio law.

5.     The Court has personal jurisdiction because the torts at issue herein occurred in Stark County, Ohio and the Defendants have sufficient minimum contacts with the State of Ohio.

6.     Venue is proper based on Civ. R. 3 and the facts set forth herein.

## FACTUAL BACKGROUND

7.     This matter relates to agreements Torea and Squirrels Research Laboratories, LLC and/or its affiliates (collectively, "SQRL"), which were negotiated via the Discord messaging application that is commonly used by members of the cryptocurrency mining community.

8.     At the beginning of March 2021, Two Hundred Sixty-Seven (267) of Torea's cryptocurrency mining boards (the "Cards") were hosted at SQRL's sites.

9.     As experts in this arena, SQRL's officials approached Torea with a proposal to rent the Cards for one month. True and accurate copies of the Discord messages related to the rental (the "Rental Agreement") are attached hereto as Exhibit 1.

10.     SQRL agreed to pay weekly rent, one week in advance, in Ethereum cryptocurrency.

11.     Since the payments were to be made in advance, the amount of Ethereum mined was to be estimated and then adjusted subsequently to match the actual amount mined.

12.     The timing of the Ethereum payments was very important because, among other things, the value of Ethereum is volatile.

13.     SQRL took control of the Torea Cards on March 3, 2021, thus creating a fiduciary relationship between Torea and SQRL executives, Stanfill and Maranda.

14.    However, the first rental payment was not made.

15.    Furthermore, additional required rent payments were not made.

16.    Torea's requests for payment in full were repeatedly deflected or ignored.

17.    Eventually, SQRL made some partial payments, but the Cards were not returned to Torea.

18.    To date, the Cards still have not been returned.

19.    After it refused to pay rent for the Cards, Stanfill, who was an executive and part owner of SQRL, offered to buy the Cards for 160.2 Ethereum on **April 12, 2021**. True and accurate copies of the Discord messages related to the sale (the "Purchase Agreement") are attached hereto as Exhibit 2.

20.    Torea accepted the offer, but then SQRL failed to pay the full amount for the Cards in a timely manner.

21.    Instead, Stanfill admitted under oath that he sold some of Torea's Cards to Maranda on **April 13, 2021**, just one day after he agreed to pay 160.2 Ethereum to buy the Cards and before he paid Torea for the Cards.

22.    Based on documents SQRL filed in relation to its bankruptcy petition, Maranda was a part-owner and longtime customer of SQRL.

23.    During his deposition related to the bankruptcy case, Stanfill confirmed Maranda was an insider both before and after he sold Maranda the Torea Cards.

24.    Stanfill also admitted he sold additional Torea Cards to third parties on **April 15, 2021**. Once again, Stanfill sold the Cards before he paid Torea anything for them.

25. Stanfill testified that he promised to pay Torea in Ethereum for the Cards, but then he reneged on his promise because it was too expensive for him and/or SQRL to purchase Ethereum using U.S. Dollars.

26. Stanfill also testified that he made arrangements to transfer Torea's Cards to Maranda and third parties before Stanfill or SQRL paid for the cards.

## COUNT I
### (Fraudulent Inducement)

27. Plaintiff hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

28. Stanfill represented that he or SQRL would pay Torea 160.2 Ethereum to purchase the Cards.

29. Stanfill's offer of 160.2 Ethereum to purchase the Cards from Torea was a material term of the parties' transaction.

30. Stanfill made the offer falsely with knowledge and intent to deceive Torea because, among other things, he admitted he did not intend to pay Torea in Ethereum for the Cards unless and until it was financially advantageous for him and/or SQRL to do so.

31. Torea reasonably relied on Stanfill's promises that he or SQRL would pay Torea 160.2 Ethereum for the Cards.

32. Torea has suffered damages in excess of $25,000.00 as a result of Stanfill's fraudulent conduct.

## COUNT II
### (Unjust Enrichment)

33. Plaintiff hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

34.   Torea conferred a benefit upon Defendants Stanfill and Maranda by, among other things, letting them take possession and control of the Cards.

35.   Defendants Stanfill and Maranda were aware of the benefit conferred, to wit: they took control of and utilized the Cards.

36.   It would be unjust under the circumstances set forth herein for Defendants Stanfill and Maranda to retain the benefit conferred without paying Torea in full in Ethereum.

37.   Torea has suffered damages in excess of $25,000.00 as a direct and proximate result of the Defendants' unlawful conduct.

## COUNT III
### (Conversion)

38.   Plaintiff hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

39.   Defendants Stanfill and Maranda have exercised dominion and control of Torea's property – the Cards.

40.   Defendants Stanfill and Maranda's exercise of dominion and control of the Cards is inconsistent with Torea's rights of ownership because Defendants and SQRL failed to pay for the Cards in full in the timely manner.

41.   Torea has suffered damages in excess of $25,000.00 as a direct and proximate result of the Defendants' unlawful conduct.

