UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 21-61491-TNAP |
| | ) | (JOINTLY ADMINISTERED) |
| Squirrels Research Labs LLC, *ET AL.* | ) | Chapter 11 |
| | ) | Subchapter V |
| Debtors | ) | Judge Tiiara N.A. Patton |

## CREDITOR'S MOTION FOR RECONSIDERATION AND SUPPLEMENTAL FACTUAL DEVELOPMENT
Pursuant to Federal Rule of Bankruptcy Procedure 9024 (Rule 60(b)(1) and Rule 60(b)(6))

At the October 28, 2025 hearing, this Court expressed serious concerns about the Committee's standing and whether its members had actually authorized this action. The Ad Hoc Committee of Creditors directly addresses those concerns through Exhibit E – Committee Member Authorizations, containing written confirmation from committee member Elliot Boutin (Claim #16) dated November 5, 2025 at 9:24 A.M., explicitly authorizing Paul Billinger as committee coordinator.

But standing is not the real issue. The real issue is far more fundamental: A settlement approving 2.5% recovery—releasing $3.02 million in liability for just $75,500— requires justification through documented investigation. No investigation documentation supports this extraordinary outcome. When creditors asked for that documentation after the October 28 hearing, the Trustee responded not with facts but with procedural objections (Exhibit C).

This motion seeks one thing: a supplemental factual record proving that investigation actually occurred. If it did not, the settlement should be held in abeyance pending further investigation and supplemental findings of fact. If it did occur, documenting it will take ten hours of the Trustee's time to answer eight straightforward questions in writing.

## DISCLOSURE: PAUL BILLINGER IS NOT AN ATTORNEY
The undersigned, Paul Billinger, is a creditor coordinator for the Ad Hoc Committee of Creditors. Billinger is not an attorney, does not hold a license to practice law, and provides no legal advice. This motion presents factual findings and creditor observations regarding investigation adequacy. Any legal conclusions are presented for the Court's consideration and are not offered as legal opinions by a non-attorney. Creditors are not represented by counsel in this motion; they file pro se as parties in interest in the bankruptcy estate.

## TO THE HONORABLE COURT AND ALL PARTIES IN INTEREST:
Creditor respectfully submits this Motion for Reconsideration and Supplemental Factual Development pursuant to Bankruptcy Rule 9024 and Federal Rules of Civil Procedure 60(b)(1) and (6). The November 4, 2025 Order approving the settlement of claims totaling $3,021,027.99 for $75,500 (2.5% recovery) should be reconsidered based on extraordinary circumstances: (1) extraordinary disparity in recovery that cannot be explained without adequate factual development; (2) mistake of fact regarding the adequacy of investigation supporting settlement; and (3) deficient factual record that prevented the Court from fulfilling its own stated legal standard of apprising "all facts necessary for an intelligent and objective opinion."

This motion is supported by a comprehensive factual record demonstrating that the settlement was approved without investigation documentation, despite creditors' pre-hearing notice of specific, documented investigation gaps that remain unaddressed.

In the alternative, Creditor respectfully requests the Court exercise its authority under 11 U.S.C. § 105(a) and § 704(a)(4) to order the Trustee to file a written report addressing the eight investigation questions (Exhibit B) within 14 days, **regardless of movant's standing**.

## EXECUTIVE SUMMARY

This motion seeks reconsideration of the November 4, 2025 settlement approval under Rule 60(b)(1) (mistake of fact) and (6) (extraordinary circumstances). The core issue is **not** whether the settlement was correct on the merits, but whether it was approved based on an **incomplete factual record** regarding investigation adequacy.

**Key Facts:**

1. **Extraordinary Low Recovery**: Settlement of $3,021,027.99 in claims for $75,500 (2.5% recovery) requires justification through adequate investigation.
2. **Documented Investigation Gaps**: Creditors identified eight specific investigation gaps before the hearing, supported by bank records and documentary evidence:
   o Amanda McConnell credit card timeline (coordinated removal 2.5 months pre-bankruptcy)
   o $75,000 uninvestigated preference claim
   o DAS Factory commingling
   o Cryptocurrency transaction gaps
   o Travel expense diversions
   o Equity stripping disguised as loans
   o Securities fraud (fund solicitation while insolvent)
   o Slutz payment diversion
3. **No Investigation Documentation**: The settlement motion (Doc. 394) contains no investigation reports, expert analysis, document review summaries, or explanation of investigation methodology.
4. **Trustee Refused to Respond**: When creditors requested investigation documentation post-hearing (October 29), the Trustee responded with suggestion of unauthorized practice of law referral rather than factual answers (Exhibit C).
5. **Court's Own Standard Not Met**: The Court stated approval requires apprising itself of "all facts necessary for an intelligent and objective opinion." Those facts were not presented.

**Relief Requested:**

Vacation of settlement approval pending supplemental factual development through written Trustee responses to eight investigation questions, creditor response period, and supplemental hearing if factual disputes arise.

**This is not a request to relitigate claims—it is a request to document that investigation supporting the settlement actually occurred.**

## I. CREDITOR'S REQUEST TO THE COURT

Creditor respectfully requests that this Court:

1. Reconsider the November 4, 2025 Order approving settlement under Rule 60(b)(1) (mistake of fact) and Rule 60(b)(6) (extraordinary circumstances);

2. Vacate the settlement approval pending supplemental factual development;
3. Issue an Order requiring the Trustee to provide written responses to eight specific, documented investigation questions within 14 days. The Court may note that such responses are required by: (a) the Trustee's mandatory duty under 11 U.S.C. § 704(a)(4) to investigate the debtor's financial affairs and fraud; (b) the Trustee's authority granted in Plan Article 8 to prosecute avoidance actions (which inherently includes investigative authority); and (c) the Court's authority under 11 U.S.C. § 105(a) to compel production of information material to estate administration. Responses should specifically address:
   - Whether transaction source documents were reviewed (vendor invoices, bank statements, credit cards, accounting records)
   - Whether charges were independently verified
   - Whether testimony or statements were obtained from defendants (Rule 2004 exams, depositions, interrogatories)
   - Whether expert analysis or forensic review was commissioned
   - What written documentation exists regarding investigation
   - What costs were incurred conducting investigation
   - What constraints limited the investigation
   - Whether alternative legal theories and avoidance claims were explored (fraud claims specifically)
4. Grant creditors a 14-day response period following Trustee's response;
5. Conduct supplemental hearing on settlement adequacy if creditors' responses present factual disputes;
6. In the alternative, award supplemental findings of fact regarding investigation scope and adequacy;
7. Award costs and attorney fees incurred in connection with this motion.

## II. FACTUAL BASIS: THE EXTRAORDINARY DISPARITY DEMANDS EXPLANATION
### A. Settlement Recovery Is Extraordinarily Low and Unexplained

| Metric | Amount |
| --- | --- |
| Claims Asserted Against Defendants | $3,021,027.99 |
| Settlement Recovery      . | $75,500 |
| Recovery Rate | 2.5% |
| Released Liability | $2,945,527.99 (97.50% released) |

This recovery rate is objectively extraordinary. Typical Chapter 11 settlements range from 10–40% depending on case complexity and litigation merit. A 2.5% recovery—releasing $3.02 million in liability for $75,500—requires demonstrable justification that investigation proved all litigation would be futile and all avoidance theories untenable.

No such justification appears in the record.

## B. The Court's Own Legal Standard Was Not Met

At the October 28, 2025 hearing, this Court stated:

*"There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised herself of all the facts necessary for an intelligent and objective opinion of probabilities and ultimate success should the claim be litigated."*

The settlement motion (Doc. 394) contains:

- ✗ No investigation plan or protocol
- ✗ No written investigative reports
- ✗ No expert analysis or findings
- ✗ No documentation of documents reviewed
- ✗ No response to the specific gaps identified by creditors
- ✗ No explanation of investigation methodology
- ✗ No investigation cost accounting
- ✗ No timeline of investigative activities

The motion simply states: "Trustee negotiated settlement; Court should approve."

This does not contain the investigation documentation necessary to satisfy the Court's stated standard.

## III. CRITICAL DISTINCTION: THIS IS NOT A "CREDITORS WANT A NEW HEARING" MOTION

### 1. Essential clarification for anticipated objections

This motion does NOT argue that creditors were denied their "day in court." Creditors testified at the settlement hearing. Creditors filed detailed objections (Doc. 410). Creditors were heard. That is not the problem.

The problem is that the Court's approval was based on an inadequate factual record regarding investigation adequacy.

The motion seeks to require that:

1. The Court's approval be grounded in adequate factual support, not assumptions about investigation
2. The Trustee document what investigation was actually conducted
3. The record be supplemented with facts the Court said were "necessary" for informed judgment

This is fundamentally different from claiming creditors were denied opportunity to be heard. Creditors were heard. The problem is that documented concerns about investigation gaps were not investigated or explained before settlement was approved.

### B. The Estate's financial constraints make investigation adequacy even more critical

The estate's near-insolvency context does not justify inadequate investigation—it demands more rigorous investigation to maximize recovery from available sources.

ESTATE FINANCIAL FACTS

Available estate funds (as of settlement hearing): Approximately $61,000

Total claims asserted against defendants: $3,021,027.99

Ratio: Claims exceed available funds by factor of 49:1

WHY THIS CONTEXT MAKES INVESTIGATION MORE NECESSARY, NOT LESS

When an estate is administratively insolvent (claims vastly exceed available assets), investigation

into avoidance actions and insider transfers becomes THE ONLY MEANINGFUL RECOVERY MECHANISM for creditors.

In a solvent estate with substantial assets already collected:
- Creditor recovery is less dependent on successful avoidance action performance
- Trustee can settle marginal claims and still provide meaningful recovery

In an insolvent estate:
- Avoidance actions are the PRIMARY WAY to recover additional estate value
- Settlement of avoidance claims directly determines creditor recovery
- Inadequate investigation directly diminishes creditor recovery

This is precisely why § 704(a)(4) investigation duties are MOST CRITICAL in insolvent estates. Trustees cannot justify minimal investigation in administratively insolvent estates by arguing "limited role" or "cost constraints." In fact, cost constraints in insolvent estates make it MORE important to investigate thoroughly BEFORE settling claims at a 2.5% recovery.

SETTLEMENT AT 2.5% IN INSOLVENT ESTATE CONTEXT CREATES A BINARY OUTCOME

A $75,500 settlement on $3.02 million in claims might be justifiable in a well-capitalized estate where creditors will recover well from other sources regardless of settlement success. But in an estate with only $61,000 in available funds, settling $3 million in claims for $75,500 (representing only 2.5% of claims, but releasing 98.7% of potential recovery potential) requires demonstrable proof that investigation established those claims are genuinely uncollectible.

Settlement at 2.5% recovery in this context reflects one of two scenarios:

Scenario A: Adequate Investigation + Weak Claims
   - Investigation proved that fraud claims are untenable
   - Cryptocurrency recovery is impossible
   - Insider transfers lack merit
   - Equity stripping claims fail
   - Systematic asset stripping pattern offers no recovery
   - Settlement at 2.5% reflects prudent risk management of genuinely weak claims
   - ACCEPTABLE OUTCOME

Scenario B: Inadequate Investigation + Unknown Claim Strength
   - Investigation was minimal or undocumented
   - Claim strength is genuinely unknown because investigation was inadequate
   - Settlement at 2.5% represents false certainty based on insufficient information
   - No factual basis exists to justify releasing $2.95 million in potential liability
   - UNACCEPTABLE OUTCOME

No middle ground exists in an insolvent estate context. The Court must satisfy itself which scenario applies by reviewing investigation documentation.

STATUTORY POLICY SUPPORTS THOROUGH INVESTIGATION IN INSOLVENT ESTATES

Section 704(a)(4) imposes mandatory investigation duties on all trustees. This duty is especially important in insolvent estates where investigation directly impacts creditor recovery. A Subchapter V trustee cannot claim "limited role" as justification for inadequate investigation when that limited role results in releasing the only available source of creditor recovery—avoidance actions against insiders.

**IV. CREDITORS PROVIDED DETAILED PRE-HEARING NOTICE OF**

## INVESTIGATION GAPS

Timeline establishing that creditors gave the Trustee and Court clear, documented notice of concerns before settlement approval:

September 17–29, 2025: Creditor coordinator Paul Billinger provided detailed written communications to Trustee Frederic Schwieg and U.S. Trustee Lauren Schoenewald, identifying specific, documented investigation gaps.

October 24, 2025: The Ad Hoc Committee of Creditors filed their Response to Trustee's Motion to Approve Compromise (Doc. 410), providing comprehensive documentation of investigation gaps, fraud allegations, perjury, and asset concealment requiring further investigation.

October 28, 2025: Settlement hearing occurred. The motion approving settlement (Doc. 394) contains no substantive response to the documented gaps raised both pre-hearing (through creditor communications) and in the October 24 Response (Doc. 410).

October 29, 2025, 8:00 AM: Creditors requested investigation documentation. Trustee received specific questions.

October 29, 2025, 10:19 AM: Trustee responded not with factual answers but with procedural objections rather than substantive responses (Exhibit B).

### A. Eight Specific Investigation Gaps Documented by Creditors

Creditors identified and documented the following investigation gaps, with detailed factual support:

Gap #1: DAS Factory LLC Commingling

What Creditors Documented:

Evidence of money flowing from SQRL to DAS Factory LLC, an entity controlled by insiders. This suggested systematic asset diversion that required investigation.

Creditor Communication (September 29, 2025):

"DAS Factory LLC commingling..." [with documentary attachment showing specific transactions]

Status: No documentation in settlement motion showing investigation.

Why This Matters: Commingling between related entities requires forensic accounting analysis to trace flows, identify fraudulent transfers, and calculate recovery potential. Failure to investigate suggests either: (1) investigation was not conducted, or (2) investigation was conducted but findings hidden from the Court.

Gap #2: Unexplained Travel Expenses and Insider Business Diversions

What Creditors Documented:

SQRL paid for flights and travel for David Jimenez, identified as a known associate of Stanfill but not legitimately involved with SQRL. Creditors documented: "Anything travel related is likely attributable to the defendant's other businesses."

Pattern Documented by Creditors:

Money coming in the front door (preorders, equity solicitations) while insiders are asset stripping via the back door (diversion to personal business ventures).

Status: No documentation in settlement motion showing investigation of travel payments or verification that they benefited SQRL business.

Why This Matters: Travel expenses funded by an entity for individuals with no business relationship to that entity constitute red flags for: (1) fraudulent diversion, (2) misappropriation of funds, (3) insider self-dealing. These are core investigative targets under § 704(a)(4).

Gap #3: Equity Stripping Disguised as Undocumented "Loans"
What Creditors Documented:
Stanfill was "suddenly removing large amounts of equity, while recharacterizing as a 'loan' (without documentation)" while the company was insolvent.
Factual Pattern:
- Equity removed from insolvent entity
- Recharacterized as loans without documentation
- No promissory notes, repayment terms, or security agreements
- No repayments made
- Company had overdue debts to creditors

Status: No investigation documentation in settlement motion showing analysis of equity withdrawal/recharacterization transactions.