## COUNT IV
### (Civil Conspiracy)

42.   Plaintiff hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

43.     As set forth above, Defendants Stanfill and Maranda have engaged in various tortious conduct aimed at injuring Torea.

44.     Defendants Stanfill and Maranda conspired with one another to facilitate the transfer of a portion of the Cards to Maranda even though neither Stanfill, Maranda, nor SQRL had paid Torea anything for the Cards.

45.     The actions noted above were intentional, willful, and malicious.

46.     The actions noted above were deliberately committed for Defendants' financial gain.

47.     Plaintiff has suffered damages in excess of $25,000 as a result of Defendants' unlawful conduct.

## COUNT V
### (Defalcation)

48.     Plaintiff hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

49.     By hosting the cards, Defendants had physical control over the cards and kept the cards in their possession for safe keeping and operations.

50.     Defendants improperly altered the hosting relationship and exercised unfair advantage related to their dominion and control of the cards by first, failing to pay rent in full for the hosted cards and then later, offering to buy the cards from Plaintiff and then immediately reselling those cards to third parties before payment was made in full.

51.     Defendants' actions amount to defalcation and occurred while Defendants were acting in a fiduciary capacity.

52.     Plaintiff has suffered damages in excess of $25,000 as a result of Defendants' unlawful conduct.

**WHEREFORE**, Plaintiff Torea Consulting, Ltd. hereby demands judgment as follows:

(i)       On Counts I-V, judgment against Defendants David Stanfill and Michael Maranda and damages in excess of $25,000.00;

(ii)      Pre- and post-judgment interest;

(iii)     Attorney's fees and costs; and

(iv)     Any further relief the Court deems just and equitable.

Respectfully submitted,

*/s/ R. Scott Heasley*
R. Scott Heasley (0087235)
sheasley@meyersroman.com
Carly Glantz (0098428)
cglantz@meyersroman.com
MEYERS, ROMAN, FRIEDBERG & LEWIS
28601 Chagrin Boulevard, Suite 600
Cleveland, OH 44122
Phone: (216) 831-0042
Fax:    (216) 831-0542
*Counsel for Plaintiff Torea Consulting, Ltd.*

## JURY DEMAND

Plaintiff hereby demands a trial by jury, with the maximum number of jurors permitted by law, in relation to all of its claims.

*/s/ R. Scott Heasley*
R. Scott Heasley (0087235)
*Counsel for Plaintiff Torea Consulting, Ltd.*

## Exhibit 1
## Rental Agreement

*Extracted from Discord messaging app*





{02162875}

## Exhibit 2
### Purchase Agreement

*Extracted from Discord messaging app*





GPU loader · 04/22/2021
I'd like to get this resolve... as soon as possible either by computing the amount... then hading to [c] address

GPU loader · 04/22/2021
It will be done here, I'm sending you 24 ETH now as deposit, there are funds owed me that are being withheld due a vpn issue - hopefully sorted tonight
0x6f675cae0c4d4e6ab0fce43f374ac793dd62c2bae...9597907b8b6b547... 1b...

pbl · 04/22/2021
OK, I see 24 ETH confirming

GPU loader · 04/22/2021
I should get the USDT to convert and send so soon as the client can confirm access to their machine, working on that now, I hope this will be no later than tomorrow

GPU loader · 04/22/2021
Different machines, just funding source

pbl · 04/26/2021
Now would be a good time to be converting from USDT. Were you able to resolve your issues?

pbl · 04/28/2021
Can you let me know when to expect payment?

pbl · 05/29/2021
I'd like an update

pbl · 01/20/2021
Please respond ASAP

pbl · 01/20/2021
are you still waiting for funds from a client?

pbl · 05/01/2021
Who is collecting the revenue from the cards currently?
Are they mining to your wallet?

pbl · 05/03/2021
If there is going to be a significant additional delay in payment then we should move the cards back to mining ETH on my address

pbl · 05/03/2021
mining address for ETH is 0xE112453dQ6D84AC4E9C02C13537185dF6f526532

pbl · 05/04/2021
I'll let Fiona know the cards should be moved over

pbl · 05/05/2021
I'd like an update

pbl · 05/05/2021
What is your suggested path forward?

pbl
If you would respond and articulate the situation then I can probably devise a solution. Right know I have limited information on which to act.
Clyde
Your message could not be delivered. This is usually because you don't share a server with the recipient or the recipient is only accepting direct messages from friends. You can see the full list of reasons here: https://support.discord.com/hc/en-us/articles/360060145013
Only you can see this • Dismiss message

{02162877}

# CERTIFICATE OF SERVICE

A copy of this Response was served on the following on the date filed by Notice of Electronic Filing or email.