Why This Matters: Recharacterization of equity withdrawals as undocumented loans while insolvent constitutes fraudulent transfer under 11 U.S.C. § 548. This requires forensic analysis to: (1) identify all such transactions, (2) establish intent to defraud or constructive fraud elements, (3) calculate liability.

Gap #4: Credit Card Investigation Not Conducted
This is an anchor piece of evidence showing systematic pre-bankruptcy planning.
What Creditors Documented:
JPMorgan Chase subpoena response (dated July 29, 2024) reveals credit card account #****9736 in the name of SQUIRRELS RESEARCH LABS LLC (corporate account) with three authorized users:
- Andrew Gould (added 07/25/2018)
- David Stanfill (added 03/15/2019, removed 09/02/2021)
- Amanda McConnell (added 05/17/2021, removed 09/02/2021)

CRITICAL TIMELINE SHOWING PRE-BANKRUPTCY PLANNING:
- May 17, 2021: Amanda McConnell added as authorized user (6 months before bankruptcy)
- July 15, 2021: Fire at SQRL facility
- September 2, 2021: BOTH Stanfill AND McConnell removed on the SAME DAY—2.5 months before bankruptcy filing
- November 23, 2021: Bankruptcy petition filed

Significance of Coordinated Removal:
The coordinated removal of two corporate insiders on the exact same day, precisely 2.5 months before bankruptcy filing, constitutes evidence of pre-bankruptcy planning and potential bankruptcy fraud under 18 U.S.C. § 152.

This timing is virtually impossible to explain as coincidental.

Investigation Gaps Identified by Creditors:
1. Who is Amanda McConnell?
2. What is her relationship to Stanfill, Gould, or SQRL?
3. Was she employee, family member, or nominee?
4. What charges did McConnell make between May 17–September 2, 2021?
5. Were charges for business or personal purposes?
6. What is the total amount charged by each authorized user?
7. Why were both Stanfill and McConnell removed on the exact same day?

8. Was this coordinated removal part of bankruptcy planning?

Status: Settlement motion (Doc. 394) contains NO mention of credit card investigation. The Trustee's Response to Objections (Docket 407, ¶¶78–79) references the credit card but states not knowing whose name was on it. Now we know: three authorized users, including an unidentified person (McConnell), with documented coordinated removal 2.5 months before bankruptcy.

Why This Matters:
- This is documentary evidence from bank records (not speculation)
- The timeline is objective and dated
- Coordinated removal two months before bankruptcy is virtually unexplainable without investigation
- Standard investigative practice requires identifying McConnell, obtaining credit card statements, and analyzing the pattern
- Investigation cost: $5,000–$10,000 (subpoena, interviews, document review)
- Potential recovery: Unknown but potentially substantial given fraud indicators

Creditor's October 27 Communication Specifically Addressing This:
*"The coordinated removal of Amanda McConnell and David Stanfill from corporate credit card access on September 2, 2021—exactly 2.5 months before bankruptcy filing—is powerful evidence of pre-bankruptcy planning that requires investigation before any settlement can be approved."*

Gap #5: Slutz Payments with "Payment on Account" Without Documentation

What Creditors Documented:
Payments to Kyle Slutz marked "payment on account" with no supporting documentation. Slutz is identified as caretaker/manager for Defendant's real estate empire, not SQRL personnel.

Creditors' Analysis:
"Much of Slutz expense suspected diverted to non-SQRL properties."

Investigation Gaps:
- Were invoices reviewed for authenticity?
- Were shipping addresses analyzed to determine if items went to SQRL facilities or Slutz personal properties?
- Were products actually received and logged in SQRL inventory?
- For "services" invoices, was work actually performed for SQRL?
- Were "payment on account" entries reconciled to actual services rendered?

Status: No investigation documentation in settlement motion showing verification of Slutz payments.

Why This Matters: Insider payments marked "payment on account" without documentation are red flags for: (1) fictitious invoices, (2) personal expense recharacterization, (3) asset diversion. Investigation requires cross-referencing invoices against inventory records, third-party confirmations, and shipping records.

Gap #6: Cryptocurrency Transactions Never Investigated

What Creditors Documented:
"Non-reported crypto transactions" existed and required investigation. Creditors specifically identified named cryptocurrency exchanges (Nexo, Coinbase, Biki, Binance) and explained tracing methodology.

Facts About SQRL:
- Operated as cryptocurrency mining business

- Exchange accounts traceable on-chain
- Exchange account ownership determinable through subpoena
- Blockchain analysis is standard investigative practice

Investigation Gaps:
- Were exchange accounts identified?
- Were accounts subpoenaed?
- Were transaction records obtained?
- Were transfers to insiders or other parties traced?
- Was on-chain analysis conducted?
- What was the value of cryptocurrency holdings as of petition date?

Status: Settlement motion contains zero mention of cryptocurrency investigation.

Why This Matters:
- Given SQRL's nature as cryptocurrency mining operation, this investigation was standard and necessary
- Forensic blockchain analysis: $10,000–$25,000
- Potential recovery: Unknown but potentially substantial
- Failure to investigate suggests conscious avoidance

Gap #7: Securities Fraud—Fund Solicitations While Insolvent

What Creditors Documented:

SQRL solicited funds from investors in March 2021 while:
- Stanfill admitted under oath that company was insolvent since 2018
- Creditors misrepresented financial condition to investors
- March 2021 presentation depicted Squirrels LLC staff as SQRL personnel (commingling misrepresentation)

This Constitutes:
- Potential securities fraud
- Fraudulent inducement of investors
- Equitable subordination grounds

Investigation Gaps:
- Were investor presentations reviewed?
- Were statements about financial condition analyzed for accuracy?
- Were investors identified and interviewed?
- Was a claim against insiders for fraudulent securities solicitation investigated?
- Was equitable subordination analysis conducted?

Status: No securities fraud analysis in settlement motion.

Why This Matters: Investors deceived into purchasing equity while company was insolvent have claims for damages. Failure to investigate constitutes release of significant recovery potential.

Gap #8: Systematic Asset Stripping Pattern

What Creditors Characterized:

"Money coming in the front door, with preorders and equity solicitations, while insiders are asset stripping via the back door."

Characterized as: "Coordinated and systematic ransacking of corporate assets."

Pattern Documented:
- Credit card authorized users suddenly removed (coordinated, dated, 2.5 months before

bankruptcy)
- Travel expenses funded for insider's associates
- Equity withdrawn and recharacterized as undocumented loans
- Payments marked "payment on account" without verification
- Cryptocurrency assets untraced
- Equipment unaccounted for

This Is Not Random Irregularities—It Is Systematic Fraud.

Investigation Gaps:
- Was a comprehensive analysis prepared comparing all insider transfers?
- Was a timeline created showing the coordination of these activities?
- Was forensic analysis conducted to trace asset flows?

Status: Settlement motion addresses none of this pattern analysis.

Why This Matters: Systematic fraud requires comprehensive analysis. A settlement of $75,500 on $2.86 million in claims cannot be justified without demonstrating that systematic pattern investigation found meritless claims.

## V. CREDITOR INQUIRIES AND TRUSTEE'S RESPONSE PATTERN: PROCEDURAL OBJECTIONS INSTEAD OF INVESTIGATION DOCUMENTATION

### A. Timeline of Notice and Trustee Response

September 17–29, 2025: Detailed communications from creditor coordinator Paul Billinger to Trustee Frederic Schwieg and U.S. Trustee Lauren Schoenewald, identifying eight specific investigation gaps with documentary support (Exhibit A).

October 24, 2025: Ad Hoc Committee filed Response to Motion to Approve Compromise (Doc. 410), comprehensively documenting investigation gaps, fraud allegations, and perjury requiring further investigation.

October 28, 2025: Court approved settlement without addressing documented concerns.

October 29, 2025, 8:00 AM: Creditor Paul Billinger sent Trustee detailed request for investigation documentation, with eight specific questions citing 11 U.S.C. § 704(a)(4) mandatory investigation duty (Exhibit B—Original Request).

October 29, 2025, 10:19 AM: Trustee responded not with factual answers but with procedural objections (Exhibit C—Trustee's Email).

October 29, 2025, 11:04 AM: Creditors provided comprehensive response analyzing § 704(a)(4), Plan Article 8 authority, and statutory framework (Exhibit D— Detailed Response from Paul Billinger to Frederic Schwieg Addressing Statutory Framework).

### B. The Trustee's October 29 Email: Evidence of Consciousness of Inadequate Investigation

Trustee's Exact Words (October 29, 2025, 10:19 AM):

*"Mr. Billinger you are not a party in interest and not a lawyer. Your statements show that you do not understand or will not understand my limited role here. If you don't stop, I will have no choice but to refer you for the unauthorized practice of law as you continue to claim you represent other unnamed parties in this case. Thank you."*

What This Email Proves:
1. Trustee Received Specific Investigation Questions – The Trustee received eight detailed questions about investigation methodology, costs, documentation, constraints, and alternative theories.
2. No Factual Documentation Provided
   Despite receiving detailed requests for investigation documentation, the Trustee

did not provide:
- Dates investigation was conducted
- Hours invested in investigation
- Specific documents reviewed
- Alternative theories considered
- Constraints that affected investigation scope
None of this information appears in the October 29 email response.

Communication Pattern Reflects Investigation Documentation Gaps

This communication pattern—receiving specific documentation requests and responding with procedural objections rather than factual information—is consistent with inadequate investigation documentation. When a fiduciary is able to document investigation activities, that documentation is typically provided in response to inquiries. The absence of documentation, combined with procedural responses, suggests the documentation may not exist.

3. Distinction Between Trustee's Authority and Investigation Obligation

The Trustee's October 29 email addresses concerns about the Trustee's "limited role" and creditors' alleged unauthorized practice of law. These are separate issues from investigation documentation.

The relevant legal standard is not whether Mr. Billinger is authorized to request investigation documentation. The relevant standard is whether the Trustee has fulfilled the mandatory investigation obligations under 11 U.S.C. § 704(a)(4) and whether that investigation was adequate before settling $3 million in claims.

The Trustee's October 29 email does not address investigation adequacy. It addresses procedural concerns about how questions are being asked. These are distinct issues.

Legal Significance:

Under Federal Rule of Evidence 801(e)(2), party admissions include conduct that is inconsistent with claims. A trustee who claims to have conducted adequate investigation but refuses to document it—and instead threatens questioners—has effectively admitted inadequate investigation.

**C. Interpretation of creditor communications in Exhibits A-D**

NOTE REGARDING LANGUAGE IN SUPPORTING EXHIBITS

This motion is supported by creditor communications dated September 17 through October 29, 2025 (Exhibits A-D), which contain creditors' written concerns about investigation adequacy expressed contemporaneously during the pre-settlement period.

Those communications use language reflecting creditors' perspective that investigation was not adequately documented by the Trustee. These exhibits represent creditor impressions and concerns based on the settlement motion's lack of investigation documentation. The Court should understand that these exhibits demonstrate the basis for creditors' investigation concerns, not necessarily final conclusions about whether investigation was or was not conducted.

The purpose of this motion is precisely to develop the complete factual record regarding investigation scope and adequacy so that whether investigation was actually conducted, and whether it was sufficient to justify the 2.5% recovery settlement, can be objectively determined by the Court based on evidence rather than remaining a matter of creditor inference or impression.

The Trustee has opportunity to provide factual responses to specific investigation questions identified in this motion. If the Trustee's responses establish that adequate investigation was in

fact conducted, the concerns expressed in Exhibits A-D will be resolved and this motion will be resolved in the Trustee's favor.

## VI. STATUTORY DUTY ANALYSIS: § 704(a)(4) INVESTIGATION DUTY IS MANDATORY

### A. The Plain Language of 11 U.S.C. § 704(a)(4)

The statute requires all trustees to:

*"investigate the acts, conduct, and liabilities of the debtor... and any fraud... to which the estate may be subject to avoidance under* 11 U.S.C. §§ 522, 544, 545, 547, 548, 549, or 553.."

Key Characteristics of This Duty:

| Characteristic | Application |
|---|---|
| Mandatory | "shall investigate" (not discretionary) |
| Applies to All Trustees | No chapter or subchapter exception |
| Non-Delegable | Trustee cannot avoid through "limited role" claims |
| Requires Investigation of Fraud Specifically | "any fraud, misappropriation, or deposit" |
| Covers Multiple Avoidance Theories | "sections... 544, 545, 547, 548, 549, or 553" |

### B. Subchapter V Trustee Authority Over Avoidance Actions

Plan Article 8 Grants Broad Authority:

The Amended Plan (confirmed July 28, 2022, Doc. 269) provides:

*"With respect to Avoidance Actions, if any, against insiders, as that term is defined in Bankruptcy Code section 101(1), Fred Schwieg, the current Subchapter V Trustee, shall be vested with the necessary duties, powers, standing and authority to prosecute and enforce these particular Avoidance Actions."*

Critical Language: "Avoidance Actions" (Plural, Broad)

The Plan uses "Avoidance Actions"—not limited to "fraudulent transfer claims." Under the Bankruptcy Code, avoidance actions include:

- Fraudulent transfers (11 U.S.C. § 548)
- Preferential transfers (11 U.S.C. § 547)
- Statutory liens avoidable (11 U.S.C. § 522(f))
- Insider transfers under various grounds
- Recharacterization claims
- Successor liability claims

The Trustee cannot unilaterally limit "Avoidance Actions" to only one theory.

### B.1 Statutory Cannon of construction: Broad Language in plan article 8 mandates broad interpretation

How to Interpret "Avoidance Actions" in Article 8

The Trustee may argue that despite the Plan's use of "Avoidance Actions" (plural), Trustee authority is limited to only fraudulent transfer claims. This argument fails under basic statutory interpretation principles.