John C. Cannizzaro on behalf of Interested Party Instantiation LLC
John.Cannizzaro@icemiller.com, Kelli.Bates@icemiller.com

Nicholas Paul Capotosto on behalf of Debtor Squirrels Research Labs LLC
nick.capotosto@dinsmore.com, theresa.palcic@dinsmore.com

Nicholas Paul Capotosto on behalf of Plaintiff Squirrels Research Labs LLC
nick.capotosto@dinsmore.com, theresa.palcic@dinsmore.com

Christopher Paul Combest on behalf of Creditor Avnet, Inc.
christopher.combest@quarles.com

Jack B. Cooper on behalf of Defendant Squirrels LLC
jcooper@milliganpusateri.com

Jack B. Cooper on behalf of Defendant Andrew Gould
jcooper@milliganpusateri.com

Jack B. Cooper on behalf of Defendant David Stanfill
jcooper@milliganpusateri.com

Jack B. Cooper on behalf of Defendant Jessica Gritzan
jcooper@milliganpusateri.com

Jack B. Cooper on behalf of Defendant Kyle Slutz
jcooper@milliganpusateri.com

Jack B. Cooper on behalf of Defendant Sidney Keith
jcooper@milliganpusateri.com

John G. Farnan on behalf of Creditor Cincinnati Insurance Company
jfarnan@westonhurd.com

Robert E. Goff, Jr. on behalf of Creditor Cincinnati Insurance Company
rgoff@westonhurd.com, cvadino@westonhurd.com

Steven Heimberger on behalf of Interested Party SCEB, LLC
sheimberger@rlbllp.com, HeimbergerSR82735@notify.bestcase.com

Jeannie Kim on behalf of Interested Party Instantiation LLC
JeKim@sheppardmullin.com, dgatmen@sheppardmullin.com

Marc Merklin on behalf of Debtor Squirrels Research Labs LLC
mmerklin@ralaw.com, dignasiak@ralaw.com

Marc Merklin on behalf of Plaintiff Squirrels Research Labs LLC
mmerklin@ralaw.com, dignasiak@ralaw.com

David M. Neumann on behalf of Creditor Envista Forensics, LLC d/b/a AREPA
dneumann@meyersroman.com, docket@meyersroman.com;mnowak@meyersroman.com

Christopher Niekamp on behalf of Creditor Better PC, LLC
cniekamp@bdblaw.com

Matthew T. Schaeffer on behalf of Creditor Fleur-de-Lis Development, LLC
mschaeffer@baileycav.com, lpatterson@baileycav.com

Matthew T. Schaeffer on behalf of Defendant Fleur-de-Lis Development, LLC
mschaeffer@baileycav.com, lpatterson@baileycav.com

Matthew T. Schaeffer on behalf of Defendant Cynthia Heinz
mschaeffer@baileycav.com, lpatterson@baileycav.com

Matthew T. Schaeffer on behalf of Defendant Rocco Piacentino
mschaeffer@baileycav.com, lpatterson@baileycav.com

Paul J. Schumacher on behalf of Interested Party Ohio Power Company dba American Electric Power
pschumacher@dmclaw.com, tgross@dmclaw.com

Frederic P. Schwieg
fschwieg@schwieglaw.com, OH84@ecfcbis.com

Frederic P. Schwieg on behalf of Plaintiff Frederic P Schwieg
fschwieg@schwieglaw.com, OH84@ecfcbis.com

Frederic P. Schwieg on behalf of Trustee Frederic P. Schwieg
fschwieg@schwieglaw.com, OH84@ecfcbis.com

Frederic P. Schwieg on behalf of Trustee Frederic P. Schwieg
fschwieg@schwieglaw.com

Bryan Sisto on behalf of Creditor Carl Forsell
bsisto@fbtlaw.com

Richard J. Thomas on behalf of Creditor Premier Bank
rthomas@hendersoncovington.com, dciambotti@hendersoncovington.com

Joshua Ryan Vaughan on behalf of Creditor Ohio Bureau of Workers Compensation
jvaughan@amer-collect.com, SAllman@AMER-COLLECT.COM;HouliECF@aol.com

Julie K. Zurn on behalf of Attorney Brouse McDowell, LPA
jzurn@ralaw.com, llawrence@ralaw.com;skenna@ralaw.com

Julie K. Zurn on behalf of Debtor Squirrels Research Labs LLC
jzurn@ralaw.com, llawrence@ralaw.com;skenna@ralaw.com

Julie K. Zurn on behalf of Debtor The Midwest Data Company LLC
jzurn@ralaw.com, llawrence@ralaw.com;skenna@ralaw.com

Julie K. Zurn on behalf of Plaintiff Squirrels Research Labs LLC
jzurn@ralaw.com, llawrence@ralaw.com;skenna@ralaw.com

Lauren Schoenewald ust47 on behalf of U.S. Trustee United States Trustee
lauren.schoenewald@usdoj.gov

VIA EMAIL
Paul Billinger
paul.billinger@toreaconsulting.com

VIA MAIL and Email
Sam Adams
3417 Bush Street
Stevens Point, WI 54481
msteel@steelcolaw

VIA MAIL
Paul Pasika
233 Schemmer St
Burlington, WI 53105

/s/ Frederic P. Schwieg
Frederic P. Schwieg