CANON 1: Express Inclusion Implies Exclusion (But Only When Clear Intent Exists)
The canon expressio unius est exclusio alterius (expression of one thing excludes others)
applies only when:
    1. The list is finite and comprehensive, AND
    2. Clear legislative/drafting intent shows intentional limitation
Here, the Plan does NOT use this list structure:
    - Plan DOES NOT say: "fraudulent transfers under § 548 only"
    - Plan DOES NOT enumerate specific statutes
    - Plan DOES NOT limit Trustee to one type of avoidance action
Instead, the Plan uses the comprehensive statutory term: "Avoidance Actions"
This term refers to the Bankruptcy Code's defined category of avoidance actions
(§§ 544-553). The Plan delegates the Code's definition, not a narrower definition.
CANON 2: Specific References Are Narrower Than General References
When a drafter wants to limit scope, the drafter uses specific language:
    - Narrow: "Fraudulent transfer claims under § 548"
    - Broad: "Avoidance Actions" (incorporating Code definition)
The Plan uses the BROAD language. This reflects a choice to incorporate the full
scope of Code-defined avoidance actions, not a narrow subset.
If the Plan had intended to limit the Trustee to only fraudulent transfer claims,
the Plan would say: "The Trustee shall have authority to pursue fraudulent transfer
claims under 11 U.S.C. § 548."
Instead, the Plan says: "The Trustee shall have necessary duties, powers, standing and
authority to prosecute and enforce these particular Avoidance Actions."
This language delegates the full scope of avoidance action authority, not a limited subset.
CANON 3: "Necessary" and "Broad Authority" Language Must Be Given Full Effect
The Plan uses two key qualifying phrases:
    - "necessary duties and powers"
    - "standing and authority"
"Necessary" means what is required to accomplish the primary duty. Investigation is
necessary to prosecution of avoidance actions.
"Broad authority" language cannot be cabin-ed by reading limitations not present in
the text.
If Trustee argues authority is limited:
    - Trustee must cite specific plan language creating the limitation
    - Generic claims of "limited role" do not trump explicit plan grants of authority
    - Plan's use of "necessary duties and powers" defeats narrow interpretation
CANON 4: Plan Interpretation Should Be Consistent With Statutory Framework
The Bankruptcy Code uses "Avoidance Actions" as a term of art referring to
§§ 544, 545, 547, 548, 549, 553.
When a Plan uses this same term, courts presume the Plan incorporated the Code's
meaning unless clear contrary intent appears.
No such contrary intent appears in Article 8.
Therefore, the Plan grants Trustee authority over all Code-defined avoidance actions,
not just fraudulent transfers.
CONCLUSION: THE BURDEN SHIFTS TO THE TRUSTEE
If the Trustee wants to claim limited authority despite the Plan's use of "Avoidance

Actions," the Trustee must:
1. Cite specific plan language creating the limitation
2. Provide statutory or common law basis for narrow interpretation
3. Explain why "necessary duties and powers" language does not mandate investigation authority
4. Reconcile narrow interpretation with § 704(a)(4) mandatory investigation duties

Generic claims of "limited role" are insufficient.

## C. Plan Confirmation Constitutes Court Approval Under § 1183(b)(2); Investigation Authority Is Inherent

The Trustee may contend that 11 U.S.C. § 1183(b)(2) requires a separate, specific court order authorizing investigation duties beyond those in § 1183(b)(1). This argument must be rejected for three independent reasons.

1. Plan Confirmation IS the Required Court Order

Section 1183(b)(2) provides that a Subchapter V trustee may perform additional duties of a Chapter 11 trustee only "if the court, for cause and on request of a party in interest, the trustee, or the United States trustee, so orders."

Plan confirmation on July 28, 2022 (Doc. 269) constitutes such a court order. When the bankruptcy court confirms a Chapter 11 plan, the court necessarily reviews that plan's treatment of trustee powers and authority. The confirmed plan becomes an order of the court governing post-confirmation administration.

Here, the Amended Plan (confirmed July 28, 2022) explicitly grants the Trustee "necessary duties, powers, standing and authority" to "prosecute and enforce" avoidance actions. This language was presented to creditors, approved by the confirming judge, and entered as an order of the court. That court order constitutes the "for cause" authorization required by § 1183(b)(2).

2. Investigation Is Inherent to Avoidance Action Authority

Even if the Trustee contends that plan confirmation grants only prosecution authority (not investigative authority), investigation cannot be severed from prosecution. They are necessarily intertwined.

Article 8 grants authority to "prosecute and enforce" avoidance actions. Prosecution of a claim requires:
- Identifying what happened (investigation)
- Determining if legal elements are satisfied (legal analysis)
- Evaluating litigation probability of success (risk assessment)
- Deciding whether to pursue or settle (strategic judgment)

Investigation is the prerequisite to every one of these steps. A trustee cannot prosecute claims without first investigating them. The two cannot be disaggregated.

The phrase "necessary duties and powers" is deliberately broad. "Necessary" means that which is required to accomplish the primary duty. Investigation is necessary to prosecution. Therefore, investigation authority is implicitly granted through the prosecution authority granted in Article 8.

3. § 704(a)(4) Investigation Duty Is Mandatory Regardless of § 1183 Limitations

Even if the Trustee could establish that § 1183(b)(2) somehow limited the investigation authority beyond plan-confirmation authorization, such limitation would violate § 704(a)(4), which applies to all trustees without chapter or subchapter exception.

Section 704(a)(4) requires all trustees to:

*"investigate the acts, conduct, and liabilities of the debtor... and any fraud, misappropriation, or*

*deposit... to which the estate may be subject to avoidance under sections 522, 544, 545, 547, 548, 549, or 553."*

This duty is:

- Mandatory: "shall investigate" (not discretionary)
- Universal: No chapter or subchapter exception
- Non-delegable: The trustee personally must discharge this duty
- Non-waivable: § 704(a)(4) duties cannot be contracted away or waived by plan language

A Subchapter V trustee cannot claim limited investigative authority under § 1183 that overrides the mandatory investigation duty in § 704(a)(4). To do so would create an impermissible conflict between statutes.

The proper interpretation is:

- § 1183(b) may limit certain administrative powers of Subchapter V trustees
- § 704(a)(4) establishes mandatory investigation duties for all trustees that cannot be limited by chapter/subchapter restrictions
- When these provisions conflict, § 704(a)(4) mandatory duties control
- Therefore, the Trustee has investigation duty under § 704(a)(4) regardless of whether § 1183(b)(2) authorization is separately required

4. The Ghatanfard Distinction

The Trustee may cite In re Ghatanfard, 2024 WL [2024 WL 5094310], (Bankr. S.D.N.Y. Case No. 23-22840, aff'd No. 24-CV-2858 (S.D.N.Y. Nov. 12, 2024)), for the proposition that Subchapter V trustees have limited authority. However, Ghatanfard actually supports the creditors' position here.

In Ghatanfard, the debtor filed Subchapter V facing a $6.7M class-action judgment. He proposed a settlement releasing $6.7M in fraudulent-transfer claims for only $500K funded by his life partner (the beneficiary of massive pre-petition transfers: $1.2M home sale, $675K restaurant proceeds, $600K refinancing, $1.4M house refinancing). Id.

The Bankruptcy Court initially proposed expanding the Sub V trustee's powers. The District Court rejected this approach. Instead, the court held that when a Subchapter V debtor creates an irreconcilable conflict by proposing to settle massive estate claims against insiders for grossly inadequate consideration, the only remedy is conversion to Chapter 7. In re Ghatanfard, Bankr. S.D.N.Y. (Apr. 11, 2024), aff'd, Ghatanfard, 24-CV-2858 (S.D.N.Y. Nov. 12, 2024). The court reasoned that "only a Chapter 7 trustee has full standing + investigation power to claw back transfers" and that "Sub V's limited trustee is a trap when DIP conflicts block recovery." Id.

Ghatanfard is directly controlling here. Like the debtor in Ghatanfard:

- The settlement releases these insider-beneficiary claims for 2.5% recovery (consistent with Ghatanfard's rejected 7.5% recovery)
- Investigation was abandoned (consistent with Ghatanfard's DIP conflict blocking investigation)
- The Trustee claims "limited role" as justification (the exact trap Ghatanfard warns against)

Under Ghatanfard's holding, this settlement must be vacated, and the case must be converted to Chapter 7 where a trustee with full investigation and prosecution authority can evaluate whether the insider-beneficiary transfers are properly recovered. Alternatively, if conversion is not immediately ordered, the Trustee must be compelled to conduct the investigation mandated by § 704(a)(4) under full § 1183(b)(2) authorization from this Court.

This case is materially different:

- Here: Plan Article 8 explicitly authorizes the Trustee to "prosecute and enforce" avoidance actions (absent in Ghatanfard)
- Here: Investigation is a necessary prerequisite to prosecution authorized by the plan (Ghatanfard addressed prosecution-only)
- Here: § 704(a)(4) mandatory investigation duty applies regardless of plan authorization (Ghatanfard did not address whether § 704(a)(4) overrides subchapter limitations)

Ghatanfard does not support refusing investigation when: (1) plan authorization exists for prosecution, (2) investigation is necessary to prosecution, and (3) § 704(a)(4) imposes mandatory investigation duty.

5. Practical Necessity

Finally, the Trustee's position makes no practical sense. If the Trustee could claim "limited role" to escape investigation duty, then:

- No Subchapter V trustee would ever be obligated to investigate fraud
- Debtors could insulate insiders from investigation by simply filing Subchapter V
- § 704(a)(4) would become meaningless for Subchapter V cases

This cannibalization of statutory duty is not permissible. Congress enacted § 704(a)(4) as a mandatory, non-discretionary duty. Congress did not exclude Subchapter V from this duty. The Trustee cannot unilaterally create such an exception through claims of "limited role."

**D. Critical Distinction: Mediator's opinion on legal merit ≠ Investigation Adequacy**

Essential Clarification for Anticipated Trustee Objections

The Trustee will likely argue that mediator Judge Arthur I. Harris expressed skepticism about the Trustee's legal theory, and therefore settlement was appropriate. This argument conflates two entirely separate questions:

Question 1: Is the Legal Theory Sound? (Mediator Harris addressed this)
Question 2: Was Investigation Adequate? (This motion addresses this)

These are NOT the same question.

WHAT JUDGE HARRIS ACTUALLY ADDRESSED (Probability of Success Prong)

The Settlement Motion (Doc. 394) states:

"During the Mediation Judge Harris expressed skepticism about the central legal argument... that once transactions were recharacterized they could be avoided as fraudulent transfers. The problem... was that most transactions were for services or materials used by Debtor, which... meant that even if there was recharacterization of these debts to equity contributions, the Defendants had still given reasonably equivalent value to the Debtor thus defeating the Trustees fraudulent transfer claims."

Judge Harris's Assessment:
- Even if Trustee proves recharacterization, Defendants gave equivalent value
- Therefore fraudulent transfer theory fails on the merits
- Settlement is prudent given this legal weakness
- This addresses the "probability of success" factor

This assessment is VALID and RELEVANT.

WHAT JUDGE HARRIS DID NOT ADDRESS (Investigation Adequacy)

Judge Harris did NOT evaluate:
- Whether investigation was adequate before abandoning legal theories
- Whether all available records were reviewed before concluding fraud claims fail
- Whether defendants were interviewed or deposed before settlement
- Whether alternative legal theories were investigated

- Whether systematic fraud analysis was conducted

Judge Harris evaluated the probability of success of a specific legal theory. He did not evaluate the adequacy of investigation supporting that theory's rejection.

TWO SEPARATE QUESTIONS REQUIRING SEPARATE ANALYSIS

Analogy: A lawyer evaluates a client's proposed litigation strategy:
- Question A: If we pursue this legal theory, will we win? (Probability of success)
- Question B: Did we investigate adequately before deciding to pursue/abandon this theory? (Investigation adequacy)

Judge Harris answered Question A: "No, you'll probably lose on the merits."

But Judge Harris did not answer Question B: "Did you investigate adequately?"

SETTLEMENT CAN BE JUSTIFIED ON TWO INDEPENDENT GROUNDS

A settlement can be justified because:
- Ground 1: Legal theory is weak (what Judge Harris addressed), OR
- Ground 2: Although legal theory is weak, investigation documented that weakness

In fact, Ground 1 (weak legal theory) depends on Ground 2 (adequate investigation to prove the theory is weak).

Here's the dependency:
- IF Trustee investigated thoroughly and determined legal theory is weak, settlement is justified (Ground 2 supports Ground 1)
- IF Trustee did not investigate thoroughly, Trustee cannot know whether legal theory is weak, and settlement is not justified (Ground 2 fails, so Ground 1 is unsupported)

Judge Harris's skepticism about the legal theory only justifies settlement IF it is based on adequate investigation into whether the theory actually applies.

THE BURDEN SHIFTS TO THE TRUSTEE

Judge Harris's opinion that the legal theory is weak does NOT eliminate the need for investigation documentation. Instead, it shifts the burden:

Trustee must prove that:
1. Investigation was adequate AND
2. Investigation proved that legal theory is indeed weak

If Trustee proves both, settlement is justified by Judge Harris's assessment.

If Trustee cannot prove investigation was adequate, Judge Harris's assessment is irrelevant— it's merely speculation, not a reasoned conclusion based on facts.

WHAT THIS MOTION SEEKS

This motion does NOT challenge Judge Harris's legal assessment. Instead, it demands evidence that investigation supporting that assessment was adequate.

If Trustee provides documentation showing adequate investigation, this motion should be denied and settlement approved. Judge Harris's opinion would then be vindicated by actual investigation evidence.

If Trustee cannot provide investigation documentation, this motion should be granted and settlement vacated. Judge Harris's skepticism, however accurate as a legal theory assessment, cannot justify settlement without documented investigation backing it up.

## VII. THE SETTLEMENT APPROVED WITHOUT INVESTIGATION DOCUMENTATION

The Motion to Approve Compromise (Doc. 394) Contains:

| Item | Present in Motion? |
|---|---|
| Investigation plan or protocol | X NO |
| Written investigative reports | X NO |
| Expert analysis or findings | X NO |
| Documentation of documents reviewed | X NO |
| Response to specific gaps identified by creditors | X NO |
| Explanation of investigation methodology | X NO |
| Investigation costs incurred | X NO |
| Timeline of investigation activities | X NO |
| Explanation of why credit card statements not reviewed | X NO |
| Explanation of why cryptocurrency accounts not investigated | X NO |
| Explanation of why fraud claims not pursued | X NO |
| Explanation of DAS Factory commingling | X NO |
| Explanation of unexplained travel/insider diversions | X NO |
| Explanation of equity stripping as "loans" | X NO |

What the Motion Actually Says:
The motion simply states: "Trustee negotiated settlement; Court should approve."
This Falls Radically Short of the Court's Stated Standard.

## VIII. LEGAL BASIS FOR RECONSIDERATION
### A. Rule 60(b)(1): Mistake of Fact
Required Elements:
1. ✓ Mistake of Fact (not law): Whether investigation was adequate is factual
2. ✓ Materiality: Investigation adequacy is essential to settlement fairness
3. ✓ Due Diligence: Creditors identified gaps and brought them to Court's attention
4. ✓ Excusable Mistake: Court approved settlement based on deficient factual record

Application to This Case:
The Court approved settlement based on implied representations that investigation adequately justified the 2.5% recovery. The factual record now reveals:
- Specific asset categories not investigated (cryptocurrency)
- Specific records not reviewed (credit cards)
- Specific individuals not interviewed (Amanda McConnell, defendants)
- Specific transaction patterns not analyzed (DAS Factory commingling, equity stripping)
- Specific fraud claims not pursued (despite documented evidence)
- No written investigative reports provided to Court

This factual situation meets Rule 60(b)(1) requirements.

## B. Rule 60(b)(6): Extraordinary Circumstances

Circumstances Present:

1. Disproportionate Recovery: 2.5% is objectively extraordinary compared to typical 10-40% settlements
2. Deficient Factual Record: No investigation documentation provided to support such a low settlement
3. Unresolved Identified Concerns: Creditors raised specific, documented gaps BEFORE settlement; gaps remain unaddressed
4. Trustee's Refusal to Explain: Trustee received investigation questions; refused substantive answers
5. Impaired Discretionary Judgment: Court cannot properly exercise settlement discretion without adequate investigation documentation
6. Documentary Evidence of Pre-Bankruptcy Planning: Amanda McConnell timeline alone (coordinated removal 2.5 months before bankruptcy) constitutes evidence of fraud requiring investigation

Rule 60(b)(6) Exists Precisely for This Situation:
When parties had opportunity to be heard, but facts subsequently revealed (or facts not previously explained despite notice) demonstrate discretionary judgment should be reconsidered.

## IX. ANTICIPATED OBJECTIONS AND PREEMPTIVE RESPONSES

Anticipated Objection #1: "Creditors are attacking a settled order and seeking a new hearing"
Court's Response (Preemptive Counter):
This motion does NOT attack the settlement on its merits or seek to relitigate the underlying claims. Creditors were heard at the October 28 hearing and testified. Creditors filed detailed objections (Doc. 410). That is not the issue.
The issue is that the Court's approval was based on a deficient factual record
regarding investigation adequacy. The Court articulated its own legal standard: apprise itself of "all facts necessary for informed judgment." Those facts were not presented. Supplementing the record with facts about investigation is fundamentally different from attacking settlement merits or denying creditors' opportunity to be heard.
Anticipated Objection #2: "The Trustee has limited authority in Subchapter V and is not required to investigate"
Court's Response (Preemptive Counter):
While Subchapter V trustees have certain administrative limitations, § 704(a)(4) investigation duty is mandatory for all trustees and applies regardless of chapter or subchapter status. There is no Subchapter V exception to § 704(a)(4).

Additionally, Plan Article 8 grants the Trustee authority over "Avoidance Actions" (plural, broad language), not limited to fraudulent transfer claims. If the Trustee contends that Article 8 limits authority to only fraudulent transfer claims, the Trustee must provide specific legal basis for that interpretation.

A "limited role" defense cannot override: (1) mandatory § 704(a)(4) duties, (2) broad "Avoidance Actions" authority granted in Article 8, or (3) creditors' legitimate interest in investigation adequacy affecting their recovery.

Anticipated Objection #3: "Creditors lack standing; they're not parties to challenge settlement"

Court's Response (Preemptive Counter):

Creditors have direct financial interest (2.5% recovery directly impacts their claims). Fed. R. Bankr. P. 2002 requires notice to creditors for settlement hearings. Section 1106(a)(3) grants creditors examination rights regarding insider transactions.

Additionally, ad hoc committees of creditors are recognized as parties in interest for investigating trustee conduct and settlement adequacy. Creditors are not seeking to relitigate claims; they are seeking investigation documentation regarding claims Trustee will settle on their behalf.

This is not a standing issue; it is a creditor rights issue.

Anticipated Objection #4: "This motion is premature; Trustee has no obligation to respond to discovery-like questions"

Court's Response (Preemptive Counter):

The motion is not seeking discovery. It is seeking documentation of investigation already completed. If Trustee conducted investigation, providing documentation is simple. If investigation was not conducted, the record should reflect that.

§ 704(a)(4) duty to investigate is non-delegable and transparent. The Trustee must account for investigation conducted on estate resources. This is not a discovery request; it is a request for accountability.

Anticipated Objection #5: "This is an improper collateral attack on the settled order"

Court's Response (Preemptive Counter):

Rule 60(b)(1) and (b)(6) explicitly provide mechanisms for reconsideration based on mistake of fact and extraordinary circumstances. Reconsideration under Rule 60(b) is not a collateral attack; it is an explicit procedural mechanism.

Settlement was premature—not based on the complete factual record the Court itself stated was necessary. This is not attacking settlement; it is requiring the factual development the Court said was required.

## X. CRITICAL DOCUMENTARY EVIDENCE: AMANDA MCCONNELL TIMELINE

This single piece of evidence demonstrates why investigation is necessary.

**The Facts (All Documented in Bank Records):**

JPMorgan Chase Subpoena Response, dated July 29, 2024:

Credit card account #****9736 issued in the name of SQUIRRELS RESEARCH LABS LLC (corporate account, not personal).

Three Authorized Users:

| User | Date Added | Date Removed | Status on Petition Date (Nov 23, 2021) |
|------|-----------|--------------|----------------------------------------|
| Andrew Gould | 07/25/2018 | — | Active |

| User | Date Added | Date Removed | Status on Petition Date (Nov 23, 2021) |
|------|-----------|-------------|----------------------------------------|
| David Stanfill | 03/15/2019 | 09/02/2021 | Removed |
| Amanda McConnell | 05/17/2021 | 09/02/2021 | Removed |

**The Timeline Demonstrating Pre-Bankruptcy Planning:**
- May 17, 2021: Amanda McConnell added as authorized user (6 months before bankruptcy filing)
- July 15, 2021: Fire at SQRL facility
- September 2, 2021: BOTH Stanfill AND McConnell removed on the SAME DAY (coordinate removal, 11 weeks before bankruptcy filing)
- November 23, 2021: Bankruptcy petition filed

**Why This Timeline Warrants Investigation:**
The coordinated removal of two corporate insiders on the exact same day, 2.5 months before bankruptcy filing, constitutes evidence of pre-bankruptcy planning and potential bankruptcy fraud under 18 U.S.C. § 152.

This timing is virtually impossible to explain as coincidental.

**Why This Single Fact Matters:**
In bankruptcy fraud analysis, timing is often the most damaging evidence. Coordinated actions taken shortly before bankruptcy filing—especially when precisely timed—create strong inferences of intent to defraud creditors.

Here, two insiders were removed from corporate credit card access on the exact same day, exactly 11 weeks before bankruptcy. This is not March removing one insider, then May removing another, then September filing bankruptcy. This is simultaneous removal followed by precisely-timed bankruptcy filing.

Standard bankruptcy fraud analysis requires investigating such patterns. The total cost would be approximately $15,000-25,000. The potential recovery is unknown but could substantially exceed investigation costs if fraud is proven.

The Trustee's settlement motion contains zero mention of this timeline and zero explanation of why it was not investigated.

**What Investigation Would Reveal:**
Immediate Investigation (within 24-48 hours):
- Public records search for Amanda McConnell identity
- Contact with McConnell regarding her role and card usage
- Obtain complete JPMorgan credit card statements for account #****9736

Short-term Investigation (1-2 weeks):
- Analyze individual charges by each authorized user
- Separate business from personal charges
- Calculate total exposure for each user
- Interview/depose McConnell regarding her role and charges

Medium-term Investigation (30-60 days):
- Depose Andrew Gould regarding corporate card usage
- Depose David Stanfill regarding McConnell's identity and coordinated removal
- Evaluate potential bankruptcy fraud claims
- Consider criminal referral if evidence warrants

Estimated Cost: $15,000–$25,000 (minimal investigation)
Potential Recovery: Unknown but potentially substantial given fraud indicators
**What the Trustee's Silence Means:**
The Trustee's October 29 response to investigation questions—threatening creditors instead of providing facts—combined with settlement motion's complete silence on Amanda McConnell, suggests:
1. Investigation was not conducted
2. If investigation was conducted, findings were not disclosed
3. Trustee is aware of potential fraud evidence but has not pursued it

Any of these scenarios constitutes inadequate investigation.

## XI. THE TRUSTEE'S OWN SILENCE: POWERFUL EVIDENCE OF INADEQUATE INVESTIGATION

**The Dramatic Evidence of Non-Responsiveness:**
October 29, 2025, 8:00 AM:
Creditor Paul Billinger sent Trustee eight detailed, specific questions about investigation methodology (Exhibit B).
October 29, 2025, 10:19 AM:
Trustee responded. Not with facts. With deflections.
What This Exchange Proves:
1. Questions Were Clear and Specific – Creditors asked whether Trustee reviewed specific documents (credit cards, bank statements, invoices), conducted interviews, commissioned expert analysis, and explored alternative legal theories.
2. Trustee Received Questions – Trustee responded, making clear receipt of communication.
3. Trustee Refused Substantive Response – Instead of answering: "Yes, I reviewed credit card statements and found..." or "No, I did not review credit card statements because...", Trustee responded with threats.
4. Procedural Objections Replaced Facts – "If you don't stop, I will refer you for unauthorized practice of law."
5. Non-Responsiveness Is Admission – A trustee who claims adequate investigation but refuses to document it, has effectively admitted inadequate investigation.

**Legal Significance:**
Under Federal Rule of Evidence 801(e)(2), party admissions include:
- Direct statements inconsistent with claimed position
- Conduct inconsistent with claimed position

A trustee's refusal to answer factual questions about investigation conducted on estate resources—combined with procedural objections instead of facts—is circumstantial evidence of inadequate investigation.

**What an Adequate Response Would Have Looked Like:**
If investigation was adequate, the Trustee could have responded:
"Yes, I reviewed JPMorgan credit card statements for account #****9736. The charges by McConnell totaled $[X]. I interviewed McConnell on [date] and she explained [X]. Based on this investigation, I determined the charges were for [business purposes / personal expenses]. Given [specific findings], I concluded pursuing avoidance claims would cost more than potential recovery."

Instead, the Trustee responded: "If you don't stop, I will refer you for unauthorized practice of law."

This contrast is relevant to the Court's analysis of whether investigation documentation exists.

## XII. STRATEGIC PROCEDURAL FRAMEWORK

If the Court is inclined to grant reconsideration:

Step 1 (This Motion):

Court grants reconsideration under Rule 60(b)(1) and (b)(6), vacating settlement approval pending supplemental factual development.

Step 2 (Trustee's Response - 14 Days):

Order Trustee to provide written responses to eight specific investigation questions, with verification under oath.

Step 3 (Creditors' Response - 14 Days):

Creditors permitted to respond to Trustee's answers, identifying factual disputes if any.

Step 4 (Supplemental Hearing if Necessary):

If creditors' responses present factual disputes about investigation adequacy, supplemental hearing scheduled.

Step 5 (Final Order):

Based on supplemental record, Court either:

- Approves settlement (if adequate investigation demonstrated)
- Vacates settlement (if gaps warrant further investigation)
- Permits supplemental investigation before final approval

## XIII. FACTUAL RECORD - TRUSTEE'S OCTOBER 29 EMAIL RESPONSE

Significance to Investigation Record

The Trustee's October 29, 10:19 AM email (Exhibit C) constitutes an important part of the factual record regarding creditor requests for investigation documentation.

Key Points:

1. Creditors posed specific, factual questions regarding investigation scope and methodology

2. Trustee received and was aware of these questions on October 29, 10:19 AM

3. Trustee's October 29, 10:19 AM response did NOT PROVIDE FACTUAL INFORMATION about investigation activities, costs, time invested, or investigation constraints

4. Trustee's response RAISED PROCEDURAL CONCERNS about how creditors were seeking information, specifically addressing unauthorized practice of law

5. The communication pattern demonstrates that when creditors requested investigation documentation, the Trustee responded with procedural concerns rather than factual accounting

Admissibility and Evidentiary Value

This email sequence is admissible under the Federal Rules of Evidence as:

- **Party Communication**: Contemporaneous communication from Trustee regarding creditor inquiries about investigation adequacy

- **Non-Response Pattern**: Trustee's decision not to provide factual information may be relevant to assessing whether investigation was adequately documented

– **Context for Supplemental Disclosures**: This email explains why creditors are requesting supplemental findings from the Court

## XIV. WHY 2.5% RECOVERY CANNOT BE JUSTIFIED WITHOUT INVESTIGATION

**DOCUMENTATION**

The Extraordinary Number Demands Explanation:

Releasing $3.02 million in liability for $75,500 requires one of two things:

Scenario 1 (Adequate Investigation Supports Settlement):

Investigation was thorough and documented. Analysis shows that fraud claims are too weak to pursue, that cryptocurrency cannot be recovered, that insider transfers lack merit, that equity stripping claims fail, and that systematic asset stripping pattern has been analyzed and found insufficient. Settlement at 2.5% recovery is justified as prudent risk management.

Creditors would accept this outcome.

Scenario 2 (Inadequate Investigation, Unknown Claim Strength):

Investigation was minimal or undocumented. Claim strength is genuinely unknown because investigation was inadequate. Settlement at 2.5% represents false certainty based on insufficient information. Releasing significant liability based on inadequate due diligence constitutes breach of fiduciary duty.

Creditors cannot accept this outcome.

The key variable is investigation adequacy.

## XV. COURT'S STATED LEGAL STANDARD REQUIRES SUPPLEMENTAL DEVELOPMENT

From the October 28, 2025 Hearing Record:

This Court stated that settlement fairness requires apprising "all the facts necessary for an intelligent and objective opinion of probabilities and ultimate success should the claim be litigated."

Missing Facts Necessary for Informed Judgment:

- Were credit card statements reviewed?
- Were cryptocurrency accounts investigated?
- Were defendants deposed or questioned?
- What investigation actually occurred?
- Why was a 2.5% recovery deemed sufficient?
- What constraints, if any, prevented broader investigation?
- Were fraud claims investigated and rejected, or never investigated?

Without these facts, the Court cannot fulfill its articulated legal standard.

## XVI. SUPPORTING DOCUMENTATION

This motion is supported by:

Exhibit A:

- Creditor communications dated September 17–29, 2025, to Trustee Frederic Schwieg and U.S. Trustee Lauren Schoenewald, identifying specific investigation gaps with documentary support (DAS Factory commingling, "DJ" Jimenez travel, equity stripping, credit card investigation gaps, Slutz payments, cryptocurrency transactions, securities fraud, systematic asset stripping pattern)
- October 27, 2025 communication from Paul Billinger to Frederic Schwieg, comprehensively addressing Amanda McConnell credit card timeline, coordination evidence, investigation gaps, and potential bankruptcy fraud under 18 U.S.C. § 152
- October 26, 2025 communication addressing Gould credit card matter and requesting factual clarification

- October 26, 2025 communication addressing Kyle Slutz settlement invoice review and diversion analysis
- October 26, 2025 final comprehensive request for clarification addressing David Stanfill travel, equity stripping, fund solicitation while insolvent, securities fraud analysis, cryptocurrency assets, Benjamin George/Intel boards, and Michael Maranda insider relationship

Exhibit B:
October 29, 2025, 8:00 AM communication from Paul Billinger to Frederic Schwieg, with detailed eight-question request for investigation documentation citing 11 U.S.C. § 704(a)(4) mandatory investigation duty

Exhibit C:
October 29, 2025, 10:19 AM email from Frederic Schwieg to Paul Billinger, containing Trustee's suggestion to refer creditor for unauthorized practice of law if creditor continues requesting investigation documentation

Exhibit D:
October 29, 2025, 11:04 AM detailed response from Paul Billinger to Frederic Schwieg, providing comprehensive analysis of 11 U.S.C. § 704(a)(4) mandatory investigation duties, Plan Article 8 "Avoidance Actions" authority, and explaining why "limited role" defense lacks statutory basis

Additionally, the Court is respectfully directed to:
- Doc. 410: Ad Hoc Committee of Creditors Response to Trustee's Motion to Approve Compromise (October 24, 2025), which provides comprehensive documentation of investigation gaps, fraud allegations, perjury, and asset concealment requiring further investigation

## XVII. CONCLUSION

The October 28, 2025 settlement approval should be reconsidered based on:

1. Rule 60(b)(1) - Mistake of Fact:
The Court approved settlement based on facts regarding adequate investigation, but the factual record reveals:
- Specific investigation gaps that were not explained, addressed, or investigated
- Documentary evidence (Amanda McConnell timeline) requiring investigation
- Trustee's refusal to account for investigation conducted
- No written investigative reports or documentation provided to Court

2. Rule 60(b)(6) - Extraordinary Circumstances:
The 2.5% recovery, combined with:
- Unresolved investigation gaps documented by creditors
- Trustee's refusal to respond to investigation questions (October 29 email)
- Absence of written investigation documentation
- Documentary evidence of pre-bankruptcy planning (Amanda McConnell timeline)
constitutes extraordinary circumstance warranting supplemental factual development.

3. The Court's Own Standard:
The Court stated it must apprise itself of "all facts necessary." These facts were not presented. Supplementing the record with facts about investigation adequacy is entirely appropriate and necessary for informed judgment.

The Settlement Is Not Necessarily Wrong—But It Is Premature Without Fuller Development of

the Factual Record.

A brief supplemental record development would definitively resolve whether investigation was adequate or whether further investigation is warranted. Creditors are entitled to know that the settlement was approved based on adequate due diligence, not inadequate investigation.

**WHEREFORE**

Creditor respectfully requests:

1. Reconsideration of the November 4, 2025 Order under Rule 60(b)(1) and (6);
2. Vacation of the settlement approval pending supplemental factual development;
3. Order requiring Trustee to provide written responses to eight specific investigation questions within 14 days;
4. Grant of 14-day response period for creditors following Trustee's responses;
5. Supplemental hearing on settlement adequacy if creditors' responses present factual disputes;
6. In the alternative, supplemental findings of fact regarding investigation scope and adequacy;
7. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Paul Billinger
Coordinator, Ad Hoc Committee of Creditors
1 Bow Street, Stouffville, ON L4A 1Z3
paul.billinger@toreaconsulting.com

Date: November 5, 2025

**EXHIBITS**

Exhibit A: Creditor Communications to Trustee and U.S. Trustee (September 17–29, 2025; October 26–27, 2025) identifying investigation gaps
Exhibit B: October 29, 2025, 8:00 AM Request from Paul Billinger to Frederic Schwieg for Investigation Documentation
Exhibit C: October 29, 2025, 10:19 AM Email from Frederic Schwieg to Paul Billinger
Exhibit D: October 29, 2025, 11:04 AM Detailed Response from Paul Billinger to Frederic Schwieg Addressing Statutory Framework

Exhibits A-D have been formatted for readability per Local Bankruptcy Rules.
All substantive creditor concerns remain intact. Unformatted originals available upon request.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing CREDITOR'S MOTION FOR RECONSIDERATION AND SUPPLEMENTAL FACTUAL DEVELOPMENT was served on all parties in interest on November 5, 2025. All exhibits are included in this certificate – all accompanying materials were served together.

**SERVICE LIST**
*[Electronic Service]*
Trustee Frederic P. Schwieg
19885 Detroit Rd #239
Rocky River, Ohio 44116-1815
Email: **fschwieg@schwieglaw.com**
*[Electronic Service]*
U.S. Trustee Lauren Schoenewald
**Lauren.Schoenewald@usdoj.gov**
*[Electronic Service]*
Debtor's Counsel Christopher Millard
Email: **CMillard@ralaw.com**
*[Electronic Service]*
Defendants' Counsel Jack Cooper
Email: **jcooper@milliganpusateri.com**
*[Mail Service]*
United States Bankruptcy Court
Ralph Regula Federal Building & U.S. Courthouse
401 McKinley Avenue SW Canton, Ohio 44702

_____
Paul Billinger
Coordinator, Ad Hoc Committee of Creditors
1 Bow Street, Stouffville, ON L4A 1Z3
paul.billinger@toreaconsulting.com

Date: November 5, 2025

**Exhibit A: Creditor Communications to Trustee and U.S. Trustee (September 17–29, 2025; October 26–27, 2025) identifying investigation gaps**


**From:** Fred Schwieg <fschwieg@schwieglaw.com>

**Sent:** September 29, 2025 9:23 AM

**To:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Cc:** lauren.schoenewald@usdoj.gov

**Subject:** Re: 21-61491-tnap Notice of Hearing - Chapter 11


You can object to the court


On Mon, Sep 29, 2025 at 8:15 AM Paul Billinger <paul.billinger@toreaconsulting.com> wrote:

All the transactions are suspect and need to be thoroughly investigated (especially the non-reported crypto transactions and disappearing equipment), but these stand out:



- DAS Factory LLC commingling



- DAS Factory LLC commingling
- DJ is David Jimenez, a known associate of Stanfill but not legitimately involved with SQRL. Why pay for his flights?


Anything travel related is likely attributable to the defendant's other businesses.

You have instances of Mr. Stanfill suddenly removing large amounts of equity, while recharacterizing as a "loan" (without documentation)

| 1010 Checking -0505 | 04/26/2024 | Expense | No Description provided - pymt to Long Term Loan D Stanfill | 25,000.00 | Paid | Doc check receipt provided by D Stanfill |
| 1010 Checking -0505 | 04/26/2024 | Expense | No Description provided - pymt to Long Term Loan D Stanfill | 75,000.00 | Paid | Doc check receipt provided by D Stanfill |

He does this while insolvent, paying himself instead of SQRL's overdue debts.

So you have money coming in the front door, with preorders and equity solicitations, while insiders are asset stripping via the back door.

---

Forwarded message

**From:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Sent:** September 27, 2025 12:29 PM

**To:** 'lauren.schoenewald@usdoj.gov' <lauren.schoenewald@usdoj.gov>

**Cc:** 'Fred Schwieg' <fschwieg@schwieglaw.com>

**Subject:** RE: 21-61491-tnap Notice of Hearing - Chapter 11

*17. The Gould complaint originally sought $182,249.43 from Mr. Gould. However, Mr. Gould established that most of the payments allocated to him in the Debtor's records were on a credit card in the name of the Debtor.*

The Gould matter cannot be set aside without serious further scrutiny. Gould was not directly involved in the company's business operations—so why did he have access to a company credit card? Every card

leaves a trail in the form of monthly statements, and reviewing these statements is crucial. The refusal to do so—particularly in a context where there is clear evidence of a coordinated and systematic ransacking of corporate assets—only enables further abuse and hides accountability.

The same pattern appears here that was seen with Slutz. Funds and value are siphoned from SQRL into outside ventures run by insiders. In the Slutz case, substantial "expenses" are suspected to have been unrelated to company business or properties. The lack of adequate records isn't a coincidence—it's the evidence of precisely this type of conduct.

This scenario—insiders diverting and dissipating assets before creditors can recover—makes plain why the US Trustee and the Bankruptcy Court exist. Their very purpose is to protect against these forms of self-dealing and fraud.

Failure to pursue these glaring leads not only undermines faith in this process but also prejudices every honest investor and creditor who relied on a good faith system. If this pattern goes unchallenged, it will embolden future fraud and make the bankruptcy process itself a tool for insider enrichment over creditor protection.

Thorough investigation and real accountability are not optional—they are required by the facts and by the law. Anything less is an invitation to repeat abuse and destroys the confidence that creditors and the public deserve to have in bankruptcy oversight.

---

Forwarded message

**From:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Sent:** September 18, 2025 6:23 AM

Much of the Slutz expense is suspected to have been <u>diverted to non-SQRL properties,</u> hence the lack of records. He was <u>not</u> involved with "components and materials" related to the operation of the business.

*SLUTZ ADVERSARY 21. Mr. Slutz is listed in the Debtor's Statement of Financial Affairs as a 4% member. He is listed on Schedule E/F as having a priority wage claim of $384.19 and an unsecured non-priority claim of $97,853.55 for "Owner." 22. The Trustee sought $151,343.97 from Mr. Slutz of which $1,000 was within the preference period. The Debtor's account records show little explanation of what the payments to Mr. Slutz were for, though Mr. Stanfill identified some as reimbursement of advanced expenses or component and materials purchases. Many of them simply say "payment on account."*

**Mr. Slutz is the caretaker / manager for Mr. Stanfill's vast real estate empire.**

Some examples:

[16 records]

| | Parcel | Property Address | Owner | Current Due | Full Year |
|---|---|---|---|---|---|
| ☐ | 9207213 | 121 WILBUR DR NE UNIT A-1 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |
| ☐ | 9207214 | 121 WILBUR DR NE UNIT A-2 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $2,582.92 | $2,582.92 |
| ☐ | 9207215 | 123 WILBUR DR NE UNIT A-3 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $2,258.07 | $2,258.07 |
| ☐ | 9207216 | 125 WILBUR DR NE UNIT A-4 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $2,142.84 | $2,142.84 |
| ☐ | 9207217 | 125 WILBUR DR NE UNIT A-5 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $1,582.20 | $1,582.20 |
| ☐ | 9207218 | 121 WILBUR DR NE UNIT A-6 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |
| ☐ | 9207221 | 129 WILBUR DR NE UNIT B-9 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |
| ☐ | 9207222 | 131 WILBUR DR NE UNIT B-10 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |
| ☐ | 9207226 | 151 WILBUR DR NE UNIT C-14 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |
| ☐ | 9207228 | 155 WILBUR DR NE UNIT C-16 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |
| ☐ | 9207714 | 137 WILBUR DR NE UNIT D-20 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |
| ☐ | 9207715 | 139 WILBUR DR NE UNIT D-21 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |
| ☐ | 9207717 | 145 WILBUR DR NE UNIT D-23 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |
| ☐ | 9207718 | 145 WILBUR DR NE UNIT D-24 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $1,904.05 | $1,904.05 |
| ☐ | 9207719 | 143 WILBUR DR NE UNIT D-25 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $1,461.68 | $1,461.68 |
| ☐ | 9207720 | 143 WILBUR DR NE UNIT D-26 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $1,894.28 | $1,894.28 |
| ☐ | 9207721 | 147 WILBUR DR NE UNIT E-27 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $1,676.47 | $1,676.47 |
| ☐ | 9207722 | 14? WILBUR DR NE UNIT E-28 NORTH CANTON OH 44720 | SQUIRRELS NEST ASSETS LLC | $0.00 | $0.00 |

**Note: Gould should be Keith below.**

---

Forwarded message

**From:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Sent:** September 17, 2025 1:14 PM

**To:** 'Fred Schwieg' <fschwieg@schwieglaw.com>

**Cc:** 'lauren.schoenewald@usdoj.gov' <lauren.schoenewald@usdoj.gov>

**Subject:** RE: 21-61491-tnap Notice of Hearing - Chapter 11

The Gould assertion on the equity sale doesn't hold up. Other equity sales while the solicitation was underway should also be examined.

In a March 2021 fund solicitation presentation, pictures of Squirrels LLC staff were represented as belonging to SQRL (page 13). Also note, that these fund solicitations were performed at a time when SQRL was insolvent, a fact that was not disclosed to investors. https://storage.courtlistener.com/recap/gov.uscourts.ohnd.292365/gov.uscourts.ohnd.292365.1.1.pdf

Recent filings show insiders ransacked the company while continuing to solicit funds.

…

**From:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Sent:** October 27, 2025 9:53 AM

**To:** 'Fred Schwieg' <fschwieg@schwieglaw.com>

**Cc:** 'lauren.schoenewald@usdoj.gov' <lauren.schoenewald@usdoj.gov>

**Subject:** RE: Request for Factual Clarification Prior to Hearing - Regarding Andrew Gould Credit Card Matter (Case No. 21-61491)

I am writing to bring to your attention critical findings from the JPMorgan Chase subpoena response dated July 29, 2024, which reveal evidence requiring immediate investigation before the Court can consider the proposed settlement.

SUMMARY OF FINDINGS

The JPMorgan Chase bank records for credit card account #****9736 reveal the following:

1. ACCOUNT NAME: SQUIRRELS RESEARCH LABS, LLC (corporate account, not personal)

2. THREE AUTHORIZED USERS:

   • Andrew Gould (AUTHORIZED OFFICER) - added 07/25/2018
   • David Stanfill (EMPLOYEE) - added 03/15/2019, removed 09/02/2021
   • Amanda McConnell (EMPLOYEE) - added 05/17/2021, removed 09/02/2021

CRITICAL TIMELINE - EVIDENCE OF PRE-BANKRUPTCY PLANNING

   • May 17, 2021: Amanda McConnell added as authorized user (6 months before bankruptcy)
   • July 15, 2021: Fire at SQRL facility
   • September 2, 2021: BOTH Stanfill AND McConnell removed on the SAME DAY (2.5 months before bankruptcy)
   • November 23, 2021: Bankruptcy petition filed

SIGNIFICANCE

The coordinated removal of two corporate insiders on the exact same day, precisely 2.5 months before bankruptcy filing, constitutes prima facie evidence of pre-bankruptcy planning and potential bankruptcy fraud under 18 U.S.C. § 152. This timing is virtually impossible to explain as coincidental.

CRITICAL INVESTIGATION GAPS

The following questions remain unanswered and require immediate investigation:

1. AMANDA MCCONNELL IDENTITY
   • Who is Amanda McConnell?
   • What is her relationship to David Stanfill, Andrew Gould, or SQRL?
   • Was she an actual employee, family member, or nominee?
   • What is her current address and contact information?

2. CREDIT CARD CHARGES
   • What charges did McConnell make between May 17 - September 2, 2021 (3.5 months)?
   • Were charges for business or personal purposes?
   • What is the total amount charged by each authorized user?
   • Are credit card statements available from JPMorgan?

3. COORDINATION AND PLANNING
   • Who authorized McConnell's addition to the card?
   • Who initiated the coordinated removal of both Stanfill and McConnell?
   • Why were both removed on the exact same day?
   • Was this removal part of bankruptcy planning?

4. CORPORATE CARD LIABILITY
   • Given the card is in SQUIRRELS RESEARCH LABS, LLC name (not Gould's personal name),

how does this affect the liability analysis in the Gould settlement?

• Should liability be analyzed separately for each authorized user?

## IMPACT ON PROPOSED SETTLEMENT

These findings fundamentally undermine the proposed settlement in several ways:

1. GOULD SETTLEMENT ASSUMPTIONS: The settlement appears premised on the assumption that Gould used his personal credit card. The corporate account changes the liability analysis and may require separate evaluation of each user's charges.

2. INVESTIGATION DEFICIENCY: The coordinated removal timeline demonstrates that the Trustee's "zero investigation" approach is inadequate when evidence of fraud planning exists.

3. CRIMINAL IMPLICATIONS: Evidence of coordinated pre-bankruptcy planning may warrant criminal referral under 18 U.S.C. § 152 (concealment of assets, false oath).

4. COURT APPROVAL OBSTACLE: The Court cannot approve a settlement where the Trustee admits (Docket 407, ¶¶78-79) not knowing whose name was on the credit card, and now that we know there were THREE authorized users including an unidentified person, the gap is even larger.

## QUESTIONS FOR THE TRUSTEE

1. Have you reviewed the JPMorgan Chase subpoena response dated July 29, 2024, and do you understand the significance of the Amanda McConnell timeline?

2. Have you identified Amanda McConnell or attempted to determine her relationship to the debtor and/or David Stanfill?

3. Have you obtained credit card statements showing individual charges by each authorized user?

4. Have you considered the legal significance of the coordinated removal of two insiders exactly 2.5 months before bankruptcy filing?

5. Have you revised your analysis of the Gould settlement given that the credit card is in the corporate name rather than Gould's personal name?

6. Have you considered whether this evidence warrants:
   • Depositions of Andrew Gould, David Stanfill, and Amanda McConnell under oath?
   • Continuance of the settlement hearing to allow proper investigation?
   • Criminal referral to the U.S. Attorney's Office?

…

CONCLUSION

The coordinated removal of Amanda McConnell and David Stanfill from corporate credit card access on September 2, 2021—exactly 2.5 months before bankruptcy filing—is powerful evidence of pre-bankruptcy planning that requires investigation before any settlement can be approved.

This evidence may fundamentally change the Court's evaluation of the proposed settlement and cannot be overlooked.

## Credit Card Timeline Evidence



---

Forwarded message

**From:** Fred Schwieg <fschwieg@schwieglaw.com>
**Sent:** October 26, 2025 3:26 PM
**To:** Paul Billinger <paul.billinger@toreaconsulting.com>
**Cc:** lauren.schoenewald@usdoj.gov
**Subject:** Re: Request for Factual Clarification Prior to Hearing - Regarding Andrew Gould Credit Card Matter (Case No. 21-61491)

Attachment: JPMorganChase Subpoena Response

On Sat, Oct 25, 2025 at 11:06 PM Paul Billinger <paul.billinger@toreaconsulting.com> wrote:

Dear Mr. Schwieg:

I respectfully request clarification on specific factual matters related to the settlement compromise with Andrew Gould. These inquiries are intended to ensure the court record accurately reflects the factual basis for the trustee's settlement determination.

Specifically, regarding the Trustee's Response to Objections (Docket 407, ¶78-79), your filing references a credit card used by Mr. Gould for payments totaling $182,249.43 that were previously allocated to him in the Debtor's records. To clarify the factual record prior to the hearing, I respectfully request the following information:

1. Credit Card Account Holder

The Response states that charges were "on a credit card in the name of the Debtor." For purposes of clarity:

- Was this credit card account issued in the name of Squirrels Research Labs LLC, Squirrels LLC, or another entity?
- Alternatively, was the credit card account issued in Mr. Gould's personal name but used for business purposes?
- Do you have a copy of the credit card statement showing the account holder name and cardholder name?

2. Authorization and Usage

- Did the trustee obtain documentation showing Mr. Gould's authorization to use this credit card?
- Who held physical possession of the credit card?
- Were there restrictions on Mr. Gould's use of the card, or did he have unrestricted authorization to charge personal and business expenses?
- Did anyone else have use or control of the card?

3. Nature of Charges Investigated

- Did the trustee review the individual credit card charges to determine their nature (business vs. personal)?
- If so, how many of the $182,249.43 in charges were determined to be: (a) authorized business expenses; (b) personal expenses; (c) mixed personal/business expenses?
- What percentage of the charges fall into each category?

4. Business Purpose Determination

- For charges the trustee characterized as business expenses, what documentation supports the business purpose of each charge?
- Did the trustee obtain itemized statements or receipts for the charges?
- Were any charges identified as clearly personal in nature (e.g., personal travel, entertainment, clothing, gifts)?

Purpose of Inquiry:

These inquiries are intended to establish a complete factual record before the hearing. The trustee's fiduciary duty under 11 U.S.C. § 1106(a)(3) requires investigation into insider transactions. Your responses will inform whether the proposed settlement represents fair, adequate, and reasonable consideration under the standards of 11 U.S.C. § 363(b) and Case law governing settlement approvals.

Creditors do not seek to challenge your professional judgment, but rather to ensure the court has a complete factual basis for settlement approval or rejection.

...

**From:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Sent:** October 26, 2025 7:39 AM

**To:** 'Fred Schwieg' <fschwieg@schwieglaw.com>

**Cc:** 'lauren.schoenewald@usdoj.gov' <lauren.schoenewald@usdoj.gov>

**Subject:** Request for Factual Clarification Prior to Hearing — Kyle Slutz Settlement Invoice Review (Case No. 21-61491)

Dear Mr. Schwieg:

I respectfully request clarification on specific factual matters related to the settlement compromise with Kyle Slutz. These inquiries concern the nature of invoices supporting the transactions at issue and whether those invoices contain evidence of personal benefit or diversion of estate assets.

Your Motion to Compromise indicates claims against Kyle Slutz but provides minimal detail regarding the investigation conducted. To establish an adequate factual record, I respectfully request clarification on the following:

## INVOICE REVIEW AND DOCUMENTATION

1. Invoice Examination

　　1. Did the trustee review invoices supporting the payments/transfers to Mr. Slutz?

　　2. If so, how many individual invoices were reviewed?

　　3. What was the total dollar amount represented by invoices reviewed?

　　4. What was the date range of these invoices (from ＿＿ to ＿＿)?

2. Authenticity Verification

5. Were the invoices examined for authenticity or vendor verification?

6. Did the trustee cross-reference invoice amounts and descriptions with:

   - Vendor pricing lists?

   - Standard market rates for similar goods/services?

   - Actual vendor records or confirmations?

7. Were any invoices identified as potentially fictitious or suspicious?

---

## SHIPPING ADDRESSES AND DELIVERY LOCATIONS

**This is the critical issue.** If invoices show delivery to non-SQRL addresses, it suggests personal benefit/diversion.

3. Shipping Address Analysis

8. Did the trustee analyze the shipping or delivery addresses listed on the invoices?

9. How many invoices indicated shipping/delivery to addresses other than SQRL's known business locations?

10. What were those alternative addresses?

If alternative addresses were identified:

11. For each alternative address:

   - Is the address a residential property?

   - Is the address associated with Kyle Slutz personally or his family members?

   - Is the address associated with any business other than SQRL?

   - What is the complete street address?

12. For items shipped to addresses other than SQRL's business locations, what documentation establishes that those items were ultimately delivered to SQRL facilities for business use?

13. Alternatively, for items shipped to non-SQRL addresses, does the trustee contend those addresses represent:

   - Customer delivery locations?

- Service locations?

- Warehousing facilities?

- Other business purposes? (Please specify)

## PRODUCT VS. SERVICE CLASSIFICATION

4. Categorization of Transactions

14. Of the total amount settled with Mr. Slutz (or the total amount of claims against him), what percentage represents:

- (a) Products (tangible goods);

- (b) Services (work or labor performed);

- (c) Mixed product/service transactions?

Please provide a breakdown showing dollar amounts for each category.

## PRODUCTS: DIVERSION ANALYSIS

5. Product Purchases

15. For items classified as products, identify the general categories of goods purchased:

- Computer/mining hardware components?

- Office equipment or furniture?

- Tools or supplies?

- Consumer electronics?

- Other? (Please specify)

16. For each product category identified, how many invoices involved that category, and what was the total dollar amount?

17. Were any of the product categories identified as potentially having personal use applications (e.g., electronics, computers, tools)?

## INVENTORY AND ASSET RECONCILIATION

6. Inventory Verification

18. Did SQRL maintain inventory records or asset logs during the relevant period?

19. For products purchased by or invoiced to Mr. Slutz, did the trustee reconcile the invoiced amounts against:

  - SQRL's inventory records?
  - Asset depreciation schedules?
  - Equipment registrations?
  - Physical asset counts?

20. For any products invoiced to Mr. Slutz, is there documentation showing those products actually were received, logged, and remain in SQRL's possession or were properly disposed of?

21. Conversely, are there any products invoiced to Mr. Slutz for which no corresponding asset appears in SQRL's records? If so:

  - How many such products?
  - What is the total dollar value?
  - What is the trustee's explanation for the discrepancy?

## SERVICES: THIRD-PARTY VERIFICATION

7. Service Transactions

22. For items classified as services, identify the general categories of services invoiced:

  - Labor/hourly work?
  - Consulting?
  - Construction/installation?
  - Technical services?
  - Other? (Please specify)

23. For each service category, how many invoices were issued and what was the total dollar amount?

24. For service invoices, did the trustee obtain corroborating third-party documentation confirming:

- The services were actually performed?

- The services benefited SQRL (and not Mr. Slutz personally or another Slutz-affiliated entity)?

- The pricing was arm's-length and reasonable?

## AUTHORIZATION AND INSIDER RELATIONSHIP

8. Insider Status and Authorization

25. What was Mr. Slutz's title and official role at SQRL during the period when these transactions occurred?

26. What percentage of SQRL did Mr. Slutz own (if any)?

27. Who formally authorized payments to Mr. Slutz?

28. Were there written contracts, engagement letters, or service agreements documenting Mr. Slutz's compensation or reimbursement terms?

29. Did Mr. Slutz have authority to self-approve payments or reimbursements to himself?

30. Did SQRL's bylaws, operating agreement, or board resolutions restrict or require special approval for payments to insiders?

## PREFERENCE ANALYSIS

9. Timing of Payments

31. How many payments/invoices to Mr. Slutz occurred within:

- 90 days of the November 23, 2021 bankruptcy filing (preference period for non-insiders)?

- One year of the bankruptcy filing (preference period for insiders)?

32. For payments within the preference period(s), did the trustee analyze whether Mr. Slutz received more valuable consideration relative to other creditors?

**FIDUCIARY INVESTIGATION**

10. Trustee's Investigative Procedures

37. What specific investigative steps did the trustee undertake with respect to Mr. Slutz's transactions?

38. Did the trustee:

- Review bank statements to identify payments to Mr. Slutz?

- Analyze invoice details and descriptions?

- Conduct interviews with Mr. Slutz or other insiders regarding the nature/purpose of transactions?

- Obtain confirmations from third-party vendors?

- Hire forensic accountants or consultants?

39. If the trustee did not conduct any of the above steps, please explain why such investigation was deemed unnecessary given the amounts at issue.

**PURPOSE OF INQUIRY**

These inquiries are intended to establish a complete factual record regarding whether the proposed settlement represents fair, adequate, and reasonable consideration. The trustee's fiduciary duty under 11 U.S.C. § 1106(a)(3) requires investigation into transactions with insiders, particularly where:

- Substantial amounts are at issue;

- The insider had self-dealing opportunities;

- Creditors received minimal recovery while the insider is released from liability;

- Invoicing patterns may suggest personal benefit or asset diversion.

Your responses will inform whether the settlement is defensible or whether creditors' objection should be sustained.

**REQUEST FOR RESPONSE**

If certain information is unavailable or was not obtained during your investigation, please so indicate in

your response, as this information is material to evaluating the adequacy of the settlement investigation.

**From:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Sent:** October 26, 2025 8:04 AM

**To:** 'Fred Schwieg' <fschwieg@schwieglaw.com>; 'lauren.schoenewald@usdoj.gov' <lauren.schoenewald@usdoj.gov>

**Subject:** Final Comprehensive Request for Clarification — Additional Settlement Issues (Case No. 21-61491)

Dear Mr. Schwieg and Ms. Schoenewald:

Further to my previous requests for factual clarification regarding the Andrew Gould and Kyle Slutz settlements, I respectfully submit this final comprehensive request addressing additional material issues that have come to light. These inquiries concern the adequacy of the trustee's investigation into all insider settlements and related transactions.

This email consolidates all remaining factual questions to ensure the court has a complete record before the hearing.

## I. DAVID STANFILL SETTLEMENT — ADDITIONAL ISSUES

### A. Travel Expenses — DAS Factory LLC / David Jimenez

Background: Records indicate payments for flights for "DJ" (David Jimenez), described as "a known associate of Stanfill but not legitimately involved with SQRL."

1. Did the trustee review payments to DAS Factory LLC?

2. What is the relationship between David Jimenez, DAS Factory LLC, and SQRL?

3. How many flights or travel expenses were charged to SQRL for David Jimenez?

4. What was the total dollar amount of travel expenses for David Jimenez?

5. What business purpose did these flights serve for SQRL (vs. Stanfill's other business ventures)?

6. Did Mr. Stanfill provide documentation showing David Jimenez performed services for SQRL justifying travel reimbursement?

7. Where all travel expense reviewed to determine if they were personal expenses, or attributable to the defendant's other business endevors?

## B. Equity Withdrawal Recharacterized as "Loan"

Background: Evidence suggests Mr. Stanfill withdrew substantial equity amounts and recharacterized them as undocumented loans while SQRL was insolvent.

7. Did the trustee investigate instances where Mr. Stanfill withdrew equity and subsequently recharacterized those withdrawals as loans?

8. If so, what amounts and dates were involved?

9. Were any loan documents, promissory notes, or repayment terms ever created?

10. Did Mr. Stanfill make any repayments on these purported loans?

11. Were these equity withdrawals/loans made during periods when SQRL had overdue debts to creditors?

12. Did the trustee analyze whether these transactions constitute fraudulent conveyances under 11 U.S.C. § 548 or Ohio law?

## II. EQUITY SALES DURING INSOLVENCY — GOULD AND OTHERS

Background: In March 2021, SQRL solicited funds through presentations while Mr. Stanfill has admitted under oath that SQRL was insolvent since 2018. Additionally, the March 2021 presentation depicted Squirrels LLC staff as SQRL personnel.

## A. Fund Solicitation While Insolvent

13. Did the trustee review the March 2021 fund solicitation presentation referenced at: **https://storage.courtlistener.com/recap/gov.uscourts.ohnd.292365/gov.uscourts.ohnd.29**

**2365.1.1.pdf**?

14. Did the trustee confirm Mr. Stanfill's testimony that SQRL was insolvent since 2018?

15. If SQRL was insolvent since 2018, did the trustee investigate whether equity sales after 2018 involved material misrepresentations or omissions regarding insolvency?

16. Did inventors purchase or retain equity based on representations about SQRL's financial health that omitted insolvency?

17. Did the trustee analyze potential securities fraud, fraudulent inducement, or equitable subordination claims against Mr. Gould or other equity investors who purchased while SQRL was insolvent?

**B. Misrepresentation of Personnel**

18. Did the March 2021 presentation depict Squirrels LLC staff as SQRL employees?

19. If so, did the trustee investigate whether this constituted fraudulent misrepresentation to prospective investors?

20. How many investors purchased equity based on the March 2021 presentation?

21. What was the total dollar amount raised from investors based on this presentation?

**III. SIDNEY KEITH SETTLEMENT**

Background: The Motion to Compromise references a settlement with Sidney Keith but provides minimal detail.

22. What was the total dollar amount of claims asserted against Mr. Keith?

23. What was the factual basis for claims against Mr. Keith (transfers, preferences, equity withdrawals, compensation, etc.)?

24. Did the trustee review invoices, bank statements, or accounting records supporting payments/transfers to Mr. Keith?

25. Did any payments to Mr. Keith occur within the preference period (1 year for insiders, 4 years for fraud)?

## IV. JESSICA GRITZAN SETTLEMENT

Background: The Motion to Compromise references a settlement with Jessica Gritzan but provides minimal detail.

26. What was the total dollar amount of claims asserted against Ms. Gritzan?

27. What was the factual basis for claims against Ms. Gritzan (transfers, preferences, compensation, etc.)?

28. Did the trustee review invoices, bank statements, or accounting records supporting payments/transfers to Ms. Gritzan?

29. Did any payments to Ms. Gritzan occur within the preference period?

## V. MISSING EQUIPMENT AND CRYPTO ASSETS

Background: Evidence suggests certain equipment and crypto assets were unaccounted for or diverted.

### A. Benjamin George / Intel Boards

30. Did the trustee investigate reports that Benjamin George was "fencing" unaccounted Intel boards?

31. What is the relationship between Benjamin George and SQRL, Stanfill, or other insiders?

32. How many Intel boards are suspected to be unaccounted for?

33. What is the estimated value of these boards?

34. Did the trustee seek to recover these assets or pursue claims against Mr. George?

### B. Non-Reported Crypto Transactions

35. Did the trustee investigate whether SQRL or MWDC held cryptocurrency wallets not disclosed in bankruptcy schedules?

36. If so, how many wallets and what types of cryptocurrency?

37. What was the value of cryptocurrency holdings as of the petition date?

38. Did the trustee analyze blockchain transaction records to trace cryptocurrency transfers during the preference period or shortly before the petition date?

39. Were any cryptocurrency assets transferred to insiders or other parties pre-petition?

## VI. MICHAEL MARANDA INSIDER RELATIONSHIP

Background: Mr. Stanfill admitted under oath that Michael Maranda was an insider. Evidence suggests cards/equipment were transferred to Maranda before payment to creditors (specifically TorEA).

### A. Insider Status and Transfers

40. Did the trustee investigate Mr. Maranda's insider status and transactions with SQRL?

41. How many cards/equipment units were transferred to Mr. Maranda?

42. What was the value of these transfers?

43. Were these transfers made before payment to TorEA Consulting?

44. Did the trustee pursue avoidance actions against Mr. Maranda for these transfers?

45. If not, why not?

### B. Maranda as SQRL Owner/Creditor

46. Did the trustee analyze whether Mr. Maranda's claim should be subordinated as an insider claim?

## VII. SQUIRRELS LLC SETTLEMENT

Background: The Motion to Compromise includes Squirrels LLC but provides minimal detail about claims or consideration.

47. Did the trustee investigate commingling of assets, operations, or personnel between SQRL and Squirrels LLC?

48. Given that the March 2021 fund solicitation depicted Squirrels LLC staff as SQRL employees, did the trustee analyze whether Squirrels LLC should be held liable for fraudulent misrepresentations?

49. Did Squirrels LLC receive any transfers from SQRL during the preference period or while SQRL was insolvent?

## VIII. GENERAL INVESTIGATIVE ADEQUACY

### A. Forensic Analysis

50. Did the trustee retain forensic accountants, blockchain analysts, or other experts to trace asset flows among SQRL, MWDC, insiders, and related entities?

51. If not, given the complexity of cryptocurrency transactions and commingling allegations, why was expert assistance deemed unnecessary?

### B. Comparative Insider Analysis

52. Did the trustee prepare a comprehensive comparison of all insider transfers showing:

- Total amounts transferred to each insider

- Dates and nature of transfers

- Business justification (or lack thereof)

- Disproportionate benefits received by certain insiders?

### C. Subchapter V Limitations

53. The trustee states he "does not have the power to investigate the financial affairs of the Debtor unless specifically authorized by the Court" (Docket 407, ¶68). However:

- Did the trustee seek court authorization to investigate given the substantial insider transfer allegations?

- If not, why did the trustee believe settlements were appropriate without investigation?

- How can the trustee satisfy his duty to determine fair settlement value without investigation into the factual basis of claims?

## PURPOSE OF INQUIRY

These inquiries are essential to establish whether the proposed settlements represent fair, adequate, and reasonable consideration under applicable law. The issues raised include:

- Travel expenses for non-SQRL associates charged to estate

- Equity withdrawals recharacterized as undocumented loans while insolvent

- Fund solicitation while insolvent without disclosure (potential securities fraud)

- Transfers to insiders (Maranda) before paying creditors

- Missing equipment and cryptocurrency assets

- Inadequate investigation into complex asset flows

Creditors are entitled to know whether the trustee conducted adequate due diligence before recommending that the court release insiders from hundreds of thousands of dollars in potential liability.

## REQUEST FOR RESPONSE

If certain information is unavailable or was not obtained during the investigation, please so indicate in your response, as this information is material to evaluating the adequacy of the settlements.

**Exhibit B: October 29, 2025, 8:00 AM Request from Paul Billinger to Frederic Schwieg for Investigation Documentation**

On Wed, Oct 29, 2025 at 8:00 AM Paul Billinger <paul.billinger@toreaconsulting.com> wrote:

TO: Frederic P. Schwieg, Chapter 11 Subchapter V Trustee

In re Squirrels Research Labs LLC and The Midwest Data Company LLC

Case No. 21-61491-TNAP

FROM: Paul Billinger, Coordinator, Ad Hoc Committee of Creditors

DATE: October 29, 2025

RE: Request for Documentation of Investigation Conducted - 11 U.S.C. § 704(a)(4) Compliance

---

## PURPOSE

The Court approved a settlement on October 28, 2025, settling claims against six defendants for $75,500 based on approximately $2.86 million in claimed avoidance actions. This represents a 2.64% recovery rate.

Before evaluating whether to accept this settlement outcome or challenge the settlement, creditors need to understand what investigation was conducted to support these claims. This email requests written documentation of the investigation methodology.

---

## CREDITOR POSITION: RISK-AWARE SOPHISTICATED PARTIES

The Ad Hoc Committee of Creditors consists of parties with substantial experience in risk assessment. The Committee understands and appreciates asymmetric risk/reward dynamics in litigation:

- Conservative approach: Accept small, certain settlement ($75,500 certain recovery today)
- Aggressive approach: Reject settlement and fund investigation to pursue fraud claims (uncertain but potentially much larger recovery)

The Committee is not opposed to risk. Creditors understand that:

- Pursuing unproven claims carries risk of complete loss

- Settling weak claims for certain recovery is sometimes prudent

- Litigation is expensive and uncertain

- Sometimes the bird-in-hand (settlement) is better than two-in-the-bush (litigation)

However, the Committee insists that the decision to accept minimal recovery must be based on ADEQUATE INVESTIGATION.

If the trustee conducted thorough investigation and determined that claims are too weak to justify further pursuit, creditors will accept that conclusion. But if investigation was minimal or inadequate, creditors believe accepting 2.64% recovery is a failure of fiduciary duty—not prudent risk management, but imprudent abdication of investigation responsibility.

The asymmetric analysis changes entirely if investigation was inadequate:

- Scenario 1 (Adequate Investigation, Weak Claims): Claims were thoroughly investigated; they're genuinely weak; settlement at 2.64% recovery is justified. Creditors accept outcome.

- Scenario 2 (Inadequate Investigation, Unknown Strength): Investigation was minimal; claim strength is genuinely unknown; settlement at 2.64% represents false certainty based on insufficient information. Creditors will not accept this outcome.

The key variable is investigation adequacy, not risk tolerance.

---

## LEGAL REQUIREMENT: § 704(a)(4) INVESTIGATION DUTY

Under 11 U.S.C. § 704(a)(4), the trustee must:

*"investigate the acts, conduct, and liabilities of the debtor... and any fraud... to which the estate may be subject"*

This duty is mandatory and applies regardless of:

- Estate funding limitations

- Court-imposed parameters

- Complexity of transactions

- Other constraints

The duty exists to ensure that adequate investigation supports any settlement of avoidance actions.

---

**REQUEST FOR INFORMATION**

Please provide written response addressing the investigation actually conducted to support the claims in the settlement:

---

QUESTION 1: Transaction Document Review

Did you review transaction source documents?

Please specify:

- Vendor Invoices: Did you obtain and review invoices from vendors to the Debtor for the transactions in question? (Y/N)
  - If Y: How many? From which vendors? What date range?
  - If N: Why not?
- Bank Records: Did you obtain and review bank statements showing payments made by the Debtor? (Y/N)
  - If Y: For what time period(s)? Which bank accounts?
  - If N: Why not?
- Credit Card Statements: Did you obtain credit card statements for cards held by insiders or the Debtor? (Y/N)
  - If Y: For which individuals/entities? What time period?
  - If N: Why not?
- Accounting Records: Did you review the Debtor's internal accounting records, ledgers, or financial statements? (Y/N)
  - If Y: What time period? What formats?
  - If N: Why not?

QUESTION 2: Verification of Charges

How did you verify that charges were actually made?

Please describe your methodology:

- Did you match vendor invoices against bank/credit card statements to confirm payments?

- Did you verify that goods/services were actually delivered or rendered?

- Did you identify any duplicate charges, unauthorized charges, or charges without supporting documentation?

- What percentage of claimed charges had supporting documentation? (e.g., 100%, 75%, 50%, less?)

QUESTION 3: Interviews and Depositions

Did you obtain testimony or statements from the Defendants?

Please specify:

- Rule 2004 Examinations: Did you conduct Rule 2004 examinations of any defendant? (Y/N)

  - If Y: Which defendants? What was asked? What was disclosed?

  - If N: Why not?

- Depositions: Did you take depositions of any defendant? (Y/N)

  - If Y: Which defendants? Date(s)? Scope?

  - If N: Why not?

- Written Interrogatories: Did you send written questions to any defendant? (Y/N)

  - If Y: Which defendants? What questions?

  - If N: Why not?

- Informal Communications: Did you discuss specific charges with defendants? (Y/N)

  - If Y: Summary of what was discussed?

  - If N: Why not?

QUESTION 4: Expert Analysis

Did you commission expert analysis or forensic review?

Please describe:

- Forensic Accountant: Did you hire a forensic accountant to analyze transactions? (Y/N)

    - If Y: What was the scope? What were the findings? Cost?

    - If N: Why not?

- Reliance on Defendant's Analysis: Did you rely on analysis or reports prepared BY the defendant?

    (Y/N)

    - If Y: What was the source document? How was it verified?

    - If N: What independent analysis was conducted?

QUESTION 5: Documentation of Investigation

What written documentation exists of this investigation?

Please identify all work products, including:

- Investigation plan or protocol (if any)

- Checklists or procedures followed

- Interview notes or transcripts

- Expert reports

- Analysis memos or summaries

- Spreadsheets or data compilations

- Correspondence with defendants

- Photographs or documentation of records reviewed

QUESTION 6: Investigation Costs

What costs were incurred in conducting investigation?

Please provide:

- Trustee time spent (hours × hourly rate)

- Attorney time spent (hours × hourly rate)

- Expert/accountant fees (if any)

- Deposition costs (if any)

- Document retrieval/subpoena costs (if any)

- Total investigation cost

QUESTION 7: Constraints on Investigation

What constraints, if any, limited the investigation?

Please address:

- Court Authority: Were you limited by Court order regarding scope of investigation? (Y/N)

    - If Y: What was the limit? Docket number? Can you provide text?

    - If N: What was the source of your authority?

- Funding: Did lack of estate funds limit investigation? (Y/N)

    - If Y: What additional investigation would have been conducted with more funds?

    - If N: Were adequate funds available for investigation?

- Time: Were you constrained by time limitations? (Y/N)

    - If Y: What deadline? From where?

    - If N: How long did investigation take?

- Other Constraints: Were there other constraints on investigation? (Y/N)

    - If Y: Please describe

QUESTION 8: Alternative Claims or Theories

Did you explore alternative legal theories or avenues of recovery?

Please address:

- Initial Claims Strategy: What was the original legal theory pursued against each defendant? (e.g., recharacterization, fraudulent transfer, fraud, breach of fiduciary duty, etc.)
- Changed Theories: Did you consider or pursue any different legal theories during the investigation? (Y/N)
  - If Y: Which theories? When were they considered? Why were they not pursued?
  - If N: Why not explore alternative theories?
- Fraud Claims Specifically: Given that the underlying facts involve claims of insider advancement and payment disputes, did you investigate whether fraud claims (false invoices, unauthorized charges, misrepresentation of services rendered) could be pursued separately or instead of transfer avoidance claims? (Y/N)
  - If Y: What was the outcome of that investigation? Why weren't fraud claims pursued?
  - If N: Why not investigate fraud claims given the nature of the transactions?
- Strategic Pivot: When initial legal theories showed weakness during investigation, did you pivot to investigate alternative theories? (Y/N)
  - If Y: Please describe the process and outcome of investigating alternative theories, and why they were not ultimately pursued
  - If N: Why not explore alternative theories when initial theory appeared weak?

---

**THE QUESTION CREDITORS NEED ANSWERED**

Creditors understand that investigation might reveal weak claims. If claims are genuinely weak after adequate investigation, creditors accept 2.64% settlement recovery as the appropriate outcome.

But creditors cannot accept inadequate investigation as justification for minimal recovery.

The question is simple: Did you investigate adequately?

If          YES:          Creditors          will          accept          outcome.

If NO: Creditors must challenge settlement and pursue alternatives.

---

**RESPONSE REQUIREMENTS**

Written Response Requested By: November 5, 2025, 5:00 PM EDT

Response Format:

- Address each question directly
- Provide specific facts (dates, amounts, names)
- Be thorough; vague answers will be interpreted against your interests
- Attach supporting documentation if available

Verification:

Sign and verify your response as follows:

*"I declare under penalty of perjury that the foregoing responses are true and accurate to the best of my knowledge and belief."*

Delivery:

Email to: **paul.billinger@toreaconsulting.com**

File copy with Bankruptcy Court (ECF)

---

**SETTLEMENT STATUS**

Before responding, please clarify settlement status:

- Have funds been received by the estate? (Y/N)
- Have funds been distributed to defendants? (Y/N)
- Have defendants' releases been executed? (Y/N)
- When is settlement scheduled to finalize? (Date/time)

This information affects creditors' ability to seek relief if investigation was inadequate.

---

Respectfully,

Paul Billinger

Coordinator, Ad Hoc Committee of Creditors

In re Squirrels Research Labs LLC, Case No. 21-61491-TNAP

Date: October 29, 2025

…

**Exhibit C: October 29, 2025, 10:19 AM Email from Frederic Schwieg to Paul Billinger**

**From:** Fred Schwieg <fschwieg@schwieglaw.com>

**Sent:** October 29, 2025 10:19 AM

**To:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Cc:** lauren.schoenewald@usdoj.gov

**Subject:** Re: : Following Up on October 29 Hearing - Clarify Your Position and Preserve Record


Mr. Billinger you are not a party in interest and not a lawyer. Your statements show that you do not understand or will not understand my limited role here. If you don't stop, I will have no choice but to refer you for the unauthorized practice of law as you continue to claim you represent other unnamed parties in this case. Thank you.

**Exhibit D: October 29, 2025, 11:04 AM Detailed Response from Paul Billinger to Frederic Schwieg Addressing Statutory Framework**

**From:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Sent:** October 29, 2025 11:04 AM

**To:** 'Fred Schwieg' <fschwieg@schwieglaw.com>

**Cc:** 'lauren.schoenewald@usdoj.gov' <lauren.schoenewald@usdoj.gov>

**Subject:** RE: : Following Up on October 29 Hearing - Clarify Your Position and Preserve Record

## INTRODUCTION

Mr. Schwieg, this email addresses your response to the Committee's factual investigation request. The Committee respectfully clarifies the legal framework, addresses each of your claims, and restates its position regarding the investigation documentation required by statute.

## I. REGARDING PARTY-IN-INTEREST STATUS

Your Claim: "You are not a party in interest"

The Committee's Response:

Standing is irrelevant to this request. The Committee is not filing a contested motion seeking court relief. The Committee is requesting factual information about investigation conducted by a fiduciary using estate resources. This is fundamentally different from a motion requiring standing. Information requests from creditors regarding trustee investigations do not implicate standing doctrine.

## II. REGARDING LEGAL REPRESENTATION

Your Claim: "You are not a lawyer"

The Committee's Response:

The Committee does not claim that Paul Billinger is a lawyer, nor does it claim to be providing legal

advice. Billinger is a creditor coordinator, which is a standard and legitimate role in bankruptcy proceedings. Creditors frequently organize committees to oversee estate administration and accountability without requiring legal representation.

---

## III. REGARDING UNAUTHORIZED PRACTICE OF LAW

Your Claim: "If you don't stop, I will have no choice but to refer you for the unauthorized practice of law"

The Committee's Response:

This threat is legally baseless and appears designed to intimidate.

The Committee is not practicing law. The Committee is:

- Coordinating creditors with claims in the estate
- Requesting factual information about trustee performance
- Exercising creditor rights under the Bankruptcy Code and Rules

Unauthorized practice of law occurs when a non-lawyer provides legal advice, represents clients in legal proceedings, or provides legal analysis to third parties. Requesting factual information about investigation conducted by a trustee does not constitute any of these activities.

Additionally, the U.S. Trustee's office (cced on this email) has oversight responsibility for trustee conduct. If the Committee's conduct were improper, the U.S. Trustee would be aware and positioned to address it. The Committee is not concerned about this unfounded threat.

---

## IV. REGARDING THE "UNNAMED PARTIES" CLAIM

Your Claim: "You continue to claim you represent other unnamed parties"

The Committee's Response:

The Committee is transparent about its composition: it is an Ad Hoc Committee of Creditors in the estate of Squirrels Research Labs LLC and The Midwest Data Company LLC.

- The Committee does not represent "unnamed parties"
- The Committee represents identified creditors with claims in this estate

- This is standard procedure in bankruptcy cases and well within recognized practice

The Committee is not obligated to disclose individual creditor identities unless ordered by the court. However, if the Court requires identification of Committee members, the Committee will provide it.

---

## V. REGARDING YOUR "LIMITED ROLE" CLAIM AND ACTUAL AUTHORITY

Your Claim (Implicit): Your statement that creditors "will not understand my limited role here" suggests your role is somehow limited and excuses investigation duties.

The Committee's Response

The Committee has reviewed the Amended Plan of Reorganization (confirmed July 28, 2022, Doc. 269) and the court-approved order authorizing avoidance actions. Article 8 of the Plan grants the Trustee explicit authority that is BROADER than fraudulent transfer claims alone.

**What the Plan Actually Grants**

Article 8 provides:

*"With respect to Avoidance Actions, if any, against insiders, as that term is defined in Bankruptcy Code section 101(1), Fred Schwieg, the current Subchapter V Trustee, shall be vested with the necessary duties, powers, standing and authority to prosecute and enforce these particular Avoidance Actions."*

The critical word is "Avoidance Actions"—not "fraudulent transfer claims."

Under the Bankruptcy Code, avoidance actions include multiple theories:

- Fraudulent transfers under § 548
- Preferential transfers under § 547
- Statutory liens avoidable under § 522(f)
- Insider transfers under various grounds
- Recharacterization claims
- Substantive consolidation grounds
- Successor liability claims

**The Investigation Duty Under § 704(a)(4)**

*11 U.S.C. § 704(a)(4)* applies to ALL trustees, including Chapter 11 Subchapter V trustees. The statute is mandatory and non-delegable. *11 U.S.C. § 704(a)(4)* requires the trustee to:

*"investigate the acts, conduct, and liabilities of the debtor . . . and any fraud . . . to which the estate may be subject"*

This duty is NOT limited by your Subchapter V status. While Subchapter V trustees have certain administrative limitations, the investigation duty under *11 U.S.C. § 704(a)(4)* is expressly incorporated into *§ 1183* and applies regardless of the trustee's chapter or subchapter status.

You are correct that your role in Subchapter V may be limited in certain respects:

- You cannot remove the debtor

- You have less authority over estate operations

- You supervise rather than control

However, investigation is NOT one of the limited areas. Investigation is a core, mandatory function that applies to all trustees.

**What Your Claimed Limitation Actually Means**

If you claim that your "limited role" means you are restricted to only fraudulent transfer claims:

1. That contradicts Article 8, which grants broader "avoidance action" authority

2. That contradicts § 704(a)(4), which imposes mandatory investigation duties

3. That would require a specific court order limiting your investigation, which the Committee has not found in the docket

**The Committee's Position on Your Authority**

The Committee does NOT accept that:

- Investigation duty under § 704(a)(4) is limited by subchapter status

- You can refuse to answer factual questions about investigation

- Vague references to "limited role" excuse non-responsiveness to statutory duties

- You lack authority to investigate broader avoidance theories against insiders

## VI. THE LEGAL FRAMEWORK

To ensure clarity: The Committee is asking whether a Chapter 11 Subchapter V Trustee can claim a "limited role" defense to avoid answering factual questions about investigation. The answer is NO.

Why:

1. Statutory Requirement: § 704(a)(4) imposes a mandatory investigation duty on all trustees

2. No Subchapter V Exception: Subchapter V does not carve out an exception from § 704(a)(4)

3. Broader Authority Granted: Article 8 grants "avoidance action" authority, not limited to fraudulent transfers

4. Non-Delegable: The investigation duty cannot be delegated or avoided based on chapter of bankruptcy

5. Creditor Interest: Creditors have a legitimate interest in how their estate was investigated and why settlement was accepted at 2.64% recovery rate

The Committee acknowledges that trustee roles differ across chapters. But investigation is fundamental to all trustee roles, not subject to limitation based on subchapter status or a narrow interpretation of plan language.

## VII. IF YOU CLAIM LIMITED AUTHORITY

If you believe Article 8 of the Plan truly limits your authority to only fraudulent transfer claims (and not broader avoidance actions), you have a duty to say so clearly and support it with legal analysis.

However, the Committee submits that such a position would be difficult to maintain because:

1. The Plan says "avoidance actions," not "fraudulent transfer claims"

2. § 704(a)(4) is mandatory regardless of plan language

3. Your authority extends to investigation of acts, conduct, and liabilities of the debtor

4. A 2.64% recovery suggests inadequate investigation across all available theories

If you disagree with this interpretation, please provide:

- Your specific reading of Article 8 and why it limits you to fraudulent transfer claims

- Legal authority for limiting avoidance action authority to one theory
- Why § 704(a)(4) does not override plan language restricting investigation

## VIII. WHAT THE COMMITTEE UNDERSTANDS

The Committee understands:

✓ You are a Subchapter V trustee with certain administrative limitations

✓ Your role differs from a Chapter 7 trustee

✓ You serve with limited authority in certain respects

✓ Your duties are narrower in some areas than Chapter 7 trustees

✓ You have explicit authority to pursue avoidance actions against insiders

What the Committee DOES NOT accept:

✗ That investigation duty under § 704(a)(4) is limited by subchapter status

✗ That "avoidance action" authority is limited to fraudulent transfer claims alone

✗ That you can refuse to answer factual questions about investigation

✗ That vague references to "limited role" excuse non-responsiveness to statutory duties

✗ That intimidation tactics (UPL referral threats) will deter creditors from seeking accountability

## IX. THE COMMITTEE'S POSITION

The Committee respectfully restates its request for investigation documentation.

The Committee understands this may be uncomfortable. But a 2.64% recovery rate (settling $2.86 million in claims for $75,500) demands explanation. The Court approved this settlement based on your representations. Before accepting minimal recovery, creditors are entitled to understand:

- What investigation was conducted
- What avoidance theories were considered

- Why fraud claims were not pursued (despite documented evidence of potential fraud)

- What constraints, if any, prevented broader investigation

The Committee is not attacking you personally. The Committee is seeking accountability for estate administration. That is a core creditor right.

## X. RESPONSE DEADLINE AND EXPECTATIONS

Due Date: November 5, 2025, 5:00 PM EDT

The Committee expects substantive written responses to the eight factual questions regarding investigation:

1. Did you review transaction source documents? (Vendor invoices, bank statements, credit cards, accounting records)

2. How did you verify that charges were actually made?

3. Did you obtain testimony or statements from defendants? (Rule 2004 exams, depositions, interrogatories, informal communications)

4. Did you commission expert analysis or forensic review?

5. What written documentation exists of this investigation?

6. What costs were incurred in conducting investigation?

7. What constraints, if any, limited the investigation?

8. Did you explore alternative legal theories or avenues of recovery? (Fraud claims specifically)

Specifically regarding Question 8:

If you pursued fraudulent transfer claims but then abandoned that theory, did you investigate fraud claims as an alternative? Did you consider fraud theories (false invoices, unauthorized charges, misrepresentation of services rendered)? If fraud claims were investigated, what was the outcome and why were they not pursued? If fraud claims were never investigated, why not?

## XI. IF YOU CANNOT RESPOND

If you believe you cannot respond to these questions due to:

- A specific court order limiting investigation (beyond the Article 8 grant of avoidance action authority)
- Statutory constraints on Subchapter V trustee authority (under § 1183)
- Other legal impediment

Then provide the specific basis for that position, including:

- Docket number and text of any court order
- Statutory citation and specific explanation
- Legal authority for refusing to answer

The Committee will consider your response. But generic claims of "limited role" without specific legal support will not suffice. And claims that contradict the plain language of Article 8 (which grants "avoidance action" authority broadly) will be rejected.

## XII. CONSEQUENCE OF NON-RESPONSIVENESS

If substantive responses are not provided by November 5, 2025, the Committee will:

1. File a Motion for Order Requiring Trustee to Show Cause why the trustee should not be required to provide investigation documentation
2. Cite your refusal to respond as evidence of consciousness of inadequate investigation
3. Argue to the Court that:
   - Article 8 grants broader avoidance action authority than the trustee claims
   - § 704(a)(4) imposes mandatory investigation duties
   - Minimal recovery (2.64%) was accepted without adequate investigation
   - This constitutes breach of fiduciary duty
4. Request the Court order the trustee to either:
   - Provide investigation documentation, or
   - Explain to the Court specifically what investigation limitations prevented adequate

investigation

- Justify why broader avoidance theories were not investigated

Your non-responsiveness, combined with vague references to "limited role" that contradict Article 8 and § 704(a)(4), will become powerful evidence that investigation was inadequate.

---

## XIII. FINAL STATEMENT

The Committee acknowledges your role as a Subchapter V trustee and respects the constraints of that position. However:

- Respect for your role does not extend to allowing evasion of statutory duties to investigate
- Your claimed "limited role" cannot override the plain language of Article 8, which grants "avoidance action" authority
- Your claimed "limited role" cannot override § 704(a)(4), which is mandatory and applies to all trustees

The Committee is not attacking you. The Committee is demanding accountability. That is what creditors are entitled to receive.

Provide the investigation documentation. Or explain specifically—with legal support—why you cannot, addressing:

- The scope of avoidance action authority granted in Article 8
- The mandatory nature of § 704(a)(4) duties
- Why a 2.64% recovery suffices despite potential fraud claims and alternative avoidance theories

The Committee awaits your response by November 5, 2025, 5:00 PM EDT.

---

**Exhibit E: Committee Member Authorizations**

**From:** Elliot Boutin <elboutin14@gmail.com>

**Sent:** November 5, 2025 9:24 AM

**To:** Paul Billinger <paul.billinger@toreaconsulting.com>

**Subject:** Re: Ad Hoc Committee Admin


**I authorize Paul Billinger as committee coordinator.**


**Thank you.**


**End of Exhibits**

# DECLARATION OF PAUL BILLINGER

I, Paul Billinger, declare under penalty of perjury:

1. I am the sole owner of Torea Consulting LTD, a creditor in Case No. 21-61491-TNAP, and serve as Coordinator of the Ad Hoc Committee of Creditors.

2. I am not an attorney and do not hold a law license. I provide no legal advice herein.

3. The Amanda McConnell credit card timeline is based on the JPMorgan Chase subpoena response dated July 29, 2024, showing:

   - May 17, 2021: McConnell added as authorized user

   - September 2, 2021: McConnell removed (same day as Stanfill)

   - November 23, 2021: Bankruptcy filed

   These dates are accurate as documented.

4. The eight investigation gaps identified in the motion are based on:

   - Documentary evidence from case record

   - Settlement motion Doc. 394 itself (showing what documentation is absent)

   - Creditor communications in Exhibit A

   - My review of the October 28 hearing record

5. The facts stated in this Motion are true to my personal knowledge, based on:

   - Bank records and court filings in the public record

   - Communications with other creditors in the estate

   - Documentary evidence attached as exhibits (formatting modifications have been made to improve readability and remove routine email administrative elements (headers, forwarding chains), but no substantive creditor concerns or factual assertions have been altered, removed, or misrepresented)

   - Public records research

6. My role as creditor coordinator is to organize creditors to request factual accountability regarding estate investigation and recovery. This is a recognized and lawful role in bankruptcy proceedings.

7. The Motion seeks only factual clarification---I am not requesting legal advice from the Trustee or providing legal analysis beyond factual observations appropriate for a creditor coordinator.

8. I acknowledge that the Trustee questioned whether certain creditor advocacy activities might constitute unauthorized practice of law in his October 29 email. I respectfully disagree with that characterization. My activities as Creditor Coordinator are limited to organizing factual requests from creditors regarding estate investigation and recovery—activities recognized and protected under bankruptcy law. I am not providing legal advice and am not engaged in the practice of law. My role is to articulate creditor concerns regarding investigation adequacy.

Executed: November 5, 2025

_____
Paul Billinger

1 Bow Street, Stouffville, ON L4A 1Z3

paul.billinger@toreaconsulting.com

**CERTIFICATE OF SERVICE**
I certify that a true and correct copy of the foregoing Declaration of Paul Billinger as served on all parties in interest on November 5, 2025.

**SERVICE LIST**
*[Electronic Service]*
Trustee Frederic P. Schwieg
19885 Detroit Rd #239
Rocky River, Ohio 44116-1815
Email: **fschwieg@schwieglaw.com**
*[Electronic Service]*
U.S. Trustee Lauren Schoenewald
**Lauren.Schoenewald@usdoj.gov**
*[Electronic Service]*
Debtor's Counsel Christopher Millard
Email: **CMillard@ralaw.com**
*[Electronic Service]*
Defendants' Counsel Jack Cooper
Email: **jcooper@milliganpusateri.com**
*[Mail Service]*
United States Bankruptcy Court
Ralph Regula Federal Building & U.S. Courthouse
401 McKinley Avenue SW Canton, Ohio 44702

Paul Billinger
Coordinator, Ad Hoc Committee of Creditors
1 Bow Street, Stouffville, ON L4A 1Z3
paul.billinger@toreaconsulting.com

Date: November 5, 2025